**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

**LOUIS GACHELIN and**
**DEBORAH ABRAHAMS,**

                             **Index No.**

                **Plaintiffs,**

**v.**                          **COMPLAINT AND JURY DEMAND**

**KAVULICH & ASSOCIATES, P.C.,**
**GARY KAVULICH,**
**RENAISSANCE EQUITY HOLDINGS LLC D,**
**HASHEM HUSSEIN, and**
**A & F PROCESS SERVICE, INC. d/b/a**
**ALLIED PROCESS SERVICE,**
                **Defendants.**

---------------------------------------------------------------x

Plaintiffs Louis Gachelin and Deborah Abrahams file suit against the debt collection law firm Kavulich & Associates, P.C. (the "Firm") and the firm's principal, Gary Kavulich (collectively the "Kavulich Defendants"), as well as Hashem Hussein and A & F Process Service, Inc. d/b/a Allied Process Service ("Allied") (collectively "Process Server Defendants"), for their violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et. sec.* (the "FDCPA"); against a putative creditor and former landlord Renaissance Equity Holdings LLC D ("Renaissance" or "the Landlord"), the Kavulich Defendants and the Process Server Defendants for violations New York General Business Law § 349 and for negligence and gross negligence; and against Kavulich Defendants for violating New York Judiciary Law § 487.

## SUMMARY OF CLAIMS[1]

Louis Gachelin had been a tenant of Renaissance since 2005 when Renaissance, represented by attorney Benjamin Epstein, filed a nonpayment action against him and his wife Deborah Abrahams in housing court in November 2020. The housing court case culminated in a

---

[1] This summary is for the convenience of Defendants and the Court. The summary is not intended to limit the basis of Plaintiff's claims as the full factual basis for the claims are laid out in far greater detail in the statement of facts.

settlement, with Mr. Gachelin and Ms. Abrahams vacating the premises on September 13, 2022 in exchange for Renaissance's "waive[r of] any and all claims it asserted or could have asserted in this action related to [Gachelin's] tenancy, including but not limited to **any claim for rental arrears owed**." (Emphasis added.)

Renaissance, now represented by Kavulich, nevertheless filed suit for the settled rental arrears against Mr. Gachelin and Ms. Abrahams in Kings County Civil Court on June 9, 2023. Renaissance and Kavulich then used a false affidavit of service executed by the Process Server Defendants that allowed Renaissance and Kavulich to fraudulently conceal their suit against Mr. Gachelin and Ms. Abrahams. This is typical of the Process Server Defendants, who systematically execute false affidavits of service on behalf of creditors and collection lawyers, including Renaissance and Kavulich.

Mr. Gachelin and Ms. Abrahams only became aware of the lawsuit in 2024, when, oddly, the Kavulich Defendants filed a lengthy motion to enter default judgment and mailed it to an address where their daughter resided. The daughter received the application for default judgment and, panicked, called her parents in Florida to tell them about the papers, and they rushed to New York.

The Kavulich Defendants forced Mr. Gachelin and Ms. Abrahams, *pro se*, to make multiple trips from Florida to Kings County Court in attempt to strong-arm and wear them down to sign a judgment and release when the Kavulich Defendants were repeatedly told by them that the debt was settled in landlord-tenant court. It was only after four trips from Florida to court in Brooklyn that Mr. Gachelin and Ms. Abrahams, *pro se*, were able to defeat the motion to enter default judgment, and to have the suit dismissed with prejudice.

The various Renaissance Equity Holdings LLC entities, lettered Renaissance Equity

2

Holdings A-F, used the Kavulich Defendants to file collection lawsuits in civil court, filing 181 collection suits in 2023; all but the last eight were filed by Kavulich. In an unrelated lawsuit, Mr. Hussein was subpoenaed to produce his log books reflecting service for a period from 2022 to 2023. Critically, in response to the subpoena, Hussein emailed a detailed spreadsheet he stated he received from Allied showing service he performed for Allied. These were Allied's own records. The spreadsheet documents impossible or nearly impossible service. For a twelve-month period, from October 3, 2022 to September 25, 2023, Mr. Hussein attempted service of 3,525 lawsuits. Unbelievably, in each and every instance he was successful in service; all service was to a person of suitable age and discretion; and all service was successful on the very first attempt. Additionally, the person who notarized Mr. Hussein's affidavits of service in this case and other cases reviewed is Frances T. Mondrone, a principal of Allied. This demonstrates Hussein is fully integrated into Allied, despite the fact that the name of Allied is conspicuously absent from the affidavits of service executed by Mr. Hussein.

As described further below, the timing of service and the distance traveled between service in many instanced – including in the case at bar – alone demonstrate the near impossibility of service.

## JURISDICTION AND VENUE

1.    The Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because the dispute involves predominant issues of federal law under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et. seq.* (the "FDCPA").

2.    The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a) because they are so related to Plaintiff's claims within the Court's original jurisdiction as to form part of the same case or controversy under Article III of the United States

Constitution.

3.    The Court also has diversity jurisdiction under 28 U.S.C. § 1332(a) in that the matter in controversy between the Plaintiffs and Defendants exceeds $75,000 and both Plaintiffs are citizens of a State different than that of any Defendant.

4.    Venue is proper because all or a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Kings County, New York.

## THE PARTIES

5.    Plaintiffs Louis Gachelin and his wife, Plaintiff Deborah Abrahams, are individuals who now reside in St. Lucie County, Florida but previously resided in Kings County, New York.

6.    Mr. Gachelin and Ms. Abrahams are consumers as defined by 15 U.S.C. § 1692a(3) because they were alleged to owe a debt to Defendant Renaissance, arising from putative rental arrears for their former residence.  Plaintiffs' alleged obligation is a "debt" as defined by 15 U.S.C. § 1692a(5) because it was incurred primarily for family, personal, or household purposes.

7.    Defendant Renaissance Equity Holdings LLC D ("Renaissance" or "the Landlord") is a limited liability company organized under the laws of the State of New York. Renaissance engages in business in New York State and this suit arises out of Renaissance's business in New York State.

8.    Renaissance was the petitioner in the collection lawsuit against Mr. Gachelin and Ms. Abrahams and alleged that it was the landlord of their former residence.

9.    Together with other Renaissance Equity Holdings LLCs ("the Renaissance

entities"), Renaissance is the managing entity of Flatbush Gardens, an apartment complex of 2,500 units.

10.     Defendant Kavulich & Associates, P.C. ("The Kavulich Firm") is a debt collection law firm organized under the laws of the State of New York. The Kavulich Firm engages in business in New York State and this suit arises out of the Kavulich Firm's business in New York State. The Kavulich Firm's principal place of business is in Port Chester, NY 10573.

11.     The Kavulich Firm specializes in – almost exclusively -- collecting putative rental arrears by filing hundreds (if not thousands) of rental arrears lawsuits, and by executing on tens of thousands of judgments rendered against consumer tenants.

12.     Defendant Gary Kavulich is an individual who resides in the State of New York. Mr. Kavulich is the principal of the P.C. and personally performed many of the acts and omissions that give rise to the claims in this action.

13.     Prior to starting his own firm, Mr. Kavulich worked for a major landlord-tenant firm and made thousands of appearances on behalf of landlords seeking rental arrears and eviction.

14.     The Kavulich Firm and Mr. Kavulich (collectively "Kavulich Defendants") are debt collectors as defined in 15 U.S.C. § 1692a(6) as they regularly collect or attempt to collect, directly or indirectly, debts owed or due or asserted to be due another, and that is their principal purpose. Specifically, Kavulich files thousands of collections lawsuits in civil court and seeks to enforce thousands of putative rental arrear debts.

15.     The Kavulich Defendants were acting as the agent of the Landlord in its litigation and other attempts to collect the putative debt. Kavulich Defendants were acting within the

course and scope of their employment. Kavulich Defendants were the freely chosen counsel of the Landlord. Therefore, the Landlord is jointly and severally liable for the conduct of the Kavulich Defendants. Further, given the public records of the systematic debt collection violations of Kavulich Defendants, the Landlord is liable for negligent hiring and supervision of Kavulich Defendants.

16.     Defendant Hashem Hussein is an individual who resides in the state of New York. Mr. Hussein is a process server with the current license number 2119375 who purportedly served Mr. Gachelin and Ms. Abrahams in 2023, and who routinely executes false affidavits of service on behalf of plaintiffs and attorneys including the Kavulich Defendants and Renaissance entities.

17.     Defendant A & F Process Service d/b/a Allied Process Service is a process serving corporation with a place of business in Nassau County, New York, and the license number 1159577. Allied Process Service employed Mr. Hussein and is liable for his conduct acting within the scope of his employment and his agency. Allied is liable for the process server misconduct that forms the basis of this suit. Something as simple as a review of the timestamps on its own records of its employees' alleged services would demonstrate the fraudulent nature of the enterprise and the impossibility of the rapid-fire service of process it contracts to provide. Allied knowingly allows its employees to falsify affidavits of service.

## STATEMENT OF FACTS

### *The Housing Court Lawsuit*

18.     3305 Flatbush Avenue is a residential apartment building in Brooklyn, NY ("the Building.")

19.     Mr. Gachelin originally moved into the Building in 2005, and renewed his lease regularly until 2019, when he added his wife Deborah Abrahams as a tenant of record and

6

renewed his lease for what would be the final two-year term.

20.     Renaissance stopped cashing Mr. Gachelin's rent checks in August of 2020. Mr. Gachelin was not given a clear or satisfactory answer as to why Renaissance stopped cashing his rent checks.

21.     On November 18, 2020, through the law firm of Benjamin Z. Epstein, P.C., Renaissance filed an action in housing court alleging nonpayment of rent.

22.     This lawsuit was eventually settled in September 2022, with Mr. Gachelin agreeing to vacate the premises and surrender his keys in exchange for Renaissance's waiver of "any and all claims it asserted or could have asserted in this action related to [Gachelin's] tenancy, including but not limited to any claim for rental arrears owed." See Exhibit A (2022-10-21 LT settlement).

23.     The language of the housing court settlement is clear and unequivocal: Mr. Gachelin surrendered the premises in exchange for the waiver of any and all potential rental arrears claims.

### *The Kavulich Defendants, on behalf of Renaissance, File a Civil Court Collection Lawsuit for the Rental Arrears Already Settled in Housing Court*

24.     Despite being bound by the terms of the settlement, Renaissance—through a different attorney, Mr. Kavulich—chose to sue for rental arrears anyway, filing a complaint on June 6, 2023 in Kings County Civil Court. See Exhibit B (2023-06-09 summons and complaint).

25.     The Kavulich Defendants did not take the most minimal of steps to make a meaningful attorney review to determine whether the debt sought was actually owed. The collection lawsuit alleged that Mr. Gachelin and Ms. Abrahams owed $23,940.39 and had stayed in possession of the unit beyond the expiration of their lease. A meaningful attorney review before filing suit would be to spend 30 seconds to check the court's free, publicly available

NYSCEF website, which would show the case and all of the filings, including the stipulation of settlement. Instead, as discussed below, the Kavulich Defendants continue their pattern and practice of performing no meaningful attorney review to determine whether the debts he collects upon are actually due, as he is required to do under 15 U.S.C. § 1692(3).

26.    In addition to suing Mr. Gachelin and Ms. Abrahams on a settled debt, Renaissance and the Kavulich Defendants used a false affidavit of service to seek to enter a default judgment against them.

27.    An affidavit of service was executed by Hashem Hussein on behalf of Renaissance and the Kavulich Defendants, claiming that Hussein could not accomplish personal service on Mr. Gachelin and Ms. Abrahams at the listed address, claiming that the address was their place of abode, and claiming he left the summons and complaint with a person of suitable age and discretion, a person named Kenyatis Gachelin, described as a 26-year-old Black man standing between six feet and six feet three inches tall. See Exhibit C (2023-07-29 affidavit of service).

28.    Mr. Gachelin and Ms. Abrahams know one Kenyatis—a woman under six feet tall who does not carry the surname Gachelin, and who did not receive the complaint.

29.    After "serving" Mr. Gachelin and Ms. Abrahams, Renaissance and the Kavulich Defendants took no further action for nearly a year. Finally, on June 4, 2024, Kavulich filed a motion for default judgment on Renaissance's behalf, and at some point thereafter mailed it to the address of the daughter of Mr. Gachelin and Ms. Abrahams. See Exhibit D (2024-06-04 Motion for Default Judgment).

30.    At this point, Mr. Gachelin and Ms. Abrahams became aware of the lawsuit as their daughter received the mailed notice of this motion. The daughter called her parents

panicked, saying she got a court paper saying there was a hearing on June 26, 2024 seeking to enter a default judgment against them for $23,940.39.

31.    This was the first time Mr. Gachelin and Ms. Abrahams knew that there was a lawsuit filed against them. They had never received a copy of the summons and the complaint by service, by mail, or by any other method, and knew nothing about a lawsuit until their daughter called.

32.    Mr. Gachelin and Ms. Abrahams are retired and living on a fixed income. They do not have much money. The thought of the entry of a judgment for $23,940.39 shocked and terrified them. They immediately purchased tickets to fly from their home in Florida to New York to appear at the June 26 hearing.

33.    At this June 26, 2024 hearing, the Kavulich Defendants attempted to pressure Mr. Gachelin and Ms. Abrahams into signing some papers, telling them they did not need to worry about the contents of the papers. Mr. Gachelin and Ms. Abrahams refused and attempted to inform the Kavulich Defendants that they did not owe this debt anymore, as it had been settled in 2022. The Kavulich Defendants nevertheless proceeded with the case, causing additional motion hearings to be held on August 6, 2024, October 17, 2024, and January 21, 2025. To attend each hearing, Mr. Gachelin and Ms. Abrahams had to purchase airfare from Florida to New York and back, and at each hearing, the Kavulich Defendants attempted to pressure Mr. Gachelin and Ms. Abrahams into signing papers, telling them that since their income was from judgment-proof sources they need not worry about the effect of a judgment against them and ignoring their repeated assertions that the debt was not owed and had been settled.

34.    The papers included a judgment for the amount of the alleged rental arrears as well as a release of Renaissance and the Kavulich Defendants from their very misconduct in

pressuring Mr. Gachelin and Ms. Abrahams to sign a judgment for a settled debt.

35.    At the October hearing, worn down by the months of travel, the stress of the alleged debt, and the frustration of reopening a matter they believed to be solved, Mr. Gachelin and Ms. Abrahams signed the Kavulich Defendants' papers, desperately hoping it would put an end to this ordeal. Upon reviewing these papers, a judge rejected the Kavulich Defendants' proposed agreement and was so outraged that she literally tore up the papers. At the January hearing, Mr. Gachelin and Ms. Abrahams brought the driver's license of the only Kenyatis they know: the aforementioned woman under six feet tall with a different surname, who does not match the description of the alleged recipient of Hashem Hussein's July 2023 service (e.g. being a woman not a man, not being anything close to six feet three inches). Mr. Gachelin and Ms. Abrahams provided this license to the attorney for the day.  With the driver's license, the legal services attorney for the day was able to get the lawsuit dismissed with prejudice, at which point the appearance attorney for the Kavulich Firm stormed out in anger.

36.    The collection lawsuit was finally dismissed with prejudice—after five months of fighting and four cross-country trips to attend hearings, all while the Kavulich Defendants and Renaissance ignored Mr. Gachelin and Ms. Abrahams's repeated assertions that the debt was no longer owed because it had been settled. At any time, the Kavulich Defendants could have performed a NYSCEF search which would have revealed that any alleged or actual rental arrears had been settled in 2022. Presumably, the Kavulich Defendants could have also asked their client, Renaissance, about the veracity of Mr. Gachelin and Ms. Abrahams's claims that the debt was not owed and had been settled. Certainly, the Kavulich Defendants should not have tried, at every turn, to attempt to strong-arm Mr. Gachelin and Ms. Abrahams into signing a judgment for a debt the repeatedly said was settled, and then absolve themselves by pressuring the signing of a

release.

37.     And of course, Renaissance, as a party to the original settlement, knew that the putative debt was already settled.

38.     Mr. Kavulich is the Renaissance entities' near-exclusive attorney in civil court collection lawsuits for 2023.  Of the 181 collection cases filed by Renaissance in 2023, all but the last eight index numbers were filed by Kavulich.

***Defendants Inflicted Substantial Garden-Variety Emotional Distress Damages and Economic Damages on This Limited Income Retired Couple***

39.     Mr. Gachelin and Ms. Abrahams experienced significant stress as a result of the civil court collection lawsuit. Upon realizing the suit was for the same rental arrears they had conclusively settled in housing court in 2022, Mr. Gachelin and Ms. Abrahams were dumbfounded. How were they going to pay a judgment for $23,940.39, and why were they being threatened with one since the debt was settled? Would their bank accounts be restrained and their savings seized if they lost in court?

40.     Mr. Gachelin and Ms. Abrahams could not sleep at night, worrying what they were going to do, how they were going to be able to fight this when they were ignored and spoken down to when they went to court. They worried about their financial future and felt frustrated by the absurdity and cruelty of the situation.

41.     The stress of the lawsuit also contributed to Mr. Gachelin's gaining twenty pounds.

42.     Ms. Abrahams, who is diabetic, experienced blood sugar spikes and troughs as a result of the stress and the associated changes to her appetite. As a result of the stress, Ms. Abrahams was frequently tired and had little desire to eat, altering her eating habits significantly.

43.     In the opposite direction than her husband, Ms. Abrahams lost about twenty

pounds due to the stress, changes in her appetite, and increased walking, which Ms. Abrahams does in response to stress.

44.    Due to the stress, Ms. Abrahams was crying on a weekly basis, and her emotional state was worsened because she did not want Mr. Gachelin to know how stressed she was.

45.    Mr. Gachelin and Ms. Abrahams also incurred significant costs defending themselves in the civil court collection lawsuit, including airfare for four trips from Florida to New York and back. They had to charge the flights on a credit card, which they are still trying to pay down, along with substantial interest.

46.    As a result of Defendants' repeated dismissals of Mr. Gachelin and Ms. Abrahams's assertions that the debt had already been settled—assertions which Mr. Gachelin and Ms. Abrahams flew up from Florida to make in person at their court appearances—Mr. Gachelin and Ms. Abrahams felt ignored, as if their words had no value.

47.    Whenever Mr. Gachelin and Ms. Abrahams asked why Defendants continued to force them to fly up from Florida to defend themselves despite the 2022 settlement, they were only met with boilerplate repetitions of the allegation that more was still owed—an allegation that Renaissance and the Kavulich Defendants actually knew was false or would have known to be false had they checked their own records *or* publicly available court records.

48.    Mr. Gachelin and Ms. Abrahams are retirees on fixed incomes, and the prospect of having to pay tens of thousands of dollars in a matter they had already settled in court previously was alarming to them. This prospect hung over their heads from when they learned of the suit in June 2024 to its final dismissal with prejudice in January 2025—causing six months of sustained fear and anxiety for Mr. Gachelin and Ms. Abrahams.

49.    Additionally, due to their financial circumstances, Mr. Gachelin and Ms.

Abrahams had to put the airfare on their credit card, which they are still paying off.

**Systematic Sewer Service[2] by the Process Server Defendants' for Kavulich Defendants and Renaissance**

50.     The physically impossible service of a six-foot-tall Black male "Kenyatis Gachelin" was not an aberration.

51.     Defendant Hussein routinely attests to his successful effectuation of physically impossible service of process. In fact, according to records belonging to the Process Server Defendants received in response to a subpoena in the case *Capital One, N.A. v. Watkins*, CV-5138-23/QU (Exhibit E, email providing records, Exhibit F, subpoena), Mr. Hussein's alleged service of process in the case of Mr. Gachelin and Ms. Abrahams occurred at 6:48:36 AM on July 19—just *one minute* after his alleged service of process in another case, at another address a block away, at 6:47:16 AM.

52.     While these records were provided by Mr. Hussein, every single one of the 3,525 attempts at service contained in these records was made on behalf of Allied Process Service, the d/b/a name of A & F. Additionally, according to Mr. Hussein's own email, he needed "the agency to approve the release" and this caused a delay in his production of the records. "The agency"—Allied—controls these records and causes them to be made.

53.     According to these records, the vast majority—2,715 out of 3,525, more than 77%—of Mr. Hussein's service occurred between the hours of 6 AM and 7 AM each day, and 3,436 of 3,525, more than 97%, occurred before noon. Allied's records of Mr. Hussein's service also exclusively claim substitute service rather than personal service of the defendant, and exclusively claim to successfully serve a person of suitable age and discretion on the very *first*

---

[2] *See, e.g. Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 418 (S.D.N.Y. 2010) ("'[S]ewer service" [is] the practice of failing to serve a summons and complaint and then filing a fraudulent affidavit attesting to service. When the debtors failed to appear in court because they did not have notice of the lawsuits, defendants obtained default judgments against them.")

attempt. While much of his claimed service could be discovered as physically impossible with a simple map search, the Kavulich Defendants and Allied need not have gone that far to conclude Mr. Hussein's service was suspect given the statistical impossibility that every single one of 3,525 services was not only successful on the first attempt, but successful on a substitute person of suitable age and discretion.

54.     Defendant Hussein has attested to his effectuation of physically impossible service of process in numerous other cases for the Kavulich Defendants and Renaissance while in the employ of Allied Process Service.

55.     For example, according to the same records, on August 17, 2023, Mr. Hussein effectuated service of process at three different Brooklyn addresses within a six-minute period, in the following order: 817 E. 17th Street at 6:17:40 AM, 2615 Avenue O at 6:20:03 AM, and 1012 Avenue K at 6:23:12 AM. Each address is approximately one mile from the address allegedly served before it.

56.     Also according to the same records, on August 22, 2023, Mr. Hussein effectuated service of process at a pair of Queens addresses more than two miles apart within a four-minute interval: 17040 132nd Street at 6:23:57 AM and 17114 140th Avenue at 6:27:17 AM.

57.     But the Process Server Defendants' records reveal the most egregious conduct on behalf of Kavulich and Renaissance in a three-day period in April 2023. From April 11 to April 13, between the hours of 6 AM and 7 AM each day, Hashem Hussein claims to have blanketed the Flatbush Gardens complex with service of process in nearly 100 cases at blinding speed, exclusively in cases where a Renaissance entity is the plaintiff and Mr. Kavulich is their attorney.

58.     On April 11, beginning at 6:00:03 AM and ending at 6:41:22 AM, Mr. Hussein

claims to have served 35 defendants in the Flatbush Gardens complex in 41 minutes, supposedly serving a new defendant every one minute and eleven seconds.

59.     On April 12, beginning at 6:00:01 AM and ending at 6:34:15 AM, Mr. Hussein claims to have served 26 defendants in the Flatbush Gardens complex in 34 minutes, supposedly serving a new defendant every one minute and nineteen seconds.

60.     On April 13, beginning at 6:00:42 AM and ending at 6:39:27 AM, Mr. Hussein claims to have served 37 defendants in the Flatbush Gardens complex in 39 minutes, supposedly serving a new defendant every one minute and three seconds.

61.     Mr. Hussein's work on behalf of other attorneys and plaintiffs reveal the same pattern of questionable service times and methods. Even without reviewing Mr. Hussein and Allied's records, his Affidavits of Service reveal a pattern of impossible early-morning rapid-fire substitute service.

62.     On March 18, 2023, for example, Mr. Hussein allegedly served ten individuals in Queens in quick succession within the span of an hour and a half: at 5:38 AM, 6:01 AM, 6:06 AM, 6:08 AM, 6:14 AM, 6:20 AM, 6:38 AM, 6:47 AM, 6:50 AM, 7:07 AM. Exhibit G (March 18, 2023 Affidavits of Service).

63.     Two of these service attempts, one at 6:06 AM and another at 6:08 AM, allegedly took place a mere two minutes apart in two different buildings.

64.     All ten were allegedly served by substitute service. Eight of the ten were served on individuals with the same last name as the defendant, and the other two were John or Jane Doe. Id.

65.     Whether in this case or another, this pattern should have raised suspicion and prompted a review of Mr. Hussein's service by Allied. Instead, a principal of Allied, Frances

Mondrone, notarized each and every one of Mr. Hussein's affidavits, including the affidavits of service against Mr. Gachelin and Ms. Abrahams.

### *Kavulich Defendants Have A History Of Failing To Perform Meaningful Attorney Review, And Have Previously Been Sued For It Multiple Times*

66. Defendants, despite having previously waived their right to pursue any and all rental arrears arising from Mr. Gachelin's tenancy, filed the Collection Lawsuit against him in order to obtain a judgment or pressure him into a settlement.

67. What happened to Mr. Gachelin is another example of Kavulich Defendants' long-documented practice of engaging in debt collection without any meaningful attorney review. Kavulich Defendants either did not perform a meaningful attorney review prior to filing the Collection Lawsuit against Mr. Gachelin, or, alternatively, Kavulich Defendants did perform a review and filed the Collection Lawsuit knowing that Mr. Gachelin did not owe the debt. Kavulich Defendants, a firm that exclusively practices collections for landlords, would want to do what it needed to keep as a client an apartment complex the size of Flatbush Gardens.

68.    Kavulich Defendants have been sued in previous lawsuits for similar misconduct as they committed against Mr. Gachelin: (1) *Prage v. Kavulich & Associates, P.C., et al.,* No. 1:16-cv-01627-CBA-RLM (EDNY) (**Exhibit H**); (2) *Morales v. Kavulich & Associates, P.C., et al.,* No. 1:16-cv-02134-ALC-JLC (SDNY) (**Exhibit I**); and (3) *Creary v. Kavulich & Associates, P.C., et al.,* No. 1:18-cv-02277-JPO-GWG (SDNY) (**Exhibit J**). In *Morales,* the Court granted summary judgment against Kavulich Defendants, finding them liable for violating GBL § 349 for, among other conduct, "falsely implying [Kavulich] had performed a meaningful review in signing and serving the Restraint and Execution." *Morales v. Kavulich & Associates, P.C., et al.,* 294 F.Supp.3d 193, 197 (S.D.N.Y. 2018).

69.    Kavulich Defendants have also been excoriated in New York state courts for failing to perform meaningful attorney review.

70.    In the federal lawsuits, there was evidence that Kavulich Defendants had failed to perform meaningful attorney reviews as a matter of course and that this conduct illegally harmed dozens of consumers, and that Kavulich Defendants were aware of this but did not change their policies or procedures in order to address it.

71.    *Prage* and *Morales* both resulted in injunctions being entered against Kavulich Defendants to cease violating the FDCPA and GBL § 349 – injunctions which Kavulich Defendants violated with their conduct in both *Creary* and in the present case. **Exhibit K** (*Prage* Injunction) and **Exhibit L** (*Morales* Injunction).

### *Prage v. Kavulich*

72.    In *Prage*, Kavulich Defendants restrained the bank account of Romain Prage pursuant to a judgment against Mr. Prage for alleged rental arrears. **Exhibit H** (*Prage* Complaint).

73.    Mr. Prage's frozen bank account consisted entirely of unemployment funds, which under the New York Exempt Income Protection Act are exempt from being restrained by debt collectors like Kavulich Defendants. *Id.*

74.    Mr. Prage immediately provided Kavulich Defendants notice that they were violating the law by sending an Exemption Claim Form attaching an unemployment award letter. *Id.* But Kavulich Defendants responded to Mr. Prage's proof by filing a motion for post-possession money enforcement, objecting to Plaintiff's exemption claim and requesting a hearing. *Id.*

75.     On May 7, 2015, Mr. Prage executed an affidavit with irrefutable documentary evidence that the funds in his bank account were exempt from restraint, but Kavulich Defendants still refused to release the money and even restrained the account again after the court ruled against them. *Id.*

76.     For this conduct, Mr. Prage filed a lawsuit against Kavulich Defendants for violating the FDCPA and GBL § 349. *Id.* Shockingly, on March 9, 2016, after the FDCPA lawsuit had been filed, Kavulich Defendants again attempted to restrain Mr. Prage's bank account. *Id.*

77.     As part of the settlement of the *Prage* lawsuit, Kavulich Defendants entered into a five-year injunction, so-ordered by the Court on May 23, 2018, that required Kavulich Defendants to, among other provisions, "Comply in all manners with their obligations under the Fair Debt Collection Practices Act, N.Y. General Business Law 349, and the N.Y. Exempt Income Protection Act." **Exhibit K** (*Prage* Injunction).

### *Morales v. Kavulich*

78.     In the *Morales* case, James Morales had been sued, along with a former girlfriend named Clara Potter, over rental arrears, but Mr. Morales was never served the collection lawsuit and thus never appeared. **Exhibit I** (*Morales* Complaint).

79.     Ms. Potter entered into a stipulation with the landlord Rosewall per which a judgment was entered for possession of the apartment and a money judgment of $2,601.16 against Ms. Potter. *Id.*

80.     No money judgment was ever entered against Mr. Morales. Despite this, Kavulich Defendants restrained Mr. Morales' bank account on behalf of Rosewall, as if the landlord had a

money judgment against him when in fact it did not. *Id.*

81.     In other words, like Mr. Gachelin, Kavulich Defendants attempted to collect a judgment from a party that was not responsible for it. *Id.*

82.     Mr. Morales filed suit against Kavulich Defendants for violating the FDCPA and GBL § 349.

83.     Discovery in *Morales* unearthed just how pervasive and unapologetic Kavulich Defendants were in their failure to perform meaningful attorney reviews. The Court made some shocking findings in its Order granting Mr. Morales' motion for summary judgment on liability:

> "As a general practice, Gary Kavulich does not review the information in bank restraints, information subpoenas, as well as other similar documents and just mechanically signs them. From 2007 through 2015, whenever there was an execution involved in any of his cases, Kavulich did not keep track of the amount that was still owed on a judgment. Moreover, during that same time period, when issuing information subpoenas, Kavulich's computer system would automatically enter the amount due as the full judgment amount without crediting the debtor for any payments already received. This led to both the bank and consumer being misinformed about the amount and the bank restraining more than the amount to which Kavulich was entitled. Kavulich was aware of this problem with his computer but chose not to ensure that the amounts were accurate by fixing the computer system. Kavulich has previously enforced non-existent money judgments seven times and also enforced already vacated judgments in seventeen other cases, sometimes holding on to a defendant's money long after the judgment had been vacated."

*Morales v. Kavulich & Assocs., P.C.*, 294 F. Supp. 3d 193, 196 (S.D.N.Y. 2018)

84.     The Court also held that Morales was not precluded from seeking punitive damages against Mr. Kavulich because a question of fact had been created by Morales' presentation of evidence that "Kavulich repeatedly enforces either non-existent or vacated judgments; he is aware that this occurs but has not changed his business practices by fixing his computer system or meaningfully reviewing documents to stop it." *Id.* at 199. Indeed, Kavulich's response to avoid punitive damages was that he was greedy, not malevolent: "Kavulich downplays the severity of his conduct by characterizing it as motivated by a desire to increase

profits rather than by maliciousness or malice." *Id*.

85. As part of the settlement of the *Morales* case, on June 25, 2018, a five-year injunction was entered against Kavulich Defendants, requiring, among other provisions, to "Comply in all manners with their obligations under the Fair Debt Collection Practices Act and N.Y. General Business Law § 349." **Exhibit L** (*Morales* Injunction).

### *Creary v. Kavulich*

86. In *Creary,* Esmerilda Creary had her bank account restrained by Kavulich Defendants pursuant to a default judgment against her for $3,588.74. **Exhibit J** (*Creary* Complaint).

87. On April 23, 2010, New York City Marshal Ronald Moses collected $2,976.30 from Ms. Creary by restraining her bank account. *Id.* Despite collecting $2,976.30, Kavulich Defendants restrained Ms. Creary's bank account on November 5, 2013 for the full amount of the judgment against her, $3,588.74. *Id.*

88. On December 5, 2013, Ms. Creary signed an exemption claim form explaining, under penalty of perjury, that funds in her bank account were exempt because they were Social Security Disability and child support. *Id.* Despite this, Kavulich Defendants restrained the account again in January 2014 for the full amount of the judgment despite most of it being paid. *Id.*

89. And like in *Prage*, Kavulich Defendants responded to Ms. Creary's exemption claim form by filing a motion for post-possession money enforcement, which made no mention of the fact that the majority of the judgment amount had already been collected via the execution on Ms. Creary's account in 2010. *Id.*

90.     Through this deception, Kavulich Defendants were able to collect even more money from Ms. Creary, taking $1,168.05 on May 19, 2015. *Id.*

91.     However, on November 5, 2015, Ms. Creary was able to successfully have the Court vacate the default judgment against her and to order Kavulich Defendants to return her money. *Id.*

92.     Kavulich Defendants refused to comply with this Order, and on March 16, 2017, Ms. Creary obtained another order directing Kavulich Defendants to return all funds taken since the judgment had been vacated and the statute of limitations had expired on the debt. *Id.*

93.     Kavulich Defendants still did not return the money for almost a whole year. *Id.*

94.     For this conduct, Ms. Creary filed a lawsuit against Kavulich Defendants for their violations of the FDCPA, GBL § 349, and Judiciary Law § 487, and committing conversion.

### *State Court Cases*

95.     In *3343 Decatur Ave. LLC v. Rios,* 2018 NY Slip Op 50264(U), 2018 WL 1057308 (Civ. Ct. Feb. 26, 2018), Judge Kraus issued a decision denying a motion for a default judgment made by Gary Kavulich "caution[ing] to review pleadings issued and motions filed with greater care before submitting them to this court."

96.     The decision noted that this was not the first time that Mr. Kavulich had been warned by the courts to perform a meaningful review before filing lawsuits and making motions – in *Zadrima v. Thompson,* Index No. CV-009362-16/BX, the court criticized Mr. Kavulich, holding: "The complaint herein is so defective that it is hard to imagine an attorney signed his name to the pleading, and the court can only assume that the attorney who signed the complaint, did so without reading it."

97.     Even more importantly, the court concluded "Had any one of the three attorneys [at Kavulich & Associates, P.C] actually read the complaint, presumably the appropriate corrective action would have been taken." *Id.*

98.     The Court's words are all too applicable to Mr. Gachelin's case – had Kavulich Defendants performed any meaningful attorney review--either by investigating Mr. Gachelin and Ms. Abrahams's repeated assertions that the debt had been settled and was not owed, or by asking their client for a full history of Mr. Gachelin's tenancy including any prior legal proceedings in housing court before proceeding to file a collection lawsuit for rental arrears— they presumably could have determined that the rental arrears had been waived by the 2022 settlement in housing court.

99.     The Court in *3343 Decatur Ave. LLC* also cited in a footnote: "Other examples of defective pleadings submitted by plaintiff's firm and pointed out by this court include the following cases: CV-8129-17, CV-1978-17, CV-6140-16."

***Defendants Attempted to Use the Collection Lawsuit to Coerce Mr. Gachelin Into Waiving His Rights to Hold Defendants Accountable for the Illegality of the Collection Lawsuit***

100.     The papers which the Kavulich Defendants attempted to coerce Mr. Gachelin and Ms. Abrahams into signing included a judgment for the amount of the alleged rental arrears as well as a release from liability for the Defendants.

101.     Using the threat of future court dates—in a lawsuit which itself should have never been brought—the Kavulich Defendants attempted to coerce Mr. Gachelin and Ms. Abrahams into releasing Defendants from liability for their conduct in the collection suit, even telling them that signing these papers was "the only way to get out of this."

102.     In other words, the Kavulich Defendants used the expense and inconvenience of a

lawsuit for a debt which had already been settled to attempt to coerce Mr. Gachelin and Ms. Abrahams into waiving their own rights to hold the Kavulich Defendants accountable *for that very same lawsuit*.

103.    Not content to drag Mr. Gachelin and Ms. Abrahams into court again and again over a settled debt, the Kavulich Defendants sought to use their own unlawful conduct as a cudgel to immunize themselves from liability.

<u>CLAIMS</u>

**FIRST COUNT**
**Violations of the Fair Debt Collection Practices Act (as to Kavulich Defendants)**

104.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

105.    The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e); see also *Hamilton v. United Healthcare of La., Inc.*, 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope.").

106.    Congress designed the FDCPA to be enforced primarily through private parties – such as plaintiff – acting as "private attorneys general." *See* S. Rep. No. 382, 95th Con., 1st Sess. 5, ("[t]he committee views this legislation as primarily self-enforcing; consumers who have been subject to debt collection abuses will be enforcing compliance"); and *Jacobson v. Healthcare*

*Fin. Servs.,* 516 F.3d 85, 91 (2d Cir. 2008) ("[i]n this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil actions brought by others.").

107. The obligation alleged to be owed by Plaintiff is a "debt" as defined by 15 U.S.C. § 1692a(5) because the rental arrears were incurred for a residential apartment.

108. Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because Plaintiff was alleged to owe a "debt" as defined by 15 U.S.C. § 1692a(5).

109. For the reasons set forth in the "Parties" section of this Complaint, the Kavulich Defendants is a "debt collector" as defined in 15 U.S.C. § 1692a(6).

110. The Kavulich Defendants violated the following sections of the FDCPA: 15 U.S.C. §§ 1692e and 1692f. By way of example and not limitation Defendant violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: using false, deceptive or misleading representations or means; misrepresenting the character, amount, or legal status of the debt; misrepresenting the services rendered or compensation which may be lawfully received; falsely representing or implying that a communication is from an attorney; threatening to take and actually taking an action prohibited by law; using any false, deceptive or misleading representations or means; using unfair or unconscionable means; and collecting or seeking to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

111. As a direct and proximate result of the Kavulich Defendants' violations, Plaintiff has suffered damages, including, *inter alia*, significant emotional distress, embarrassment,

humiliation, loss of his two vacation days, and costs of printing and mailing.

112.    The injuries inflicted on Plaintiff by the Kavulich Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

113.    Plaintiff suffered economic injuries that historically has provided a basis for lawsuits in American courts, including but not limited to out of pocket expenses for airfare and other travel costs.

114.    Plaintiff's injuries are analogous to, *inter alia*, the following common law claims: defamation, negligence, invasion of privacy, intrusion upon seclusion, and abuse of process.

115.    The Kavulich Defendants had a duty to exercise reasonable care in the collection of debts, including in the selection of companies to attempt to collect the debt, in ensuring that a debt sued on has not already been settled, and in furnishing agents with accurate information when those agents rely on and use that information in attempting to collect debts.

### SECOND COUNT
### Deceptive Acts or Practices in Violation of New York General Business Law § 349 (as to all Defendants)

116.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

117.    New York General Business Law § 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state." An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such action." N.Y. Gen. Bus. § 349(h).

118.    As enumerated above, Defendants violated N.Y. Gen. Bus. § 349 *et seq.* by using

deceptive acts and practices in the conduct of their businesses. These acts were done by Defendants systematically and, as such, have had a broad impact on consumers at large.

119.    Defendants committed the above described acts willfully and/or knowingly.

120.    Defendants' wrongful and deceptive acts have caused injury and damages to Plaintiff.

121.    As a direct and proximate result of those violations of N.Y. Gen. Bus. § 349 *et seq,* Plaintiff has suffered compensable harm and is entitled to preliminary and permanent injunctive relief, and to recover actual, treble, exemplary, and damages, together with costs and attorney's fees

122.    The Defendants' deceptive conduct towards Plaintiff is the type of conduct that has a broad impact on consumers at large.

123.    That the relevant steps may be taken in a matter of minutes shows a high degree of moral culpability.  Defendants' violations were willful and knowing, or, at minimum, evidence a conscious and reckless disregard for basic fairness and for the law. Defendants' wrongful and deceptive acts caused injury and damages to Plaintiff.

124.    As a direct and proximate result of Defendants' violations, Plaintiff has suffered damages, including, *inter alia*, significant emotional distress, embarrassment, and humiliation.

125.    The injuries inflicted on Plaintiff by Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

126.    Plaintiff suffered economic injuries that historically has provided a basis for lawsuits in American courts, including but not limited to airfare and other travel costs..

127.    Plaintiff's injuries are analogous to, *inter alia*, the following common law claims:

defamation, negligence, invasion of privacy, intrusion upon seclusion, and abuse of process.

128.    Defendants had a duty to exercise reasonable care in the collection of debts, including in the selection of companies to attempt to collect the debt, in ensuring that a debt sued on has not been previously settled, and in furnishing agents with accurate information when those agents rely on and use that information in attempting to collect debts.

**THIRD COUNT**
**Gross Negligence (as to all Defendants)**

129.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

130.    Defendants' failure to exercise even slight care or diligence amounts to gross negligence.

131.    Moreover, had Defendants exercised even slight diligence they would have known their conduct was unlawful.

132.    Defendants' actions evince a reckless disregard for the rights of Plaintiff and others. The actions have the appearance of intentional wrongdoing. Defendants' conduct was part of a broader pattern of misconduct aimed at the public in general.

133.    Defendants' conduct demonstrates a high degree of moral culpability and willful or wanton negligence or recklessness. As a result, Plaintiff is entitled to a punitive damage award.

**FOURTH COUNT**
**N.Y. Judiciary Law § 487 (as to Kavulich Defendants)**

134.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

135.    New York Judiciary Law § 487 creates a private right of action against an

attorney or counselor who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party;" or "willfully receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for."

136.    Judiciary Law § 487 is a traditional cause of action in American courts - N.Y. Judiciary Law § 487 is "the modern-day counterpart of a statute dating from the first decades after Magna Carta; its language virtually (and remarkably) unchanged from that of a law adopted by New York's Legislature two years before the United States Constitution was ratified." *Amalfitano v. Rosenberg*, 12 N.Y.3d 8, 14 (2009).

137.    Plaintiff is entitled to actual damages, treble damages, and attorneys' fees and costs for the violations of N.Y. Judiciary Law § 487, and Plaintiff so seeks.

## FIFTH COUNT
## Violations of N.Y.C. Admin. Code § 20-409.2 (as to Hussein and Allied)

138.    New York City Administrative Code § 20-409.2 states that "Any person injured by the failure of a process server to act in accordance with the laws and rules governing service of process in New York state, including this subchapter and regulations promulgated thereunder, shall have a cause of action against such process server and process serving agency, which distributed or assigned process for service, in any court of competent jurisdiction."

139.    New York City Administrative Code § 20-409.2 allows individuals to recover compensatory damages, punitive damages (for willful failure to service process only), injunctive and declaratory relief, costs, and attorneys' fees.

140.    Defendants Hussein and Allied violated New York City Administrative Code § 20-409.2 by failing to act in accordance with the laws and rules governing service of process in New York state, and did so negligently and or willfully.

141.    As a direct and proximate result of these violations of New York City Administrative Code § 20-409.2, Plaintiffs have suffered compensable harm and are entitled to recover compensatory and punitive damages, costs, and attorneys' fees.

## JURY DEMAND

142.    Please take notice that Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

143.    Wherefore, Plaintiff requests the following relief:

a.    A declaration that Defendants have committed the violations of law alleged in this action;

b.    An order enjoining and directing Defendants to cease violating New York G.B.L. § 349;

c.    Actual damages

d.    Exemplary and punitive damages;

e.    Statutory damages under 15 U.S.C. § 1692k and G.B.L. § 349;

f.    An order awarding disbursements, costs, and attorney fees under 15 U.S.C. § 1692k and G.B.L. § 349;

g.    Pre-judgment and post-judgment interest as permitted by law;

h.    All other and further relief that the Court deems just and proper.

Dated: June 4, 2025

*/s/ Ahmad Keshavarz*

_____

Ahmad Keshavarz
The Law Office of Ahmad Keshavarz
16 Court St., 26th Floor
Brooklyn, NY 11241
Tel: (718) 522-7900
Fax: (877) 496-7809
Email: ahmad@NewYorkConsumerAttorney.com