Case 1:25-cv-03127-BKC-JKE   Document 44-9   Filed 11/19/25   Page 1 of 23 PageID
#: 475
Case 1:16-cv-02134-ALC-JLC   Document 52   Filed 01/23/17   Page 1 of 23

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

| | |
|---|---|
| James Morales, § | |
| § | |
| § | Case No. 1:16-cv-02134-ALC-JLC |
| Plaintiff, § | |
| § | |
| --- against --- § | |
| § | |
| Kavulich & Associates, P.C., | |
| Gary Kavulich, | |
| Rosewall Gardens Associates, LP f/k/a | |
|     Rosewall Gardens Associates,  and | |
| Rosewall, Inc. | |
|       Defendants. | |

## FIRST-AMENDED COMPLAINT AND JURY DEMAND

Plaintiff James Morales brings suit against a debt collection law firm and its principal (the Kavulich Defendants) for violating the Fair Debt Collections Practices Act, 15 U.S.C § 1692 *et seq.*, and N.Y. Gen. Bus. Law § 349 *et seq.,* and for committing conversion by executing on Mr. Morales' bank account for a non-existent judgment. As the Kavulich Defendants acting as the agent for the judgment creditor, Plaintiff also brings suit for conversion against the judgement creditor and its general partner (the Rosewall Defendants).

## JURISDICTION AND VENUE

1. The Court has federal question jurisdiction over the lawsuit because the action arises under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.*, ("FDCPA").  Jurisdiction of the Court arises under 15 U.S.C. § 1692k (d) and 28

1

U.S.C. § 1331 because this dispute involves predominant issues of federal law under the FDCPA. The Court has supplemental jurisdiction under 28 U.S.C. §1367 over Plaintiff's state law claims because said claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the United States Constitution.

2.      Venue is properly laid within the Southern District of New York because the defendant transacts business in that district and the conduct complained of occurred within that district.

## PARTIES

3.      Plaintiff, James Morales, is an individual who resides in Bronx County, New York. He is a "consumer" as defined by 15 U.S.C. §1692 (a)(3) because Mr. Morales was alleged to owe rent, which constitutes a "debt" under 15 U.S.C. § 1692(5).

4.      Defendant Kavulich & Associates, P.C. is a New York Law Firm that has its principal place of business in Port Chester, NY 10573.

5.      Defendant Gary Kavulich is an individual, who on information and belief, resides in the State of New York. He may be served at his place of employment, Kavulich & Associates, P.C. or wherever he may be found.

6.      Defendant Rosewall Gardens Associates, LP  f/k/a Rosewall Gardens Associates ("Rosewall LP") is a domestic limited partnership. It may be served through its registered agent Jeffrey Moskin, 565 West End Ave, New York, NY 10024.

7.      Rosewall, Inc. is a domestic corporation with its principal executive office

2

Case 1:25-cv-03127-BKG-LKE   Document 41-9   Filed 11/19/25   Page 3 of 23 PageID
Case 1:16-cv-02134-AEC-JLC   Document 52   Filed 01/23/17   Page 3 of 23 PageID
#: 477

located at 141-50 85th Rd., Briarwood, NY 11435.  Rosewall Inc. is the general partner

of Rosewall LP, and thus is jointly and severally liable for all of the acts and omissions

of Rosewall LP committed in the course and scope of the partnership.  As such

Rosewall, Inc. and Rosewall LP will be identified jointly as "Rosewall."

8.      Defendants Kavulich & Associates, P.C. and Gary Kavulich (collectively

"Kavulich") are "debt collector[s]" as defined in 15 U.S.C. §1692 (a)(6) as they

regularly collect or attempt to collect, directly or indirectly, debts owed, or due or

asserted to be due another.  Specifically, Kavulich files thousands of collection

lawsuits in civil court, primarily for rent, and seeks to enforce putative debts obtained

by others, primarily for rent.

## FACTUAL ALLEGATIONS

9.      This case originates with an act of charity taken by the plaintiff, James Morales

in 2007 when he agreed to help his best friend's girlfriend, Clara Potter, secure an

apartment by co-signing a lease. After he helped Ms. Potter get the apartment, he

believes he had no further contact with her.

10.      On October 5, 2007, the law firm of Gutman, Mintz, Baker and Sonnenfeldt

("Gutman and Mintz") filed a petition in Bronx Housing Court captioned *Rosewall

Gardens Associates v. James Morales and Clara Potter*, Index number 67049/07 (the

"LT Action").   *See* **Exhibit A**. The petition alleged Ms. Potter and Mr. Morales had

defaulted on their rental agreement for property 2300 Sedgwick Ave, Apt. 4k Bronx

NY 10468 and were residing in the apartment in violation of the lease. The petition

stated that Mr. Morales and Ms. Potter owed Rosewall back rent in the amount of

3

Last saved:  1/13/2017 2:10 PM

Case 1:25-cv-02127-BKG-JKE - Document 44-9 Filed 11/19/25 Page 4 of 23 PageID
Case 1:16-cv-02134-ALC-JLC Document 52 Filed 01/23/17 Page 4 of 23 PageID
#: 478

$2,550.00.

11.     Mr. Morales was never served a copy of the LT Action, and did not know of the

LT Action  until his bank account was restrained in 2015.

12.     On October 17, 2012, Ms. Potter filed an answer disputing the allegations. Mr.

Morales did not receive notice of the lawsuit and did not file an answer or appear in

court.

13.     On January 29, 2008 Ms. Potter entered into a stipulation with Gutman and

Mintz in the LT Action in which Ms. Potter agreed to make a one-time payment of

$2,601.16 to Gutman and Mintz, and pay all future rent on time. Gutman and Mintz

agreed to inspect her home and make certain repairs. *See* **Exhibit B.**

14.     On the same date, as per the stipulation, a judgment for possession of the

apartment and a money judgment for $2,601.16 were awarded against Ms. Potter.

*See* **Exhibit C.**

15.     Mr. Morales did not appear in court January 29, 2008 because he had no

knowledge of the ongoing proceedings, but no judgment was awarded against him.

16.     On March 13, 2008 Ms. Potter entered into a second stipulation in the LT

Action in which she agreed to pay $4,352.74 to Gutman and Mintz. Gutman and

Mintz agreed to make certain repairs. *See* **Exhibit D.**

17.     On the same date, as per the stipulation, a judgment for possession of the

apartment and a money judgment was again entered against Ms. Potter for $4,352.74.

*See* **Exhibit E.**

18.     Mr. Morales did not appear in court for the March 13, 2008 hearing.

Last saved:  1/13/2017 2:10 PM

Case 1:25-cv-03127-BKG-JKE Document 44-9 Filed 11/19/25 Page 5 of 23 PageID
Case 1:16-cv-02134-ALC-JLC Document 52 Filed 01/23/17 Page 5 of 23 PageID
#: 479

19.     Critically, **_no money judgment was entered against Mr. Morales at the March 13, 2008 hearing_**, or at any other time.  Rather, the Court issued only a judgment against Mr. Morales for possession of the apartment.  *See* **Exhibit F** (zero dollar judgment against Mr. Morales).

20.     As stated above, Mr. Morales was never served with the petition in the LT Action, nor was he ever aware of the action until he learned his bank account was restrained in April 2015.

21.     On July 11, 2008, Kavulich & Associates, P.C. filed (and Gary Kavulich personally signed) a summons and complaint in Bronx *Civil Court* captioned *Rosewall Gardens Associates v. James Morales and Clara Potter*, Index number CV-060346-08/BX ("CC Action").  *See* **Exhibit G.**  Mr. Kavulich, on behalf of his firm, signed all of the pleadings and executions at issue in this case.  As such Mr. Kavulich and his firm are jointly and severally liable and as such will be referred to jointly as "Kavulich."

22.     In the CC Action, Kavulich sought to recover damages in the amount of $6,104.32 plus $500.00 in attorney's fees and additional interest, for the putative breach of a lease agreement. The complaint specifically alleged that Ms. Potter and Mr. Morales owed rental arrears for the months of November, 2007, through and including May, 2008 for the premises known as 2300 Sedgwick Ave, Apt. 4K Bronx NY 10463, the same premises about which the initial housing court case had been based.

23.     The complaint in the CC Action made no mention of the fact that a judge in housing court had already issued a money judgment against Ms. Potter.

Last saved:  1/13/2017 2:10 PM

Case 1:25-cv-08127-BKC-JKE - Document 44-9 - Filed 11/19/25 - Page 6 of 23 PageID
Case 1:16-cv-02134-ALC-JLC   Document 52   Filed 01/23/17   Page 6 of 23
#: 480

24.     No judgment was ever issued in the CC Action against either Mr. Morales or

Ms. Potter.  There are affidavits of service in the CC Action, court file, but in fact Mr.

Morales was never served suit and did not learn of it until years later when his bank

account was restrained in the caption of the LT Action, as discussed below.

25.     Kavulich never served Mr. Morales with the CC Action complaint.  The first

time Mr. Morales learned of the CC Action was when he began searching court records

after his bank account was restrained in April or May, 2015.

26.     On or about March 18, 2015 Kavulich sought to collect on a non-existing

judgment by signing and later issuing an Information Subpoena and Restraining

Notice ("Restraining Notice") on TD Bank, where Mr. Morales had accounts. *See*

**Exhibit H.**

27.      The information subpoena alleged that the full judgment amount was still due

and owing.

28.     However, documents produced in this case by Kavulich, the putative judgment

creditor, and the two marshals who had been executing on the putative judgment

disclosed that Kavulich had in fact had collect most if not all of the judgment already

from Clara Potter.  Ms. Potter was the co-Defendant in the Landlord Tenant suit, and

the only judgment debtor from the case.  Indeed, the ledger from the judgment

creditor appears to show that Ms. Potter had actually been garnished for more that

the amount of the judgment.

29.     Therefore, not only was Kavulich executing against Mr. Morales for a judgment

that was never entered against him, but for the full amount of the judgment when the

Last saved:  1/13/2017 2:10 PM

Case 1:25-cv-02127-BKC-JKE Document 44-9 Filed 11/19/25 Page 7 of 23 PageID
Case 1:16-cv-02134-ALC-JLC Document 52 Filed 01/23/17 Page 7 of 23
#: 481

judgment appears to have been mostly if not entirely satisfied by executions against
Ms. Potter, the actual judgment debtor.

30.     Mr. Morales did not know and could not have reasonably known that the
judgment had been paid off in whole or in part by Ms. Potter.  Further, Mr.  Morales'
inability to know that the amount of the judgment had been inflated was due to the
fraudulent concealment of the payments by Ms. Potter by Kavulich.  That
concealment was done by Kavulich expressly representing in the execution documents
that the full amount of the judgment was still owed.  Therefore, any claims by Mr.
Morales of the inflation of the amount of the debt are tolled.

31.     On or about April 2, 2015 Kavulich served the Restraining Notice on TD Bank,
where Mr. Morales had accounts. *See* **Exhibit L.** (Kavulich objection to exemption
claim, ¶ 8).

32.     Kavulich used the index number from the LT Action in the Restraining Notice.

33.     The Restraining Notice falsely stated there was a judgment against Mr.
Morales in the LT Action for $4,352.47, with interest accruing since 3/13/2008, adding
approximately 3,000 to the putative debt.The 3/13/2008 date is that of the agreed
money judgment against Ms. Potter.  The possessory judgment against Mr. Morales
was issued the day before, on 3/12/2008. The Restraining Notice also falsely stated
that the entire judgment in the amount of $4,352.47 (plus interest) was still due.
Again, this statement actively concealed the amounts Kavulich already collected from
Ms. Potter.

34.     On or about April 27, 2015 Kavulich issued an Execution With Notice to

7

Case 1:25-cv-03427-BKC-JKE Document 44-9 Filed 11/19/25 Page 8 of 23 PageID
Case 1:16-cv-02134-AEC-JLC Document 52 Filed 01/23/17 Page 8 of 23
#: 482

Garnishee against TD Bank. The date and amount of the (non-existent judgment) was
the same as in the Restraining Notice. *See* **Exhibit I.** As with the restraining notice,
the Execution with Notice to Garnishee falsely represented that their was a judgment
against Mr. Morales, but also that nothing had been paid on the judgment. Oddly,
while the Restraining Notice stated interest was accruing on the judgment at 9% from
the date of judgment, the Execution With Notice to Garnishee represented that "only
that  the execution incorrectly alleged that zero dollars was due on the judgment.

35.      On or about April 27, 2015 New York City Marshal Stephen W. Biegel ("the
Marshal") issued a Levy and Demand on TD Bank seeking to collect an amount of
principal and interest consistent with the amounts Kavulich listed in his Restraining
Notice, plus additional fees. *See* **Exhibit J.**

36.      In issuing the Restraining Notice and Execution Kavulich knew and intended
that those documents would ultimately be delivered to Mr. Morales, which they were.
In signing and serving the Restraining Notice and Execution, Kavulich impliedly
represented to Mr. Morales, the least sophisticated consumer, that there was a valid,
existing judgment against him for amounts claimed. And by failing to credit the
amount collected from Ms. Potter, Kavulich also represented that the amount due on
the judgment was significantly greater than it in fact was.

37.      Kavulich did not perform a meaningful attorney review prior to signing and
serving those documents. If he had, Kavulich would have reviewed the LT Action and
noted that there no money judgment against against Mr. Morales. And if Kavulich
had performed a meaningful review of the case and collection notes, they would not

8

Last saved:  1/13/2017 2:10 PM

Case 1:25-cv-02827-BKC-JKE   Document 44-9   Filed 11/19/25   Page 9 of 23 PageID
Case 1:16-cv-02134-ALC-JLC   Document 52   Filed 01/23/17   Page 9 of 23
#: 483

have represented that the full judgment amount was still due. In the alternative,
Kavulich knew there was no money judgment and/or knew that the majority of the
judgment amount had already been collected, but issued the Restraining Notice and
Execution on a non-judgment debtor for the full judgment amount to intentionally
seize money to which Kavulich knew he had no right.

38. On or about April 16, 2015, in response to the executions of Kavulich, TD Bank
froze Mr. Morales' bank accounts. Mr. Morales promptly went to the bank to attempt
to find out what was going on.

39. TD charged Mr. Morales a $125 bank fee on multiple occasions because of the
restraint, and transferred $1,081.19 from his account to pay the non-existent
judgment. At the time of these deductions, there was $1,486.32 in the savings account.
After the deductions only $280.13 remained.

40. On April 23, 2015, Mr. Morales sought out the free limited scope legal
assistance of Civil Legal Advice and Referral Office ("CLARO"). The volunteers at
CLARO advised him on how to access his exempt funds from his frozen bank account,
and suggested he request the underlying housing court file which seemed to form the
basis of the lien on his bank account. Mr. Morales went back and forth to CLARO on
numerous occasions after that, as he continued to try and gather information to shed
light on why his account had been frozen.

41. On April 30, 2015 Mr. Morales executed an exemption claim form and promptly
delivered and caused the same to be promptly delivered to Kavulich. The form
indicated the funds in the restrained account were exempt because they were earned

Last saved:  1/13/2017 2:10 PM

income from within the prior 60 days. *See* **Exhibit K.**

42. During the months of April and May 2015, Mr. Morales requested the underlying housing court file and went back and forth to his bank attempting to access his funds. In housing court he was told it would take weeks for the file to be obtained from archives and there was nothing he could do to speed up the process.

43. On May 5, 2015 Kavulich purportedly filed a Notice of Motion [for] Post-Possession Money Enforcement objection (the "Objection") to Mr. Morales' April 30, 2015 exemption claim form (the "Exemption Claim"). *See* **Exhibit L.**

44. Kavulich "affirmed under the penalty of perjury" certain facts.

45. The Objection contended that on or about April 2, 2015 Kavulich served the Restraining Notice on TD Bank and on May 5, 2015 received the Exemption Claim. *See* **Exhibit L** (¶¶ 8, 13).

46. The Objection constitutes a series of material false, deceptive, misleading, and unconscionable representations and means.

47. Most obviously, Kavulich sought to challenge a claim exemption for a non-existent judgment.

48. This is not the first FDCPA action against Kavulich for intentionally executing on a known non-existent judgment. *See* ¶ 20 in **Exhibit M** (Complaint in *Ormsby v. Gary Kavulich et al*, Case No. 1:10-cv-03400-SJ-JO, ED NY. )("[D]efendants violated the FDCPA in seeking to collect on a non-existent judgment against plaintiff for a debt plaintiff has never owed.")

49. The Objection (¶ 4) contends it attaches as Exhibit 1 a copy of a putative March

Last saved: 1/13/2017 2:10 PM

Case 1:25-cv-00127-RKC-LKE   Document 44-9   Filed 11/19/25   Page 11 of 23 PageID
Case 1:16-cv-02134-ALC-JLC   Document 52   Filed 01/23/17   Page 11 of 23
#: 485

13, 2008 money judgment against Mr. Morales. However, the document is not in fact a

judgment, but rather just the March 13, 2008 stipulation by Ms. Potter.

50.     Had Kavulich actually attached (or even looked at) the March 12, 2008

judgment as to Mr. Morales it would show that the judgment awarded for possession

of the property and a zero dollar money judgment.

51.     On information and belief, Kavulich actually knew that there was no judgment

against Mr. Morales, but executed on his bank account anyway because Kavulich was

unable to satisfy the judgment against the actual judgment debt, Ms. Potter.

52.     For example, in its Objection, Kavulich states that the last monies received was

over four years ago, December 28, 2011, and further states that Ms. Potter had been

previously garnished, but there is still a balance remaining of $1,811.08. *See* **Exhibit L**

(¶¶ 6, 7).

53.     Even if there was a judgment against Mr. Morales – which there was not – in

its Objection (¶ 6) admits that the balance of the judgment would be only $1,811.08.

However, in its Restraint Notice and Execution did not disclose that most of the

judgment was satisfied, and instead falsely stated that the amount of

"$4,353.74…remains due and unpaid."

54.     The Objection was purported faxed to TD Bank on May 5, 2015, and mailed to

Mr. Morales the same say. *See* **Exhibit L** (fax cover sheets to TD Bank and certificate

of service).

55.     In May, 2015 Mr. Morales received a notice of a motion that had been filed by

Kavulich and (purportedly) to be heard on May 18, 2015 in Bronx Civil Court.

Last saved:  1/13/2017 2:10 PM

Case 1:25-cv-02127-BKG-LKE   Document 44-9   Filed 11/01/25   Page 12 of 23 PageID
Case 1:16-cv-02134-ALC-JLC   Document 52   Filed 01/23/17   Page 12 of 23 PageID
#: 486

56.     On May 18, 2015 Mr. Morales appeared on that date in Bronx Civil Court but
was told that the case had not been calendared and that he could go home.

57.     The Objection listed the index number of the LT Action, but the address for the
hearing at the courthouse what the CC Action was pending.

58.     Sometime in late April, early May, 2015, Mr. Morales finally received the
housing court file. Due to a clerical error on the part of the clerk, however, the wrong
file had been requested and Mr. Morales had to request the file again. Weeks later,
Mr. Morales finally received the correct file, only to see that there was in fact no
money judgment against him.  Frustrated and confused by the paperwork, Mr.
Morales again went to CLARO. It was at this meeting in early July 2015 that CLARO
approached Community Development Project ("CDP") at the Urban Justice Center
and asked if CDP was able to take his case.

59.     On July 16, 2015 attorneys, Lauren Elfant and Nasoan Sheftel-Gomes, from
the Urban Justice Center, and Matt Schedler from CAMBA Legal Services, Inc., met
with Mr. Morales to review the housing court file. After a review of the housing court
file it became immediately evident that there was no money judgment against Mr.
Morales from housing court, but that it was also necessary to get a copy of the civil
court file to ensure that no judgment had been issued against Mr. Morales in civil
court.

60.     After a review of the file in the CC Action, on or about July 17, 2015 Mr.
Morales sent a letter to Kavulich demanding that they immediately release the
unlawful restraint of his bank account.  A true copy of this demand letter (absent the

Last saved:  1/13/2017 2:10 PM

enclosures) is attached as **Exhibit N.**

61.     Kavulich failed to perform a meaningful review of this case before restraining Mr. Morales' bank account. Had a meaningful review been performed, Kavulich would have know that there was no judgment against Mr. Morales and that Kavulich had already collected most if not all of the judgment from Ms. Potter.

62.     Moreover, the misrepresentation as to the amount still due on the judgment is not unique to this case. From 2007 through 2015, whenever there was an execution involved in any of its cases, Kavulich did not keep track of the amount that was still owed on a judgment. Rather, he relied on the marshal to keep track of the payments made and the interest accruing and to inform Kavulich of when a judgment was satisfied. However, Kavulich has used at least three different marshals since 2007. If, as here, Kavulich used more than one marshal for one case and did not themselves keep track of the amount currently due, then the two marshals could both attempt to collect the full judgment amount, essentially doubling the amount to which Kavulich is entitled.

63.     When issuing information subpoenas, Kavulich's computer automatically entered the amount due as the full judgment amount without crediting the debtor for any payments already received. As a result, as was the case here, both the bank and the consumer were misinformed as to the amount due and the bank was instructed to restrain more than the amount to which Kavulich was entitled.

64.     Kavulich was aware of this fault in his document processing system and knew that the computer-generated amount entered on information subpoenas would not

13

Case 1:25-cv-08127-RKC-LKE   Document 44-9   Filed 11/01/25   Page 14 of 23 PageID
Case 1:16-cv-02134-ALC-JLC   Document 52   Filed 01/23/17   Page 14 of 23 PageID
#: 488

reflect any payments made on the judgment. However, he chose not to correct his computer system to accurately calculate and credit consumers for the amount already paid because, he testified in deposition, he would have to pay for someone to set up the software to keep track of the balance and he did not want to pay the cost of doing so.

65.     In other words, Kavulich made the conscious decision that he would make more money issuing restraints and executions falsely stating that the full amount of the judgment (and interest) was due than to have his office keep track of all of the payments and the balance.

66.     These misrepresentations are deceptive to any consumer – least sophisticated or otherwise – because it gives Kavulich leverage to try to collect on the full balance of the judgment (plus the interest on the full balance) from the consumer.

67.     Mr. Morales is precisely the type of vulnerable consumer the FDCPA was designed to protect. In the time since the defendants restrained Mr. Morales' bank account without a valid judgment Mr. Morales' life has been turned upside down. Mr. Morales' blood pressure, (which is already prone to abnormal elevation due to Mr. Morales' stressful work) was skyrocketing due to the stress of defendant's bank restraint.

68.     The defendants' conduct caused Mr. Morales to sustain actual damages including monies improperly frozen, bank fees, out-of-pocket expenses to investigate his case and the loss of countless days of work shuffling back and forth to CLARO, Bronx Civil and Housing Courts, TD Bank, and meetings and consultation with attorneys.

Last saved:  1/13/2017 2:10 PM

69.     Defendants' conduct has also caused Mr. Morales to experience severe emotional and mental pain and anguish, embarrassment and humiliation. The defendants' unlawful conduct came at an especially vulnerable time for Mr. Morales. At the time his account was frozen Mr. Morales was working as a mover. He was making approximately $1,200 a month plus tips and was just managing to pay his bills and at various times save a little bit each month. With monthly expenses equaling approximately $1,400 a month, there were months he was able to save a little bit of money and months where he just managed to break even or had to dip into his savings.

70.     Mr. Morales had been saving money in his savings account to visit his parents in Puerto Rico, who he had not seen since 1990. He was extremely excited to take this trip as he had not had a vacation in many years and was looking forward to seeing his parents. However, when his account was frozen, he was unable to buy a plane ticket. And not only was Kavulich representing in the Restraining notice that the amount due (with interest) was over $7,000, had Kavulich actually used his own accounting of the amount due then either he would also have not issued the Restraining Notice because the judgment was already satisfied by Ms. Potter, or at least it was mostly satisfied.

71.     The months after Mr. Morales' account was frozen were difficult for him. He fell behind on his rent and other bills. Because he frequently had to miss work during this period to deal with the aftermath of the bank restraint, it proved challenging to catch up on his bills even after his account was released. This caused him great

15

Case 1:25-cv-09127-BKC-LKE Document 44-9 Filed 11/19/25 Page 16 of 22 PageID
Case 1:16-cv-02134-ALC-JLC Document 52 Filed 01/23/17 Page 16 of 23
#: 490

embarrassment and humiliation.

72.     As the stress mounted, Mr. Morales felt ill. He often couldn't sleep and he felt
extremely stressed. Given how physically stressful his work was, this made his job
almost unbearable and he felt extreme exhaustion.

73.      As the pressure rose, Mr. Morales ended up in the emergency room at
Montefiore Medical Center in the Bronx, where they prescribed him medication for his
high blood pressure.

74.     The stress and anxiety that Mr. Morales has felt has caused him irreparable
harm. The severe emotional damage manifests itself physically in Mr. Morales' body.
He is mentally exhausted and is still experiencing exacerbated pains in his body
resulting from lack of sleep and loss of appetite. Although Mr. Morales was ultimately
able to get all of his funds returned, minus various fees incurred along the way, he is
just starting to get his life back together and get back on track with his bills and
various other commitments.

75.     Plaintiff also claims as actual damages the reasonable value of his attorney's
time and labor to investigate the circumstances surrounding the levy on his account
and obtain a favorable resolution for Mr. Morales.

76.     Kavulich was acting as the agent of Rosewall in seeking to collect the non-
existent judgment and in filing an additional collection suit for the same putative
debt. Kavulich was acting within the course and scope of his agency.  Therefore
Rosewall is jointly and severally liable for the conduct of Kavulich.

Last saved:  1/13/2017 2:10 PM

Case 1:25-cv-09427-BKC-LKE   Document 44-9   Filed 11/19/25   Page 17 of 23 PageID
Case 1:16-cv-02134-ALC-JLC   Document 52   Filed 01/23/17   Page 17 of 23
#: 491

## FIRST CLAIM FOR RELIEF
## VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT
### (AS TO KAVULICH ONLY)

77.     Plaintiff repeats and realleges each and every allegation set forth in the

above paragraphs of this complaint as if fully set forth herein.

78.     The purpose of the FDCPA is "to eliminate abusive debt collection practices

by debt collectors, to insure that debt collectors who refrain from using abusive debt

collection practices are not competitively disadvantages, and to promote consistent

State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692

(e); *see also Hamilton v. United Healthcare of La., Inc.* 310 F.3d 385, 392 (5th Cir.

2002) ("Congress, through the FDCPA, has legislatively expressed a strong public

policy disfavoring dishonest, abusive, and unfair consumer debt collection practices,

and clearly intended the FDCPA to have a broad remedial scope.").

79.     Congress designed the FDCPA to be enforced primarily through private

parties-such as plaintiff-acting as "private attorneys general." See S. Rep. No. 382,

95th Con,. 1st Sess. 5, ("[t]he committee views this legislation as primarily self-

enforcing; consumers who have been subject to debt collection abuses will be

enforcing compliance"); and *Jacobson v. Healthcare Fin. Servs.*, 516 F.3d 85, 91 (2d

Cir. 2008) ("[i]n this way, the FDCPA enlists the efforts of sophisticated consumers

like [plaintiff] as 'private attorneys general' to aid their less sophisticated

Counterparts, who are unlikely themselves to bring suit under the Act, but who are

assumed by the Act to benefit from the deterrent effect of civil actions brought by

Last saved:  1/13/2017 2:10 PM

Case 1:25-cv-02427-RKC-LKE   Document 44-9   Filed 11/01/25   Page 18 of 23 PageID
Case 1:16-cv-02134-ALC-JLC   Document 52   Filed 01/23/17   Page 18 of 23
#: 492

others.").

80.     The actions of Kavulich enumerated above constitute an attempt to collect a

debt or were taken in connection with an attempt to collect a debt within the

meaning of the FDCPA.

81.     Kavulich violated the following sections of the FDCPA: 15 U.S.C. §§ 1692e

and 1692f.  By way of example and not limitation Defendant violated the FDCPA by

taking the following actions in an attempt to collect a debt or in connection with an

attempt to collect a debt: using false, deceptive or misleading representations or

means; misrepresenting the character, amount, or legal status of the debt;

misrepresenting the services rendered or compensation which may be lawfully

received; the false representation or implication that any individual is an attorney

or that any communication is from an attorney; threatening to take and actually

taking an action prohibited by law; communicating or threatening to communicate

to any person credit information which is known or which should be known to be

false; using any false, deceptive or misleading representations or means; using

unfair or unconscionable means; and collecting or seeking to collect any amount

(including any interest, fee, charge, or expense incidental to the principal

obligation) unless such amount is expressly authorized by the agreement creating

the debt or permitted by law.

### SECOND CLAIM FOR RELIEF
### CONVERSION
### (AS TO ALL DEFENDANTS)

Last saved:  1/13/2017 2:10 PM

82.     Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

83.     The elements of conversion in New York State include: 1) having a possessory interest in property; and 2) having the possessory interest taken or interfered with by another in a manner that is contrary to the possessor's rights.

84.     Property subject to conversion includes readily identifiable funds from a bank account.

85.     Defendants intentionally and without authority, assumed and exercised control over Mr. Morales' money, interfering with his right to possession of the same, by: a) causing Mr. Morales's bank account to be restraint; b) by causing money to be withdrawn from Mr. Morales's bank account for garnishment and for bank fees.

86.     Defendants' improper restraint of Mr. Morales's money, which harmfully interfered with Mr. Morales's rights to control his own property, constitutes conversion.

87.     For the reasons stated in the statement of facts, and under the aforementioned Counts, Defendants' conduct is gross, wanton or deliberate and demonstrates a high degree of moral culpability. The conduct demonstrates malice, insult, and/or willful or reckless disregard of Mr. Morales's rights, or other aggravated acts. Defendants' conduct evidences a high degree of moral culpability, or is so flagrant as to transcend mere carelessness, or constitutes willful or wanton

Case 1:25-cv-02427-BKC-LKE   Document 44-9   Filed 11/01/25   Page 20 of 23 PageID
Case 1:16-cv-02134-AEC-JLC   Document 52   Filed 01/23/17   Page 20 of 23
#: 494

negligence or recklessness to justify a punitive damage award.

88.     For these reasons, Plaintiff is entitled to exemplary and punitive damages, in addition to actual damages. Actual damages are outlined in the above statement of facts, and incorporated by reference.

### THIRD CLAIM FOR RELIEF
### NEW YORK GENERAL BUSINESS LAW SECTION 349 *ET SEQ.*
### (AS TO KAVULICH ONLY)

89.     Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

90.     New York General Business Law §349(a) prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state…"

91.     An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such action." N.Y. Gen. Bus. Law § 349(h). An individual may also be awarded punitive damages.

92.     As enumerated above, Kavulich violated N.Y. Gen. Bus. Law § 349 *et seq.* by using deceptive acts and practices in the conduct of their business that have broad impacts on consumers at large. This includes a pattern and practice of misrepresenting to financial institutions and consumers the amount owed and actively concealing the amount that has already been paid on a judgment. Kavulich

Last saved:  1/13/2017 2:10 PM

Case 1:25-cv-08127-PKC-LKE   Document 44-9   Filed 11/19/25   Page 21 of 23 PageID
Case 1:16-cv-02134-ALC-JLC   Document 52   Filed 01/23/17   Page 21 of 23
#: 495

engages in this pattern and practice because it is profitable and because it would be
more costly for Kavulich to create a computer system that can track any payments
that should be credited to an account. The result is that consumers are led to
believe that they owe more than they do and banks are instructed to restrain more
than what is owed on the judgment. Consumers may even continue to be executed
upon even when prior executions already satisfied the judgment.  This is especially
an issue ifif Kavulich used more than one marshal, as here, because one marshal is
not crediting garnishments received by a different marshal.

93.     For these reasons and for the other reasons stated in the statement of facts,
Kavulich's conduct evidences a high degree of moral culpability, or is so flagrant as
to transcend mere carelessness, or constitutes willful or wanton negligence or
recklessness to justify a punitive damage award. Defendant's wrongful and
deceptive acts caused injury and damages to Plaintiff.

94.     As a direct and proximate result of those violations of N.Y. Gen. Bus. Law §
349 *et seq*, Mr. Morales suffered compensable harm and is entitled to preliminary
and permanent injunctive relief, and to recover actual, treble, exemplary, and
punitive damages, together with costs and attorney's fees.

## JURY DEMAND.

54.     Plaintiff demands a trial by jury.

## PRAYER

Last saved:  1/13/2017 2:10 PM

55.        WHEREFORE, Plaintiff requests the following relief:

a.        A declaration that Defendants have committed the violations of law alleged in this action;

c.        Actual damages, treble, exemplary, and punitive damages;

d.        Statutory damages under 15 U.S.C. § 1692k and GBL § 349;

e.        An order awarding disbursements, costs, and attorneys' fees under 15 U.S.C. § 1692k and GBL § 349;

f.        Prejudgment and post judgment interest as allowed by law;

g.        All other relief, in law and in equity, both special and general, to which Plaintiff may be justly entitled.

DATED: Brooklyn, New York
         January 13, 2017

                        Respectfully submitted,

                        By: *Melissa Koven*

                        CAMBA LEGAL SERVICES, INC.
                        Melissa Koven, Of Counsel
                        Kathleen Ames, General Counsel
                        885 Flatbush Ave.  2nd Fl.
                        Brooklyn, NY  11226
                        Phone: (718) 940-6311
                        MelissaK@camba.org

                        By: *Matthew Schedler*

                        CAMBA LEGAL SERVICES, INC.
                        Matthew Schedler, Of Counsel (MS-3774)

Last saved:  1/13/2017 2:10 PM

Case 1:25-cv-09427-RKC-LKE  Document 44-9  Filed 11/19/25  Page 23 of 23 PageID
Case 1:16-cv-02134-ALC-JLC  Document 52  Filed 01/23/17  Page 23 of 23
#: 497

Kathleen Ames, General Counsel
885 Flatbush Ave.  2nd Fl.
Brooklyn, NY  11226
Phone: (718) 940-6311
MatthewSc@camba.org


By: *Nasoan Sheftel-Gomes*

Harvey Epstein, Esq.
URBAN JUSTICE CENTER One of
Plaintiffs' Attorneys
By: Nasoan Sheftel-Gomes, of counsel (NS-3482)
123 William Street, 16th Floor
New York, NY 10038
Phone: (646) 459-3013
Fax: (212) 533-4598
E-mail: nsheftel-gomes@urbanjustice.org


By: *Ahmad Keshavarz*

Ahmad Keshavarz
One of Plaintiffs' Attorneys
The Law Office of Ahmad Keshavarz
16 Court St., 26th Floor
Brooklyn, NY 11241-1026
Phone: (718) 522-7900
Fax:    (877) 496-7809
Email: ahmad@NewYorkConsumerAttorney.com

Last saved:  1/13/2017 2:10 PM