**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**
**FORM 10-K**

X     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2024**

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from          to**
**Commission File Number: 001-38010**
**CLIPPER REALTY INC.**
**(Exact name of Registrant as specified in its charter)**

| | |
|---|---|
| **Maryland** | **47-4579660** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**4611 12th Avenue, Suite 1L**
**Brooklyn, New York 11219**
**(Address of principal executive offices) (Zip Code)**
**(718) 438-2804**
**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Trading Symbol** | **Name of each exchange on which registered** |
|---|---|---|
| Common Stock, par value $0.01 per share | CLPR | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**
None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
Yes ☐    No X

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
Yes ☐    No X

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes  X    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes  X    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See definition of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ |
| Non-accelerated filer  X | Smaller reporting company  X |
| | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes ☐    No X

The aggregate market value of the voting and non-voting common stock held by non-affiliates of the registrant based on the closing price per share of the registrant's common stock on the New York Stock Exchange as of June 28, 2024, the last business day of the registrant's most recently completed second fiscal quarter – $49,096,593

As of February 14, 2025, there were 16,146,546 shares of the registrant's common stock outstanding.

---

**DOCUMENTS INCORPORATED BY REFERENCE**

The registrant intends to file its definitive proxy statement relating to its 2025 Annual Meeting of Stockholders no later than 120 days after the end of its fiscal year, and certain portions of such proxy statement are incorporated by reference into Part III of this Annual Report on Form 10-K.

**TABLE OF CONTENTS**

| | PAGE |
|---|---|
| CAUTIONARY NOTE CONCERNING FORWARD-LOOKING STATEMENTS | 2 |
| SUMMARY OF RISK FACTORS | 3 |
| **PART I** | |
| ITEM 1. BUSINESS | 5 |
| ITEM 1A. RISK FACTORS | 9 |
| ITEM 1B. UNRESOLVED STAFF COMMENTS | 34 |
| ITEM 1C. CYBERSECURITY | 34 |
| ITEM 2. PROPERTIES | 34 |
| ITEM 3. LEGAL PROCEEDINGS | 41 |
| ITEM 4. MINE SAFETY DISCLOSURE | 41 |
| | |
| **PART II** | |
| ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 42 |
| ITEM 6. RESERVED | 43 |
| ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 43 |
| ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 60 |
| ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 60 |
| ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 60 |
| ITEM 9A. CONTROLS AND PROCEDURES | 60 |
| ITEM 9B. OTHER INFORMATION | 61 |
| ITEM 9C. DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS | 61 |
| | |
| **PART III** | |
| ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE | 61 |
| ITEM 11. EXECUTIVE COMPENSATION | 61 |
| ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 62 |
| ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE | 62 |
| ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES | 62 |
| | 62 |
| **PART IV** | |
| ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES | 62 |
| ITEM 16. FORM 10-K SUMMARY | 67 |

**CAUTIONARY NOTE CONCERNING FORWARD-LOOKING STATEMENTS**

Various statements contained in this Annual Report on Form 10-K, including those that express a belief, expectation or intention, as well as those that are not statements of historical fact, are forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements may include projections and estimates concerning the timing and success of specific projects and our future production, revenues, income and capital spending. Our forward-looking statements are generally accompanied by words such as "estimate," "project," "predict," "believe," "expect," "intend," "anticipate," "potential," "plan," "goal" or other words that convey the uncertainty of future events or outcomes. The forward-looking statements in this Annual Report on Form 10-K speak only as of the date of this Report; we disclaim any obligation to update these statements unless required by law, . We may not actually achieve the plans, intentions, or expectations disclosed in our forward-looking statements, and you should not place undue reliance on our forward-looking statements. We have based these forward-looking statements on our current expectations and assumptions about future events. While our management considers these expectations and assumptions to be reasonable, they are inherently subject to significant business, economic, competitive, regulatory, and other risks, contingencies and uncertainties, most of which are difficult to predict and many of which are beyond our control. These and other important factors, including those discussed under "Risk Factors," may cause our actual results, performance or achievements to differ materially from any future results, performance or achievements expressed or implied by these forward-looking statements. These risks, contingencies and uncertainties include, but are not limited to, the following:

- our dependency on two commercial leases with certain agencies of the City of New York, as a single government tenant in our office buildings, which could cause a material adverse effect on us, including our financial condition, results of operations and cash flow, with one lease terminating effective August 23, 2025 and the other lease expiring on December 27, 2025;

- the impact of the increase in inflation in the United States which could increase the cost of acquiring, replacing and operating our properties;

- market and economic conditions, affecting occupancy, rental rates, the overall market value of our properties, our access to capital and the cost of capital, and our ability to refinance indebtedness;

- economic or regulatory developments in New York City;

- changes in rent stabilization regulations or claims by tenants in rent-stabilized units that their rents exceed specified maximum amounts under current regulations;

- our ability to control operating costs to the degree anticipated;

- the risk of damage to our properties, including from severe weather, natural disasters, climate change, and terrorist attacks;

- risks related to financing, cost overruns, and fluctuations in occupancy rates and rents resulting from development or redevelopment activities and the risk that we may not be able to pursue or complete development or redevelopment activities or that such development or redevelopment activities may not be profitable;

- concessions or significant capital expenditures that may be required to attract and retain tenants;

- the relative illiquidity of real estate investments;

- competition affecting our ability to engage in investment and development opportunities or attract or retain tenants;

- unknown or contingent liabilities in properties acquired in formative and future transactions;

- the possible effects of departure of key personnel in our management team on our investment opportunities and relationships with lenders and prospective business partners;

- conflicts of interest faced by members of management relating to the acquisition of assets and the development of properties, which may not be resolved in our favor;

- a transfer of a controlling interest in any of our properties that may obligate us to pay transfer tax based on the fair market value of the real property transferred;

- our ability to maintain effective internal control over financial reporting;

- the need to establish litigation reserves, costs to defend litigation and unfavorable litigation settlements or judgments; and

- other risks and risk factors or uncertainties identified from time to time in our filings with the SEC.

You should read this Annual Report on Form 10-K and the documents that we reference in this Annual Report on Form 10-K and have filed as exhibits to this Annual Report on Form 10-K, completely and with the understanding that our actual future results may be materially different from what we expect. We qualify all of the forward-looking statements in this Annual Report on Form 10-K by these cautionary statements.

## SUMMARY OF RISK FACTORS

***Our business is subject to a number of risks, including risks that may prevent us from achieving our business objectives or may adversely affect our business, financial condition, liquidity, results of operations and prospects. These risks are discussed more fully in Item 1A. Risk Factors. These risks include, but are not limited to, the following:***

- We depend on two commercial leases with certain agencies of the City of New York (NYC), as a single government tenant in our office buildings, with one lease terminating effective August 23, 2025 and the other lease expiring on December 27, 2025. Our inability to replace NYC as a tenant at rent rates comparable to the rates in the lease that terminates in August 2025 or to negotiate a five-year extension of the lease expiring in December 2025 could cause a material adverse effect on us, including our financial condition, results of operations and cash flow.

- Unfavorable market and economic conditions in the United States and globally and in the specific markets or submarkets where our properties are located could adversely affect occupancy levels, rental rates, rent collections, operating expenses, and the overall market value of our assets, impair our ability to sell, recapitalize or refinance our assets and have an adverse effect on our results of operations, financial condition, cash flow and our ability to make distributions to our stockholders;

- Multifamily residential properties are subject to rent stabilization regulations, which limit our ability to raise rents above specified maximum amounts and could give rise to claims by tenants that their rents exceed such specified maximum amounts;

- All of our properties are located in New York City, and adverse economic or regulatory developments in New York City or parts thereof, including the boroughs of Brooklyn and Manhattan, could negatively affect our results of operations, financial condition, cash flow, and ability to make distributions to our stockholders;

- Our portfolio's revenue is currently generated from eight of our properties;

- We may be unable to renew leases or lease currently vacant space or vacating space on favorable terms or at all as leases expire or terminate, which could adversely affect our financial condition, results of operations and cash flow;

- The actual rents we receive for the properties in our portfolio may be less than market rents, and we may experience a decline in realized rental rates, which could adversely affect our financial condition, results of operations and cash flow. Short-term leases with respect to our residential tenants expose us to the effects of declining market rents;

- We engage in development and redevelopment activities, which could expose us to different risks that could adversely affect us, including our financial condition, cash flow and results of operations;

- We have in the past and we may be required to make rent or other concessions and/or significant capital expenditures to improve our properties in order to retain and attract tenants, generate positive cash flows or to make real estate properties suitable for sale, which could adversely affect us, including our financial condition, results of operations and cash flow;

- Real estate investments are relatively illiquid and may limit our flexibility;

- Competition could limit our ability to acquire attractive investment opportunities and increase the costs of those opportunities, which may adversely affect us, including our profitability, and impede our growth;

- Competition may impede our ability to attract or retain tenants or re-lease space, which could adversely affect our results of operations and cash flow;

- We may acquire properties or portfolios of properties through tax-deferred contribution transactions, which could result in stockholder dilution and limit our ability to sell such assets;

- Capital and credit market conditions, including higher interest rates, may adversely affect our access to various sources of capital or financing and/or the cost of capital, which could affect our business activities, dividends, earnings and common stock price, among other things;

- Increased inflation may have a negative effect on rental rates and our results of operations;

- Our subsidiaries may be prohibited from making distributions and other payments to us;.

- We are required to comply with Section 404 of the Sarbanes-Oxley Act of 2002, and our inability to maintain effective internal control over financial reporting in the future could result in investors losing confidence in the accuracy and completeness of our financial reports and negatively affect the market price of our common stock;

- Our continuing investors hold shares of our special voting stock that entitle them to vote together with holders of our common stock on an as-exchanged basis, based on their ownership of Class B LLC units in our predecessor entities, and are generally able to significantly influence the composition of our board of directors, our management and the conduct of our business;

- Conflicts of interest may exist or could arise in the future between the interests of our stockholders and the interests of holders of OP Units and of LLC units in our predecessor entities, which may impede business decisions that could benefit our stockholders;

- Our charter contains a provision that expressly permits our officers to compete with us;

- We have a substantial amount of indebtedness that may limit our financial and operating activities and may adversely affect our ability to incur additional debt to fund future needs;

- Changing interest rates could increase interest costs and adversely affect our cash flows and the market price of our securities;

- Mortgage debt obligations expose us to the possibility of foreclosure, which could result in the loss of our investment in a property or group of properties subject to mortgage debt;

- System failures or security incidents through cyberattacks, intrusions, or other methods could disrupt our information technology networks, enterprise applications, and related systems, cause a loss of assets or data, give rise to remediation or other expenses, expose us to liability under federal and state laws, and subject us to litigation and investigations, which could result in substantial reputational damage and adversely affect our business and financial condition.

- Failure to qualify or to maintain our qualification as a REIT would have significant adverse consequences to the value of our common stock; and

- Complying with the REIT requirements may cause us to forego otherwise attractive opportunities or liquidate certain of our investments.

PART I

**ITEM 1. BUSINESS**

*In this Annual Report on Form 10-K, when we use the terms the "Company," "Clipper Realty," "we," "us," or "our," unless the context otherwise requires, we are referring to Clipper Realty Inc. and its consolidated subsidiaries. Certain disclosures included in this Annual Report on Form 10-K constitute forward-looking statements that are subject to risks and uncertainties. See Item 1A, "Risk Factors," and "Cautionary Note Concerning Forward-Looking Statements."*

**Overview**

　　Clipper Realty Inc. is a self-administered and self-managed real estate company that acquires, owns, manages, operates and repositions multifamily residential and commercial properties in the New York metropolitan area, with a portfolio in Manhattan and Brooklyn. We were formed to continue and expand the commercial real estate business of the 50/53 JV LLC, a Delaware limited liability company, Renaissance Equity Holdings LLC, a Delaware limited liability company, Berkshire Equity LLC, a Delaware limited liability company, and Gunki Holdings LLC, a Delaware limited liability company (collectively referred to as, the "Predecessor" or the "predecessor entities"). These predecessor entities were formed by principals of our management team from 2002 to 2014. Our primary focus is to continue to own, manage and operate our portfolio, and to acquire and re-position additional multifamily residential and commercial properties in the New York metropolitan area.

　　We were incorporated in the State of Maryland on July 7, 2015. On August 3, 2015, we closed a private offering of shares of our common stock, in which we raised net proceeds of approximately $130.2 million. In connection with the private offering, we consummated a series of investment and other formation transactions that were designed, among other things, to enable us to qualify as a real estate investment trust, or a "REIT," for U.S. federal income tax purposes, and we elected to be treated as a REIT commencing with the taxable year ended December 31, 2015. We contributed the net proceeds of the private offering to Clipper Realty L.P., our operating partnership subsidiary, or the "Operating Partnership,", in exchange for units in the Operating Partnership.

　　On February 9, 2017, we priced an initial public offering, or the "IPO," of 6,390,149 primary shares of our common stock (including the exercise of the over-allotment option, which closed on March 10, 2017). The net proceeds of the IPO were approximately $78.7 million. We contributed the proceeds of the IPO to the Operating Partnership, in exchange for units in the Operating Partnership.

　　As of December 31, 2024, the properties owned by the Company consisted of the following:

- Tribeca House in Manhattan, comprising two buildings, one with 21 stories and one with 12 stories, containing residential and retail space with an aggregate of approximately 483,000 square feet of residential rental Gross Leasable Area ("GLA") and 77,000 square feet of retail rental and parking GLA;
- Flatbush Gardens in Brooklyn, a 59-building residential housing complex with 2,494 rentable units and approximately 1,749,000 square feet of residential rental GLA;
- 141 Livingston Street in Brooklyn, a 15-story office building with approximately 216,000 square feet of GLA;
- 250 Livingston Street in Brooklyn, a 12-story office and residential building with approximately 370,000 square feet of GLA (fully remeasured);
- Aspen in Manhattan, a 7-story building containing residential and retail space with approximately 166,000 square feet of residential rental GLA and approximately 21,000 square feet of retail rental GLA;
- Clover House in Brooklyn, a 11-story residential building with approximately 102,000 square feet of residential rental GLA;
- 10 West 65th Street in Manhattan, a 6-story residential building with approximately 76,000 square feet of residential rental GLA;
- 1010 Pacific Street in Brooklyn, a 9-story residential building with approximately 119,000 square feet of residential rental GLA; and
- The Dean Street property in Brooklyn, which the Company plans to redevelop as a 9-story residential building with approximately 160,000 square feet of residential rental GLA and approximately 9,000 square feet of retail rental GLA.

　　See "Descriptions of Our Properties" in Item 2 for a detailed discussion of the Company's properties.

These properties are located in the most densely populated major city in the United States, each with immediate access to mass transportation.

Our ownership interest in our initial portfolio of properties (Tribeca House, Flatbush Gardens, 141 Livingston Street and 250 Livingston Street) was acquired in the formation transactions in connection with the private offering of shares of our common stock on August 3, 2015. These properties are owned by the predecessor entities, which after the formation transactions are referred to as the "LLC subsidiaries." Upon completion of the private offering and the formation transactions described above, we assumed responsibility for managing the LLC subsidiaries, which are managed by us through the Operating Partnership. The Operating Partnership is the managing member of the LLC subsidiaries and owns Class A units in such LLC subsidiaries. The Operating Partnership's interests in the LLC subsidiaries generally entitle the Operating Partnership to all cash distributions from, and the profits and losses of, the LLC subsidiaries, other than the preferred distribution to the continuing investors who hold Class B LLC units in these LLC subsidiaries. In connection with the formation transactions, holders of interests in the predecessor entities received Class B LLC units in the LLC Subsidiaries and an equal number of special, non-economic, voting stock in the Company. The Class B LLC units, together with the special voting shares, are convertible into shares of our common stock on a one-for-one basis. As of December 31, 2024, the continuing investors owned an aggregate amount of 26,317,396 Class B LLC units, representing 62.0% of our common stock on a fully diluted basis. Accordingly, the Operating Partnership's interests in the LLC subsidiaries entitle it to receive 38.0% of the aggregate distributions from the LLC subsidiaries.

We have two reportable operating segments: residential rental properties and commercial rental properties. Our revenue consists primarily of rents received from our residential, commercial and, to a lesser extent, retail tenants. We derive approximately 74% of our revenues from rents received from residents in our apartment rental properties and the remainder from commercial and retail rental customers. As of December 31, 2024, agencies of the City of New York leased an aggregate of 548,580 rentable square feet of commercial space at our commercial office properties at 141 Livingston Street and 250 Livingston Street, representing approximately 22% of our total revenues for the year ended December 31, 2024.

As of February 23, 2024, the City of New York notified the Company of its intention to terminate its lease for 342,496 square feet of office space located at 240-250 Livingston Street effective August 23, 2025. The Lease generally provides for rent payments in the amount of $9.9 million through the end of the term. Additionally, the Company and the City of New York are negotiating the terms of a five-year extension of its current 206,084 square foot lease at 141 Livingston Street that expires in December of 2025. There can be no assurance that the negotiations will conclude with an agreement. The current lease at 141 Livingston Street provides for $10.3 million rent per annum.

**Business and Growth Strategies**

Our primary business objective is to enhance stockholder value by increasing cash flow from operations and total return to stockholders through the following strategies:

- Increase existing below-market rents – capitalize on the successful repositioning of our portfolio and solid market fundamentals to increase rents at several of our properties.

- Disciplined acquisition strategy – opportunistically acquire additional properties, with a focus on premier submarkets and assets, by utilizing the significant experience of our senior management team.

- Proactive asset and property management – utilize our proactive, service-intensive approach to help increase occupancy and rental rates and manage operating expenses.

- Redevelop assets – execute on our targeted capital program to selectively redevelop properties and achieve rent growth in an expedited fashion.

**Competitive Strengths**

We believe that the following competitive strengths distinguish us from other owners and operators of multifamily residential and commercial properties:

- Diverse portfolio of properties in the New York metropolitan area, which is characterized by supply constraints, high barriers to entry, near- and long-term prospects for job creation, vacancy absorption and long-term rental rate growth.

- Expertise in redeveloping and managing multifamily residential properties.

- Experienced management team with a proven track record over generations in New York real estate.

6

- Balance sheet well-positioned for future growth.

- Strong internal rent growth prospects.

**Regulation**

*Environmental and Related Matters*

Under various federal, state and local laws, ordinances and regulations, as a current or former owner and operator of real property, we may be liable for costs and damages resulting from the presence or release of hazardous substances (such as lead, asbestos and polychlorinated biphenyls), waste, petroleum products and other miscellaneous products (including but not limited to natural products such as methane and radon gas) at, on, in, under or from such property, including costs for investigation or remediation, natural resource damages or third-party liability for personal injury or property damage.

In addition, our properties are subject to various federal, state and local environmental and health and safety laws and regulations. As the owner or operator of real property, we may also incur liability based on various building conditions. We are not presently aware of any material liabilities related to building conditions, including any instances of material noncompliance with asbestos requirements or any material liabilities related to asbestos.

In addition, our properties may contain or develop harmful mold or suffer from other indoor air quality issues, which could lead to liability for adverse health effects or property damage, or costs for remediation. We are not presently aware of any material adverse indoor air quality issues at our properties.

*Americans with Disabilities Act and Similar Laws*

Our properties must comply with Title III of Americans with Disabilities Act of 1990 ("ADA") to the extent that such properties are "public accommodations" as defined by the ADA. We have not conducted a recent audit or investigation of all of our properties to determine our compliance with these or other federal, state or local laws. Noncompliance with the ADA could result in imposition of fines or an award of damages to private litigants. The obligation to make readily achievable accommodations is an ongoing one, and we will continue to assess our properties and to make alterations as appropriate in this respect.

*New York Regulation*

The Company and its properties are subject to government regulations including, but not limited to real property, rental and environmental regulations such as the New York State Real Property Law and the New York State Real Property Tax Law. Additionally, numerous municipalities, including New York City where our multi-family residential properties are located, impose rent control or rent stabilization on apartment buildings including, as discussed below, the Housing Stability and Tenant Protection Act of 2019 which affects rent-stabilized apartments in New York City. The update to the New York eviction laws for the so-called "Good Cause-Eviction" law limits evictions for certain tenants that failed to pay what is deemed "unreasonable" rent increases. The Americans With Disabilities Act requires us to meet federal requirements related to access and use by disabled persons and the FHAA (as defined below) requires our buildings to comply with design and construction requirements for disabled access. Our buildings are also subject to certain New York City environmental regulations which require us to meet certain environmental criteria over various periods of time.

7

**Environmental Social and Governance**

The health and safety of the Company's employees and their families remains a top priority, along with the health and safety of the Company's tenants and the communities they serve.

The Company has also been working to identify areas where it can improve the carbon footprint of its properties. This includes complying with NYC Local Law 97 (LL97) that requires most buildings over 25 thousand square feet meet stringent carbon emissions caps starting in 2024. As such, the Company has replaced certain roofs, including the upgrading of the roofing insulation, changed light fixtures to LED lighting and insulated building piping.

On June 29, 2023, the Company's Flatbush Gardens property entered into a 40 year regulatory agreement under Article 11 of the Private Housing Finance Law with the New York City Department of Housing Preservation and Development ( the "Article 11 Agreement"). The Company committed to maintain rents with existing area median income groups, to lease 249 units to formerly homeless families and provide certain services as units become vacant, committed to pay prevailing wage rates to employees of the property as defined under New York City regulations and committed to a 3-year capital improvements plan.

**Insurance**

We carry commercial general liability insurance coverage on our properties, with limits of liability customary within the industry to insure against liability claims and related defense costs. Similarly, we are insured against the risk of direct and indirect physical damage to our properties including coverage for the perils of flood and earthquake shock. Our policies also cover the loss of rental revenue during any reconstruction period. Our policies reflect limits and deductibles customary in the industry and specific to the buildings and portfolio. We also obtain title insurance policies when acquiring new properties, which insure fee title to our real properties. We currently have coverage for losses incurred in connection with both domestic and foreign terrorist-related activities. While we do carry commercial general liability insurance, property insurance and terrorism insurance with respect to our properties, these policies include limits and terms we consider commercially reasonable. In addition, there are certain losses (including, but not limited to, losses arising from known environmental conditions or acts of war) that are not insured, in full or in part, because they are either uninsurable or the cost of insurance makes it, in our belief, economically impractical to maintain such coverage. Should an uninsured loss arise against us, we would be required to use our own funds to resolve the issue, including litigation costs. In addition, for properties we may self-insure certain portions of our insurance program, and therefore, use our own funds to satisfy those limits, when applicable. We believe the policy specifications and insured limits are adequate given the relative risk of loss, the cost of the coverage and industry practice and, in the opinion of our management, the properties in our portfolio are adequately insured.

**Competition**

The leasing of real estate is highly competitive in Manhattan, Brooklyn and the greater New York metropolitan market in which we operate. We compete with numerous acquirers, developers, owners and operators of commercial and residential real estate, many of which own or may seek to acquire or develop properties similar to ours in the same markets in which our properties are located. The principal means of competition are rents charged, location, services provided and the nature and condition of the facility to be leased.

In addition, we face competition from numerous developers, real estate companies and other owners and operators of real estate for buildings for acquisition and pursuing buyers for dispositions. We expect competition from other real estate investors, including other REITs, private real estate funds, domestic and foreign financial institutions, life insurance companies, pension trusts, partnerships, individual investors and others, that may have greater financial resources or access to capital than we do or that are willing to acquire properties in transactions which are more highly leveraged or are less attractive from a financial viewpoint than we are willing to pursue.

8

**Human Capital Resources**

As of December 31, 2024, we had 171 employees who provide property management, maintenance, landscaping, construction management and accounting services. Certain of these employees are covered by union-sponsored, collectively bargained, multiemployer defined benefit pension and profit-sharing plans, and health insurance, legal and training plans. Contributions to the plans are determined in accordance with the provisions of the negotiated labor contracts. The Local 94 International Union of Operating Engineers contract is in effect through December 31, 2026. The Local 32BJ Service Employees International Union apartment building contract is in effect through April 20, 2026. The Local 32BJ Service Employees International Union commercial building contract in effect through December 31, 2027. The Building Maintenance Employees Union, Local 486 contract is in effect through February 28, 2026.

The Company believes that its success is dependent upon the diverse backgrounds of its employees and strives to build a culture that is collaborative, diverse, supportive and inclusive. In furtherance of that goal, the Company provides diversity equity and inclusion training as part of its annual harassment training for both supervisors and non-supervisors.

The Company places a high value on the physical and mental health of its employees. The Company provides employees with competitive compensation and a wide range of benefits including comprehensive medical and dental insurance coverage, short and long-term disability benefits, a 401(K) retirement program with matching, vacation, sick and personal leave, flexible work arrangements, flexible savings accounts, and other benefits.

**Company Information**

Our principal executive offices are located at 4611 12th Avenue, Brooklyn, New York 11219. Our current facilities are adequate for our present and future operations. Our telephone number is (718) 438-2804. Our website address is *www.clipperrealty.com*. We are not including the information contained on our website as a part of, or incorporating it by reference into, this Annual Report on Form 10-K. Our electronic filings with the SEC (including annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K, and any amendments to these reports), including the exhibits, are available free of charge through our website as soon as reasonably practicable after we electronically file them with or furnish them to the SEC.

**ITEM 1A. RISK FACTORS**

*Set forth below are certain risk factors that could harm our business, results of operations and financial condition. You should carefully read the following risk factors, together with the financial statements, related notes and other information contained in this Annual Report on Form 10-K. Our business, financial condition and operating results may suffer if any of the following risks are realized. If any of these risks or uncertainties occur, the trading price of our common stock could decline and you might lose all or part of your investment. This Annual Report on Form 10-K contains forward-looking statements that involve risks see "Cautionary Note Concerning Forward-Looking Statements."*

**Risks Related to Real Estate**

***We depend on two commercial leases with certain agencies of the City of New York (NYC), as a single government tenant in our office buildings, with one lease terminating effective August 23, 2025 and the other lease expiring on December 27, 2025. Our inability to replace NYC as a tenant at rent rates comparable to the rates in the lease that terminates in August 2025 or to negotiate a five-year extension of the lease expiring in December 2025 could cause a material adverse effect on us, including our financial condition, results of operations and cash flow.***

Our rental revenue depends on entering into leases with and collecting rents from tenants. As of December 31, 2024, Kings County Court, the Human Resources Administration, and the Department of Environmental Protection, all of which are agencies of the City of New York, leased an aggregate of 548,580 rentable square feet of commercial space at our commercial office properties at 141 Livingston Street and 250 Livingston Street, the rents from which represented approximately 22% of our total revenues for the year-ended December 31, 2024. We are also subject to covenants covering these leases in our loan agreements related to our commercial office properties located at 250 Livingston Street and 141 Livingston Street. Breaches of these covenants could result in defaults under the loan agreements.

As of February 23, 2024, The City of New York, a municipal corporation acting through the Department of Citywide Administrative Services ("NYC"), notified us of its intention to terminate its lease at 250 Livingston Street effective August 23, 2025. The lease generally provides for rent payments in the amount of $15.4 million per annum. We may be unable to replace NYC as a tenant or unable to replace it with other commercial tenants at comparable rent rates, may incur substantial costs to improve the vacated space or may have to offer significant inducements to fill the space, all of which may have an adverse effect on our financial condition, results of operations and cash flow. In connection with the termination of the 250 Livingston Street lease, pursuant to the terms of the loan agreement related to $125 million building mortgage, we have established a cash management account for the benefit of the lender, into which we will be obligated to deposit all revenue generated by the building at 250 Livingston Street. All amounts remaining in such cash management account after the lender's allocations set forth in the loan agreement will be disbursed to us once the tenant cure conditions are satisfied under the loan agreement. As of February 14, 2025, we are required to deposit into such cash management account approximately $5.7 million upon demand by the lender. If we are unable to replace the NYC lease at comparable rents, we may not be able to cure the conditions listed in the loan agreement. If the excess cash is not released to us, it could impact our available cash to fund corporate operations and pay dividends and distributions to our stockholders.

9

On January 2, 2025, we were notified that the loan servicing of the loan related to the 250 Livingston Street property was transferred, at our request, to LNR Partners ("LNR") to serve as special servicer in order for us to engage in negotiations on a modification of our loan. On January 6, 2025, we and LNR signed a Pre-Negotiation Letter Agreement to discuss our request for a reduction in the loan. These negotiations continue and there can be no guarantee that they will conclude with an agreement.

The 141 Livingston Street lease expires on December 27, 2025, and if NYC were to decide not to renew or extend such lease on its stated termination date, pursuant to the terms of the lease, we would be at risk of not being able to replace NYC as a tenant, leasing the space below the current rates, incurring costs to improve the space or offer other inducements to fill the space, all of which may have an adverse effect on our financial condition, results of operations and cash flow. We and NYC are in the process of negotiating the terms of a five-year extension of the current lease upon its expiration in December 2025. There can be no assurance that the negotiations will conclude with an agreement.

Our subsidiary, 141 Livingston Owner LLC (the "Borrower") and Citi Real Estate Funding Inc. entered into the loan agreement related to a $100 million loan. The loan is evidenced by promissory mortgage notes and secured by the 141 Livingston Street property. We and our Operating Partnership subsidiary serve as limited guarantors of certain obligations under the loan, including those related to the reserve monthly deposit discussed below.

If we are not able to extend or replace the NYC lease at our 141 Livingston Street property for a minimum of a five-year term, we will be required to either fund a reserve account in the amount of $10 million payable in equal monthly payments over the 18 months after lease expiration or deliver to the lender a letter of credit in the amount of $10 million

On October 28, 2024, we received notice that, as of October 7, 2024, the servicing of the mortgage notes was transferred to a special servicer (the "Special Servicer") due to our alleged failure to make certain required payments under the loan agreement, including, but not limited to, the reserve deposit starting on July 7, 2024. The Special Servicer demanded that we pay (i) $2.2 million of reserve payments into a reserve account immediately (for July-October 2024) and continued monthly payments of $555,555 for an additional 14 months, (ii) $1.2 million of default interest and late charges through October 7, 2024, and (iii) an additional $10,417 per diem interest for each day thereafter.

On November 11, 2024, the Special Servicer notified the Borrower that, due to its alleged event of default under the Loan Agreement, as a result of the failure to make the payments described above, the mortgage notes have been accelerated, and all amounts under the loan agreement were due and payable. Such amounts include, but are not limited to, $100.0 million principal amount of the mortgage notes, approximately $5.0 million of default yield maintenance premium, $10.0 million aggregate reserve deposit, and the above-described penalty default interest and penalties.

We believe that (i) we have made timely payments under the loan agreement, (ii) the servicer and the Special Servicer have misinterpreted the terms of the loan agreement requiring monthly reserve payments beginning on July 7, 2024, (iii) we have no current obligation to make such reserve payments under the loan agreement and (iv) we should not be obligated to pay the default interest and late charges. We and the Special Servicer have entered into a pre-negotiation agreement and as such are engaged in good faith discussions regarding the terms of the loan agreement related to the monthly reserve deposit, among other matters. However, if we are unable to resolve this matter in a manner favorable to us, the lender may also seek to exercise any of its other rights or remedies under the loan agreement.

On December 18, 2024, we received notice from the Special Servicer that due to its allegation that Clipper Realty (the "Guarantor") did not maintain a net worth of not less than $100 million as of December 31, 2022 and 2023, respectively, as required under the loan agreement, we are in default on the loan. We replied to the Special Servicer disputing such calculation and alleging that the Special Servicer did not calculate net worth in a reasonable manner. We provided the Special Servicer with our own calculation of net worth that shows a net worth in excess of the required amount. We await a response from the Special Servicer.

On January 21, 2025, we received notice from the Special Servicer alleging that certain elements of our insurance on the building at 141 Livingston Street are not in compliance with the loan agreement requirements, including, but not limited to, due to a deductible in excess of what is permitted under the terms of the loan agreement and the use of an insurance carrier with a rating agency rating below that which is permitted under the terms of the loan agreement.

***Unfavorable market and economic conditions in the United States and globally and in the specific markets or submarkets where our properties are located could adversely affect occupancy levels, rental rates, rent collections, operating expenses, and the overall market value of our assets, impair our ability to sell, recapitalize or refinance our assets and have an adverse effect on our results of operations, financial condition, cash flow and our ability to make distributions to our stockholders.***

Unfavorable market conditions in the areas in which we operate and unfavorable economic conditions in the United States and/or globally may significantly affect our occupancy levels, rental rates, rent collections, operating expenses, the market value of our assets and our ability to strategically acquire, dispose, recapitalize or refinance our properties on economically favorable terms or at all. Our ability to lease our properties at favorable rates may be adversely affected by increases in supply of commercial, retail and/or residential space in our markets and is dependent upon overall economic conditions, which are adversely affected by, among other things, job losses and increased unemployment levels, recession, stock market volatility and uncertainty about the future. Some of our major expenses, including mortgage payments and real estate taxes, generally do not decline when related rents decline. We expect that any declines in our occupancy levels, rental revenues and/or the values of our buildings would cause us to have less cash available to pay our indebtedness, fund necessary capital expenditures and make distributions to our stockholders, which could negatively affect our financial condition and the market value of our common stock. Our business may be affected by volatility and illiquidity in the financial and credit markets, a general global economic recession and other market or economic challenges experienced by the real estate industry or the U.S. economy as a whole. Our business may also be adversely affected by local economic conditions, as all of our revenue is currently derived from properties located in New York City, with our entire portfolio located in Manhattan and Brooklyn.

Factors that may affect our occupancy levels, our rental revenues, our income from operations, our funds from operations ("FFO"), our adjusted funds from operations ("AFFO"), our adjusted earnings before interest, income tax, depreciation and amortization ("Adjusted EBITDA"), our net operating income ("NOI"), our cash flow and/or the value of our properties include the following, among others:

- downturns in global, national, regional and local economic and demographic conditions;

- the Housing Stability and Tenant Protection Act of 2019, which was signed into law in New York in June 2019, as well as other rent control or stabilization laws, or other laws regulating rental housing, which could prevent us from raising rents to offset increases in operating costs;

- declines in the financial condition of our tenants, which may result in tenant defaults under leases due to bankruptcy, lack of liquidity, operational failures or other reasons, and declines in the financial condition of buyers and sellers of properties;

- declines in local, state and/or federal government budgets and/or increases in local, state and/or federal government budget deficits, which among other things could have an adverse effect on the financial condition of our only office tenant, the agencies of the City of New York, and may result in tenant defaults under leases and/or cause such tenant to seek alternative office space arrangements;

- the inability or unwillingness of our tenants to pay rent increases, or our inability to collect rents and other amounts due from our tenants;

- significant job losses in the industries in which our commercial and/or retail tenants operate, and/or from which our residential tenants derive their incomes, which may decrease demand for our commercial, retail and/or residential space, causing market rental rates and property values to be affected negatively;

- an oversupply of, or a reduced demand for, commercial and/or retail space and/or apartment homes;

- declines in household formation;

- unfavorable residential mortgage rates;

- changes in market rental rates in our markets and/or the attractiveness of our properties to tenants, particularly as our buildings continue to age, and our ability to fund repair and maintenance costs;

- competition from other available commercial and/or retail lessors and other available apartments and housing alternatives, and from other real estate investors with significant capital, such as other real estate operating companies, other REITs and institutional investment funds;

- economic conditions that could cause an increase in our operating expenses, such as increases in property taxes (particularly as a result of increased local, state and national government budget deficits and debt and potentially reduced federal aid to state and local governments), utilities, insurance, compensation of on-site personnel and routine maintenance;

- opposition from local community or political groups with respect to the development and/or operations at a property;

- investigation, removal or remediation of hazardous materials or toxic substances at a property;

- changes in, and changes in enforcement of, laws, regulations and governmental policies, including without limitation, health, safety, environmental and zoning laws; and

- changes in rental housing subsidies provided by the government and/or other government programs that favor single-family rental housing or owner-occupied housing over multifamily rental housing.

***Multifamily residential properties are subject to rent stabilization regulations, which limit our ability to raise rents above specified maximum amounts and could give rise to claims by tenants that their rents exceed such specified maximum amounts.***

Numerous municipalities, including New York City where our multi-family residential properties are located, impose rent control or rent stabilization on apartment buildings. The rent stabilization regulations applicable to our multifamily residential properties set maximum rates for annual rent increases, entitle our tenants to receive required services from us and entitle our tenants to have their leases renewed. On June 14, 2019, the Housing Stability and Tenant Protection Act of 2019 was signed into law in New York State. The legislation affects rent-stabilized apartments in New York City. Provisions of the law make it extremely difficult for apartments to exit rent regulation, repeal vacancy decontrol and high-income deregulation, repeal vacancy and longevity bonuses, establish a preferential rent as the base rent at lease renewal, and reduce / limit rent increases associated with major capital improvements and individual apartment improvements. The new law took effect immediately, is permanent and reduces the Company's ability to raise rents on its rent-stabilized units. The legislation generally limits a landlord's ability to increase rents on rent-regulated apartments and makes it more difficult to convert rent-regulated apartments to market-rate apartments. As a result, the value of our portfolio may be impaired and our stock price may decline.

In addition, we are subject to claims from tenants that the rent charged by us exceeds the amount permitted by rent stabilization. Although we believe that all of our rents are compliant with applicable rent stabilization regulation, tenants have in the past made claims that their rents exceed the maximum rent that could be charged under rent stabilization. These claims include claims that the annual increases in the maximum rent have in the past been inapplicable as a result of a failure to provide essential services by us or the prior owners. The number of these claims may increase as our rents approach the maximum rent that could be charged under rent stabilization. Tenants could also claim that our determination that luxury deregulation was applicable to their apartment was incorrect and seek a reduction in rent and/or return of rents paid in excess of the maximum legal rent. Finally, a tenant in an apartment eligible for tax benefits, such as Section 421-g of the Real Property Tax Law, could claim that rent stabilization applies to the tenant's apartment while those tax benefits are available, even if the apartment is eligible for luxury deregulation. For example, in 2016 and later, certain present and former tenants of apartment units at our Tribeca House properties brought an action against the Company alleging that they were subject to applicable rent stabilization laws. For more information regarding these claims, see "Legal Proceedings."

The application of rent stabilization to apartments in our multifamily residential properties limits the amount of rent we are able to collect, which may have a material adverse effect on our cash flows and our ability to fully take advantage of the investments that we are making in our properties.

On April 20, 2024, New York eviction laws were updated to enact the Good Cause Eviction Law (Good Cause), which dramatically impacts the rights and obligations of landlords and tenants in New York by limiting evictions, requiring lease renewals, and capping rent increases for most market rate apartments in New York City, and potentially, other villages, towns, or cities state-wide. Good Cause is effective immediately and will apply to all new leases and renewal leases, unless exempted, in New York City and to any other villages, towns, or cities that chose to opt-in to the law.

Under Good Cause, unless an exemption applies, landlords are now subject to various limitations on seeking to remove a tenant from a residential unit, unless there is good cause to do so. The law listed what is considered Good Cause, including rent that is not unreasonable. This law generally restricts the amount the landlord can increase rents.

***All of our properties are located in New York City, and adverse economic or regulatory developments in New York City or parts thereof, including the boroughs of Brooklyn and Manhattan, could negatively affect our results of operations, financial condition, cash flow, and ability to make distributions to our stockholders.***

All of our properties are located in New York City, with all of our current portfolio being in the boroughs of Manhattan and Brooklyn. As a result, our business is dependent on the condition of the economy in New York City and the views of potential tenants regarding living and working in New York City, which may expose us to greater economic risks than if we owned a more geographically diverse portfolio. We are susceptible to adverse developments in New York City, such as business layoffs or downsizing, industry slowdowns, relocations of businesses, terror attacks, increases in real estate and other taxes, increases in costs of complying with governmental regulations and/or increased regulation such as the Housing Stability and Tenant Protection Act of 2019, which was signed into law in New York in June 2019 and the so-called Good Cause Eviction law that was signed into law in New York in April of 2024. Such adverse developments could materially reduce the value of our real estate portfolio and our rental revenues, and thus adversely affect our ability to meet our debt obligations and to make distributions to our stockholders.

***Our portfolio's revenue is currently generated from eight properties.***

As of December 31, 2024, our portfolio consisted of nine properties, eight of which generated revenues in 2024 – the Tribeca House properties, the Flatbush Gardens complex, the 141 Livingston Street property, the 250 Livingston Street property, the Aspen property, the 10 West 65th Street property, the Clover House property and the 1010 Pacific Street property, which accounted for 28.2%, 31.3%, 11.1%, 12.1%, 4.8%, 2.7%, 5.5% and 4.3%, respectively, of our portfolio's total revenue for the year ended December 31, 2024. Our results of operations and cash available for distribution to our stockholders would be adversely affected if any of these properties were materially damaged or destroyed.

***We may be unable to renew leases or lease currently vacant space or vacating space on favorable terms or at all as leases expire or terminate, which could adversely affect our financial condition, results of operations and cash flow.***

As of December 31, 2024, we had approximately 65,696 rentable square feet of vacant residential space (excluding leases signed but not yet commenced) at our operating properties, and leases representing approximately 69% of the square footage of residential space at the operating properties will expire during the year ending December 31, 2025 (including month-to-month leases). As of December 31, 2024, we had no vacant commercial space, and approximately 13,000 rentable square feet of vacant retail space. We cannot assure you that expiring leases will be renewed or tenants will not exercise any early termination options or that our properties will be re-leased at net effective rental rates equal to or above the current average net effective rental rates

As of February 23, 2024, NYC notified us of its intention to terminate its lease at 250 Livingston Street effective August 23, 2025. As of that date, 342,496 of rentable square feet of commercial space will be available.

Additionally, the 206,084 square foot lease with the City of New York at 141 Livingston Street property will expire at December 27, 2025. We and the NYC are negotiating the terms of a five-year extension of the current lease. There can be no assurance that the negotiations will conclude with an agreement.

If the rental rates for our commercial and/or residential space decrease, our existing commercial tenants do not renew their leases or exercise early termination options or we do not re-lease a significant portion of our available and soon-to-be-available commercial and/or residential space, our financial condition, results of operations, cash flow, the market value of our common stock and our ability to satisfy our debt obligations and to make distributions to our stockholders would be adversely affected.

***The actual rents we receive for the properties in our portfolio may be less than market rents, and we may experience a decline in realized rental rates, which could adversely affect our financial condition, results of operations and cash flow. Short-term leases with respect to our residential tenants expose us to the effects of declining market rents.***

As a result of potential factors, including competitive pricing pressure in our markets, a general economic downturn and the desirability of our properties compared to other properties in our markets, we may be unable to realize market rents across the properties in our portfolio. In addition, depending on market rental rates at any given time as compared to expiring or terminating leases in our portfolio, from time-to-time rental rates for expiring or terminating leases may be higher than starting rental rates for new leases. A majority of our apartment leases are for a term of one year. Because these leases generally permit the residents to leave at the end of the lease term without penalty, our rental revenues for residential space in our properties are affected by declines in market rents more quickly than if those leases were for longer terms. If we are unable to obtain sufficient rental rates across our portfolio, then our ability to generate cash flow growth will be negatively affected.

***We engage in development and redevelopment activities, which could expose us to different risks that could adversely affect us, including our financial condition, cash flow and results of operations.***

We engage in development and redevelopment activities with respect to our properties as we believe market conditions dictate. For example, in 2023 we completed the development of the 1010 Pacific Street property and plan to develop the Dean Street property as fully amenitized residential rental buildings. We are also reviewing the regulatory, architectural and financial considerations regarding a residential square footage expansion at Flatbush Gardens; such further development would require significant capital investment.

If we engage in these activities, we will be subject to certain risks, which could adversely affect us, including our financial condition, cash flow and results of operations. These risks include, without limitation:

- the availability and pricing of financing on favorable terms or at all;

- the availability and timely receipt of zoning and other regulatory approvals;

- the potential for the fluctuation of occupancy rates and rents at development and redeveloped properties, which may result in our investment not being profitable;

- startup, development and redevelopment costs may be higher than anticipated;

- cost overruns and untimely completion of construction (including risks beyond our control, such as weather or labor conditions or material shortages); and

- changes in the pricing and availability of buyers and sellers of such properties.

These risks could result in substantial unanticipated delays or expenses and could prevent the initiation or the completion of development and redevelopment activities, any of which could have an adverse effect on our financial condition, results of operations, cash flow, the market value of our common stock and our ability to satisfy our debt obligations and to make distributions to our stockholders.

*We have in the past and we may be required to make rent or other concessions and/or significant capital expenditures to improve our properties to retain and attract tenants, generate positive cash flows or to make real estate properties suitable for sale, which could adversely affect us, including our financial condition, results of operations and cash flow.*

In the event that there are adverse economic conditions in the real estate market and demand for commercial, retail and/or residential space decreases with respect to our current vacant space and as leases at our properties expire or terminate, we may be required to increase tenant improvement allowances or concessions to tenants, accommodate increased requests for renovations, build-to-suit remodeling (with respect to our commercial and retail space) and other improvements or provide additional services to our tenants, all of which could negatively affect our cash flow. If the necessary capital is unavailable, we may be unable to make these potentially significant capital expenditures. This could result in non-renewals by tenants upon expiration or early termination of their leases and our vacant space remaining untenanted, which could adversely affect our financial condition, results of operations, cash flow and the market value of our common stock.

*Our dependence on rental revenue may adversely affect us, including our profitability, our ability to meet our debt obligations and our ability to make distributions to our stockholders.*

Our income is derived from rental revenue from real property. As a result, our performance depends on our ability to collect rent from tenants. Our income and funds for distribution would be adversely affected if a significant number of our tenants, or any of our major tenants:

- delay lease commencements;

- decline to extend or renew leases upon expiration or exercise rights of early termination;

- fail to make rental payments when due; or

- declare bankruptcy.

Any of these actions could result in the termination of such tenants' leases with us and the loss of rental revenue attributable to the terminated leases. In these events, we cannot assure you that such tenants will renew those leases or not exercise early termination options or that we will be able to re-lease spaces on economically advantageous terms or at all. For example, the City of New York has advised us that it will vacate the 250 Livingston Street property in August 2025. The loss of rental revenues from our tenants and our inability to replace such tenants may adversely affect us, including our profitability, our ability to meet our debt and other financial obligations and our ability to make distributions to our stockholders.

*Reimbursements from government agencies under the Article 11 Agreement might be lower than expected and costs to implement the mandatory capital improvements might be higher than expected.*

On June 29, 2023, our Flatbush Gardens property entered into a 40- year regulatory agreement under Article 11 of the Private Housing Finance Law with the New York City Department of Housing Preservation and Development (the "Article 11 Agreement"). The Article 11 Agreement made us eligible for incremental assistance payments under section 610 of the Private Housing Financing Law for tenants receiving governmental rental assistance ("Section 610 Benefits"). Section 610 Benefits are provided under current New York State Law and are subject to change via legislation or regulation. In addition, the number of eligible tenants may be reduced if they no longer receive governmental rental assistance. costs. Under the Article 11 Agreement, we also entered into a Housing Repair and Maintenance Letter Agreement ("HRMLA") in which we agreed to perform certain capital improvements to Flatbush Gardens over the next three years. The current estimate is that the costs of that work will be an amount up to $27 million. Although we expect those costs to be offset by the savings provided under the Article 11 Agreement by property tax exemption and enhanced payments for tenants receiving government assistance, these costs are subject to market costs for construction materials and labor and may increase beyond current expectations.

14

*Real estate investments are relatively illiquid and may limit our flexibility.*

Equity real estate investments are relatively illiquid, which may tend to limit our ability to react promptly to changes in economic or other market conditions. Our ability to dispose of assets in the future will depend on prevailing economic and market conditions. Our inability to sell our properties on favorable terms or at all could have an adverse effect on our sources of working capital and our ability to satisfy our debt obligations. In addition, real estate can at times be difficult to sell quickly at prices we find acceptable. The Internal Revenue Code, as amended (the "Code"), also imposes restrictions on REITs, which are not applicable to other types of real estate companies, regarding the disposal of properties. These potential difficulties in selling real estate in our markets may limit our ability to change, or reduce our exposure to, the properties in our portfolio promptly in response to changes in economic or other conditions.

*Competition could limit our ability to acquire attractive investment opportunities and increase the costs of those opportunities, which may adversely affect us, including our profitability, and impede our growth.*

We compete with numerous commercial developers, real estate companies and other owners and operators of real estate for properties for acquisition and pursuing buyers for dispositions. We expect that other real estate investors, including insurance companies, private equity funds, sovereign wealth funds, pension funds, other REITs and other well-capitalized investors, will compete with us to acquire existing properties and to develop new properties. Our markets are each generally characterized by high barriers-to-entry to construction and limited land on which to build new commercial, retail and residential space, which contribute to the competition we face to acquire existing properties and to develop new properties in these markets. This competition could increase prices for properties of the type we may pursue and adversely affect our profitability and impede our growth.

*Competition may impede our ability to attract or retain tenants or re-lease space, which could adversely affect our results of operations and cash flow.*

The leasing of real estate in our markets is highly competitive. The principal means of competition are rents charged, location, services provided and the nature and condition of the premises to be leased. The number of competitive properties in our markets, which may be newer or better located than our properties, could have an adverse effect on our ability to lease space at our properties and on the effective rents that we are able to charge. If other lessors and developers of similar spaces in our markets offer leases at prices comparable to or less than the prices we offer, we may be unable to attract or retain tenants or re-lease space in our properties, which could adversely affect our results of operations and cash flow.

*We are subject to potential losses that are either uninsurable, not economically insurable or that are in excess of our insurance coverage.*

Our properties are located in areas that could be subject to, among other things, flood and windstorm losses. Insurance coverage for flood and windstorms can be costly because of limited industry capacity. As a result, we may experience shortages in desired coverage levels if market conditions are such that insurance is not available or the cost of insurance makes it, in our belief, economically impractical to maintain such coverage. In addition, our properties may be subject to a heightened risk of terrorist attacks. We carry commercial general liability insurance, property insurance and terrorism insurance with respect to our properties with limits and on terms we consider commercially reasonable. We cannot assure you, however, that our insurance coverage will be sufficient or that any uninsured loss or liability will not have an adverse effect on our business and our financial condition and results of operations.

*We are subject to risks from natural disasters such as severe weather.*

Natural disasters and severe weather such as hurricanes or floods may result in significant damage to our properties. The extent of our casualty losses and loss in operating income in connection with such events is a function of the severity of the event and the total amount of exposure in the affected area. With our geographic concentration of exposures, a single catastrophe or destructive weather event (such as a hurricane) affecting New York City may have a significant negative effect on our financial condition, results of operations and cash flows. As a result, our operating and financial results may vary significantly from one period to the next. Our financial results may be adversely affected by our exposure to losses arising from natural disasters or severe weather. We also are exposed to risks associated with inclement winter weather, including increased need for maintenance and repair of our buildings.

15

*Actual or threatened terrorist attacks may adversely affect our ability to generate revenues and the value of our properties.*

All of our properties are located in New York City, which has been and may in the future be the target of actual or threatened terrorist attacks. As a result, some tenants in these markets may choose to relocate their businesses or homes to other markets or buildings within New York City that may be perceived to be less likely to be affected by future terrorist activity. This could result in an overall decrease in the demand for commercial, retail and/or residential space in these markets generally or in our properties in particular, which could increase vacancies in our properties or necessitate that we lease our properties on less favorable terms, or both. In addition, future terrorist attacks in these markets could directly or indirectly damage our properties, both physically and financially, or cause losses that materially exceed our insurance coverage. As a result of the foregoing, our ability to generate revenues and the value of our properties could decline materially.

*We may become subject to liability relating to environmental and health and safety matters, which could have an adverse effect on us, including our financial condition, cash flows and results of operations.*

Under various federal, state and/or local laws, ordinances and regulations, as a current or former owner or operator of real property, we may be liable for costs and damages resulting from the presence or release of hazardous substances (such as lead, asbestos and polychlorinated biphenyls), waste, petroleum products and other miscellaneous products (including but not limited to natural products such as methane and radon gas) at, on, in, under or from such property, including costs for investigation or remediation, natural resource damages, or third-party liability for personal injury or property damage. These laws often impose liability without regard to whether the owner or operator knew of, or was responsible for, the presence or release of such materials, and the liability may be joint and several. Some of our properties may be affected by contamination arising from current or prior uses of the property or from adjacent properties used for commercial, industrial or other purposes. Such contamination may arise from spills of petroleum or hazardous substances or releases from tanks used to store such materials. We also may be liable for the costs of remediating contamination at off-site disposal or treatment facilities when we arrange for disposal or treatment of hazardous substances at such facilities, without regard to whether we comply with environmental laws in doing so. The presence of contamination or the failure to remediate contamination on our properties may adversely affect our ability to attract and/or retain tenants and our ability to develop or sell or borrow against those properties. In addition to potential liability for cleanup costs, private plaintiffs may bring claims for personal injury, property damage or for similar reasons. Environmental laws also may create liens on contaminated sites in favor of the government for damages and costs it incurs to address such contamination. Moreover, if contamination is discovered on our properties, environmental laws may impose restrictions on the manner in which that property may be used or how businesses may be operated on that property.

In addition, our properties are subject to various federal, state and local environmental and health and safety laws and regulations. Noncompliance with these environmental and health and safety laws and regulations could subject us or our tenants to liability. These liabilities could affect a tenant's ability to make rental payments to us. Moreover, changes in laws could increase the potential costs of compliance with such laws and regulations or increase liability for noncompliance. This may result in significant unanticipated expenditures or may otherwise adversely affect our operations and/or cash flow, or those of our tenants, which could in turn have an adverse effect on us.

As the owner or operator of real property, we may also incur liability based on various building conditions. For example, buildings and other structures on properties that we currently own or those we acquire or operate in the future contain, may contain, or may have contained, asbestos-containing material ("ACM"). Environmental and health and safety laws require that ACM be properly managed and maintained and may impose fines or penalties on owners, operators or employers for non-compliance with those requirements. These requirements include special precautions, such as removal, abatement or air monitoring, if ACM would be disturbed during maintenance, renovation or demolition of a building, potentially resulting in substantial costs. In addition, we may be subject to liability for personal injury or property damage sustained as a result of exposure to ACM or releases of ACM into the environment.

In addition, our properties may contain or develop harmful mold or suffer from other indoor air quality issues. Indoor air quality issues also can stem from inadequate ventilation, chemical contamination from indoor or outdoor sources, and other biological contaminants such as pollen, viruses and bacteria. Indoor exposure to airborne toxins or irritants can be alleged to cause a variety of adverse health effects and symptoms, including allergic or other reactions. As a result, the presence of significant mold or other airborne contaminants at any of our properties could require us to undertake a costly remediation program to contain or remove the mold or other airborne contaminants or to increase ventilation. In addition, the presence of significant mold or other airborne contaminants could expose us to liability from our tenants or others if property damage or personal injury occurs.

16

We cannot assure you that costs or liabilities incurred as a result of environmental issues will not affect our ability to make distributions to our stockholders or that such costs, liabilities, or other remedial measures will not have an adverse effect on our financial condition, results of operations and cash flows.

***We may incur significant costs complying with the ADA and similar laws (including but not limited to the Fair Housing Amendments Act of 1988 ("FHAA") and the Rehabilitation Act of 1973), which could adversely affect us, including our future results of operations and cash flows.***

Under the ADA, all public accommodations must meet federal requirements related to access and use by disabled persons. The FHAA requires apartment communities first occupied after March 13, 1991, to comply with design and construction requirements for disabled access. For projects receiving federal funds, the Rehabilitation Act of 1973 also has requirements regarding disabled access. We have not conducted a recent audit or investigation of all of our properties to determine our compliance with these or other federal, state or local laws. If one or more of our properties were not in compliance with such laws, then we could be required to incur additional costs to bring the property into compliance. We cannot predict the ultimate amount of the cost of compliance with such laws. Noncompliance with these laws could also result in the imposition of fines or an award of damages to private litigants. Substantial costs incurred to comply with such laws, as well as fines or damages resulting from actual or alleged noncompliance with such laws, could adversely affect us, including our future results of operations and cash flows.

***As we increase rents and improve our properties, we could become the target of public scrutiny and investigations similar to the public scrutiny and investigations that other apartment landlords in Brooklyn and other neighborhoods in the New York metropolitan area have experienced, which could lead to negative publicity and require that we expend significant resources to defend ourselves, all of which could adversely affect our operating results and our ability to pay distributions to our stockholders.***

Apartment landlords in gentrifying neighborhoods in Brooklyn and other parts of the New York metropolitan area have come under public scrutiny, and in a few cases have been the subject of civil and criminal investigations, for their alleged treatment of tenants who cannot afford the rent increases that often result from neighborhood gentrification and landlord improvements to properties. As disclosed in Note 8, "Commitments and Contingencies", Clipper Equity was the subject of an investigation by the Office of the Attorney General of the State of New York with respect to its activities, and in April 2022 entered into an Assurance of Discontinuance with the OAG to resolve the investigation on behalf of itself and its affiliates. It is possible that we or members of our management team could come under additional similar public scrutiny or become the target of additional similar investigations, which could lead to negative publicity and require that we expend significant resources to defend ourselves, all of which could adversely affect our operating results and our ability to pay distributions to our stockholders. In addition, if we or our affiliates violate the Assurance of Discontinuance or future regulatory orders or consent decrees, we could be subject to substantial monetary fines and other penalties that could seriously harm our business.

***We may acquire properties or portfolios of properties through tax-deferred contribution transactions, which could result in stockholder dilution and limit our ability to sell such assets.***

In the future, we may acquire properties or portfolios of properties through tax-deferred contribution transactions in exchange for partnership interests in our operating partnership, which may result in stockholder dilution. This acquisition structure may have the effect of, among other things, reducing the amount of tax depreciation we could deduct over the tax life of the acquired properties, and may require that we agree to protect the contributors' ability to defer recognition of taxable gain through restrictions on our ability to dispose of the acquired properties and/or the allocation of partnership debt to the contributors to maintain their tax bases. These restrictions could limit our ability to sell an asset at a time, or on terms, that would be favorable absent such restrictions.

***From time to time, we may enter into joint venture relationships or other arrangements regarding the joint ownership of property. Our investments in and through such arrangements could be adversely affected by our lack of sole decision-making authority regarding major decisions, our reliance on our joint venture partners' financial condition, any disputes that may arise between us and our joint venture partners and our exposure to potential losses from the actions of our joint venture partners. Risks associated with joint venture arrangements may include but are not limited to the following:***

- our joint venture partners might experience financial distress, become bankrupt or fail to fund their share of required capital contributions, which may delay construction or development of a property or increase our financial commitment to the joint venture;

- we may be responsible to our partners for indemnifiable losses;

- our joint venture partners may have business interests or goals with respect to a property that conflict with our business interests and goals (including as relates to compliance with the REIT requirements), which could increase the likelihood of disputes regarding the ownership, management or disposition of the property;

- we may be unable to take actions that are opposed by our joint venture partners under arrangements that require us to share decision-making authority over major decisions affecting the ownership or operation of the joint venture and any property owned by the joint venture, such as the sale or financing of the property or the making of additional capital contributions for the benefit of the property;

- our joint venture partners may take actions that we oppose;

- our ability to sell or transfer our interest in a joint venture to a third party without prior consent of our joint venture partners may be restricted;

- we may disagree with our joint venture partners about decisions affecting a property or a joint venture, which could result in litigation or arbitration that increases our expenses, distracts our officers and directors and disrupts the day-to-day operations of the property, including by delaying important decisions until the dispute is resolved;

- we may suffer losses as a result of actions taken by our joint venture partners with respect to our joint venture investments; and

- in the event that we obtain a minority position in a joint venture, we may not have significant influence or control over such joint venture or the performance of our investment therein.

***If there is a transfer of a controlling interest in any of our properties (or in the entities through which we hold our properties), issuances of our common stock in exchange for Class B LLC units pursuant to the exchange right granted to holders of Class B LLC units, sales of Class B LLC units by the holders thereof or the issuance of LLC interests to our Operating Partnership, we may be obligated to pay New York City and New York State transfer tax based on the fair market value of the New York City and/or New York State real property transferred.***

Subject to certain exceptions, New York City and New York State impose a tax on the transfer of New York City and/or New York State real property or the transfer of a controlling interest in New York City and/or New York State real property, generally at a current, maximum combined rate of 3.275% of the fair market value of the New York City and/or New York State real property. A direct or indirect transfer of a 50% or greater interest in any of our properties (or in the entities that own our properties) generally would constitute a transfer of a controlling interest in real property. Certain aggregation rules apply in determining whether a transfer of a controlling interest has occurred. For example, transfers made within a three-year period generally are presumed to be aggregated. Therefore, a transfer of a controlling interest could occur as a result of the combination of one or more of the private offering, other offerings of common stock by us resulting of an increase in our investment in the entities that own our properties, issuances of our common stock to our continuing investors in exchange for Class B LLC units pursuant to the exchange right granted to holders of Class B LLC units, sales of Class B LLC units by the holders thereof, the issuance of LLC interests to our Operating Partnership in connection with the private offering or a subsequent offering of our stock, or as a result of any combination of such transfers being aggregated. In addition to any transfer tax that may be imposed upon us, we have agreed with our continuing investors to pay any such transfer taxes imposed upon a continuing investor as a result of the private offering and the related formation transactions (including subsequent issuances of additional LLC units or interests, issuances of units by the Operating Partnership ("OP Units") or issuances of our common stock by the Company), issuances of our common stock in exchange for Class B LLC units, dispositions of property by any LLC subsidiary, the issuance of LLC interests to our Operating Partnership in connection with a subsequent offering of our stock, or as a result of any combination of such transfers being aggregated. If a transfer of a controlling interest in an entity owning our properties occurs, New York City and/or New York State transfer tax could be payable based on the fair market value of the New York City and/or New York State property at the time of each such transfer (including any transfers that are treated as a part of the transfer of the controlling interest that occur prior to the transfer that caused the 50% threshold to be met). For example, if exchanges of Class B LLC units resulted in our ownership of the entities that own our properties increasing to greater than 50%, we could be subject to New York City and New York State transfer tax at a current, maximum combined rate of 3.275% of the fair market value of such New York City and/or New York State properties. In addition, we may or may not be eligible to take advantage of the 50% reduction to the New York City and New York State transfer tax rates that could apply with respect to transfers of real property to certain REITs.

Risks Related to Our Business and Operations

***Capital and credit market conditions, including higher interest rates, may adversely affect our access to various sources of capital or financing and/or the cost of capital, which could affect our business activities, dividends, earnings and common stock price, among other things.***

In periods when the capital and credit markets experience significant volatility, the amounts, sources and cost of capital available to us may be adversely affected. We primarily use third-party financing to fund acquisitions of properties and to refinance indebtedness as it matures. As of December 31, 2024, we had no corporate debt and $1,275.4 million in property-level debt. See Note 4 of the accompanying "Notes to Consolidated Financial Statements" for a discussion of the Company's property-level debt. If sufficient sources of external financing are not available to us on cost-effective terms, we could be forced to limit our acquisition, development and redevelopment activities and/or take other actions to fund our business activities and repayment of debt, such as selling assets, reducing our cash dividend or paying out less than 100% of our taxable income. To the extent that we are able and/or choose to access capital at a higher cost than we have experienced in recent years (reflected in higher interest rates for debt financing or a lower stock price for equity financing), our earnings per share and cash flow could be adversely affected. In addition, the price of our common stock may fluctuate significantly and/or decline in a high interest rate or volatile economic environment. If economic conditions deteriorate, the ability of lenders to fulfill their obligations under working capital or other credit facilities that we may have in the future may be adversely affected.

***Increased inflation may have a negative effect on rental rates and our results of operations.***

Substantial inflationary pressures could have a negative effect on rental rates and property operating expenses. The U.S. economy is currently experiencing high rates of inflation, which has increased our operating expenses due to higher third-party vendor costs and increased our interest expense due to higher interest rates on our variable rate debt. Although the short-term nature of our apartment leases generally enables us to compensate for inflationary effects by increasing rents, inflation could outpace any increases in rent and adversely affect us. We may not be able to mitigate the effects of inflation and related impacts, and the duration and extent of any prolonged periods of inflation, and any related adverse effects on our results of operations and financial condition, are unknown at this time. Additionally, inflation may also increase the costs to complete our development projects, including costs of materials, labor and services from third-party contractors and suppliers. Higher construction costs could adversely impact our investments in real estate assets and our expected returns on development projects.

***We may from time to time be subject to litigation or government investigations that could have an adverse effect on our financial condition, results of operations, cash flow and the market value of our common stock.***

We are a party to various claims and routine litigation arising in the ordinary course of business and are subject to government oversight and actions. Some of these claims and actions or others to which we may be subject from time to time may result in defense costs, settlements, fines or judgments against us, some of which are not, or cannot be, covered by insurance. Payment of any such costs, settlements, fines or judgments that are not insured could have an adverse effect on our financial position and results of operations. Adverse developments in existing litigation claims legal proceedings or government investigations involving us or new claims or investigations could require us to establish litigation reserves, enter into unfavorable settlements or satisfy judgments for monetary damages for amounts in excess of current reserves, which could adversely affect our financial results. In addition, certain litigation or the resolution of certain litigation or investigations may affect the availability or cost of some of our insurance coverage, which could adversely affect our results of operations and cash flow, expose us to increased risks that would be uninsured, and/or adversely affect our ability to attract officers and directors. See Note 7, "Commitments and Contingencies" of our consolidated financial statements included in Item 15 of this Annual Report on Form 10-K.

***Our subsidiaries may be prohibited from making distributions and other payments to us.***

All of our properties are owned indirectly by subsidiaries, in particular our LLC subsidiaries, and substantially all of our operations are conducted by our Operating Partnership. As a result, we depend on distributions and other payments from our Operating Partnership and subsidiaries in order to satisfy our financial obligations and make payments to our investors. The ability of our subsidiaries to make such distributions and other payments depends on their earnings and cash flow and may be subject to statutory or contractual limitations. See "Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity and Capital Resources — Property-Level Debt." As an equity investor in our subsidiaries, our right to receive assets upon their liquidation or reorganization will be effectively subordinated to the claims of their creditors. To the extent that we are recognized as a creditor of such subsidiaries, our claims may still be subordinate to any security interest in, or other lien on, their assets and to any of such subsidiaries' debt or other obligations that are senior to our claims.

***We are required to comply with Section 404 of the Sarbanes-Oxley Act of 2002, and our inability to maintain effective internal control over financial reporting in the future could result in investors losing confidence in the accuracy and completeness of our financial reports and negatively affect the market price of our common stock.***

As a public company, we are required to maintain internal control over financial reporting and to report any material weaknesses in such internal controls. Our compliance with the requirements of Section 404 of the Sarbanes-Oxley Act has been and will continue to be time-consuming. Further, the costs associated with compliance with and implementation of procedures under these and future laws and related rules could have a material impact on our results of operations.

If we fail to maintain the adequacy of our internal control over financial reporting in the future, we will not be able to conclude on an ongoing basis that we have effective internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act. Any failure to achieve and maintain an effective system of internal control could result in materially misstated consolidated financial statements and a failure to meet our reporting obligations, which would likely cause investors to lose confidence in our reported financial information. This could result in significant expenses to remediate any internal control deficiency and lead to a decline in the price of our common stock.

***We are a smaller reporting company and, because we have opted to use the reduced reporting requirements available to us, certain investors may find investing in our securities less attractive.***

As a smaller reporting company, we are permitted to comply with scaled-back disclosure obligations in our SEC filings compared to other issuers, including with respect to disclosure obligations regarding executive compensation in our periodic reports and proxy statements. We have elected to adopt the accommodations available to smaller reporting companies. Until we cease to be a smaller reporting company or elect not to adopt such accommodations, the scaled-back disclosure in our SEC filings will result in less information about our company being available than for other public companies. If investors consider our common shares less attractive as a result of our election to use the scaled-back disclosure permitted for smaller reporting company, there may be a less active trading market for our common shares and our share price may be more volatile.

***If our information technology networks or data, or those of third parties upon which we rely, are or were disrupted or otherwise compromised, we could experience costly remediation or other expenses, liability under federal and state laws, and litigation and investigations, any of which could result in substantial reputational damage and materially and adversely affect our business, financial condition, results of operations, cash flows, and the market price of our common stock.***

Information technology, communication networks, enterprise applications, and related systems, including those in our properties, are essential to the operation of our business. In the ordinary course of our business, we use these systems to service our tenants, manage our tenant and vendor relationships, internal communications, accounting, financial reporting, and record-keeping systems, and many other key aspects of our business. These operations rely on the secure collection, storage, transmission, and other processing of confidential and other information in our computer systems and networks and subject us, and the third parties upon which we rely, to a variety of evolving threats, including, but not limited to ransomware attacks, which could cause security incidents.

Cyberattacks, malicious Internet-based activity, online and offline fraud, and other similar activities threaten the confidentiality, integrity, and availability of our confidential, proprietary, and sensitive data and information technology systems, and those of the third parties upon which we rely. Such threats are prevalent and continue to rise, are increasingly difficult to detect, and come from a variety of sources, including traditional computer "hackers," threat actors, "hacktivists," organized criminal threat actors, our personnel (such as through theft or misuse), sophisticated nation states, and nation-state-supported actors.

We rely on certain third-party service providers to operate our business. Our ability to monitor these third parties' information security practices is limited, and these third parties may not have adequate information security measures in place. If our third-party service providers experience a security incident or other interruption, we could experience adverse consequences. While we may be entitled to damages if our third-party service providers fail to satisfy their data privacy or security-related obligations to us, any award may be insufficient to cover our damages, or we may be unable to recover such award. In addition, supply chain attacks have increased in frequency and severity, and we cannot guarantee that third parties' infrastructure in our supply chain or our third-party partners' supply chains have not been compromised.

We take steps to monitor and develop our information technology networks and infrastructure, but we may not be able to detect and remediate all vulnerabilities because the threats and techniques used to exploit the vulnerability change frequently and are often sophisticated in nature. Therefore, such vulnerabilities could be exploited but may not be detected until after a security incident has occurred. Undetected and/or unremedied critical vulnerabilities that are exploited could pose material risks to our business. Further, we may experience delays in developing and deploying remedial measures designed to address any such identified vulnerabilities.

Furthermore, the extent of a particular cyberattack and the steps that we may need to take to investigate the attack may not be immediately clear. Therefore, in the event of an attack, it may take a significant amount of time before such an investigation can be completed. During an investigation, we may not necessarily know the extent of the damage incurred or how best to remediate it, and certain errors or actions could be repeated or compounded before they are discovered and remediated, which could further increase the costs and consequences of a cyberattack. Additionally, applicable data privacy and security obligations may require us to notify relevant stakeholders of security incidents. Such disclosures are costly, and the disclosure or the failure to comply with such disclosure requirements could lead to adverse consequences.

Risks Related to Our Organization and Structure

*Our continuing investors hold shares of our special voting stock that entitle them to vote together with holders of our common stock on an as-exchanged basis, based on their ownership of Class B LLC units in our predecessor entities, and are generally able to significantly influence the composition of our board of directors, our management and the conduct of our business.*

Our continuing investors hold shares of our special voting stock, which generally allows them to vote together as a single class with holders of our common stock on all matters brought before our common stockholders, including the election of directors, on an as-exchanged basis, as if our continuing investors had exchanged their Class B LLC units in our predecessor entities and shares of our special voting stock for shares of our common stock. As a result, our continuing investors are generally entitled to exercise 69.8% of the voting power in our Company. Even though none of our continuing investors is, by himself or together with his affiliates, entitled to exercise a majority of the total voting power in our Company, for so long as any continuing investor continues to be entitled to exercise a significant percentage of our voting power, our continuing investors are generally able to significantly influence the composition of our board of directors and the approval of actions requiring stockholder approval, and have significant influence with respect to our management, business plans and policies, including appointing and removing our officers, issuing additional shares of our common stock and other equity securities, paying dividends, incurring additional debt, making acquisitions, selling properties or other assets, acquiring or merging with other companies and undertaking other extraordinary transactions. In any of these matters, any of our continuing investors may have interests that differ or conflict with the interests of our other stockholders, and they may exercise their voting power in a manner that is not consistent with the interests of other stockholders. For so long as our continuing investors continue to own shares of our stock entitling them to exercise a significant percentage of our voting power, the concentration of voting power in our continuing investors may discourage unsolicited acquisition proposals and may delay, defer or prevent any change of control of our Company that might involve a premium price for holders of our common stock or otherwise be in their best interest.

22

***The ability of stockholders to control our policies and effect a change of control of our Company is limited by certain provisions of our charter and bylaws and by Maryland law.***

Certain provisions in our charter and bylaws may discourage a third party from making a proposal to acquire us, even if some of our stockholders might consider the proposal to be in their best interests. These provisions include the following:

- Our continuing investors hold shares of our special voting stock and shares of our common stock that generally entitle them to exercise 69.8% of the voting power in our Company, including in connection with a merger or other acquisition of our Company or a change in the composition of our board of directors. As a result, our continuing investors as a group or individually could delay, defer or prevent any change of control of our Company and, as a result, adversely affect our stockholders' ability to realize a premium for their shares of common stock.

- Our charter authorizes our board of directors to, without common stockholder approval, amend our charter to increase or decrease the aggregate number of our authorized shares of stock or the authorized number of shares of any class or series of our stock, authorize us to issue additional shares of our common stock or preferred stock and classify or reclassify unissued shares of our common stock or preferred stock and thereafter authorize us to issue such classified or reclassified shares of stock. We believe these charter provisions provide us with increased flexibility in structuring possible future financings and acquisitions and in meeting other needs that might arise. The additional classes or series, as well as the additional authorized shares of our common stock, will be available for issuance without further action by our common stockholders, unless such action is required by applicable law or the rules of any stock exchange or automated quotation system on which our securities may be listed or traded. Although our board of directors does not currently intend to do so, it could authorize us to issue a class or series of stock that could, depending upon the terms of the particular class or series, delay, defer or prevent a transaction or a change of control of our Company that might involve a premium price for holders of our common stock or that our common stockholders otherwise believe to be in their best interests.

- In order to qualify as a REIT, not more than 50% in value of our outstanding stock may be owned, directly or indirectly, by or for five or fewer individuals (as defined in the Code to include certain entities such as private foundations) at any time during the last half of any taxable year (beginning with our second taxable year as a REIT). In order to help us qualify as a REIT, among other reasons, our charter generally prohibits any person or entity from owning or being deemed to own by virtue of the applicable constructive ownership provisions, more than 9.8% in value or number of shares, whichever is more restrictive, of the outstanding shares of any class or series of our common stock or 9.8% of the aggregate value of all our outstanding stock. We refer to these restrictions as the "ownership limit." The ownership limit may prevent or delay a change in control and, as a result, could adversely affect our stockholders' ability to realize a premium for their shares of common stock.

- The provisions in our charter regarding the removal of directors and the advance notice provisions of our bylaws, among others, could delay, defer or prevent a transaction or a change of control of our Company that might involve a premium price for holders of our common stock or otherwise be in their best interest.

23

In addition, certain provisions of the Maryland General Corporation Law ("MGCL") may have the effect of deterring a third party from making a proposal to acquire us or of impeding a change of control under circumstances that otherwise could provide the holders of shares of our common stock with the opportunity to realize a premium over the then-prevailing market price of such shares, including the Maryland business combination and control share provisions. These provisions include the following:

- The "business combination" provisions of the MGCL, subject to limitations, prohibit certain business combinations between us and an "interested stockholder" (defined generally as any person who beneficially owns 10% or more of our then-outstanding voting shares or an affiliate or associate of ours who, at any time within the two-year period prior to the date in question, was the beneficial owner of 10% or more of our then-outstanding voting shares) or an affiliate of an interested stockholder for five years after the most recent date on which the stockholder becomes an interested stockholder and, thereafter, imposes special appraisal rights and supermajority stockholder approval requirements on these combinations. As permitted by the MGCL, our board of directors has adopted a resolution exempting any business combinations between us and any other person or entity from the business combination provisions of the MGCL, if such business combination is approved by our board of directors, including a majority of our directors who are not affiliated or associated with the interested stockholder.

- The "control share" provisions of the MGCL provide that "control shares" of a Maryland corporation (defined as shares which, when aggregated with all other shares controlled by the stockholder (except solely by virtue of a revocable proxy), entitle the stockholder to exercise one of three increasing ranges of voting power in electing directors) acquired in a "control share acquisition" (or the direct or indirect acquisition of ownership or control of control shares) have no voting rights unless approved by a supermajority vote of our stockholders excluding the acquirer of control shares, our officers and our directors who are also our employees. As permitted by the MGCL, our bylaws contain a provision exempting from the control share acquisition provisions of the MGCL any and all acquisitions by any person of shares of our stock.

- Title 3, Subtitle 8 of the MGCL permits our board of directors, without stockholder approval and regardless of what is currently provided in our charter or bylaws, to implement certain takeover defenses, including adopting a classified board.

Each item discussed above may have the effect of deterring a third party from making an acquisition proposal for us or may delay, deter or prevent a change in control of our Company, even if a proposed transaction is at a premium over the then-current market price for our common stock. Further, these provisions may apply in instances where some stockholders consider a transaction beneficial to them. As a result, our stock price may be negatively affected by these provisions.

***Our board of directors may change our policies without stockholder approval.***

Our policies, including any policies with respect to investments, leverage, financing, growth, debt and capitalization, will be determined by our board of directors or those committees or officers to whom our board of directors may delegate such authority. Our board of directors will also establish the amount of any dividends or other distributions that we may pay to our stockholders. Our board of directors or the committees or officers to which such decisions are delegated have the ability to amend or revise these and our other policies at any time without stockholder approval. For example, we previously established a policy for our target leverage ratio in a range of 45% to 55%. Under the policy, our leverage ratio may be greater than or less than the target range from time to time and our board of directors may amend our target leverage ratio range at any time without stockholder approval. Accordingly, while not intending to do so, we may adopt policies that may have an adverse effect on our financial condition, results of operations, ability to pay dividends or make other distributions to our stockholders and the market value of our common stock.

24

***Conflicts of interest may exist or could arise in the future between the interests of our stockholders and the interests of holders of OP Units and of LLC units in our predecessor entities, which may impede business decisions that could benefit our stockholders.***

Conflicts of interest may exist or could arise in the future as a result of the relationships between us and our affiliates, on the one hand, and our Operating Partnership or any of its partners or our predecessor entities and their members, on the other. Our directors and officers have duties to our Company under Maryland law in connection with their management of our Company. At the same time, we, as the general partner of our Operating Partnership, and our Operating Partnership, as managing member of our predecessor entities, have fiduciary duties and obligations to our Operating Partnership and its limited partners and our predecessor entities and their members under Delaware and New York law, the partnership agreement of our Operating Partnership in connection with the management of our Operating Partnership, and the limited liability company agreements of our predecessor entities in connection with the management of those entities. Our fiduciary duties and obligations as the general partner of our Operating Partnership and managing member of our predecessor entities may come into conflict with the duties of our directors and officers to our Company. We have adopted policies that are designed to eliminate or minimize certain potential conflicts of interest, and the members of our predecessor entities have agreed that, in the event of a conflict in the duties owed by us to our stockholders and the fiduciary duties owed by our Operating Partnership, in its capacity as managing member of our predecessor entities, to such members, we may give priority to the separate interests of our Company or our stockholders, including with respect to tax consequences to limited partners, LLC members, assignees or our stockholders. Nevertheless, the duties and obligations of the general partner of our Operating Partnership and the duties and obligations of the managing member of our predecessor entities may come into conflict with the duties of our directors and officers to our Company and our stockholders.

***Our charter contains a provision that expressly permits our officers to compete with us.***

Our officers have outside business interests and may compete with us for investments in properties and for tenants. There is no assurance that any conflicts of interest created by such competition will be resolved in our favor. Our charter provides that we renounce any interest or expectancy in, or right to be offered or to participate in, any business opportunity identified in any investment policy or agreement with any of our officers unless the policy or agreement contemplates that the officer must present, communicate or offer such business opportunity to us. We have adopted an Investment Policy that provides that our officers, including David Bistricer, JJ Bistricer and Jacob Schwimmer, are not required to present certain identified investment opportunities to us, including assets located outside the New York metropolitan area, for-sale condominium or cooperative conversions, development projects, projects that would require us to obtain guarantees from third parties or to backstop obligations of other parties, and land acquisitions. As a result, except to the extent that our officers must present certain identified business opportunities to us, our officers have no duty to refrain from engaging, directly or indirectly, in the same business activities or similar business activities or lines of business in which we or our subsidiaries engage or propose to engage or to refrain from otherwise competing with us. These individuals also may pursue acquisition opportunities that may be complementary to our business, and, as a result, those acquisition opportunities may not be available to us. These provisions may limit our ability to pursue business or investment opportunities that we might otherwise have had the opportunity to pursue, which could have an adverse effect on our financial condition, our results of operations, our cash flow, the market value of our common stock and our ability to meet our debt obligations and to make distributions to our stockholders.

***We may have assumed unknown liabilities in connection with the formation transactions, which, if significant, could adversely affect our business.***

As part of the formation transactions, we acquired indirect interests in the properties and assets of our predecessor entities, subject to existing liabilities, some of which may have been unknown at the time the private offering was consummated. As part of the formation transactions, each of the predecessor entities made limited representations, warranties and covenants to us regarding the predecessor entities and their assets. Because many liabilities, including tax liabilities, may not have been identified, we may have no recourse for such liabilities. Any unknown or unquantifiable liabilities to which the properties and assets previously owned by our predecessor entities are subject could adversely affect the value of those properties and as a result adversely affect us. See "Risks Related to Real Estate" for discussion as to the possibility of undisclosed environmental conditions potentially affecting the value of the properties in our portfolio.

***We may pursue less vigorous enforcement of terms of employment agreements with certain of our executive officers, which could negatively impact our stockholders.***

Certain of our executive officers, including David Bistricer, JJ Bistricer and Jacob Schwimmer, are party to employment agreements with us. We may choose not to enforce, or to enforce less vigorously, our rights under these agreements because of our desire to maintain our ongoing relationships with members of our senior management or our board of directors and their affiliates, with possible negative impact on stockholders. Moreover, these agreements were not negotiated at arm's length and in the course of structuring the formation transactions, certain of our executive officers had the ability to influence the types and level of benefits that they receive from us under these agreements.

***David Bistricer, our Co-Chairman of the board of directors and Chief Executive Officer, and Sam Levinson, our Co-Chairman of the board of directors and Head of the Investment Committee, have outside business interests that will take their time and attention away from us, which could materially and adversely affect us. In addition, notwithstanding the Investment Policy, members of our senior management may in certain circumstances engage in activities that compete with our activities or in which their business interests and ours may be in conflict.***

David Bistricer, our Co-Chairman of the board of directors and Chief Executive Officer, Sam Levinson our Co-Chairman of the board of directors and Chairman of the Investment Committee, , and other members of our senior management team continue to own interests in properties and businesses that were not contributed to us in the formation transactions. For instance, each of David Bistricer, our Co-Chairman of the board of directors and Chief Executive Officer, and JJ Bistricer, our Chief Operating Officer, is an officer of Clipper Equity and each of Sam Levinson, our Co-Chairman of the board of directors and Chairman of the Investment Committee, and Jacob Schwimmer, our Chief Property Management Officer, has ownership interests in Clipper Equity. Clipper Equity owns interests in, and controls and manages entities that own interests in, multifamily and commercial properties in the New York metropolitan area.

We have adopted an Investment Policy that provides that our officers, including David Bistricer, JJ Bistricer and Jacob Schwimmer, are not required to present certain identified investment opportunities to us, including assets located outside the New York metropolitan area, for-sale condominium or cooperative conversions, development projects, projects that would require us to obtain guarantees from third parties or to backstop obligations of other parties, and land acquisitions. As a result, except to the extent that our officers must present certain identified business opportunities to us, our officers have no duty to refrain from engaging, directly or indirectly, in the same business activities or similar business activities or lines of business in which we or our subsidiaries engage or propose to engage or to refrain from otherwise competing with us, and therefore may compete with us for investments in properties and for tenants. These individuals also may pursue acquisition opportunities that may be complementary to our business, and, as a result, those acquisition opportunities may not be available to us.

We and members of our senior management may also determine to enter into joint ventures or co-investment relationships with respect to one or more properties. As a result of the foregoing, there may at times be a conflict between the interests of members of our senior management and our business interests. Further, although David Bistricer, JJ Bistricer and Jacob Schwimmer will devote such portion of their business time and attention to our business as is appropriate and will be compensated on that basis, under their employment agreements, they will also devote substantial time to other business and investment activities.

***We may experience conflicts of interest with certain of our directors and officers and significant stockholders as a result of their tax positions.***

David Bistricer, our Co-Chairman of the board of directors and Chief Executive Officer, and Sam Levinson, our Co-Chairman of the board of directors and Chairman of the Investment Committee may be subject to tax on a disproportionately large amount of the built-in gain that would be realized upon the sale or refinancing of certain properties. David Bistricer and Sam Levinson may therefore influence us to not sell or refinance certain properties, even if such sale or refinancing might be financially advantageous to our stockholders, or to enter into tax deferred exchanges with the proceeds of such sales when such a reinvestment might not otherwise be in our best interest, as they may wish to avoid realization of their share of the built-in gains in those properties. Alternatively, to avoid realizing such built-in gains, they may have to agree to additional reimbursements or guarantees involving additional financial risk.

***We hold a portion of our cash and cash equivalents in deposit accounts that could be adversely affected if the financial institutions holding such deposits fail.***

We maintain our cash and cash equivalents at insured financial institutions. The combined account balances at each institution periodically exceed the FDIC insurance coverage of $250,000, and, as a result, there is a concentration of credit risk related to amounts in excess of FDIC insurance coverage. We do not have any bank accounts, loans to or from, or any other amounts due to or from any other recently failed financial institution, nor have we experienced any losses to date on our cash and cash equivalents held in bank accounts. However, there is no assurance that financial institutions in which we hold our cash and cash equivalents will not fail, in which case we may be subject to a risk of loss or delay in accessing all or a portion of our funds exceeding the FDIC insurance coverage, which could adversely impact our short-term liquidity, ability to operate our business, and financial performance.

**Risks Related to Our Indebtedness and Financing**

***We have a substantial amount of indebtedness that may limit our financial and operating activities and may adversely affect our ability to incur additional debt to fund future needs.***

As of December 31, 2024, we had $1,275.4 million of total indebtedness, all of which was property-level debt. See Note 4 of the accompanying "Notes to Consolidated Financial Statements" for a discussion of the Company's property-level debt.

Payments of principal and interest on borrowings may leave us with insufficient cash resources to operate our properties, fully implement our capital expenditure, acquisition and redevelopment activities, or meet the REIT distribution requirements imposed by the Code. Our level of debt and the limitations imposed on us by our debt agreements could have significant adverse consequences, including the following:

- require us to dedicate a substantial portion of cash flow from operations to the payment of principal, and interest on, indebtedness, thereby reducing the funds available for other purposes;

- make it more difficult for us to borrow additional funds as needed or on favorable terms, which could, among other things, adversely affect our ability to meet operational needs;

- force us to dispose of one or more of our properties, possibly on unfavorable terms (including the possible application of the 100% tax on income from prohibited transactions) or in violation of certain covenants to which we may be subject;

- subject us to increased sensitivity to interest rate increases;

- make us more vulnerable to economic downturns, adverse industry conditions or catastrophic external events;

- limit our ability to withstand competitive pressures;

- limit our ability to refinance our indebtedness at maturity or result in refinancing terms that are less favorable than the terms of our original indebtedness;

- reduce our flexibility in planning for or responding to changing business, industry and economic conditions; and/or

- place us at a competitive disadvantage to competitors that have relatively less debt than we have.

If any one of these events were to occur, our financial condition, results of operations, cash flow and the market value of our common stock could be adversely affected. Furthermore, foreclosures could create taxable income without accompanying cash proceeds, which could hurt our ability to meet the REIT distribution requirements imposed by the Code.

*Changing interest rates could increase interest costs and adversely affect our cash flows and the market price of our securities.*

We currently have, and expect to incur in the future, interest-bearing debt at rates that vary with market interest rates. As of December 31, 2024, we had approximately $140.0 million of variable rate indebtedness outstanding, for our Dean Street development property and our 10 West 65th Street property, which constitutes approximately 11.0% of total outstanding indebtedness as of such date, and we have experienced increases in the interest rates on such indebtedness, which has increased our interest expense and adversely impacted our results of operations and cash flows. Continued increases in interest rates would further increase our interest expense and increase the cost of refinancing existing indebtedness and of issuing new debt. The effect of prolonged interest rate increases could negatively impact our ability to service our indebtedness, make distributions and make acquisitions and develop properties.

*Our tax protection agreement requires our Operating Partnership to maintain certain debt levels that otherwise would not be required to operate our business.*

Under our tax protection agreement, we undertake that our LLC subsidiaries will maintain a certain level of indebtedness and, in the case that level of indebtedness cannot be maintained, we are required to provide our continuing investors the opportunity to guarantee debt. If we fail to maintain such debt levels, or fail to make such opportunities available, we will be required to deliver to each applicable continuing investor a cash payment intended to approximate the continuing investor's tax liability resulting from our failure and the tax liabilities incurred as a result of such tax protection payment. We agreed to these provisions in order to assist our continuing investors in deferring the recognition of taxable gain as a result of and after the formation transactions. These obligations require us to maintain more or different indebtedness than we would otherwise require for our business.

*We may not have sufficient cash flow to meet the required payments of principal and interest on our debt or to pay distributions on our common stock at expected levels.*

In the future, our cash flow could be insufficient to meet required payments of principal and interest or to pay distributions on our shares at expected levels. In this regard, we note that in order for us to qualify as a REIT, we are required to make annual distributions generally equal to at least 90% of our taxable income, computed without regard to the dividends paid deduction and excluding net capital gain. In addition, as a REIT, we will be subject to U.S. federal income tax to the extent that we distribute less than 100% of our taxable income (including capital gains) and will be subject to a 4% nondeductible excise tax on the amount by which our distributions in any calendar year are less than a minimum amount specified by the Code. These requirements and considerations may limit the amount of our cash flow available to meet required principal and interest payments.

If we are unable to make required payments on indebtedness that is secured by a mortgage on our property, the asset may be transferred to the lender resulting in the loss of income and value to us, including adverse tax consequences related to such a transfer.

*Mortgage debt obligations expose us to the possibility of foreclosure, which could result in the loss of our investment in a property or group of properties subject to mortgage debt.*

Incurring mortgage and other secured debt obligations increases our risk of property losses because defaults on indebtedness secured by property may result in foreclosure actions initiated by lenders and ultimately our loss of the property securing any loans for which we are in default. Any foreclosure on a mortgaged property or group of properties could adversely affect the overall value of our portfolio of properties. For tax purposes, a foreclosure of any of our properties that is subject to a nonrecourse mortgage loan would be treated as a sale of the property for a purchase price equal to the outstanding balance of the debt secured by the mortgage. If the outstanding balance of the debt secured by the mortgage exceeds our tax basis in the property, we would recognize taxable income on foreclosure, but would not receive any cash proceeds, which could hurt our ability to meet the distribution requirements applicable to REITs under the Code.

*Hedging activity may expose us to risks, including the risks that a counterparty will not perform and that the hedge will not yield the economic benefits we anticipate, which could adversely affect us.*

We may, in a manner consistent with our qualification as a REIT, seek to manage our exposure to interest rate volatility by using interest rate hedging arrangements that involve risk, such as the risk that counterparties may fail to honor their obligations under these arrangements, and that these arrangements may not be effective in reducing our exposure to interest rate changes. Moreover, there can be no assurance that our hedging arrangements will qualify for hedge accounting or that our hedging activities will have the desired beneficial impact on our results of operations. Should we desire to terminate a hedging agreement, there could be significant costs and cash requirements involved to fulfill our obligations under the hedging agreement. Generally, failure to hedge effectively against interest rate changes may adversely affect our results of operations.

When a hedging agreement is required under the terms of a mortgage loan, it is often a condition that the hedge counterparty maintains a specified credit rating. With the current volatility in the financial markets, there is an increased risk that hedge counterparties could have their credit rating downgraded to a level that would not be acceptable under the loan provisions. If we were unable to renegotiate the credit rating condition with the lender or find an alternative counterparty with an acceptable credit rating, we could be in default under the loan and the lender could seize that property through foreclosure, which could adversely affect us.

***Complying with REIT requirements may limit our ability to hedge effectively and may cause us to incur tax liabilities.***

The REIT provisions of the Code limit our ability to hedge our liabilities. Generally, income from a hedging transaction we enter into either to manage risk of interest rate changes with respect to borrowings incurred or to be incurred to acquire or carry real estate assets, or to manage the risk of currency fluctuations with respect to any item of income or gain (or any property which generates such income or gain) that constitutes "qualifying income" for purposes of the 75% or 95% gross income tests applicable to REITs, does not constitute "gross income" for purposes of the 75% or 95% gross income tests, provided that we properly identify the hedging transaction pursuant to the applicable sections of the Code and Treasury regulations. To the extent that we enter into other types of hedging transactions, the income from those transactions is likely to be treated as non-qualifying income for purposes of both gross income tests. As a result of these rules, we may need to limit our use of otherwise advantageous hedging techniques or implement those hedges through a taxable REIT subsidiary (a "TRS"). The use of a TRS could increase the cost of our hedging activities (because our TRS would be subject to tax on income or gain resulting from hedges entered into by it) or expose us to greater risks than we would otherwise want to bear. In addition, net losses in any of our TRSs will generally not provide any tax benefit except for being carried forward for use against future taxable income in the TRSs.

***A portion of our distributions may be treated as a return of capital for U.S. federal income tax purposes, which could reduce the basis of a stockholder's investment in shares of our common stock and may trigger taxable gain.***

As a general matter, a portion of our distributions will be treated as a return of capital for U.S. federal income tax purposes if the aggregate amount of our distributions for a year exceeds our current and accumulated earnings and profits for that year. To the extent that a distribution is treated as a return of capital for U.S. federal income tax purposes, it will reduce a holder's adjusted tax basis in the holder's shares, and to the extent that it exceeds the holder's adjusted tax basis, will be treated as gain resulting from a sale or exchange of such shares.

**Risks Related to Our Status as a REIT**

***Failure to qualify or to maintain our qualification as a REIT would have significant adverse consequences to the value of our common stock.***

We elected to qualify to be treated as a REIT commencing with our first taxable year ended December 31, 2015. The Code generally requires that a REIT distribute at least 90% of its taxable income (without regard to the dividends paid deduction and excluding net capital gains) to stockholders annually, and a REIT must pay tax at regular corporate rates to the extent that the REIT distributes less than 100% of its taxable income (including capital gains) in a given year. In addition, a REIT is required to pay a 4% nondeductible excise tax on the amount, if any, by which the distributions the REIT makes in a calendar year are less than the sum of 85% of the REIT's ordinary income, 95% of the REIT's capital gain net income and 100% of the REIT's undistributed income from prior years. To avoid entity-level U.S. federal income and excise taxes, we anticipate distributing at least 100% of our taxable income. However, our ability to make such distributions may be limited by a requirement to escrow cash flow from our lease at 250 Livingston Street, which may be classified as taxable income.

We believe that we are organized, have operated and will continue to operate in a manner that will allow us to qualify as a REIT commencing with our first taxable year ended December 31, 2015. However, we cannot assure you that we are organized, have operated and will continue to operate as such. This is because qualification as a REIT involves the application of highly technical and complex provisions of the Code as to which there may only be limited judicial and administrative interpretations and involves the determination of facts and circumstances not entirely within our control. We have not requested and do not intend to request a ruling from the Internal Revenue Service ("IRS") that we qualify as a REIT. Moreover, in order to qualify as a REIT, we must meet, on an ongoing basis, various tests regarding the nature and diversification of our assets and our income, the ownership of our outstanding stock and the amount of our distributions. Our ability to satisfy the asset tests depends upon our analysis of the characterization and fair market values of our assets, some of which are not susceptible to a precise determination, and for which we will not obtain independent appraisals. Our compliance with the REIT gross income and quarterly asset requirements also depends upon our ability to manage successfully the composition of our gross income and assets on an ongoing basis. Future legislation, new regulations, administrative interpretations or court decisions may significantly change the tax laws or the application of the tax laws with respect to qualification as a REIT for U.S. federal income tax purposes or the U.S. federal income tax consequences of such qualification. Accordingly, it is possible that we may not meet the requirements for qualification as a REIT.

If, with respect to any taxable year, we fail to maintain our qualification as a REIT, we would not be allowed to deduct distributions to stockholders in computing our taxable income. If we were not entitled to relief under the relevant statutory provisions, we would also be disqualified from treatment as a REIT for the four subsequent taxable years. If we fail to qualify as a REIT, we would no longer be required to make distributions and we would be subject to entity-level income tax, including any applicable alternative minimum tax, on our taxable income at regular corporate tax rates. As a result, the amount available for distribution to holders of our common stock would be reduced for the year or years involved. In addition, our failure to qualify as a REIT could impair our ability to expand our business and raise capital, and adversely affect the value of our common stock.

***If our special voting stock and the Class B LLC units are treated as a single stock interest in the Company, we could fail to qualify as a REIT.***

We believe that the special voting stock and Class B LLC units will be treated as separate interests in the Company and its predecessor entities, respectively. However, no assurance can be given that the IRS will not argue, or that a court would not find or hold, that the special voting stock and the Class B LLC units should be treated as a single stock interest in the Company for U.S. federal income tax purposes. If the special voting stock and Class B LLC units were treated as a single stock interest in the Company, it is possible that more than 50% in value of the outstanding stock of the Company could be treated as held by five or fewer individuals. In such a case, we could be treated as "closely held" and we could therefore fail to qualify as a REIT. Such failure would have significant adverse consequences. See "Risks Related to Our Status as a REIT – Failure to qualify or to maintain our qualification as a REIT would have significant adverse consequences to the value of our common stock."

***Complying with the REIT requirements may cause us to forego otherwise attractive opportunities or liquidate certain of our investments.***

To qualify as a REIT for U.S. federal income tax purposes, we must continually satisfy tests concerning, among other things, the sources of our income, the nature and diversification of our assets, the amounts we distribute to our stockholders and the ownership of our stock. We may be required to make distributions to our stockholders at disadvantageous times or when we do not have funds readily available for distribution. Thus, compliance with the REIT requirements may, for instance, hinder our ability to make certain otherwise attractive investments or undertake other activities that might otherwise be beneficial to us and our stockholders, or may require us to borrow or liquidate investments in unfavorable market conditions and, therefore, may hinder our investment performance.

As a REIT, at the end of each calendar quarter, at least 75% of the value of our assets must consist of cash, cash items, government securities and qualified real estate assets. The remainder of our investments in securities (other than cash, cash items, government securities, securities issued by a TRS and securities treated as qualified real estate assets) generally cannot include more than 10% of the outstanding voting securities of any one issuer or more than 10% of the total value of the outstanding securities of any one issuer. In addition, in general, no more than 5% of the value of our total assets can consist of the securities (other than cash, cash items, government securities, securities issued by a TRS and qualified real estate assets) of any one issuer, no more than 20% of the value of our total assets can be represented by securities of one or more TRSs (25% for taxable years ending on or before December 31, 2017), and no more than 25% of the value of our total assets may consist of "nonqualified" debt instruments issued by publicly offered REITs. After meeting these requirements at the close of a calendar quarter, if we fail to comply with these requirements at the end of any subsequent calendar quarter, we must correct the failure within 30 days after the end of the calendar quarter or qualify for certain statutory relief provisions to avoid losing our REIT qualification. As a result, we may be required to liquidate from our portfolio otherwise attractive investments. These actions could have the effect of reducing our income and amounts available for distribution to our stockholders.

***We may be subject to a 100% penalty tax on any prohibited transactions that we enter into, or may be required to forego certain otherwise beneficial opportunities in order to avoid the penalty tax on prohibited transactions.***

If we are found to have held, acquired or developed property primarily for sale to customers in the ordinary course of business, we may be subject to a 100% "prohibited transactions" tax under U.S. federal tax laws on the gain from disposition of the property unless the disposition qualifies for one or more safe harbor exceptions for properties that have been held by us for at least two years and satisfy certain additional requirements (or the disposition is made by a TRS and, therefore, the gain, if any, is subject to corporate U.S. federal income tax).

Under existing law, whether property is held primarily for sale to customers in the ordinary course of a trade or business is a question of fact that depends on all the facts and circumstances. We intend to hold, and, to the extent within our control, to have any joint venture to which our Operating Partnership is a partner hold, properties for investment with a view to long-term appreciation, to engage in the business of acquiring, owning, operating and developing the properties, and to make sales of our properties and other properties acquired subsequent to the date hereof as are consistent with our investment objectives. Based upon our investment objectives, we believe that overall, our properties should not be considered property held primarily for sale to customers in the ordinary course of business. However, it may not always be practical for us to comply with one of the safe harbors, and, therefore, we may be subject to the 100% penalty tax on the gain from dispositions of property if we otherwise are deemed to have held the property primarily for sale to customers in the ordinary course of business.

The potential application of the prohibited transactions tax could cause us to forego potential dispositions of other property or to forego other opportunities that might otherwise be attractive to us, or to hold investments or undertake such dispositions or other opportunities through a TRS, which would generally result in corporate income taxes being incurred. For example, we anticipate that we would have to effect any potential condominium or cooperative conversion and sale of our Tribeca House properties or 141 Livingston Street property through a TRS.

***REIT distribution requirements could adversely affect our liquidity and adversely affect our ability to execute our business plan.***

In order to maintain our qualification as a REIT and to meet the REIT distribution requirements, we may need to modify our business plans. Our cash flow from operations may be insufficient to fund required distributions, for example, as a result of differences in timing between our cash flow, the receipt of income for GAAP purposes and the recognition of income for U.S. federal income tax purposes, the effect of non-deductible capital expenditures, the creation of reserves, payment of required debt service or amortization payments, or the need to make additional investments in qualifying real estate assets. The insufficiency of our cash flow to cover our distribution requirements could require us to (i) sell assets in adverse market conditions, (ii) borrow on unfavorable terms, (iii) distribute amounts that would otherwise be invested in future acquisitions or capital expenditures or used for the repayment of debt, (iv) pay dividends in the form of "taxable stock dividends" or (v) use cash reserves, in order to comply with the REIT distribution requirements. If we choose to make all or part of a distribution in our own stock, stockholders may be required to pay income taxes with respect to such distributions in excess of the cash portion, if any, of the distribution received. Further, taking the actions enumerated above to comply with the REIT distribution requirements could adversely affect the market value of our common stock. The inability of our cash flow to cover our distribution requirements could have an adverse impact on our ability to raise short- and long-term debt or sell equity securities. In addition, if we are compelled to liquidate our assets to repay obligations to our lenders or make distributions to our stockholders, we may be subject to a 100% tax on any resultant gain if we sell assets that are treated as property held primarily for sale to customers in the ordinary course of business.

***The ability of our board of directors to revoke our REIT qualification without stockholder approval may cause adverse consequences to our stockholders.***

Our charter provides that our board of directors may revoke or otherwise terminate our REIT election, without the approval of our stockholders, if it determines that it is no longer in our best interest to continue to qualify as a REIT. If we cease to be a REIT, we will not be allowed a deduction for dividends paid to stockholders in computing our taxable income and will be subject to U.S. federal income tax at regular corporate rates and state and local taxes, which may have adverse consequences on our total return to our stockholders.

31

*Our ability to provide certain services to our tenants may be limited by the REIT rules, or may have to be provided through a TRS.*

As a REIT, we generally cannot provide services to our tenants other than those that are customarily provided by landlords, nor can we derive income from a third party that provides such services. If we forego providing such services to our tenants, we may be at a disadvantage to competitors who are not subject to the same restrictions. However, we can provide such non-customary services to tenants or share in the revenue from such services if we do so through a TRS, though income earned by the TRS will be subject to corporate income taxes.

*Although our use of TRSs may partially mitigate the impact of meeting certain requirements necessary to maintain our qualification as a REIT, there are limits on our ability to own TRSs, and a failure to comply with the limits would jeopardize our REIT qualification and may result in the application of a 100% excise tax.*

A REIT may own up to 100% of the stock of one or more TRSs. A TRS may hold assets and earn income that would not be qualifying assets or income if held or earned directly by a REIT. Both the subsidiary and the REIT must jointly elect to treat the subsidiary as a TRS. A corporation of which a TRS directly or indirectly owns more than 35% of the voting power or value of the stock will automatically be treated as a TRS. Overall, no more than 20% of the value of a REIT's assets may consist of securities of one or more TRSs (25% for taxable years ended on or before December 31, 2017). In addition, rules limit the deductibility of interest paid or accrued by a TRS to its parent REIT to assure that the TRS is subject to an appropriate level of corporate taxation. Rules also impose a 100% excise tax on certain transactions between a TRS and its parent REIT that are treated as not being conducted on an arm's-length basis.

Any TRSs that we form will pay U.S. federal, state and local income tax on the TRSs' taxable income, and the TRSs' after-tax net income will be available for distribution to us but is not required to be distributed to us unless necessary to maintain our REIT qualification. Although we will monitor the aggregate value of the securities of such TRSs and intend to conduct our affairs so that such securities will represent less than 20% of the value of our total assets, there can be no assurance that we will be able to comply with the TRS limitation in all market conditions.

*Our property taxes could increase due to property tax rate changes or reassessment, which could impact our cash flow.*

Even if we qualify as a REIT for U.S. federal income tax purposes, we will be required to pay state and local taxes on our properties. The real property taxes on our properties may increase as property tax rates change or as our properties are assessed or reassessed by taxing authorities. Therefore, the amount of property taxes we pay in the future may increase substantially from what we have paid in the past and such increases may not be covered by tenants pursuant to our lease agreements. If the property taxes we pay increase, our financial condition, results of operations, cash flow, per share trading price of our common stock and our ability to satisfy our principal and interest obligations and to make distributions to our stockholders could be adversely affected.

## Risks Related to Ownership of Our Common Stock

*The market price and trading volume of our common stock may be volatile, which could result in rapid and substantial losses for our stockholders.*

Our financial performance, government regulatory action, tax laws, interest rates and market conditions in general could have a significant impact on the future market price of our common stock. Some of the factors that could negatively affect or result in fluctuations in the market price of our common stock include:

- actual or anticipated variations in our quarterly or annual operating results;

- increases in market interest rates that lead purchasers of our shares to demand a higher yield;

- changes in market valuations of similar companies;

- adverse market reaction to any increased indebtedness we incur in the future;

- additions or departures of key personnel;

- actions by stockholders;

- speculation in the press or investment community;

- general market, economic and political conditions, including an economic slowdown or dislocation in the global credit markets;

- our operating performance and the performance of other similar companies;

- negative publicity regarding us specifically or our business lines generally;

- changes in accounting principles; and

- passage of legislation or other regulatory developments that adversely affect us or our industry, such as the Housing Stability and Tenant Protection Act of 2019, which was signed into law in New York in June 2019.

Broad market and industry factors may decrease the market price of our common stock, regardless of our actual operating performance. The stock market in general has from time to time experienced extreme price and volume fluctuations. In addition, in the past, following periods of volatility in the overall market and the market price of a company's securities, securities class action litigation has often been instituted against these companies. This litigation, if instituted against us, could result in substantial costs and a diversion of our management's attention and resources.

*There are restrictions on ownership and transfer of our common stock.*

To assist us in qualifying as a REIT, among other purposes, our charter generally limits beneficial ownership by any person to no more than 9.8% in value or number of shares, whichever is more restrictive, of the outstanding shares of any class or series of our common stock or 9.8% of the aggregate value of all our outstanding stock. In addition, our charter contains various other restrictions on the ownership and transfer of shares of our stock. As a result, an investor that purchases shares of our common stock may not be able to readily resell such common stock.

*Future sales of our common stock or other securities convertible into our common stock could cause the market value of our common stock to decline and could result in dilution.*

Our board of directors is authorized, without approval of our common stockholders, to cause us to issue additional shares of our stock or to raise capital through the issuance of preferred stock, options, warrants and other rights on terms and for consideration as our board of directors in its sole discretion may determine.

Sales of substantial amounts of our common stock could dilute current ownership and could cause the market price of our common stock to decrease significantly. We cannot predict the effect, if any, of future sales of our common stock, or the availability of our common stock for future sales, on the value of our common stock. Sales of substantial amounts of our common stock, or the perception that such sales could occur, may adversely affect the market price of our common stock.

In addition, our Operating Partnership may issue additional OP Units and our LLC subsidiaries may issue additional LLC units to third parties without the consent of our stockholders, which would reduce our ownership percentage in our Operating Partnership or LLC subsidiaries, as applicable, and would have a dilutive effect on the amount of distributions made to us by our Operating Partnership and, if applicable, to our Operating Partnership by our LLC subsidiaries and, therefore, the amount of distributions we can make to our stockholders. Any such issuances, or the perception of such issuances, could materially and adversely affect the market price of our common stock.

**ITEM 1B.    UNRESOLVED STAFF COMMENTS**

None.

**ITEM 1C. CYBERSECURITY**

*Risk management and strategy*

Our corporate information technology, communication networks, enterprise applications, accounting and financial reporting platforms, and related systems are necessary for the operation of our business. We use these systems, among others, to manage our tenant and vendor relationships, for internal communications, for accounting to operate record-keeping function, and for many other key aspects of our business. Our business operations rely on the secure collection, storage, transmission, and other processing of proprietary, confidential, and sensitive data.

We rely on a third-party service providers, to identify, assess, and manage cybersecurity threats and risks. We identify and assess risks from cybersecurity threats by monitoring and evaluating our threat environment and our risk profile using various methods including, for example, subscribing to reports and services that identify cybersecurity threats and evaluating our industry's risk profile.

To operate our business, we utilize certain third-party service providers to perform a variety of functions. We seek to engage reliable, reputable service providers that maintain cybersecurity programs.

During the reporting period, we have not identified any risks from cybersecurity threats, including as a result of previous cybersecurity incidents, which we believe have materially affected, or are reasonably likely, to materially affect our Company, including our business strategy, results of operations, or financial condition. However, we cannot assure you that we will not experience any such threats or incidents in the future. See "Item 1A. Risk factors" in this Annual Report on Form 10-K, for additional discussion about cybersecurity-related risks.

*Governance*

Our Board of Directors holds oversight responsibility over the Company's strategy and risk management, including material risks related to cybersecurity threats. This oversight is executed directly by the Board of Directors and through its committees. The Audit Committee of the Board of Directors (the "Audit Committee") oversees process by which senior management of the Company assesses and manages the Company's exposure to risk, including cybersecurity, in accordance with its charter. The Audit Committee engages in discussions with management regarding the Company's significant financial risk exposures and the measures implemented to monitor and control these risks, including those that may result from material cybersecurity threats. These discussions include the Company's risk assessment and risk management policies.

Our management, represented by our IT Director, and our third-party information technology provider lead our cybersecurity risk assessment and management processes and oversee their implementation and maintenance.

Our cybersecurity incident response and vulnerability management processes are designed to escalate certain cybersecurity incidents to members of management depending on the circumstances. In addition, the Company's incident response processes include reporting to the Audit Committee for certain cybersecurity incidents.

**ITEM 2. PROPERTIES**

**Our Portfolio Summary**

As of December 31, 2024, our portfolio consisted of nine properties totaling approximately 3.4 million rentable square feet (plus an approximately 154 thousand rentable square feet under development) and was approximately 98% leased (excluding square footage under development). These properties include Tribeca House (two nearly adjacent residential properties with street-level and mezzanine-level retail space and an externally managed parking garage), the Flatbush Gardens complex (a 59-building residential complex), two properties in Downtown Brooklyn (one exclusively commercial, one mixed commercial and residential), the Aspen property (a residential building with street-level retail space and an externally managed parking garage), the 10 West 65th Street residential property, the Clover House residential property, the 1010 Pacific Street residential property and the Dean Street property (currently under development).

34

The table below presents an overview of the Company's portfolio as of December 31, 2024:

| Address | Submarket | Year Built | Leasable Sq. Ft. | # Units | Percent Leased | Annualized December 2024 Base Rental Revenue (millions)(1) | | Net Effective Rent Per Occupied Square Foot | |
|---|---|---|---|---|---|---|---|---|---|
| Residential | | | | | | | | | |
| Tribeca House | Manhattan | 1921/1964 | 482,512 | 506 | 98.4% | $ | 38.27 | $ | 84.98 |
| Flatbush Gardens | Brooklyn | 1950 | 1,748,671 | 2,494 | 99.1% | $ | 51.40 | $ | 30.04 |
| 250 Livingston Street | Brooklyn | 1920 | 26,819 | 36 | 100.0% | $ | 1.49 | $ | 61.11 |
| Aspen | Manhattan | 2004 | 165,542 | 232 | 99.5% | $ | 6.56 | $ | 40.82 |
| 10 West 65th Street | Manhattan | 1939 | 75,678 | 82 | 100.0% | $ | 4.28 | $ | 56.59 |
| Clover House | Brooklyn | 1959 | 102,131 | 158 | 97.4% | $ | 8.16 | $ | 85.91 |
| 1010 Pacific Street | Brooklyn | 2023 | 115,401 | 175 | 97.7% | $ | 6.81 | $ | 62.80 |
| | | | 2,716,754 | 3,683 | 98.9% | $ | 116.7 | $ | 44.31 |
| | | | | | | | | | |
| Commercial | | | | | | | | | |
| 141 Livingston Street | Brooklyn | 1959 | 220,937 | 2 | 100.0% | $ | 10.7 | $ | 81.17 |
| 250 Livingston Street | Brooklyn | 1920 | 343,486 | 2 | 100.0% | $ | 15.5 | $ | 175.85 |
| Tribeca House | Manhattan | 1921/1964 | 77,383 | 10 | 88.5% | $ | 3.89 | $ | 67.56 |
| Aspen | Manhattan | 2004 | 12,429 | 5 | 73.4% | $ | 0.46 | $ | 50.29 |
| | | | 654,235 | 19 | 90.5% | $ | 30.55 | $ | 51.60 |
| Total | | | 3,370,989 | 3,702 | 97.3% | $ | 147.52 | $ | 44.97(2) |
| Real Estate Under Development | | | | | | | | | |
| Dean Street | Brooklyn | | 154,468(3) | 242(3) | | | | | |

(1)  Represents annualized revenue based on December 2024 data.

(2)  Represents weighted average.

(3)  Land purchases made on December 22, 2021, February 14, 2022 and April 14, 2022, square footage and number of units based on management's development estimates

The table below presents an overview of commercial and retail lease expirations for the next ten years and thereafter, beginning in 2024. Excludes residential leases which are generally of one year duration.

| Year | Number of Tenants | Total Square Feet | Annualized Rental Revenue | % of Annualized Rental Revenue Expiring |
|---|---|---|---|---|
| 2025 | 2 | 548,550 | 25,693,317 | 84.0% |
| 2026 | 1 | 510 | 18,727 | 0.1% |
| 2027 | 2 | 40,568 | 1,730,482 | 5.7% |
| 2028 | 2 | 1,597 | 138,336 | 0.5% |
| 2029 | — | — | — | 0.0% |
| 2030 | 2 | 2,685 | 172,017 | 0.6% |
| 2031 | 1 | 540 | 165,500 | 0.5% |
| 2032 | 3 | 6,106 | 522,132 | 1.7% |
| 2033 | 1 | 24,200 | 1,456,560 | 4.8% |
| 2034 | 1 | 2,212 | 149,976 | 0.5% |
| Thereafter | 3 | 8,052 | 541,500 | 1.8% |
| Total | 18 | 635,020 | $ 30,588,547 | 100.0% |

**Descriptions of Our Properties**

*Tribeca House*

The Company purchased the 50 Murray Street and 53 Park Place buildings on December 15, 2014.

These buildings were built in 1964 and 1921, respectively, renovated in 2001, and comprise a total of 506 units which include studio and one- and two-bedroom apartments as well as retail space and parking. The buildings are both full-service luxury rentals which include building finishes such as ceilings as high as 11 feet, stainless steel appliances and granite countertops, and amenities such as a doorman, elevators, landscaped roof deck, rooftop basketball court, tenant lounge, game room, toddlers' playroom, in-house valet service and screening room. 50 Murray Street includes 390 units and 396,528 square feet and 53 Park Place includes 116 units and 86,288 square feet.

The properties also feature approximately 77,400 square feet of retail space, comprising approximately 53,000 square feet of street-level and mezzanine-level retail space, and an externally managed garage. Tenants include Equinox (a premium fitness club), Starbucks and 7 Eleven. The weighted average remaining lease duration of the retail tenants at December 31, 2024, is approximately four years.

Property highlights include:

| | |
|---|---|
| Location | • 50 Murray Street and 53 Park Place |
| Building Type | • Residential |
| | • Retail |
| Number of Units | • 506 |
| Amenities | • Doorman |
| | • Elevators |
| | • Landscaped roof deck |
| | • Rooftop basketball court |
| | • Tenant lounge |
| | • Game room |
| | • Toddler's play room |
| | • In-house valet service |
| | • Screening room |
| Nearby Rapid Transit Access | • MTA Subway A, C, E, N, R, 1, 2, 3 trains |
| | • PATH train |

The Tribeca House properties are encumbered by a loan through Deutsche Bank AG with a balance of $360.0 million as of December 31, 2024. The loan matures on March 6, 2028, bears interest at 4.506% and requires interest-only payments for the entire term. We have the option to prepay all (but not less than all) of the unpaid balance of the loan prior to the maturity date, subject to a prepayment premium if it occurs prior to December 6, 2027.

*Flatbush Gardens*

Flatbush Gardens is a 59-building complex located along Foster Avenue between Nostrand and Brooklyn Avenues in the East Flatbush neighborhood of Brooklyn. The property's buildings are located on seven tax parcels. The complex was constructed around 1950 and contains 2,494 studio, one-bedroom, two-bedroom, and three-bedroom apartments, and four below-grade garages. The aggregate site area is 898,940 square feet, the aggregate gross building area is 1,926,180 square feet and the aggregate gross leasable area is 1,748,671 square feet.

| Address | Block | Lot | Site Area (Sq. Ft.) | Net Leasable Area (Sq. Ft.) | No. of Units |
|---|---|---|---|---|---|
| 3101 Foster Avenue | 4964 | 47 | 60,000 | 120,276 | 168 |
| 1405 Brooklyn Avenue | 5000 | 200 | 47,500 | 90,762 | 144 |
| 1402 Brooklyn Avenue | 4981 | 50 | 161,655 | 293,898 | 420 |
| 1368 New York Avenue | 4964 | 40 | 195,865 | 354,835 | 503 |
| 3505 Foster Avenue | 4967 | 40 | 182,300 | 355,476 | 504 |
| 3202-24 Foster Avenue | 4995 | 30 | 112,875 | 239,316 | 336 |
| 1401 New York Avenue | 4981 | 1 | 138,745 | 294,108 | 419 |
| **Total** | | | **898,940** | **1,748,671** | **2,494** |

Community District 17 is a mixed-income community. We believe Flatbush Gardens represents an entry-level, low-cost option in the market and that we will increasingly draw tenants who have been priced out of other New York City sub-markets. The neighborhood surrounding the Flatbush Gardens complex is residential on all sides. The Newkirk Avenue subway station, which is serviced by the No. 2 and No. 5 trains, is located on the west side of the complex. Brooklyn College is located 0.6 miles along Nostrand Avenue to the south of Flatbush Gardens. The No. 2 and No. 5 trains, which service both Flatbush Gardens and Brooklyn College, provide direct access to the west side and east side, respectively, of Manhattan, as well as other points in Brooklyn. Two large regional medical centers are located within a mile of the complex.

Property highlights include:

| | | |
|---|---|---|
| Building Type | • | Residential |
| Number of Units | • | 2,494 |
| Amenities | • | Park-like space between buildings |
| | • | Parking lots |
| Nearby Rapid Transit Access | • | MTA Subway 2, 5 trains |

Flatbush Gardens is encumbered by a mortgage note to New York Community Bank with a balance of $329.0 million as of December 31, 2024. The note matures on June 1, 2032, and bears interest at 3.125% through May 2027 and thereafter at the prime rate plus 2.75%, subject to an option to fix the rate. The note requires interest-only payments through May 2027, and monthly principal and interest payments thereafter based on a 30-year amortization schedule. We have the option to prepay all (but not less than all) of the unpaid balance of the note prior to the maturity date, subject to certain prepayment premiums, as defined.

*141 Livingston Street*

The 141 Livingston Street property is a 15-story office building with 206,084 commercial square feet, located on a 0.26-acre site in Downtown Brooklyn. The property's main commercial tenant, the City of New York, executed a 10-year lease in December 2015; under the agreement, the annual rent increased by 25%, or $2.1 million, beginning at the end of December 2020. The property is located approximately 500 feet from the Jay Street-Metrotech, Hoyt-Schermerhorn, Hoyt Street, and Borough Hall subway stops, offering direct one-stop access to the east and west sides of Manhattan, as well as access to surrounding regions of Brooklyn and Queens, and connections to every other New York City subway line. The property is located near the Fulton Street Mall, a pedestrian mall that runs along Fulton Street between Boerum Place and Flatbush Avenue, and is within walking distance of Barclays Center and Atlantic Avenue. In addition, the property includes an adjacent lot at 22 Smith Street, currently used as a parking lot measuring approximately 5,000 square feet.

37

Property highlights include:

| | |
|---|---|
| Location | • 141 Livingston Street |
| Building Type | • Commercial |
| | • Retail (parking) |
| Tenant | • City of New York |
| Amenities | • Elevators |
| | • Parking |
| Nearby Rapid Transit Access | • MTA Subway A, C, F, G, R, 2, 3, 4, 5 trains |

The 141 Livingston Street property is encumbered by a mortgage note with Citi Real Estate Funding Inc. with a balance of $100 million as of December 31, 2024. The note matures on March 6, 2031, bears interest at 3.21% and requires interest-only payments for the entire term. We have the option to prepay all (but not less than all) of the unpaid balance of the loan within three months of maturity, without a prepayment premium.

The 141 Livingston Street lease expires on December 27, 2025, and if NYC were to decide not to renew or extend such lease on its stated termination date, pursuant to the terms of the lease, we would be at risk of not being able to replace  NYC as a tenant, leasing the space below the current rates, incurring costs to improve the space or offer other inducements to fill the space, all of which may have an adverse effect on our financial condition, results of operations and cash flow. We and NYC are in the process of negotiating the terms of a five-year extension of the current lease upon its expiration in December 2025. There can be no assurance that the negotiations will conclude with an agreement.

Our subsidiary, 141 Livingston Owner LLC (the "Borrower") and Citi Real Estate Funding Inc. entered into the loan agreement related to a $100 million loan. The loan is evidenced by promissory mortgage notes and secured by the 141 Livingston Street property. We and our Operating Partnership subsidiary serve as limited guarantors of certain obligations under the loan, including those related to the reserve monthly deposit discussed below.

If we are not able to extend or replace the NYC lease at our 141 Livingston Street property for a minimum of a five-year term, we will be required to either fund a reserve account in the amount of $10 million payable in equal monthly payments over the 18 months after lease expiration or deliver to the lender a letter of credit in the amount of $10 million

On October 28, 2024, we received notice that, as of October 7, 2024, the servicing of the mortgage notes was transferred to a special servicer (the "Special Servicer") due to our alleged failure to make certain required payments under the loan agreement, including, but not limited to, the reserve deposit starting on July 7, 2024. The Special Servicer demanded that we pay (i) $2.2 million of reserve payments into a reserve account immediately (for July-October 2024) and continued monthly payments of $555,555 for an additional 14 months, (ii) $1.2 million of default interest and late charges through October 7, 2024, and (iii) an additional $10,417 per diem interest for each day thereafter.

On November 11, 2024, the Special Servicer notified the Borrower that, due to its alleged event of default under the Loan Agreement, as a result of the failure to make the payments described above, the mortgage notes have been accelerated, and all amounts under the loan agreement were due and payable. Such amounts include, but are not limited to, $100.0 million principal amount of the mortgage notes, approximately $5.0 million of default yield maintenance premium, $10.0 million aggregate reserve deposit, and the above-described penalty default interest and penalties.

We believe that (i) we have made timely payments under the loan agreement, (ii) the servicer and the Special Servicer have misinterpreted the terms of the loan agreement requiring monthly reserve payments beginning on July 7, 2024, (iii) we have no current obligation to make such reserve payments under the loan agreement and (iv) we should not be obligated to pay the default interest and late charges. We and the Special Servicer have entered into a pre-negotiation agreement and as such are engaged in good faith discussions regarding the terms of the loan agreement related to the monthly reserve deposit, among other matters. However, if we are unable to resolve this matter in a manner favorable to us, the lender may also seek to exercise any of its other rights or remedies under the loan agreement.

On December 18, 2024, we received notice from the Special Servicer that due to its allegation that Clipper Realty (the "Guarantor") did not maintain a net worth of not less than $100 million as of December 31, 2022 and 2023, respectively, as required under the loan agreement, we are in default on the loan. We replied to the Special Servicer disputing such calculation and alleging that the Special Servicer did not calculate net worth in a reasonable manner. We provided the Special Servicer with our own calculation of net worth that shows a net worth in excess of the required amount. We await a response from the Special Servicer.

On January 21, 2025, we received notice from the Special Servicer alleging that certain elements of our insurance on the building at 141 Livingston Street are not in compliance with the loan agreement requirements, including, but not limited to, due to a deductible in excess of what is permitted under the terms of the loan agreement and the use of an insurance carrier with a rating agency rating below that which is permitted under the terms of the loan agreement.

*250 Livingston Street*

The 250 Livingston Street property is a 12-story mixed-use building, with office and residential uses on the upper floors and office and retail at grade. The total land area of the site is 29,707 square feet. The building currently contains 342,496 square feet of office space which is 100% leased to the City of New York's Department of Environmental Protection and Human Resources Administration under a ten-year lease that expires in August 2030; however, the City holds one-time termination options at the end of the fifth year and the seventh year. The City of New York has advised us that it will vacate the 250 Livingston Street property in 2025. Additionally, the property includes 36 multifamily residential apartment units (26,819 square feet), which were developed by Clipper Realty from 2003 through 2013.

38

Property highlights include:

| | | |
|---|---|---|
| Location | • | 250 Livingston Street |
| Building Type | • | Commercial |
| | • | Residential |
| | • | Retail |
| Commercial Tenant | • | City of New York |
| Amenities | • | Elevators |
| Nearby Rapid Transit Access | • | MTA Subway A, B, C, F, G, Q, R, 2, 3, 4, 5 trains |

The 250 Livingston Street property is encumbered by a mortgage note to Citi Real Estate Funding Inc. with a balance of $125.0 million as of December 31, 2024. The note matures on June 6, 2029, bears interest at 3.63% and requires interest-only payments for the entire term. We have the option to prepay all (but not less than all) of the unpaid balance of the loan within three months of maturity, without a prepayment premium.

As of February 23, 2024, The City of New York, a municipal corporation acting through the Department of Citywide Administrative Services ("NYC"), notified us of its intention to terminate its lease at 250 Livingston Street effective August 23, 2025. The lease generally provides for rent payments in the amount of $15.4 million per annum. We may be unable to replace NYC as a tenant or unable to replace it with other commercial tenants at comparable rent rates, may incur substantial costs to improve the vacated space or may have to offer significant inducements to fill the space, all of which may have an adverse effect on our financial condition, results of operations and cash flow. In connection with the termination of the 250 Livingston Street lease, pursuant to the terms of the loan agreement related to $125 million building mortgage, we have established a cash management account for the benefit of the lender, into which we will be obligated to deposit all revenue generated by the building at 250 Livingston Street. All amounts remaining in such cash management account after the lender's allocations set forth in the loan agreement will be disbursed to us once the tenant cure conditions are satisfied under the loan agreement. As of February 14, 2025, we are required to deposit into such cash management account approximately $5.7 million upon demand by the lender. If we are unable to replace the NYC lease at comparable rents, we may not be able to cure the conditions listed in the loan agreement. If the excess cash is not released to us, it could impact our available cash to fund corporate operations and pay dividends and distributions to our stockholders.

On January 2, 2025, we were notified that the loan servicing of the loan related to the 250 Livingston Street property was transferred, at our request, to LNR Partners ("LNR") to serve as special servicer in order for us to engage in negotiations on a modification of our loan. On January 6, 2025, we and LNR signed a Pre-Negotiation Letter Agreement to discuss our request for a reduction in the loan. These negotiations continue and there can be no guarantee that they will conclude with an agreement.

*Aspen*

In June 2016, the Company purchased the Aspen property located at 1955 1st Avenue in Manhattan for $103 million. The property fronts the west side of First Avenue on the full block between 100th and 101st Streets, and comprises 186,602 square feet, 232 residential rental units, four retail units and a parking garage. The residential units are subject to regulations established by the HDC under which there are no rental restrictions on approximately 55% of the units and low- and middle-income restrictions on approximately 45% of the units. The residential units feature stainless steel appliances including a range, oven, refrigerator, microwave, and dishwasher. Property amenities include a courtyard, game room, fitness center, clubhouse, laundry facilities and onsite below-grade garage parking.

Property highlights include:

| | | |
|---|---|---|
| Location | • | 1955 1st Avenue |
| Building Type | • | Residential |
| | • | Retail |
| Number of Units | • | 232 |
| Amenities | • | Courtyard, game room, fitness center |
| Nearby Rapid Transit Access | • | MTA Subway Q, 4, 5, 6 trains |

The Aspen property is encumbered by a mortgage note to Capital One Multifamily Finance LLC with a balance of $59.4 million as of December 31, 2024. The note matures on July 1, 2028, and bears interest at 3.68%. The note required interest-only payments through July 2018, and monthly principal and interest payments of approximately $321,000 thereafter based on a 30-year amortization schedule. We have the option to prepay the loan prior to the maturity date, subject to a prepayment premium.

*Clover House*

In May 2018, the Company purchased the Clover House property in the historic Brooklyn Heights district in Brooklyn for $87.5 million, in vacant condition. The property is located near the Clark Street subway stop, the Brooklyn-Queens Expressway, the Brooklyn Bridge, the Manhattan Bridge and multiple bus lines. The Company completed renovations in 2019 to create 158 well-appointed studio, one- and two-bedroom units across 102,131 square feet, with amenities and indoor parking for 68 cars. Amenities include various unit terraces, a rooftop terrace, a fitness center and a landscaped courtyard.

Property highlights include:

| | |
|---|---|
| Location | • 107 Columbia Heights |
| Building Type | • Residential |
| Number of Units | • 158 |
| Amenities | • Courtyard, rooftop terrace, fitness center |
| Nearby Rapid Transit Access | • MTA Subway 2, 3, A, C, F trains |

The Clover House property is encumbered by a mortgage note to MetLife Investment Management with a balance of $82.0 million as of December 31, 2024. The note matures on December 1, 2029, bears interest at 3.53% and requires interest-only payments for the entire term. We have the option, commencing on January 1, 2024, to prepay the note prior to the maturity date, subject to a prepayment premium if it occurs prior to September 2, 2029.

### 10 West 65th Street

In October 2017, the Company purchased the 10 West 65th Street property in the Upper West Side neighborhood of Manhattan for $79 million. The property, located less than a block from Central Park, consists of approximately 76,000 square feet of leasable residential area, with 82 apartment units, plus an additional 53,000 square feet of air rights. The property is located near Lincoln Center and several prominent museums. Touro College, which had leased 40 apartment units in accordance with an agreement entered into when the Company purchased the property, exercised its option to terminate the leases, effective January 31, 2019. The Company subsequently repositioned the apartments and leased them at market rates.

Property highlights include:

| | |
|---|---|
| Location | • 10 West 65th Street |
| Building Type | • Residential |
| Number of Units | • 82 |
| Amenities | • Elevator |
| Nearby Rapid Transit Access | • MTA Subway A, B, C, D, 1, 2, 3 trains |

The 10 West 65th Street property is encumbered by a mortgage note to New York Community Bank, entered into in connection with the acquisition of the property, with a balance of $31.4 million as of December 31, 2024. The note matures on November 1, 2027, and bore an interest rate of 3.375% through October 2022 at which time it was scheduled to reset to the prime rate plus 2.75%, subject to an option to fix the rate. On August 26, 2022, the Company signed an amendment to the note that changed the benchmark and spread used from LIBOR plus 2.75% to 1-Month CME term SOFR plus 2.5%, rounded up to the nearest 1/8th and reset monthly. The benchmark rate at December 31, 2024 was 4.75%. The note required interest-only payments through November 2019, and monthly principal and interest payments thereafter based on a 30-year amortization schedule. We have the option to prepay all (but not less than all) of the unpaid balance of the note prior to the maturity date, subject to certain prepayment premiums, as defined.

### 1010 Pacific Street

In November 2019, the Company purchased the 1010 Pacific Street property in the Prospect Heights neighborhood of Brooklyn for $31 million. The Company redeveloped the property as a fully amenitized residential building with 115,000 square feet of leasable area. Amenities include on-site parking, media room, fitness center, library bridge, co-working lounge, kids' playroom & gym, outdoor deck bar & lounge and pet spa. The building has 175 total units, 70% of which will be leased at market rates and 30% of which will be designated as affordable housing.

Property highlights include:

| | |
|---|---|
| Location | • 1010 Pacific Street |
| Building Type | • Residential |
| Number of Units | • 175 |
| Amenities | • Elevator, media room, fitness center |
| Nearby Rapid Transit Access | • MTA Subway A, C, S, 2, 3 trains |

There is $80.0 million in mortgage debt secured by 1010 Pacific Street as of December 31, 2024, in the form of a mortgage note to Valley National Bank which provides for maximum borrowings of $80.0 million. The loan provided initial funding of $60.0 million and a further $20.0 million subject to the achievement of certain financial targets. The initial funding of $60.0 million has an annual interest rate of 5.55%. The additional borrowing of $20.0 million has an annual interest rate of 6.37%. The total borrowing of $80.0 million has a term of twenty-four months and matures on September 15, 2025. The Company has the option to prepay in full, or in part, the unpaid balance of the note prior to the maturity date.

*953 Dean Street*

During the period December 2021 through April 2022, the Company purchased the Dean Street property which consists of multiple parcels of land in the Prospect Heights neighborhood of Brooklyn for approximately $48.5 million. The Company intends to redevelop the property as a fully amenitized residential building with approximately 160,000 square feet of residential leasable area. The building is expected to have 240 residential units, 70% of which will be leased at market rates and 30% of which will be designated as affordable housing. The property will also feature approximately 9,000 square feet of retail space. The construction process is estimated to take approximately two years.

On December 22, 2021, the Company entered into a $30 million mortgage note agreement with Bank Leumi, N.A related to the Dean Street acquisition. The notes original maturity was December 22, 2022, and was subsequently extended to September 22, 2023. The note required interest-only payments and bore interest at the prime rate (with a floor of 3.25%) plus 1.60%. In April 2022, the Company borrowed an additional $7.0 under the mortgage note in connection with the acquisition of additional parcels of land in February and April 2022.

On August 10, 2023, the Company refinanced its $37 million mortgage on its Dean Street development with a senior construction loan with Valley National Bank that permits borrowings up to $115 million and a Mezzanine Loan with BADF 953 Dean Street Lender LLC that permits borrowings up to $8 million.

The Senior Loan allows maximum borrowings of $115 million for a 30-month term, has two 6-month extension options, and bears interest at 1-Month Term SOFR plus 4.00%, with an all-in floor of 5.50% (8.55% at December 31, 2024). The Senior Loan consists of a land loan, funded at closing to refinance the existing loan totaling $37.0 million, a construction loan of up to $62.4 million and a project loan of up to $15.6 million. The Company has provided a 30% payment guarantee of outstanding borrowings among other standard indemnities. As of December 31, 2024, the Company has drawn $49.3 million from the construction loan and $12.5 million from the project loan.

The Mezzanine Loan allows maximum borrowings of $8,000 for a 30-month term, have two 6-month extension options, and bears interest at 1-Month Term SOFR plus 10%, with an all-in floor of 13% (14.55% at December 31, 2024). Interest shall accrue on the principal, is compounded monthly and is due at the end of the term of the loan. At closing, $4,500 was funded to cover closing costs incurred on the construction loans. As of December 31,2024, the remaining $3,500 was drawn for ongoing construction costs.

During the years ended December 31, 2024 and 2023, the Company incurred $1,508 and $161, respectively, in interest and is included in the balance of the Notes Payable in the Consolidated Balance Sheet.

On August 10, 2023, the Company entered into a $5,000 corporate line of credit with Valley National Bank. The line of credit bears interest of Prime + 1.5%. The line of credit expired on August 10, 2024.

The Company has provided a limited guaranty for mortgage notes at several of its properties. The Company's loan agreements contain customary representations, covenants, and events of default. Certain loan agreements require the Company to comply with affirmative and negative covenants, including the maintenance of debt service coverage ratios and liquidity balances. If the Company is not compliant, certain lenders may require cash sweeps of rent until the conditions are cured. The Company believes it is not in default on any of its loan agreements.

## ITEM 3. LEGAL PROCEEDINGS

See Note 7, "Commitments and Contingencies" of our consolidated financial statements included in this form 10-K for a discussion of legal proceedings.

## ITEM 4. MINE SAFETY DISCLOSURE

Not applicable.

41

PART II

**ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

**Market Information**

Our common stock is traded on the NYSE under the ticker symbol "CLPR". The stock began trading on February 10, 2017.

**Holders**

As of February 14, 2025, there were 6,112 beneficial holders of our common stock.

**Dividends**

There is no guarantee that we will make quarterly cash distributions to holders of our common stock. We may make distributions only when, as and if authorized by our board of directors from funds legally available for distribution. Our cash distribution policy may be changed at any time and is subject to certain restrictions, including the following:

- we may lack sufficient cash to pay distributions on shares of our common stock for a number of reasons, including as a result of increases in our operating or general and administrative expenses, principal and interest payments on our debt, working capital requirements or cash needs;

- our ability to make cash distributions to holders of our common stock depends on the performance of our subsidiaries and their ability to distribute cash to us, and on the performance of our properties and tenants; and

- the ability of our subsidiaries to make distributions to us may be restricted by, among other things, covenants in the instruments governing current or future debt of these subsidiaries.

U.S. federal income tax law requires that we distribute annually at least 90% of our taxable income (without regard to the dividends paid deduction and excluding net capital gains). As a result, we expect to generally distribute a significant percentage of our available cash to holders of our common stock. Therefore, our growth may not be as fast as businesses that reinvest their available cash to expand ongoing operations. We expect that we will rely primarily upon external financing sources, including commercial bank borrowings and the issuance of debt and equity securities, to fund our acquisitions and capital expenditures. As a result, to the extent we are unable to finance growth externally, our cash distribution policy will significantly impair our ability to grow. To the extent we issue additional shares of common stock, our operating partnership issues OP Units or our existing or new LLC subsidiaries issue LLC units in connection with any acquisitions or other transactions, the payment of distributions on those additional securities may increase the risk that we will be unable to maintain or increase our distributions to stockholders.

Any future distributions we make will be at the discretion of our board of directors and will depend on a number of factors, including prohibitions or restrictions under financing agreements, our charter, applicable law and other factors described below.

We cannot assure you that our board of directors will not change our distribution policy in the future. Any distributions we pay in the future will depend upon our actual results of operations, liquidity, cash flows, financial condition, economic conditions, debt service requirements and other factors that could differ materially from our current expectations. Our actual results of operations, liquidity, cash flows and financial condition will be affected by several factors, including the revenue we receive from our properties, our operating expenses, interest expense, the ability of our tenants to meet their obligations and unanticipated expenditures. For more information regarding risk factors that could materially adversely affect our ability to pay dividends and make other distributions to our stockholders, see "Risk Factors."

**Unregistered Sales of Equity Securities**

    None.

**Issuer Purchases of Equity Securities**

    None.

**ITEM 6. RESERVED**

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*You should read the following discussion of our financial condition and results of operations together with our consolidated financial statements and related notes appearing elsewhere in this Annual Report on Form 10-K. This discussion contains forward-looking statements based upon current expectations that involve risks and uncertainties. Our actual results may differ materially from those anticipated in these forward-looking statements as a result of various factors, including those set forth under the section titled "Risk Factors" or in other parts of this Annual Report on Form 10-K. See "Cautionary Note Concerning Forward-Looking Statements." in this Annual Report on Form 10-K. Our historical results are not necessarily indicative of the results that may be expected for any period in the future.*

**Overview of Our Company**

    Clipper Realty Inc. (the "Company" or "we") is a self-administered and self-managed real estate company that acquires, owns, manages, operates and repositions multifamily residential and commercial properties in the New York metropolitan area, with a current portfolio in Manhattan and Brooklyn. Our primary focus is to own, manage and operate our portfolio and to acquire and reposition additional multifamily residential and commercial properties in the New York metropolitan area. The Company has been organized and operates in conformity with the requirements for qualification and taxation as a real estate investment trust ("REIT") under the U.S. federal income tax law and elected to be treated as a REIT commencing with the taxable year ended December 31, 2015.

    The Company was incorporated on July 7, 2015. On August 3, 2015, we closed a private offering of shares -of our common stock, in which we raised net proceeds of approximately $130.2 million. In connection with the private offering, we consummated a series of investment and other formation transactions that were designed, among other things, to enable us to qualify as a REIT for U.S. federal income tax purposes.

    In February 2017, the Company sold 6,390,149 primary shares of common stock (including the exercise of the over-allotment option, which closed on March 10, 2017) to investors in an initial public offering ("IPO") at $13.50 per share. The proceeds, net of offering costs, were approximately $78.7 million. The Company contributed the IPO proceeds to the Operating Partnership in exchange for units in the Operating Partnership.

    On May 9, 2017, the Company completed the purchase of 107 Columbia Heights (since rebranded as "Clover House"), a 158-unit apartment community located in Brooklyn Heights, New York, for $87.5 million.

    On October 27, 2017, the Company completed the acquisition of an 82-unit residential property at 10 West 65th Street in Manhattan, New York, for $79.0 million.

    On November 8, 2019, the Company completed the acquisition of property located at 1010 Pacific Street in Prospect Heights, New York, for $31.0 million.

    During the period December 2021 through April 2022, the Company purchased the Dean Street property located in Prospect Heights, New York, for approximately $48.5 million.

As of December 31, 2024, the Company owned:

• two neighboring residential/retail rental properties at 50 Murray Street and 53 Park Place in the Tribeca neighborhood of Manhattan;

• one residential property complex in the East Flatbush neighborhood of Brooklyn consisting of 59 buildings;

• two primarily commercial properties in Downtown Brooklyn (one of which includes 36 residential apartment units);

• one residential/retail rental property at 1955 1st Avenue in Manhattan;

• one residential rental property at 107 Columbia Heights in the Brooklyn Heights neighborhood of Brooklyn;

• one residential rental property at 10 West 65th Street in the Upper West Side neighborhood of Manhattan;

• one residential rental property at 1010 Pacific Street in the Prospect Heights neighborhood of Brooklyn; and

• the Dean Street property, to be redeveloped as a residential/retail rental building.

These properties are located in the most densely populated major city in the United States, each with immediate access to mass transportation.

The Company's ownership interest in its initial portfolio of properties, which includes the Tribeca House, Flatbush Gardens and the two Livingston Street properties, was acquired in the formation transactions in connection with the private offering. These properties are owned by the LLC subsidiaries, which are managed by the Company through the Operating Partnership. The Operating Partnership's interests in the LLC subsidiaries generally entitle the Operating Partnership to all cash distributions from, and the profits and losses of, the LLC subsidiaries other than the preferred distributions to the continuing investors who hold Class B LLC units in these LLC subsidiaries. The continuing investors own an aggregate amount of 26,317,396 Class B LLC units, representing 62.1% of the Company's common stock on a fully diluted basis. Accordingly, the Operating Partnership's interests in the LLC subsidiaries entitle the Operating Partnership to receive 37.9% of the aggregate distributions from the LLC subsidiaries. The Company, through the Operating Partnership, owns all of the ownership interests in the Aspen property, the Clover House property, the 10 West 65th Street property, the 1010 Pacific Street property and the Dean Street property.

**How We Derive Our Revenue**

Our revenue consists primarily of rents received from our residential, commercial and, to a lesser extent, retail tenants. We have two reportable operating segments, Residential Rental Properties and Commercial Rental Properties.  See Note 9. Segment Reporting to our consolidated financial statements included in this Form 10-K.

**Trends**

During 2024, the Company's residential properties continued to have elevated occupancy levels and experienced growth in rental rates, as a result of a robust rental market in the New York metro area. The average rental rate per square foot at the Tribeca House property at December 31, 2024 was $82.52, up from $77.70 at December 31, 2023. At the Flatbush Garden property, average residential rent per square foot increased at December 31, 2024, was $30.04, up from $26.69 at December 31, 2023. At the Clover House property, average residential rent per square foot at December 31, 2024, was $85.91, an increase from $80.93 at December 31, 2023. Urban office markets have also generally been negatively impacted as a result of the increase in remote working that began during the COVID-19 pandemic, leading to less demand for office space.

As of December 31, 2024, the Company's office properties had not been adversely affected from a rent perspective as a result of its long-term leases with the City of New York. However, As of February 23, 2024, the City of New York informed the Company of its intention to terminate the lease at 250 Livingston Street effective August 23, 2025. Additionally, as we move forward with the approaching expiration of the lease at 141 Livingston Street in December 2025, the Company and the City of New York are negotiating the terms of a five-year extension of their current lease. There can be no assurance that the negotiations will conclude with an agreement, and the Company is at risk of not replacing the City of New York as its tenant or not being able to replace it at comparable rents. See "- Liquidity and Capital Resources" below and Part I, Item 1A. Risk Factors."

44

Throughout 2024 and 2023, we continued to benefit from relatively low interest rates on our debt. Our weighted average interest rate as of December 31, 2024, was approximately 4.0% per annum.

**Factors that May Influence Future Results of Operations**

We derive approximately 74% of our revenues from rents received from residents in our apartment rental properties and the remainder from commercial and retail rental customers. We believe that we have expertise in operating, renovating and repositioning our properties. As we grow, we will likely add personnel as necessary to provide outstanding customer service to our residents in order to maintain or increase occupancy levels at our apartment communities and to preserve the ability to increase rents. This is likely to result in an increase in our operating and general and administrative expenses over time.

A majority of the leases at our apartment communities are for approximately one-year terms, which, in a rising market, generally enables us to seek increased rents upon renewal of existing leases or commencement of new leases. This may offset the potential adverse effect of inflation or deflation on rental revenue, although residents may leave without penalty at the end of their lease terms for any reason and, in a falling market, may require us to receive decreased rents upon renewal of existing leases or commencement of new leases. Our ability to seek increased rents at our Flatbush Gardens property, our Aspen property and a portion of our 10 West 65th Street property is limited, however, as a result of the rent stabilization laws and regulations of New York City, including the Housing Stability and Tenant Protection Act of 2019 ("HSTP"), which was signed into law in New York in June 2019. These regulations generally limit rental increases that we can charge at our Flatbush Gardens property, our Aspen property and a portion of our Tribeca House and 10 West 65th Street property upon lease renewal; effective October 1, 2024, such increases are 2.75% for a one-year lease and 5.25% for a two-year lease. The regulations also limit the maximum rent we can charge at our Flatbush Gardens property, our Aspen property and a portion of our 10 West 65th Street property on new leases. In addition to the HSTP regulation, at Flatbush Gardens the Company entered into a 40 year regulatory agreement under Article 11 of the Private Housing Finance Law with the New York City Department Housing Preservation and Development (the "Article 11 Agreement"). This agreement required us to commit to maintaining rents within existing area medium income groups. In exchange, the Company is eligible to receive incremental rental assistance under section 610 of the Private Housing Financing Law for tenants receiving government rental assistance. The Section 610 rental assistance is paid by the government the City of New York as incremental rent above and beyond the base rent paid by the tenant. At our Aspen property, the residential units are subject to regulations established by the HDC, under which there are no rental restrictions on approximately 55% of the units and low- and middle-income restrictions on approximately 45% of the units. There are no rent stabilization restrictions at our Tribeca House properties, our 250 Livingston Street property, our Clover House property and a portion of our 10 West 65th Street property. However, they may be impacted by the April 2024 New York "Good-Cause eviction" law.

We also incur costs on turnover of residents when one resident moves out and we prepare the apartment for a new resident. The costs include the costs of repainting and repairing apartment units, replacing obsolete or damaged appliances and re-leasing the units. While we budget for turnover and the costs associated therewith, our turnover cost may be affected by certain factors we cannot control. Excessive turnover and failure to properly manage turnover cost may adversely affect our operations and could adversely affect our financial condition, results of operations, cash flows and ability to pay distributions on, and the market price of, our common stock.

We seek earnings growth primarily through increasing rents and occupancy at existing properties and acquiring additional apartment communities in markets complementing our existing portfolio locations. Our apartment and commercial operating properties are concentrated in six neighborhoods within the boroughs of Manhattan and Brooklyn in New York City, which makes us susceptible to adverse developments in these markets. As a result, we are particularly affected by the local economic conditions in these markets, including, but not limited to, changes in supply of or demand for apartment units in our markets, competition for real property investments in our markets, changes in government rules, regulations and fiscal policies, including those governing real estate usage and tax, and any environmental risks related to the presence of hazardous or toxic substances or materials at or in the vicinity of our properties, which could negatively affect our overall performance.

45

We may be unable to accurately predict future changes in national, regional or local economic, demographic or real estate market conditions. For example, continued volatility and uncertainty in the global, national, regional and local economies could make it more difficult for us to lease apartment, commercial and retail space and may require us to lease our apartment, commercial and retail space at lower rental rates than projected and may lead to an increase in resident defaults. In addition, these conditions may also lead to a decline in the value of our properties and make it more difficult for us to dispose of these properties at competitive prices. These conditions, or others we cannot predict, could adversely affect our financial condition, results of operations, cash flows and ability to pay distributions on, and the market price of, our common stock.

As a public company with shares listed on a U.S. exchange, we incur general and administrative expenses, including legal, accounting, and other expenses, related to corporate governance, public reporting and compliance with various provisions of the Sarbanes-Oxley Act, related regulations of the SEC, including compliance with the reporting requirements of the Exchange Act, and the requirements of the national securities exchange on which our stock is listed.

**Significant Accounting Policies**

*Segments*

On December 31, 2024, the Company had two reportable operating segments, Residential Rental Properties and Commercial Rental Properties. Our Chief Operating Decision Maker ("CODM"), represented by our Co-Chairman and Chief Executive Officer, reviews the results in which the revenue and Income from Operations is divided between the commercial and residential performance.

*Basis of Consolidation*

The consolidated financial statements of the Company included elsewhere herein are prepared in accordance with generally accepted accounting principles in the United States ("GAAP"). The effect of all intercompany balances has been eliminated. The consolidated financial statements include the accounts of all entities in which the Company has a controlling interest. The ownership interests of other investors in these entities are recorded as non-controlling interests.

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of commitments and contingencies at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Management adjusts such estimates when facts and circumstances dictate. The most significant estimates made include the recoverability of accounts receivable, allocation of property purchase price to tangible and intangible assets acquired and liabilities assumed, the useful lives of long-lived assets, review of long-lived assets for impairment and contingent liabilities. Actual results could materially differ from these estimates.

*Investment in Real Estate*

Real estate assets held for investment are carried at historical cost and consist of land, buildings and improvements, furniture, fixtures and equipment and real estate under development. Expenditures for ordinary repair and maintenance costs are charged to expense as incurred. Expenditures for improvements, renovations, and replacements of real estate assets are capitalized and depreciated over their estimated useful lives if the expenditures qualify as betterment or the life of the related asset will be substantially extended beyond the original life expectancy.

The Company evaluates each acquisition of real estate or in-substance real estate to determine if the integrated set of assets and activities acquired meets the definition of a business and needs to be accounted for as a business combination. If either of the following criteria is met, the integrated set of assets and activities acquired would not qualify as a business:

• Substantially all of the fair value of the gross assets acquired is concentrated in either a single identifiable asset or a group of similar identifiable assets; or

• The integrated set of assets and activities is lacking, at a minimum, an input and a substantive process that together significantly contribute to the ability to create outputs (i.e., revenue generated before and after the transaction).

An acquired process is considered substantive if:

• The process includes an organized workforce (or includes an acquired contract that provides access to an organized workforce) that is skilled, knowledgeable and experienced in performing the process;

• The process cannot be replaced without significant cost, effort or delay; or

• The process is considered unique or scarce.

Generally, the Company expects that acquisitions of real estate or in-substance real estate will not meet the revised definition of a business because substantially all of the fair value is concentrated in a single identifiable asset or group of similar identifiable assets (i.e., land, buildings and related intangible assets) or because the acquisition does not include a substantive process in the form of an acquired workforce or an acquired contract that cannot be replaced without significant cost, effort or delay.

Upon acquisition of real estate, the Company assesses the fair values of acquired tangible and intangible assets including land, buildings, tenant improvements, above and below-market leases, in-place leases and any other identified intangible assets and assumed liabilities. The Company allocates the purchase price to the assets acquired and liabilities assumed based on their fair values. In estimating fair value of tangible and intangible assets acquired, the Company assesses and considers fair value based on estimated cash flow projections that utilize appropriate discount and capitalization rates, estimates of replacement costs, net of depreciation, and available market information. The fair value of the tangible assets of an acquired property considers the value of the property as if it were vacant.

The Company records acquired above-market and below-market lease values initially based on the present value, using a discount rate which reflects the risks associated with the leases acquired based on the difference between (i) the contractual amounts to be paid pursuant to each in-place lease and (ii) management's estimate of fair market lease rates for each corresponding in-place lease, measured over a period equal to the remaining term of the lease for above-market leases and the initial term plus the term of any below-market fixed renewal options for the below-market leases. Other intangible assets acquired include amounts for in-place lease values and tenant relationship values (if any) that are based on management's evaluation of the specific characteristics of each tenant's lease and the Company's overall relationship with the respective tenant. Factors to be considered by management in its analysis of in-place lease values include an estimate of carrying costs to execute similar leases. In estimating carrying costs, management includes real estate taxes, insurance and other operating expenses and estimates of lost rentals at market rates during the expected lease-up periods, depending on local market conditions. In estimating costs to execute similar leases, management considers leasing commission, legal and other related expenses.

The Company reviews long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. A property's value is impaired if management's estimate of the aggregate future cash flows (undiscounted and without interest charges) to be generated by the property is less than the carrying value of the property. To the extent impairment has occurred, a write-down is recorded and measured by the amount of the difference between the carrying value of the asset and the fair value of the asset. Management of the Company does not believe that any of its properties within the portfolio are impaired as of December 31, 2024.

For long-lived assets to be disposed of, impairment losses are recognized when the fair value of the assets less estimated cost to sell is less than the carrying value of the assets. Properties classified as real estate held for sale generally represent properties that are actively marketed or contracted for sale with closing expected to occur within the next twelve months. Real estate held for sale is carried at the lower of cost, net of accumulated depreciation, or fair value less cost to sell, determined on an asset-by-asset basis. Expenditures for ordinary repair and maintenance costs on held for sale properties are charged to expense as incurred. Expenditures for improvements, renovations, and replacements related to held-for-sale properties are capitalized at cost. Depreciation is not recorded on real estate held for sale.

47

If a tenant vacates its space prior to the contractual termination of the lease and no rental payments are being made on the lease, any unamortized balances of the related intangibles are written off. The tenant improvements and origination costs are amortized to expense over the remaining life of the lease (or charged against earnings if the lease is terminated prior to its contractual expiration date).

Depreciation is computed using the straight-line method over the estimated useful lives of the assets as follows:

| | |
|---|---|
| Building and improvements | 10 – 44 years |
| Tenant improvements | Shorter of useful life or lease term |
| Furniture, fixtures, and equipment | 3 – 15 years |

Capitalized above-market lease values are amortized as a reduction of base rental revenue over the remaining term of the respective leases, and capitalized below-market lease values are amortized as an increase to base rental revenue over the remaining initial terms plus the terms of any below-market fixed rate renewal options of the respective leases. The value of in-place leases is amortized to expense over the remaining initial terms of the respective leases.

### Cash and Cash Equivalents

Cash and cash equivalents are defined as cash on hand and in banks, plus all short-term investments with a maturity of three months or less when purchased. The Company maintains some of its cash in bank deposit accounts, which, at times, may exceed the federally insured limit. No losses have been experienced related to such accounts.

### Restricted Cash

Restricted cash generally consists of escrows for future real estate taxes and insurance expenditures, repairs, capital improvements, loan reserves and security deposits.

### Tenant and Other Receivables and Allowance for Doubtful Accounts

Tenant and other receivables are comprised of amounts due for monthly rents and other charges less allowance for doubtful accounts. As described more fully under Revenue Recognition below, in the first quarter of 2022 the Company adopted Accounting Standards Codification ("ASC") 842 "Leases" which replaced guidance under ASC 840 and provided for transition from balances at December 31, 2021. In accordance with ASC 842, the Company performs a detailed review of amounts due from tenants to determine if accounts receivable balances and future lease payments were probable of collection, writes off receivables not probable of collection and records a general reserve against revenues for receivables probable of collection for which a loss can be reasonably estimated. If management determines that the tenant receivable is not probable of collection it is written off against revenues. In addition, the Company records a general reserve under ASC 450.

### Deferred Costs

Deferred lease costs consist of fees incurred to initiate and renew operating leases. Lease costs are being amortized using the straight-line method over the terms of the respective leases. Deferred financing costs represent commitment fees, legal and other third-party costs associated with obtaining financing. These costs are amortized over the term of the financing and are recorded in interest expense in the combined financial statements. Unamortized deferred financing costs are expensed when the associated debt is refinanced or repaid before maturity. Costs incurred in seeking financing transactions which do not close are expensed in the period the financing transaction is terminated.

48

*Revenue Recognition*

As mentioned above under Tenant and Other Receivables and Allowance for Doubtful Accounts the Company records lease income under ASC 842,"Leases" which replaces the guidance under ASC 840. ASC 842 applies to the Company principally as lessor; as a lessee, the Company's leases are immaterial. The Company has determined that all its leases as lessor are operating leases. The Company has elected to not bifurcate lease and non-lease components under a practical expedient provision. With respect to collectability, the Company has written off all receivables not probable of collection and related deferred rent, and has recorded income for those tenants on a cash basis. When the probability assessment has changed for these receivables, the Company has recognized lease income to the extent of the difference between the lease income that would have been recognized if collectability had always been assessed as probable and the lease income recognized to date. For remaining receivables probable of collection, the Company has recorded a general reserve under ASC 450.

For the year ended December 31, 2024 and 2023, the Company charged revenue in the amount of $4,219 and $4,526, respectively, for residential receivables not deemed probable of collection and recognized revenue of $299 and $1,447, respectively, for a reassessment of collectability of residential receivables previously not deemed probable of collection.

In accordance with the provisions of ASC 842, rental revenue for commercial leases is recognized on a straight-line basis over the terms of the respective leases. Deferred rents receivable represents the amount by which straight-line rental revenue exceeds rents currently billed in accordance with lease agreements. Rental income attributable to residential leases and parking is recognized as earned, which is not materially different from the straight-line basis. Leases entered by residents for apartment units are generally for one-year terms, renewable upon consent of both parties on an annual or monthly basis.

Reimbursements for operating expenses due from tenants pursuant to their lease agreements are recognized as revenue in the period the applicable expenses are incurred. These costs generally include real estate taxes, utilities, insurance, common area maintenance costs and other recoverable costs and are recorded as part of commercial rental income in the condensed consolidated statements of operations.

*Stock-based Compensation*

The Company accounts for stock-based compensation pursuant to Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 718, "Compensation — Stock Compensation." As such, all equity-based awards are reflected as compensation expense in the Company's consolidated statements of operations over their vesting period based on the fair value at the date of grant. In the event of a forfeiture, the previously recognized expense would be reversed.

*Transaction Pursuit Costs*

Transaction pursuit costs primarily reflect costs incurred for abandoned acquisition, disposition or other transaction pursuits.

*Income Taxes*

The Company elected to be taxed and to operate in a manner that will allow it to qualify as a REIT under the Code. To qualify as a REIT, the Company is required to distribute dividends equal to at least 90% of the REIT taxable income (computed without regard to the dividends paid deduction and net capital gains) to its stockholders, and meet the various other requirements imposed by the Code relating to matters such as operating results, asset holdings, distribution levels and diversity of stock ownership. Provided the Company qualifies for taxation as a REIT, it is generally not subject to U.S. federal corporate-level income tax on the earnings distributed currently to its stockholders. If the Company fails to qualify as a REIT in any taxable year, the Company will be subject to U.S. federal and state income tax on its taxable income at regular corporate tax rates and any applicable alternative minimum tax. In addition, the Company may not be able to re-elect as a REIT for the four subsequent taxable years. The entities comprising the Predecessor are limited liability companies and are treated as pass-through entities for income tax purposes. Accordingly, no provision has been made for federal, state or local income or franchise taxes in the accompanying consolidated financial statements.

49

In accordance with FASB ASC Topic 740, the Company believes that it has appropriate support for the income tax positions taken and, as such, does not have any uncertain tax positions that, if successfully challenged, could result in a material impact on its financial position or results of operations. The prior three years' income tax returns are subject to review by the Internal Revenue Service.

*Fair Value Measurements*

Refer to Note 6, "Fair Value of Financial Instruments".

*Derivative Financial Instruments*

FASB derivative and hedging guidance establishes accounting and reporting standards for derivative instruments, including certain derivative instruments embedded in other contracts, and for hedging activities. As required by FASB guidance, the Company records all derivatives on the consolidated balance sheets at fair value. The accounting for changes in the fair value of derivatives depends on the intended use of the derivative and the resulting designation.

Derivatives used to hedge the exposure to changes in the fair value of an asset, liability, or firm commitment attributable to a particular risk, such as interest rate risk, are considered fair value hedges. Derivatives used to hedge the exposure to variability in expected future cash flows, or other types of forecast transactions, are considered cash flow hedges. For derivatives designated as fair value hedges, changes in the fair value of the derivative and the hedged item related to the hedged risk are recognized in earnings. For derivatives designated as cash flow hedges, the effective portion of changes in the fair value of the derivative is initially reported in other comprehensive income (loss) (outside of earnings) and subsequently reclassified to earnings when the hedged transaction affects earnings, and the ineffective portion of changes in the fair value of the derivative is recognized directly in earnings. The Company assesses the effectiveness of each hedging relationship by comparing the changes in the fair value or cash flows of the derivative hedging instrument with the changes in the fair value or cash flows of the designated hedged item or transaction. For derivatives not designated as hedges, changes in fair value would be recognized in earnings. As of December 31, 2024 and 2023, the Company has no derivatives for which it applies hedge accounting.

*Loss Per Share*

Basic and diluted net loss per share is computed by dividing net loss attributable to common stockholders by the weighted average common shares outstanding. As of December 31, 2024 and 2023, the Company had unvested LTIP units which provide for non-forfeitable rights to dividend-equivalent payments. Accordingly, these unvested LTIP units are considered participating securities and are included in the computation of basic and diluted net loss per share pursuant to the two-class method. The Company did not have dilutive securities as of December 31, 2024, or 2023.

The effect of the conversion of the 26,317 Class B LLC units outstanding is not reflected in the computation of basic and diluted net loss per share, as the effect would be anti-dilutive. The net loss allocable to such units is reflected as non-controlling interests in the accompanying consolidated financial statements.

**Results of Operations**

Our focus throughout the years ended December 31, 2024 and 2023, has been to manage our properties to optimize revenues and control costs, while continuing to renovate and reposition certain properties. The discussion below highlights the specific properties contributing to the changes in the results of operations and focuses on the properties that the Company owned and operated for the full period in each comparison.

*Income Statement for the Years Ended December 31, 2024 and 2023 (in thousands)*

| | 2024 | Less: 1010 Pacific | 2024: Excluding 1010 Pacific | 2023 | Less: 1010 Pacific | 2023: Excluding 1010 Pacific | Increase (decrease) Excluding 1010 Pacific | % |
|---|---|---|---|---|---|---|---|---|
| Revenues | | | | | | | | |
| Residential rental income | $  109,873 | $  6,451 | $  103,422 | $  99,716 | $  3,114 | $  96,602 | $  6,820 | 7.1% |
| Commercial rental income | 38,902 | 66 | 38,836 | 38,489 | 24 | 38,465 | 371 | 1.0% |
| Total revenues | 148,775 | 6,517 | 142,258 | 138,205 | 3,138 | 135,067 | 7,191 | 5.3% |
| Operating Expenses | | | | | | | | |
| Property operating expenses | 34,163 | 906 | 33,257 | 30,619 | 702 | 29,917 | 3,340 | 11.2% |
| Real estate taxes and insurance | 29,770 | (20) | 29,790 | 31,951 | 360 | 31,591 | (1,801) | (5.7)% |
| General and administrative | 14,152 | 421 | 13,731 | 13,169 | 240 | 12,929 | 802 | 6.2% |
| Transaction pursuit costs | — | — | — | 357 | — | 357 | (357) | (100.0)% |
| Depreciation and amortization | 29,892 | 1,417 | 28,475 | 28,939 | 1,305 | 27,634 | 841 | 3.0% |
| Total operating expenses | 107,977 | 2,724 | 105,253 | 105,035 | 2,607 | 102,428 | 2,825 | 2.8% |
| Litigation settlement and other | (269) | — | (269) | — | — | — | (269) | — |
| Income from operations | 40,529 | 3,793 | 36,736 | 33,170 | 531 | 32,639 | 4,097 | 12.6% |
| Interest expense, net | (47,111) | (5,168) | (41,943) | (44,867) | (3,013) | (41,854) | (89) | (0.2)% |
| Loss on modification/extinguishment of debt | — | — | — | (3,868) | — | (3,868) | 3,868 | 100.0% |
| Net loss | $  (6,582) | $  (1,375) | $  (5,207) | $  (15,565) | $  (2,482) | $  (13,083) | $  7,876 | 60.2% |

The dollar amounts in the narrative disclosure below are in thousands, other than the base rent per square foot figures. The discussion below compares amounts in 2024, excluding 1010 Pacific, to 2023 amounts.

*Revenue*. Residential rental income increased to $103,422 for the year ended December 31, 2024, from $96,602 for the year ended December 31, 2023, primarily, due to increases in rental rates. For example, base rent per square foot increased at the Tribeca House property to $82.52 at December 31, 2024, from $77.70 at December 31, 2023 and base rent per square foot increased at the Clover House property to $85.91 at December 31, 2024, from $80.93 at December 31, 2023.

Commercial rental income increased to $38,836 for the year ended December 31, 2024, from $38,465 for the year ended December 31, 2023, primarily due to increased escalation billings at the 250 Livingston Street property.

*Property operating expenses*.  Property operating expenses include property-level costs such as compensation costs for property-level personnel, repairs and maintenance, supplies, utilities and landscaping. Property operating expenses increased to $33,257 for the year ended December 31, 2024, from $29,917 for the year ended December 31, 2023, primarily due to increased payroll for maintenance activities, legal costs for collection activities and utilities costs.

*Real estate taxes and insurance*.  Real estate taxes and insurance expenses decreased to $29,790 for the year ended December 31, 2024, from $31,591 for the year ended December 31, 2023, due to the real estate tax exemption at Flatbush Gardens that began July 1, 2023, partially offset by increased property taxes and insurance across the portfolio .

*General and administrative*.   General and administrative expenses increased to $13,731 for the year ended December 31, 2024, from $12,929 for the year ended December 31, 2023, primarily due to higher payroll costs partially offset by lower accounting fees in relation to the separation from our prior auditor in 2023.

*Transaction pursuit costs.* Transaction pursuit costs of $357 in 2023 primarily reflect costs related to the Article 11 Agreement and an abandoned acquisition.

*Depreciation and amortization*.   Depreciation and amortization expense increased to $28,475 for the year ended December 31, 2024, from $27,634 for the year ended December 31, 2023, due to additions to real estate across the portfolio, primarily at Flatbush Gardens.

*Litigation settlement.* Litigation settlement costs of $269 related to additional costs of litigation at the Tribeca House property primarily settled in 2022.

*Interest expense, net*.   Interest expense, net, increased to $41,943 for the year ended December 31, 2024 from $41,854 for the year ended December 31, 2023, primarily due to lower capitalized interest as a result of completion of development of the 1010 Pacific property in the second quarter of 2023.

*Loss on modification/extinguishment of debt*.   Loss on the extinguishment of debt in 2023 consists of costs related to the early termination of our construction loan at 1010 Pacific including the acceleration of the remaining unamortized loan costs from the prior loan.

*Net loss*.   As a result of the foregoing, net loss decreased to $5,205 for the year ended December 31, 2024, from $13,083 for the year ended December 31, 2023.

For comparison of the year ended December 31, 2023 to the year ended December 31, 2022, refer to Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations," included in the Company's Annual Report on Form 10-K for the year ended December 31, 2023.

**Liquidity and Capital Resources**

As of December 31, 2024, we had $1,275.4 million of indebtedness (net of unamortized issuance costs) secured by our properties, $19.9 million of cash and cash equivalents, and $18.2 million of restricted cash. See Note 4 "Notes Payable" of the accompanying "Notes to Consolidated Financial Statements" for a discussion of the Company's property-level debt.

As a REIT, we are required to distribute at least 90% of our REIT taxable income, computed without regard to the dividends paid deduction and excluding net capital gains, to stockholders on an annual basis. We expect that these needs will be met from cash generated from operations and other sources, including proceeds from secured mortgages and unsecured indebtedness, proceeds from additional equity issuances and cash generated from the sale of property.

*Short-Term and Long-Term Liquidity Needs*

Our short-term liquidity needs will primarily be to fund operating expenses, recurring capital expenditures, property taxes and insurance, interest and scheduled debt principal payments, general and administrative expenses, and distributions to stockholders and unit holders. We generally expect to meet our short-term liquidity requirements through net cash provided by operations and cash on hand, and we believe we will have sufficient resources to meet our short-term liquidity requirements.

Our principal long-term liquidity needs will primarily be to fund additional property acquisitions, major renovation and upgrading projects, and debt payments and retirements at maturity. We do not expect that net cash provided by operations will be sufficient to meet all of these long-term liquidity needs. We anticipate meeting our long-term liquidity requirements by using cash as an interim measure and funds from public and private equity offerings and long-term secured and unsecured debt offerings.

We believe that as a publicly traded REIT, we will have access to multiple sources of capital to fund our long-term liquidity requirements. These sources include the incurrence of additional debt and the issuance of additional equity. However, we cannot provide assurance that this will be the case. Our ability to secure additional debt will depend on a number of factors, including our cash flow from operations, our degree of leverage, the value of our unencumbered assets and borrowing restrictions that may be imposed. Our ability to access the equity capital markets will depend on a number of factors as well, including general market conditions for REITs and market perceptions about our company.

We believe that our current cash flows from operations and cash on hand, coupled with additional mortgage debt, will be sufficient to allow us to continue operations, satisfy our contractual obligations and make distributions to our stockholders and the members of our LLC subsidiaries for at least the next twelve months. However, no assurance can be given that we will be able to refinance any of our outstanding indebtedness in the future on favorable terms or at all.

### Property-Level Debt

The mortgages, loans and mezzanine notes payable collateralized by the properties, or the Company's interest in the entities that own the properties and assignment of leases, are as follows (in thousands):

| Property | Maturity | Interest Rate | December 31, 2024 |
|---|---|---|---|
| Flatbush Gardens, Brooklyn, NY | 6/1/2032 | 3.125% | $ 329,000 |
| 250 Livingston Street, Brooklyn, NY | 6/6/2029 | 3.63% | 125,000 |
| 141 Livingston Street, Brooklyn, NY | 3/6/2031 | 3.21% | 100,000 |
| Tribeca House, Manhattan, NY | 3/6/2028 | 4.506% | 360,000 |
| Aspen, Manhattan, NY | 7/1/2028 | 3.68% | 59,403 |
| Clover House, Brooklyn, NY | 12/1/2029 | 3.53% | 82,000 |
| 10 West 65th Street, Manhattan, NY | 11/1/2027 | SOFR + 2.50% | 31,437 |
| 1010 Pacific Street, Brooklyn, NY | 9/15/2025 | 5.55% | 60,000 |
| 1010 Pacific Street, Brooklyn, NY | 9/15/2025 | 6.37% | 20,000 |
| 953 Dean Street, Brooklyn, NY | 8/10/2026 | SOFR + 4% | 98,984 |
| 953 Dean Street, Brooklyn, NY | 8/10/2026 | SOFR + 10% | 9,670 |
| | | | $ 1,275,359 |

#### Flatbush Gardens

There is $329,000 of mortgage debt secured by Flatbush Gardens, as of December 31, 2024, in the form of a mortgage note to New York Community Bank. The note matures on June 1, 2032, and bears interest at 3.125% through May 2027 and thereafter at the prime rate plus 2.75%, subject to an option to fix the rate. The note requires interest-only payments through May 2027, and monthly principal and interest payments thereafter based on a 30-year amortization schedule. We have the option to prepay all (but not less than all) of the unpaid balance of the note prior to the maturity date, subject to certain prepayment premiums, as defined.

#### 250 Livingston Street

There is $125.0 million in mortgage debt secured by 250 Livingston Street, as of December 31, 2024, in the form of a mortgage note to Citi Real Estate Funding Inc. The note matures on June 6, 2029, bears interest at 3.63% and requires interest-only payments for the entire term. We have the option to prepay all (but not less than all) of the unpaid balance of the note within three months of maturity, without a prepayment premium.

As of February 23, 2024, The City of New York, a municipal corporation acting through the Department of Citywide Administrative Services ("NYC"), notified us of its intention to terminate its lease at 250 Livingston Street effective August 23, 2025. The lease generally provides for rent payments in the amount of $15,400 per annum. We may be unable to replace NYC as a tenant or unable to replace it with other commercial tenants at comparable rent rates, may incur substantial costs to improve the vacated space or may have to offer significant inducements to fill the space, all of which may have an adverse effect on our financial condition, results of operations and cash flow. In connection with the termination of the 250 Livingston Street lease, pursuant to the terms of the loan agreement related to $125,000 building mortgage, we have established a cash management account for the benefit of the lender, into which we will be obligated to deposit all revenue generated by the building at 250 Livingston Street. All amounts remaining in such cash management account after the lender's allocations set forth in the loan agreement will be disbursed to us once the tenant cure conditions are satisfied under the loan agreement. As of February 14, 2025, we are required to deposit into such cash management account approximately $5,684 upon demand by the lender. If we are unable to replace the NYC lease at comparable rents, we may not be able to cure the conditions listed in the loan agreement. If the excess cash is not released to us, it could impact our available cash to fund corporate operations and pay dividends and distributions to our stockholders.

On January 2, 2025, we were notified that the loan servicing of the loan related to the 250 Livingston Street property was transferred, at our request, to LNR Partners ("LNR") to serve as special servicer in order for us to engage in negotiations on a modification of our loan. On January 6, 2025, we and LNR signed a Pre-Negotiation Letter Agreement to discuss our request for a reduction in the loan. These negotiations continue and there can be no guarantee that they will conclude with an agreement. On October 10, 2024, the Company guaranteed an agreement between the Company's subsidiary, 250 Livingston Owner LLC, and IronHound Management Company LLC, whose principal is the Company's director Roberto Verrone, to provide consulting services regarding the loan related to the 250 Livingston Street property. The initial fee paid upon the agreement is $125 and the agreement also includes restructuring and other fees payable upon certain loan modifications. The arrangement was approved by an independent committee of the Company's board of directors.

*141 Livingston Street*

There is $100,000 in mortgage debt secured by 141 Livingston Street, as of December 31, 2024, in the form of a mortgage note to Citi Real Estate Funding Inc. The note matures on March 6, 2031, bears interest at 3.21% and requires interest-only payments for the entire term. We have the option to prepay all (but not less than all) of the unpaid balance of the loan within three months of maturity, without a prepayment premium.

The 141 Livingston Street lease expires on December 27, 2025, and if NYC were to decide not to renew or extend such lease on its stated termination date, pursuant to the terms of the lease, we would be at risk of not being able to replace  NYC as a tenant, leasing the space below the current rates, incurring costs to improve the space or offer other inducements to fill the space, all of which may have an adverse effect on our financial condition, results of operations and cash flow. We and NYC are in the process of negotiating the terms of a five-year extension of the current lease upon its expiration in December 2025. There can be no assurance that the negotiations will conclude with an agreement.

Our subsidiary, 141 Livingston Owner LLC (the "Borrower") and Citi Real Estate Funding Inc. entered into the loan agreement related to a $100,000 loan. The loan is evidenced by promissory mortgage notes and secured by the 141 Livingston Street property. We and our Operating Partnership subsidiary serve as limited guarantors of certain obligations under the loan, including those related to the reserve monthly deposit discussed below.

If we are not able to extend or replace the NYC lease at our 141 Livingston Street property for a minimum of a five-year term, we will be required to either fund a reserve account in the amount of $10,000 payable in equal monthly payments over the 18 months after lease expiration or deliver to the lender a letter of credit in the amount of $10,000

On October 28, 2024, we received notice that, as of October 7, 2024, the servicing of the mortgage notes was transferred to a special servicer (the "Special Servicer") due to our alleged failure to make certain required payments under the loan agreement, including, but not limited to, the reserve deposit starting on July 7, 2024. The Special Servicer demanded that we pay (i) $2,200 of reserve payments into a reserve account immediately (for July-October 2024) and continued monthly payments of $555 for an additional 14 months, (ii) $1.2 million of default interest and late charges through October 7, 2024, and (iii) an additional $10 per diem interest for each day thereafter (an additional $1,356 as of February 14, 2025).

On November 11, 2024, the Special Servicer notified the Borrower that, due to its alleged event of default under the Loan Agreement, as a result of the failure to make the payments described above, the mortgage notes have been accelerated, and all amounts under the loan agreement were due and payable. Such amounts include, but are not limited to, $100,000 principal amount of the mortgage notes, approximately $5,000 of default yield maintenance premium, $10,000 aggregate reserve deposit, and the above-described penalty default interest and penalties.

We believe that (i) we have made timely payments under the loan agreement, (ii) the servicer and the Special Servicer have misinterpreted the terms of the loan agreement requiring monthly reserve payments beginning on July 7, 2024, (iii) we have no current obligation to make such reserve payments under the loan agreement and (iv) we should not be obligated to pay the default interest and late charges. We and the Special Servicer have entered into a pre-negotiation agreement and as such are engaged in good faith discussions regarding the terms of the loan agreement related to the monthly reserve deposit, among other matters. However, if we are unable to resolve this matter in a manner favorable to us, the lender may also seek to exercise any of its other rights or remedies under the loan agreement.

On December 18, 2024, we received notice from the Special Servicer that due to its allegation that Clipper Realty (the "Guarantor") did not maintain a net worth of not less than $100,000 as of December 31, 2022 and 2023, respectively, as required under the loan agreement, we are in default on the loan. We replied to the Special Servicer disputing such calculation and alleging that the Special Servicer did not calculate net worth in a reasonable manner. We provided the Special Servicer with our own calculation of net worth that shows a net worth in excess of the required amount. We await a response from the Special Servicer.

On January 21, 2025, we received notice from the Special Servicer alleging that certain elements of our insurance on the building at 141 Livingston Street are not in compliance with the loan agreement requirements, including, but not limited to, due to a deductible in excess of what is permitted under the terms of the loan agreement and the use of an insurance carrier with a rating agency rating below that which is permitted under the terms of the loan agreement.

*Tribeca House*

There is a $360,000 loan secured by the Tribeca House properties, as of December 31, 2024, through Deutsche Bank A.G. The loan matures on March 6, 2028, bears interest at 4.506% and requires interest-only payments for the entire term. We have the option to prepay all (but not less than all) of the unpaid balance of the note prior to the maturity date, subject to a prepayment premium if it occurs prior to December 6, 2027.

*Aspen*

There is $59,403 in mortgage debt secured by Aspen, as of December 31, 2024, in the form of a mortgage note to Capital One Multifamily Finance LLC. The note matures on July 1, 2028, and bears interest at 3.68%. The note required interest-only payments through July 2018, and monthly principal and interest payments of approximately $321 thereafter based on a 30-year amortization schedule. We have the option to prepay the note prior to the maturity date, subject to a prepayment premium.

*Clover House*

There is $82,000 in mortgage debt secured by Clover House as of December 31, 2024, in the form of a mortgage note to MetLife Investment Management. The note matures on December 1, 2029, bears interest at 3.53% and requires interest-only payments for the entire term. We have the option, commencing on January 1, 2024, to prepay the note prior to the maturity date, subject to a prepayment premium if it occurs prior to September 2, 2029.

There is $31,437 in mortgage debt secured by 10 West 65th Street as of December 31, 2024, in the form of a mortgage note to New York Community Bank ("NYCB"), entered into in connection with the acquisition of the property. The note matures on November 1, 2027. Through October 2022 the Company paid a fixed interest rate of 3.375% and thereafter was scheduled to pay at the prime rate plus 2.75%, subject to an option to fix the rate. On August 26, 2022 the Company and NYCB amended the note to replace prime plus 2.75% rate with SOFR plus 2.5% (7.88% at December 31, 2024). The note required interest-only payments through November 2019, and monthly principal and interest payments thereafter based on a 30-year amortization schedule. We have the option to prepay all (but not less than all) of the unpaid balance of the note prior to the maturity date, subject to certain prepayment premiums, as defined.

*1010 Pacific Street*

There is $80,000 in mortgage debt secured by 1010 Pacific Street as of December 31, 2024, in the form of two mortgage notes to Valley National Bank. There is a $60,000 note which has an annual interest rate of 5.55% and a second note of $20,000 with an annual interest rate of 6.37%. The total borrowing of $80,000 has a term of twenty-four months and matures on September 15, 2025. The Company has the option to prepay in full, or in part, the unpaid balance of the note prior to the maturity date.

*Dean Street*

On December 22, 2021, the Company entered into a $30,000 mortgage note agreement with Bank Leumi, N.A related to the Dean Street acquisition. The note's original maturity was December 22, 2022 and was subsequently extended to September 22, 2023. The note required interest-only payments and bears interest at the prime rate (with a floor of 3.25%) plus 1.60%. In April 2022, the Company borrowed an additional $6,985 under the mortgage note in connection with the acquisition of additional parcels of land in February and April 2022.

On August 10, 2023, the "Company refinanced its $36,985 mortgage on its Dean Street development with a senior construction loan ("Senior Loan") with Valley National Bank that permits borrowings up to $115,000 and a mezzanine loan (the "Mezzanine Loan") with BADF 953 Dean Street Lender LLC that permits borrowings up to $8,000.

The Senior Loan allows maximum borrowings of $115,000 for a 30-month term, has two 6-month extension options, and bears interest at 1-Month Term SOFR plus 4.00%, with an all-in floor of 5.50% (8.55% at December 31, 2024). The Senior Loan consists of a land loan, funded at closing to refinance the existing loan totaling $36,985, a construction loan of up to $62,400 and a project loan of up to $15,600. The Company has provided a 30% payment guarantee of outstanding borrowings among other standard indemnities. As of December 31, 2024, the Company has drawn $49,315 from the construction loan and $12,549 from the project loan.

The Mezzanine Loan allows maximum borrowings of $8,000 for a 30-month term, have two 6-month extension options, and bears interest at 1-Month Term SOFR plus 10%, with an all-in floor of 13% (14.55% at December 31, 2024). Interest shall accrue on the principal, is compounded monthly and is due at the end of the term of the loan. At closing, $4,500 was funded to cover closing costs incurred on the construction loans. As of December 31,2024, the remaining $3,500 was drawn for ongoing construction costs.

During the years ended December 31, 2024 and 2023, the Company incurred $1,508 and $161, respectively, in interest and is included in the balance of the Notes Payable in the Consolidated Balance Sheet.

*Corporate*

On August 10, 2023 the Company entered into a $5,000 corporate line of credit with Valley National Bank. The line of credit bears interest of Prime + 1.5%. The line of credit expired on August 10, 2024.

The Company has provided a limited guaranty for mortgage notes at several of its properties which require the Company to maintain certain minimum liquidity and net worth levels. The Company's loan agreements contain customary representations, covenants and events of default. Certain loan agreements require the Company to comply with affirmative and negative covenants, including the maintenance of debt service coverage and debt yield ratios. In the event that the Company is not compliant, certain lenders may require cash sweeps of rent until the conditions are cured. Except as described above, the Company is not in default on any of its loan agreements.

*Contractual Obligations and Commitments*

The following table summarizes principal and interest payment requirements on our debt under terms as of December 31, 2024:

| | (in thousands) | | |
|---|---|---|---|
| | **Principal** | **Interest** | **Total** |
| 2025 | $ 82,144 | $ 44,554 | $ 126,699 |
| 2026 | 101,091 | 41,792 | 142,883 |
| 2027 | 43,019 | 51,333 | 94,352 |
| 2028 | 416,554 | 45,712 | 462,266 |
| 2029 | 209,571 | 37,714 | 247,285 |
| Thereafter | 422,980 | 75,940 | 498,919 |
| Total | $ 1,275,359 | $ 297,045 | $ 1,572,404 |

On June 29, 2023 the Company entered into the Article 11 Agreement. Under the Article 11 agreement, the Company has entered into a Housing Repair and Maintenance Letter Agreement ("HRMLA") in which the Company has agreed to perform certain capital improvements to Flatbush Gardens over the next three years. The current estimate is that the costs of that work will be an amount up to $27 million. The Company expects those costs to be offset by the savings provided by property tax exemption and enhanced payments for tenants receiving government assistance (See note 1). Through December 31, 2024 the Company spent approximately $9.1 million on capital improvements required under the HRMLA.

The Company is obligated to provide parking availability through August 2025 under a lease with a tenant at the 250 Livingston Street property; the current cost to the Company is approximately $205 per year.

*Distributions*

In order to qualify as a REIT for Federal income tax purposes, we must currently distribute at least 90% of our taxable income to our stockholders. During the years ended December 31, 20424 and 2023, we paid dividends and distributions on our common shares, Class B LLC units and LTIP units totaling $17.6 million and $17.4 million, respectively.

56

*Cash Flows for the Years ended December 31, 2024 and 2023 (in thousands)*

|  | Year Ended December 31, | |
|---|---|---|
|  | **2024** | **2023** |
| Operating activities | $ 31,862 | $ 26,185 |
| Investing activities | (68,781) | (41,357) |
| Financing activities | 38,746 | 20,731 |

*Cash flows provided by (used in) operating activities, investing activities and financing activities for the years ended December 31, 2024 and 2023, are as follows:*

Net cash provided by operating activities was $31,862 for the year ended December 31, 2024, compared to $26,185 for the year ended December 31, 2023. The net increase during the 2024 period primarily reflects improved revenues discussed above, improved collection experience and lower property tax payments due to the entry into the Article 11 Agreement.

Net cash used in investing activities was $68,781 for the year ended December 31, 2024, compared to $41,357 for the year ended December 31, 2023. The increase was primarily due to $41,099 increased capital spending at the Dean Street and Flatbush Garden properties partially offset by $13,675 lower capital spending at all of our operating properties, primarily at 1010 Pacific Street which went into service in early 2023.

Net cash provided by financing activities was $38,746 for the year ended December 31, 2024, compared to $20,731 for the year ended December 31, 2023. The increase was primarily due to $45,126 additional borrowings under the Dean Street property loans partially offset by $36,523 borrowings in 2023 under the 1010 Pacific Street loans and scheduled debt amortization payments in 2024.

### Income Taxes

No provision has been made for income taxes since all of the Company's operations are held in pass-through entities and accordingly the income or loss of the Company is included in the individual income tax returns of the partners or members.

We elected to be treated as a REIT for U.S. federal income tax purposes, beginning with our first taxable three months ended March 31, 2015. As a REIT, we generally will not be subject to federal income tax on income that we distribute to our stockholders. If we fail to qualify as a REIT in any taxable year, we will be subject to federal income tax on our taxable income at regular corporate tax rates. We believe that we are organized and operate in a manner that will enable us to qualify and be taxed as a REIT and we intend to continue to operate so as to satisfy the requirements for qualification as a REIT for federal income tax purposes.

### Inflation

Inflation has recently become a factor in the United States economy and has increased the cost of acquiring, developing, replacing and operating properties. A substantial portion of our interest costs relating to operating properties are fixed through 2027. Leases at our residential rental properties, which comprise approximately 70% of our revenue, are short-term in nature and permit rent increases to recover increased costs, and our longer-term commercial and retail leases generally allow us to recover some increased operating costs.

## Non-GAAP Financial Measures

In this Annual Report on Form 10-K, we disclose and discuss funds from operations ("FFO"), adjusted funds from operations ("AFFO"), adjusted earnings before interest, income taxes, depreciation and amortization ("Adjusted EBITDA") and net operating income ("NOI"), all of which meet the definition of "non-GAAP financial measures" set forth in Item 10(e) of Regulation S-K promulgated by the SEC.

While management and the investment community in general believe that presentation of these measures provides useful information to investors, neither FFO, AFFO, Adjusted EBITDA, nor NOI should be considered as an alternative to net income (loss) or income from operations as an indication of our performance. We believe that to understand our performance further, FFO, AFFO, Adjusted EBITDA, and NOI should be compared with our reported net income (loss) or income from operations and considered in addition to cash flows computed in accordance with GAAP, as presented in our consolidated financial statements.

### *Funds from Operations and Adjusted Funds from Operations*

FFO is defined by the National Association of Real Estate Investment Trusts ("NAREIT") as net income (computed in accordance with GAAP), excluding gains (or losses) from sales of property and impairment adjustments, plus depreciation and amortization, and after adjustments for unconsolidated partnerships and joint ventures. Our calculation of FFO is consistent with FFO as defined by NAREIT.

AFFO is defined by us as FFO excluding amortization of identifiable intangibles incurred in property acquisitions, straight-line rent adjustments to revenue from long-term leases, amortization costs incurred in originating debt, interest rate cap mark-to-market adjustments, amortization of non-cash equity compensation, acquisition and other costs, loss on modification/extinguishment of debt, gain on involuntary conversion, gain on termination of lease and certain litigation-related expenses, less recurring capital spending.

Historical cost accounting for real estate assets implicitly assumes that the value of real estate assets diminishes predictably over time. In fact, real estate values have historically risen or fallen with market conditions. FFO is intended to be a standard supplemental measure of operating performance that excludes historical cost depreciation and valuation adjustments from net income. We consider FFO useful in evaluating potential property acquisitions and measuring operating performance. We further consider AFFO useful in determining funds available for payment of distributions. Neither FFO nor AFFO represent net income (loss) or cash flows from operations computed in accordance with GAAP. You should not consider FFO and AFFO to be alternatives to net income (loss) as reliable measures of our operating performance; nor should you consider FFO and AFFO to be alternatives to cash flows from operating, investing or financing activities (computed in accordance with GAAP) as measures of liquidity.

Neither FFO nor AFFO measure whether cash flow is sufficient to fund all of our cash needs, including principal amortization, capital improvements and distributions to stockholders. FFO and AFFO do not represent cash flows from operating, investing or financing activities computed in accordance with GAAP. Further, FFO and AFFO as disclosed by other REITs might not be comparable to our calculations of FFO and AFFO.

The following table sets forth a reconciliation of FFO and AFFO for the periods presented to net loss, computed in accordance with GAAP (amounts in thousands):

|  | Years ended December 31, | | | |
|---|---|---|---|---|
|  | **2024** | | **2023** | |
| **FFO** | | | | |
| Net loss | $ | (6,582) | $ | (15,565) |
| Real estate depreciation and amortization | | 29,892 | | 28,939 |
| FFO | $ | 23,310 | $ | 13,374 |
|  | | | | |
| **AFFO** | | | | |
| FFO | $ | 23,310 | $ | 13,374 |
| Amortization of real estate tax intangible | | 481 | | 481 |
| Amortization of above- and below-market leases | | - | | (18) |
| Straight-line rent adjustments | | 251 | | 214 |
| Amortization of debt origination costs | | 2,122 | | 1705 |
| Amortization of LTIP awards | | 2,701 | | 3,015 |
| Transaction pursuit costs | | - | | 357 |
| Loss on modification/extinguishment of debt | | - | | 3,868 |
| Certain litigation-related expenses | | 269 | | (10) |
| Recurring capital spending | | (324) | | (436) |
| AFFO | $ | 28,810 | $ | 22,550 |

*Adjusted Earnings Before Interest, Income Taxes, Depreciation and Amortization*

We believe that Adjusted EBITDA is a useful measure of our operating performance. We define Adjusted EBITDA as net income (loss) before allocation to non-controlling interests, plus real estate depreciation and amortization, amortization of identifiable intangibles, straight-line rent adjustments to revenue from long-term leases, amortization of non-cash equity compensation, interest expense (net), acquisition and other costs, loss on modification/extinguishment of debt and certain litigation-related expenses, less gain on involuntary conversion and gain on termination of lease.

We believe that this measure provides an operating perspective not immediately apparent from GAAP income from operations or net income (loss). We consider Adjusted EBITDA to be a meaningful financial measure of our core operating performance.

However, Adjusted EBITDA should only be used as an alternative measure of our financial performance. Further, other REITs may use different methodologies for calculating Adjusted EBITDA, and accordingly, our Adjusted EBITDA may not be comparable to that of other REITs.

The following table sets forth a reconciliation of Adjusted EBITDA for the periods presented to net loss, computed in accordance with GAAP (amounts in thousands):

| | Years ended December 31, | | | |
| | **2024** | | **2023** | |
|---|---|---|---|---|
| **Adjusted EBITDA** | | | | |
| Net loss | $ | (6,582) | $ | (15,565) |
| Real estate depreciation and amortization | | 29,892 | | 28,939 |
| Amortization of real estate tax intangible | | 481 | | 481 |
| Amortization of above- and below-market leases | | - | | (18) |
| Straight-line rent adjustments | | 251 | | 214 |
| Amortization of LTIP awards | | 2,701 | | 3,015 |
| Interest expense, net | | 47,111 | | 44,867 |
| Transaction pursuit costs | | - | | 357 |
| Loss on modification/extinguishment of debt | | - | | 3,868 |
| Certain litigation-related expenses | | 269 | | (10) |
| Adjusted EBITDA | $ | 74,123 | $ | 66,148 |

*Net Operating Income*

We believe that NOI is a useful measure of our operating performance. We define NOI as income from operations plus real estate depreciation and amortization, general and administrative expenses, acquisition and other costs, amortization of identifiable intangibles and straight-line rent adjustments to revenue from long-term leases, less gain on termination of lease. We believe that this measure is widely recognized and provides an operating perspective not immediately apparent from GAAP income from operations or net income (loss). We use NOI to evaluate our performance because NOI allows us to evaluate the operating performance of our company by measuring the core operations of property performance and capturing trends in rental housing and property operating expenses. NOI is also a widely used metric in valuation of properties.

However, NOI should only be used as an alternative measure of our financial performance. Further, other REITs may use different methodologies for calculating NOI, and accordingly, our NOI may not be comparable to that of other REITs.

59

The following table sets forth a reconciliation of NOI for the periods presented to income from operations, computed in accordance with GAAP (amounts in thousands):

| | Years ended December 31, | | |
| --- | --- | --- | --- |
| | 2024 | | 2023 |
| **NOI** | | | |
| Income from operations | $ | 40,529 | $ | 33,170 |
| Real estate depreciation and amortization | | 29,892 | | 28,939 |
| General and administrative expenses | | 14,152 | | 13,169 |
| Transaction pursuit costs | | - | | 357 |
| Amortization of real estate tax intangible | | 481 | | 481 |
| Amortization of above- and below-market leases | | - | | (18) |
| Certain litigation expenses | | 269 | | - |
| Straight-line rent adjustments | | 251 | | 214 |
| NOI | $ | 85,574 | $ | 76,312 |

**Recent Accounting Pronouncements**

See Note 2, "Significant Accounting Policies" of our consolidated financial statements included in Item 15 for a discussion of recent accounting pronouncements.

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

Our future income, cash flows and fair value relevant to our financial instruments depends upon prevailing market interest rates. Market risk refers to the risk of loss from adverse changes in market prices and interest rates. Based upon the nature of our operations, the principal market risk to which we are exposed is the risk related to interest rate fluctuations. Many factors, including governmental monetary and tax policies, domestic and international economic and political considerations, and other factors that are beyond our control, contribute to interest rate risk.

A one percent change in interest rates on our $140.0 million of variable rate debt as of December 31, 2024, would impact annual net income by approximately $1.4 million.

At December 31, 2024, there were no interest rate caps for the Company's outstanding debt.

The fair value of the Company's notes payable was approximately $1,209.6 million and $1,160.4 million as of December 31, 2024 and 2023, respectively.

**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

The financial statements beginning on Page F-1 of this Annual Report on Form 10-K are incorporated herein by reference.

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

**ITEM 9A. CONTROLS AND PROCEDURES**

Evaluation of Disclosure Controls and Procedures.

As required by Rule 13a-15 under the Securities Exchange Act of 1934, as of the end of the period covered by this report, the Company carried out an evaluation under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures. Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company in the reports it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms. We continue to review and document our disclosure controls and procedures, including our internal controls and procedures for financial reporting, and may from time to time make changes aimed at enhancing their effectiveness and to ensure that our systems evolve with our business.

Management's Report on Internal Control Over Financial Reporting.

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rules 13a-15(f) and 15d-15(f). Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2024 based on the framework in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on that evaluation, our management concluded that our internal control over financial reporting was effective as of December 31, 2024.

The Company's internal control over financial reporting includes policies and procedures that: relate to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the Company; provide reasonable assurance of the recording of all transactions necessary to permit the preparation of the Company's consolidated financial statements in accordance with generally accepted accounting principles and the proper authorization of receipts and expenditures in accordance with authorization of the Company's management and directors; and provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the Company's consolidated financial statements.

This Annual Report on Form 10-K does not include an attestation report of our Independent Registered Public Accounting Firm, PKF O'Connor Davies LLP, regarding Management's Report on Internal Control over Financial Reporting because the Company is non-accelerated filer, and rules of the Securities and Exchange Commission permit the Company to provide only Management's Report in this Annual Report on Form 10-K.

**Changes in Internal Control**

There were no changes in our internal control over financial reporting identified in management's evaluation pursuant to Rules 13a-15(d) or 15d-15(d) of the Exchange Act during the last quarter covered by this Annual Report on Form 10-K that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Limitations on Effectiveness of Controls and Procedures**

In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply judgment in evaluating the benefits of possible controls and procedures relative to their costs.

**ITEM 9B. OTHER INFORMATION**

None.

**ITEM 9C. DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS**

Not applicable.

PART III

**ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

The information required by Item 10 will be set forth in the Company's Proxy Statement, to be filed no later than 120 days after the end of our fiscal year.

**ITEM 11. EXECUTIVE COMPENSATION**

The information required by Item 11 will be set forth in the Company's Proxy Statement, to be filed no later than 120 days after the end of our fiscal year.

**ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

**Securities Authorized For Issuance Under Equity Compensation Plans**

As of December 31, 2024, we had the following shares of our common stock reserved for future issuance under our 2015 Omnibus Plan, as amended, and 2015 Director Plan, as amended.

Equity Compensation Plan Information

| Plan category | (a)<br>Number of securities to be issued upon exercise of outstanding options, warrants and rights | (b)<br>Weighted-average exercise price of outstanding options, warrants and rights | (c)<br>Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| Equity compensation plans approved by security holders | | | |
| 2015 Omnibus Plan | 4,156,431 | — | 1,574,314 |
| 2015 Director Plan | 1,458,868 | — | 225,155 |
| | | | |
| Equity compensation plans not approved by security holders | — | — | — |
| Total | 5,615,299 | — | 1,799,469 |

The remaining information required by Item 12 will be set forth in the Company's Proxy Statement, to be filed no later than 120 days after the end of our fiscal year.

**ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE**

The information required by Item 13 will be set forth in the Company's Proxy Statement, to be filed no later than 120 days after the end of our fiscal year.

**ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES**

The information required by Item 14 will be set forth in the Company's Proxy Statement, to be filed no later than 120 days after the end of our fiscal year.

**PART IV**

**ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES**

(a) The following documents are filed as part of this Annual Report on Form 10-K:

1) Consolidated Financial Statements: See Index to Consolidated Financial Statements and Schedule on page F-1 of this Form 10-K

2) Financial Statement Schedule: See Index to Consolidated Financial Statements and Schedule on page F-1 of this Form 10-K

3) Exhibits: See the Exhibit Index

**Exhibit Index**

| Exhibit Number | Description |
|---|---|
| 3.1* | Articles of Amendment and Restatement |
| 3.2* | Bylaws |
| 3.3* | Articles Supplementary |
| 4.1** | Description of Securities |
| 10.1* | Amended and Restated Limited Liability Company Agreement of Berkshire Equity LLC |
| 10.2* | Amended and Restated Limited Liability Company Agreement of 50/53 JV LLC |
| 10.3* | Second Amended and Restated Limited Liability Company Agreement of Renaissance Equity Holdings LLC |
| 10.4* | Amended and Restated Limited Liability Company Agreement of Gunki Holdings LLC |
| 10.5* | Registration Rights Agreement, made and entered into as of August 3, 2015, between Clipper Realty Inc. and FBR Capital Markets & Co. |
| 10.6* | Registration Rights Agreement, made and entered into as of August 3, 2015, by and among Clipper Realty Inc. and each of the Holders from time to time party thereto. |
| 10.7†* | Employment Agreement, made and entered into as of August 3, 2015, by and among Clipper Realty Inc. and David Bistricer |
| 10.8†* | Employment Agreement, made and entered into as of August 3, 2015, by and among Clipper Realty Inc. and Lawrence Kreider |
| 10.9†* | Employment Agreement, made and entered into as of August 3, 2015, by and among Clipper Realty Inc. and Jacob Schwimmer |
| 10.10†* | Employment Agreement, made and entered into as of August 3, 2015, by and among Clipper Realty Inc. and JJ Bistricer |
| 10.11†* | Clipper Realty Inc. 2015 Omnibus Incentive Compensation Plan |
| 10.12†* | Clipper Realty Inc. 2015 Non-Employee Director Plan |
| 10.13†* | Clipper Realty Inc. 2015 Executive Incentive Compensation Plan |
| 10.14†* | Clipper Realty Inc. 2015 Omnibus Incentive Compensation Plan Restricted LTIP Unit Agreement |
| 10.15†* | Clipper Realty Inc. 2015 Non-Employee Director Plan Restricted LTIP Unit Agreement |
| 10.16* | Tax Protection Agreement, made and entered into as of August 3, 2015, by and among Clipper Realty Inc., Clipper Realty L.P., Renaissance Equity Holdings LLC, Berkshire Equity LLC, Gunki Holdings LLC, 50/53 JV LLC, and each of the Continuing Investors listed on Schedules A-D thereto |

| 10.17* | Shared Services Agreement, made and entered into as of August 3, 2015, by and among Clipper Equity LLC and Clipper Realty L.P. |
|---|---|
| 10.18* | Shared Services Agreement, made and entered into as of August 3, 2015, by and among Clipper Realty L.P. and Clipper Equity LLC |
| 10.19* | Loan Indemnification Agreement, made and entered into as of August 3, 2015, by and among Clipper Realty Inc., Clipper Realty L.P. and the Guarantor defined therein |
| 10.20* | Loan Indemnification Agreement, made and entered into as of August 3, 2015, by and among Clipper Realty Inc., Clipper Realty L.P. and the Guarantor defined therein |
| 10.21* | Loan Indemnification Agreement, made and entered into as of August 3, 2015, by and among Clipper Realty Inc., Clipper Realty L.P. and the Guarantor defined therein |
| 10.22* | Loan Indemnification Agreement, made and entered into as of August 3, 2015, by and among Clipper Realty Inc., Clipper Realty L.P. and the Guarantor defined therein |
| 10.23* | Loan Indemnification Agreement, made and entered into as of August 3, 2015, by and among Clipper Realty Inc., Clipper Realty L.P. and the Guarantor defined therein |
| 10.24* | Indemnification Agreement, made and entered into as of August 3, 2015, by and among David Bistricer, Trapeze Inc., Clipper Realty Inc., Clipper Realty L.P., and Berkshire Equity LLC |
| 10.25* | Amended and Restated Loan Agreement, made and entered into as of December 15, 2014, by and among 50 Murray Street Acquisition LLC, German American Capital Corporation, and Deutsche Bank AG, New York Branch |
| 10.26* | Joinder, Reaffirmation and Ratification of Guaranty of Recourse Obligations and Environmental Indemnity Agreement, made and entered into as of August 3, 2015, by and among David Bistricer, Trapeze Inc., Clipper Realty L.P., and Deutsche Bank AG, New York Branch |
| 10.27* | Lease, made and entered into as of December 17, 2015, by and between Berkshire Equity LLC and the City of New York. |
| 10.28* | Lease, made and entered into as of January 1, 1997, by and between NPMM Realty Inc. and the City of New York |
| 10.29* | Letter Regarding Option to Renew Lease, dated as of December 28, 2010, from the City of New York to Berkshire Equity LLC |
| 10.30* | Lease Renewal and Amendment Agreement, made and entered into as of December 15, 2016, by and between 250 Livingston Owner, LLC and the City of New York |
| 10.31* | Limited Partnership Agreement of Clipper Realty L.P., dated as of August 3, 2015 |
| 10.32* | Amendment No. 3 to Registration Rights Agreement, made and entered into February 2, 2017, between Clipper Realty Inc. and FBR Capital Markets & Co. |
| 10.33*** | Loan Agreement, dated February 21, 2018, between 50 Murray Street Acquisition LLC and Deutsche Bank AG, New York Branch |

| 10.34*** | First Mezzanine Loan Agreement, dated February 21, 2018, between 50 Murray Mezz One LLC and Deutsche Bank AG, New York Branch |
| 10.35*** | Second Mezzanine Loan Agreement, dated February 21, 2018, between 50 Murray Mezz Two LLC and Deutsche Bank AG, New York Branch |
| 10.36*** | Consolidation, Modification and Extension Agreement, Assignment of Leases and Rents and Security Agreement, dated February 21, 2018, between Renaissance Equity Holdings LLC A, Renaissance Equity Holdings LLC B, Renaissance Equity Holdings LLC C, Renaissance Equity Holdings LLC D, Renaissance Equity Holdings LLC E, Renaissance Equity Holdings LLC F, and Renaissance Equity Holdings LLC G and New York Community Bank |
| 10.37**** | Loan Agreement, dated May 31, 2019, between 250 Livingston Owner LLC and Citi Real Estate Funding Inc. |
| 10.38***** | Amended and Restated Mortgage Note, dated May 8, 2020, between Renaissance Equity Holdings LLC A, Renaissance Equity Holdings LLC B, Renaissance Equity Holdings LLC C, Renaissance Equity Holdings LLC D, Renaissance Equity Holdings LLC E, Renaissance Equity Holdings LLC F and Renaissance Equity Holdings LLC G, and New York Community Bank |
| 10.39***** | Mortgage, Assignment of Leases and Rents and Security Agreement, dated May 8, 2020, between Renaissance Equity Holdings LLC A, Renaissance Equity Holdings LLC B, Renaissance Equity Holdings LLC C, Renaissance Equity Holdings LLC D, Renaissance Equity Holdings LLC E, Renaissance Equity Holdings LLC F and Renaissance Equity Holdings LLC G. and New York Community Bank |
| 10.40†****** | First Amendment to the Clipper Realty Inc. 2015 Omnibus Incentive Compensation Plan |
| 10.41†******* | First Amendment to the Clipper Realty Inc. 2015 Non-Employee Director Plan |
| 10.42†*********** | Second Amendment to the Clipper Realty Inc. 2015 Omnibus Incentive Compensation Plan |
| 10.43†*********** | Second Amendment to the Clipper Realty Inc. 2015 Non-Employee Director Plan |
| 10.44†********** | Employment Agreement, dated May 11, 2021, between Clipper Realty Inc. and Lawrence Kreider |
| 10.45************* | Affordable Housing Regulatory Agreement, dated June 29, 2023, between  Renaissance Equity Holdings LLC A, Renaissance Equity Holdings LLC B, Renaissance Equity Holdings LLC C, Renaissance Equity Holdings LLC D, Renaissance Equity Holdings LLC E, Renaissance Equity Holdings LLC F, Renaissance Equity Holdings LLC G, Flatbush Gardens Housing Development Fund Corporation and The City of New York. |
| 10.46************** | Housing Repair and Maintenance Letter Agreement dated June 29, 2023 |
| 10.47************** | Acquisition Loan Note, dated August 10, 2023, by Dean Owner LLC in favor of Valley National Bank |
| 10.48************** | Building Loan Note, dated August 10, 2023, by Dean Owner LLC in favor of Valley National Bank |
| 10.49************** | Project Loan Note, dated August 10, 2023, by Dean Owner LLC in favor of Valley National Bank |

| | |
|---|---|
| 10.50*************** | Credit Agreement, dated August 10, 2023, by Dean Owner LLC in favor of Valley National Bank |
| 10.51*************** | Mezzanine Loan Note, dated August 10, 2023, by Dean Member LLC in favor of BADF 953 Dean Street Lender LLC |
| 10.52*************** | Line of Credit Note, dated August 10, 2023, between Clipper Realty Inc. in favor of Valley National Bank |
| 10.53******** | Agreement of Lease made May 9, 2019, between 250 Livingston Owner LLC and The City of New York |
| 10.54**************** | Loan Agreement, dated February 18, 2021 between 141 Livingston Owner LLC and Citi Real Estate Funding Inc. |
| 19.1******** | Insider trading policies and procedures |
| 21.1******** | List of subsidiaries |
| 23.1******** | Consent of PKF O'Connor Davies, LLP |
| 24.1******** | Power of Attorney (included on signature page hereto) |
| 31.1******** | Rule 13a-14(a)/15d-14(a) Certification of Principal Executive Officer |
| 31.2******** | Rule 13a-14(a)/15d-14(a) Certification of Principal Financial Officer |
| 32.1******** | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2******** | Certification of Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 97.1******** | Policy relating to recovery of erroneously awarded compensation. dated as of October 2, 2023. |
| 101.INS********* | Inline XBRL Instance Document (the Instance Document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document) |
| 101.SCH********* | Inline XBRL Taxonomy Extension Schema Document |
| 101.CAL********* | Inline XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.LAB********* | Inline XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE********* | Inline XBRL Taxonomy Extension Presentation Linkbase Document |
| 101.DEF********* | Inline XBRL Taxonomy Extension Definition Linkbase Document |
| 104********** | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101) |
| * | Incorporated by reference to the Company's registration statement on Form S-11 (No. 333-214021) |
| † | Indicates management contract or compensation plan |
| ** | Incorporated by reference to the Company's Form 10-K for the year ended December 31, 2019, filed on March 12, 2020 |
| *** | Incorporated by reference to the Company's Form 8-K dated February 21, 2018, filed on February 27, 2018 |
| **** | Incorporated by reference to the Company's Form 10-Q for the quarterly period ended June 30, 2019, filed on August 1, 2019 |
| ***** | Incorporated by reference to the Company's Form 10-Q for the quarterly period ended March 31, 2020, filed on May 11, 2020 |

| ****** | Incorporated by reference to Appendix A to the Company's Definitive Proxy Statement filed on April 29, 2020 |
| ******* | Incorporated by reference to Appendix B to the Company's Definitive Proxy Statement filed on April 29, 2020 |
| ******** | Filed herewith |
| ********* | Submitted electronically with the report |
| ********** | Incorporated by reference to the Company's Form 10-Q for the quarterly period ended June 30, 2021, filed on August 9, 2021 |
| *********** | Incorporated by reference to Appendix A to the Company's Definitive Proxy Statement filed on May 2, 2022 |
| ************ | Incorporated by reference to Appendix B to the Company's Definitive Proxy Statement filed on May 2, 2022 |
| ************* | Incorporated by reference to the Company's Form 8-K dated June 29, 2023, filed on July 5, 2023 |
| ************** | Incorporated by reference to the Company's Form 8-K dated August 10, 2023, filed on August 14, 2023 |
| *************** | Incorporated by reference to the Company's Form 10-Q for the quarterly period ended June 30, 2023, filed on August 3, 2023 |
| **************** | Incorporated by reference to the Company's Form 10-Q for the quarterly period ended June 30, 2024, filed on August 1, 2024 |

**ITEM 16.    FORM 10-K SUMMARY**

None.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**CLIPPER REALTY INC.**

February 14, 2025

By:    /s/ David Bistricer
David Bistricer
*Co-Chairman and Chief Executive Officer*

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints David Bistricer and Sam Levinson his or her true and lawful attorneys-in-fact (with full power to each of them to act alone), with full power of substitution and re-substitution, for him or her and in his or her name, place and stead, in any and all capacities to sign any and all amendments (including post-effective amendments) to this Annual Report on Form 10-K, and to file the same, with the exhibits thereto, and other documents in connection herewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agent, full power and authority to do and perform each and every act and thing required and necessary to be done in and about the foregoing as fully for all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agent or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this Annual Report on Form 10-K has been signed by the following persons in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/ David Bistricer<br>David Bistricer | Co-Chairman of the Board and<br>Chief Executive Officer<br>*(Principal Executive Officer)* | February 14, 2025 |
| /s/ Lawrence E. Kreider, Jr.<br>Lawrence E. Kreider, Jr. | Chief Financial Officer<br>*(Principal Financial Officer and Principal<br>Accounting Officer)* | February 14, 2025 |
| /s/ Sam Levinson<br>Sam Levinson | Co-Chairman of the Board | February 14, 2025 |
| /s/ Howard M. Lorber<br>Howard M. Lorber | Director | February 14, 2025 |
| /s/ Robert J. Ivanhoe<br>Robert J. Ivanhoe | Director | February 14, 2025 |
| /s/ Roberto A. Verrone<br>Roberto A. Verrone | Director | February 14, 2025 |
| /s/ Richard Burger<br>Richard Burger | Director | February 14, 2025 |
| /s/ Harmon Spolan<br>Harmon Spolan | Director | February 14, 2025 |

68

**Index to Consolidated Financial Statements and Schedule**

| | Page |
|---|---|
| Consolidated Financial Statements | |
| Reports of Independent Registered Public Accounting Firm (PCAOB ID# 127) | F-2 |
| Consolidated Balance Sheets as of December 31, 2024 and 2023 | F-3 |
| Consolidated Statements of Operations for the years ended December 31, 2024 and 2023 | F-4 |
| Consolidated Statements of Equity for the years ended December 31, 2024 and 2023 | F-5 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2024 and 2023 | F-6 |
| Notes to Consolidated Financial Statements | F-7 |
| | |
| Financial Statement Schedule | |
| Schedule III – Real Estate and Accumulated Depreciation | F-25 |

F-1

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To The Stockholders and Board of Directors
Clipper Realty Inc.
Brooklyn, NY

Opinion on the Consolidated Financial Statements

We have audited the accompanying consolidated balance sheets of Clipper Realty Inc. (the "Company") as of December 31, 2024 and 2023, and the related consolidated statements of operations, equity (deficit) and cash flows for each of the two years in the period ended December 31, 2024, and the related notes and financial statement schedule listed in the accompanying index (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2024 and 2023, and the results of its operations and its cash flows for each of the two years in the period ended December 31, 2024, in conformity with accounting principles generally accepted in the United States of America.

Emphasis of matter – Commercial Leases with the City of New York

As disclosed in note 5, the Company has two commercial leases with the City of New York (the "City") that comprised approximately 22% of total revenues for the year ended December 31, 2024. One of the leases with the City terminates effective August 23, 2025 and the Company and the City are negotiating the terms of the second lease that expires in December 2025 with no assurance that the negotiations will conclude with an agreement. Our opinion is not modified with respect to this matter.

Basis for Opinion

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

Critical Audit Matters

Critical audit matters are matters arising from the current period audit of the financial statements that were communicated or required to be communicated to the audit committee and that (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. We determined that there are no critical audit matters.

/s/ PKF O'Connor Davies, LLP

We have served as the Company's auditor since 2022.

New York, New York
February 14, 2025

PCAOB ID No. 127

**Clipper Realty Inc.**
**Consolidated Balance Sheets**
**(In thousands, except for share and per share data)**

| | December 31, 2024 | | December 31, 2023 |
|---|---|---|---|
| **ASSETS** | | | |
| Investment in real estate | | | |
| Land and improvements | $ | 571,988 | $ 571,988 |
| Building and improvements | | 736,420 | 726,273 |
| Tenant improvements | | 3,366 | 3,366 |
| Furniture, fixtures and equipment | | 13,897 | 13,278 |
| Real estate under development | | 146,249 | 87,285 |
| Total investment in real estate | | 1,471,920 | 1,402,190 |
| Accumulated depreciation | | (243,392) | (213,606) |
| Investment in real estate, net | | 1,228,528 | 1,188,584 |
| Cash and cash equivalents | | 19,896 | 22,163 |
| Restricted cash | | 18,156 | 14,062 |
| Tenant and other receivables, net of allowance for doubtful accounts of $258 and $234, respectively | | 6,365 | 5,181 |
| Deferred rent | | 2,108 | 2,359 |
| Deferred costs and intangible assets, net | | 5,676 | 6,127 |
| Prepaid expenses and other assets | | 6,236 | 10,854 |
| **TOTAL ASSETS** | $ | 1,286,965 | $ 1,249,330 |
| **LIABILITIES AND EQUITY (DEFICIT)** | | | |
| Liabilities: | | | |
| Notes payable, net of unamortized loan costs of $9,019 and $13,405, respectively | $ | 1,266,340 | $ 1,205,624 |
| Accounts payable and accrued liabilities | | 18,731 | 20,994 |
| Security deposits | | 9,067 | 8,765 |
| Other liabilities | | 7,057 | 6,712 |
| **TOTAL LIABILITIES** | | 1,301,195 | 1,242,095 |
| Equity (Deficit): | | | |
| Preferred stock, $0.01 par value; 100,000 shares authorized (including 140 shares of 12.5% Series A cumulative non-voting preferred stock), zero shares issued and outstanding | | — | — |
| Common stock, $0.01 par value; 500,000,000 shares authorized, 16,146,546 and 16,063,228 shares issued and outstanding, at December 31, 2024 and 2023, respectively | | 160 | 160 |
| Additional paid-in-capital | | 89,938 | 89,483 |
| Accumulated deficit | | (95,507) | (86,899) |
| Total stockholders' equity (deficit) | | (5,409) | 2,744 |
| Non-controlling interests | | (8,821) | 4,491 |
| **TOTAL EQUITY (DEFICIT)** | | (14,230) | 7,235 |
| **TOTAL LIABILITIES AND EQUITY (DEFICIT)** | $ | 1,286,965 | $ 1,249,330 |

See accompanying notes to these consolidated financial statements.

F-3

**Clipper Realty Inc.**
**Consolidated Statements of Operations**
**(In thousands, except per share data)**

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| | | **2024** | | **2023** |
| **REVENUES** | | | | |
| Residential rental income | $ | 109,873 | $ | 99,716 |
| Commercial rental income | | 38,902 | | 38,489 |
| **TOTAL REVENUES** | | 148,775 | | 138,205 |
| | | | | |
| **OPERATING EXPENSES** | | | | |
| Property operating expenses | | 34,163 | | 30,619 |
| Real estate taxes and insurance | | 29,770 | | 31,951 |
| General and administrative | | 14,152 | | 13,169 |
| Transaction pursuit costs | | - | | 357 |
| Depreciation and amortization | | 29,892 | | 28,939 |
| **TOTAL OPERATING EXPENSES** | | 107,977 | | 105,035 |
| | | | | |
| Litigation settlement and other | | (269) | | - |
| **INCOME FROM OPERATIONS** | | 40,529 | | 33,170 |
| | | | | |
| Interest expense, net | | (47,111) | | (44,867) |
| Loss on modification/extinguishment of debt | | - | | (3,868) |
| | | | | |
| **Net loss** | | (6,582) | | (15,565) |
| | | | | |
| Net loss attributable to non-controlling interests | | 4,082 | | 9,665 |
| **Net loss attributable to common stockholders** | $ | (2,500) | $ | (5,900) |
| Basic and diluted net loss per share | $ | (0.25) | $ | (0.45) |

See accompanying notes to these consolidated financial statements.

F-4

**Clipper Realty Inc.**
**Consolidated Statements of Equity(Deficit)**
**(In thousands, except for share data)**

| | Number of common shares | | Common stock | | Additional paid-in-capital | | Accumulated deficit | | Total stockholders' equity(deficit) | | Non-controlling interests | | Total equity(deficit) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Balance December 31, 2022** | 16,063,228 | | 160 | | 88,829 | $ | (74,895) | $ | 14,094 | $ | 23,085 | $ | 37,179 |
| | | | | | | | | | | | | | | |
| Amortization of LTIP grants | — | | — | | — | | — | | — | | 3,015 | | 3,015 |
| Dividends and distributions | — | | — | | — | | (6,104) | | (6,104) | | (11,290) | | (17,394) |
| Net loss | — | | — | | — | | (5,900) | | (5,900) | | (9,665) | | (15,565) |
| Reallocation of non-controlling interests | — | | — | | 654 | | — | | 654 | | (654) | | — |
| **Balance December 31, 2023** | 16,063,228 | $ | 160 | $ | 89,483 | $ | (86,899) | $ | 2,744 | $ | 4,491 | $ | 7,235 |
| | | | | | | | | | | | | | | |
| Redemption of LTIP grants | 83,318 | | — | | — | | — | | — | | — | | — |
| Amortization of LTIP grants | — | | — | | — | | — | | — | | 2,701 | | 2,701 |
| Dividends and distributions | — | | — | | — | | (6,108) | | (6,108) | | (11,476) | | (17,584) |
| Net loss | — | | — | | — | | (2,500) | | (2,500) | | (4,082) | | (6,582) |
| Reallocation of non-controlling interests | — | | — | | 455 | | — | | 455 | | (455) | | — |
| **Balance December 31, 2024** | 16,146,546 | $ | 160 | $ | 89,938 | $ | (95,507) | $ | (5,409) | $ | (8,821) | $ | (14,230) |

See accompanying notes to these consolidated financial statements.

F-5

**Clipper Realty Inc.**
**Consolidated Statements of Cash Flows**
**(In thousands)**

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| | | **2024** | | **2023** |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | |
| Net loss | $ | (6,582) | $ | (15,565) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | | | |
| Depreciation | | 29,786 | | 28,825 |
| Amortization of deferred financing costs | | 2,122 | | 1,705 |
| Amortization of deferred costs and intangible assets | | 587 | | 595 |
| Amortization of above- and below-market leases | | — | | (18) |
| Loss on modification/extinguishment of debt | | — | | 3,868 |
| Deferred rent | | 251 | | 214 |
| Stock-based compensation | | 2,701 | | 3,015 |
| Bad debt expense (recovery) | | 30 | | (87) |
| *Changes in operating assets and liabilities:* | | | | |
| Tenant and other receivables | | (1,215) | | (86) |
| Prepaid expenses, other assets and deferred costs | | 4,483 | | 2,701 |
| Accounts payable and accrued liabilities | | (948) | | (707) |
| Security deposits | | 302 | | 825 |
| Other liabilities | | 345 | | (900) |
| **Net cash provided by operating activities** | | 31,862 | | 26,185 |
| | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | |
| Additions to land, buildings and improvements | | (68,781) | | (41,357) |
| **Net cash used in investing activities** | | (68,781) | | (41,357) |
| | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | |
| Payments of mortgage notes | | (2,000) | | (84,728) |
| Proceeds from mortgage notes | | 58,330 | | 132,519 |
| Dividends and distributions | | (17,584) | | (17,394) |
| Loan issuance and extinguishment costs | | — | | (9,666) |
| **Net cash provided by financing activities** | | 38,746 | | 20,731 |
| | | | | |
| Net increase in cash and cash equivalents and restricted cash | | 1,827 | | 5,559 |
| Cash and cash equivalents and restricted cash – beginning of year | | 36,225 | | 30,666 |
| **Cash and cash equivalents and restricted cash – end of year** | | 38,052 | $ | 36,225 |
| | | | | |
| Cash and cash equivalents and restricted cash – beginning of year: | | | | |
| Cash and cash equivalents | $ | 22,163 | $ | 18,152 |
| Restricted cash | | 14,062 | | 12,514 |
| Total cash and cash equivalents and restricted cash – beginning of year | $ | 36,225 | $ | 30,666 |
| | | | | |
| Cash and cash equivalents and restricted cash – end of year: | | | | |
| Cash and cash equivalents | $ | 19,896 | $ | 22,163 |
| Restricted cash | | 18,156 | | 14,062 |
| Total cash and cash equivalents and restricted cash – end of year | $ | 38,052 | $ | 36,225 |
| | | | | |
| Supplemental cash flow information: | | | | |
| Cash paid for interest, net of capitalized interest of $9,417 and $5,508 in 2024 and 2023, respectively | $ | 43,995 | $ | 45,323 |
| Non-cash interest capitalized to real estate under development | | 2,264 | | 339 |
| Additions to investment in real estate included in accounts payable and accrued liabilities | | 8,169 | | 9,484 |

See accompanying notes to these consolidated financial statements.

F-6

**Clipper Realty Inc.**
**Notes to Consolidated Financial Statements**
**(In thousands, except for share and per share data and as noted)**

## 1. Organization

Clipper Realty Inc. (the "Company" or "We") was organized in the state of Maryland on July 7, 2015. On August 3, 2015, we completed certain formation transactions and the sale of shares of common stock in a private offering. We contributed the net proceeds of the private offering to Clipper Realty L.P., our operating partnership subsidiary (the "Operating Partnership"), in exchange for units in the Operating Partnership. The Operating Partnership in turn contributed such net proceeds to the limited liability companies ("LLCs") that comprised the predecessor of the Company in exchange for Class A LLC units in such LLCs and became the managing member of such LLCs. The owners of the LLCs exchanged their interests for Class B LLC units and an equal number of special, non-economic, voting stock in the Company. The Class B LLC units, together with the special voting shares, are convertible into common shares of the Company on a one-for-one basis and are entitled to distributions.

On June 27, 2016, the Operating Partnership acquired the Aspen property located at 1955 First Avenue in Manhattan, New York.

On February 9, 2017, the Company priced an initial public offering of 6,390,149 primary shares of its common stock (including the exercise of the over-allotment option, which closed on March 10, 2017) at a price of $13.50 per share (the "IPO"). The net proceeds of the IPO were approximately $79,000. We contributed the proceeds of the IPO to the Operating Partnership, in exchange for units in the Operating Partnership.

On May 9, 2017, the Company completed the purchase of 107 Columbia Heights (subsequently renovated and rebranded "Clover House"), a 158-unit apartment building located in the Brooklyn Heights neighborhood of Brooklyn, New York.

On October 27, 2017, the Company completed the acquisition of an 82-unit residential property at 10 West 65th Street in the Upper West Side neighborhood of Manhattan, New York.

On November 8, 2019, the Company completed the acquisition of 1010 Pacific Street located in the Prospect Heights neighborhood of Brooklyn, New York; the Company redeveloped the property into a 175-unit residential building.

During the period December 2021 through February 2022, the Company purchased the Dean Street property which consists of multiple parcels of land in the Prospect Heights neighborhood of Brooklyn, New York; the Company plans to redevelop the property as a 240-unit residential building with two ground floor retail units.

As of December 31, 2024, the properties owned by the Company consist of the following (collectively, the "Properties"):

- Tribeca House in Manhattan, comprising two buildings, one with 21 stories and one with 12 stories, containing residential and retail space with an aggregate of approximately 483,000 square feet of residential rental Gross Leasable Area ("GLA") and 77,000 square feet of retail rental and parking GLA;

- Flatbush Gardens in Brooklyn, a 59-building residential housing complex with 2,494 rentable units;

- 141 Livingston Street in Brooklyn, a 15-story office building with approximately 216,000 square feet of GLA;

- 250 Livingston Street in Brooklyn, a 12-story office and residential building with approximately 370,000 square feet of GLA (fully remeasured);

F-7

- Aspen in Manhattan, a 7-story building containing residential and retail space with approximately 166,000 square feet of residential rental GLA and approximately 21,000 square feet of retail rental GLA;

- Clover House in Brooklyn, a 11-story residential building with approximately 102,000 square feet of residential rental GLA;

- 10 West 65th Street in Manhattan, a 6-story residential building with approximately 76,000 square feet of residential rental GLA;

- 1010 Pacific Street in Brooklyn, 9-story residential building with approximately 119,000 square feet of residential rental GLA; and

- the Dean Street property in Brooklyn, which the Company plans to redevelop as a 9-story residential building with approximately 160,000 square feet of residential rental GLA and approximately 9,000 square feet of retail rental GLA.

Square footage, leased occupancy percentage and rentable unit disclosures in the consolidated financial statements are unaudited.

During 2019, we entered into a joint venture in which we own a 50% interest through which we are paying certain legal and advisory expenses in connection with various rent laws and ordinances which govern certain of our properties. During the year ended December 31, 2024, the Company incurred $787 of such expenses, which was recorded as part of general and administrative in the Consolidated Statements of Operations, and the Company has fulfilled its commitment to the joint venture.

On June 29, 2023 the Company's Flatbush Gardens property entered into a 40 year regulatory agreement under Article 11 of the Private Housing Finance Law with the New York City Department of Housing Preservation and Development ("Article 11 Agreement"). For the full term of the agreement, Flatbush Gardens received a full exemption from property taxes, committed to maintain rents with existing area median income groups, received eligibility for incremental rental assistance payments under Section 610 of the Private Housing Financing Law for tenants receiving government rental assistance, committed to lease 249 units to formerly homeless families and provide certain services as units become vacant, and committed to pay prevailing wage rates to employees of the property as defined under New York City regulations. The property also committed to a 3-year capital improvements plan. As part of the agreement, a new not-for-profit Corporation, Flatbush Gardens Housing Development Fund Corporation ("HDFC"), became the nominal owner of the Flatbush Gardens properties. This has no effect on the beneficial operations and finances of the properties but provides HDFC with certain consent rights for transfers and financings of the properties. (See Note 7 Commitments and Contingencies).

The operations of Clipper Realty Inc. and its consolidated subsidiaries are carried on primarily through the Operating Partnership. The Company has elected to be taxed as a Real Estate Investment Trust ("REIT") under Sections 856 through 860 of the Internal Revenue Code (the "Code"). The Company is the sole general partner of the Operating Partnership and the Operating Partnership is the sole managing member of the LLCs that comprised the Predecessor.

At December 31, 2024 and 2023, the Company's interest, through the Operating Partnership, in the LLCs that own the properties generally entitles it to 38.0% and 37.9% of the aggregate cash distributions from, and the profits and losses of, the LLCs, respectively.

The Company determined that the Operating Partnership and the LLCs are variable interest entities ("VIEs") and that the Company was the primary beneficiary. The assets and liabilities of these VIEs represented substantially all of the Company's assets and liabilities.

## 2. Significant Accounting Policies

*Segments*

At December 31, 2024, the Company had two reportable operating segments, Residential Rental Properties and Commercial Rental Properties. Our Chief Operating Decision Maker ("CODM"), represented by our Co-Chairman and Chief Executive Officer, reviews the results in which the revenue and Income from Operations is divided between the commercial and residential performance.

*Basis of Consolidation*

The accompanying consolidated financial statements of the Company are prepared in accordance with generally accepted accounting principles in the United States ("GAAP"). The effect of all intercompany balances has been eliminated. The consolidated financial statements include the accounts of all entities in which the Company has a controlling interest. The ownership interests of other investors in these entities are recorded as non-controlling interests.

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of commitments and contingencies at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Management adjusts such estimates when facts and circumstances dictate. The most significant estimates made include the recoverability of accounts receivable, allocation of property purchase price to tangible and intangible assets acquired and liabilities assumed, the useful lives of long-lived assets, review of long-lived assets for impairment and contingent liabilities. Actual results could materially differ from these estimates.

*Investment in Real Estate*

Real estate assets held for investment are carried at historical cost and consist of land, buildings and improvements, furniture, fixtures and equipment. Expenditures for ordinary repair and maintenance costs are charged to expense as incurred. Expenditures for improvements, renovations, and replacements of real estate assets are capitalized and depreciated over their estimated useful lives if the expenditures qualify as betterments or the life of the related asset will be substantially extended beyond the original life expectancy.

In accordance with ASU 2018-01, "Business Combinations – Clarifying the Definition of a Business," the Company evaluates each acquisition of real estate or in-substance real estate to determine if the integrated set of assets and activities acquired meets the definition of a business and needs to be accounted for as a business combination. If either of the following criteria is met, the integrated set of assets and activities acquired would not qualify as a business:

• Substantially all of the fair value of the gross assets acquired is concentrated in either a single identifiable asset or a group of similar identifiable assets; or

• The integrated set of assets and activities is lacking, at a minimum, an input and a substantive process that together significantly contribute to the ability to create outputs (i.e., revenue generated before and after the transaction).

An acquired process is considered substantive if:

• The process includes an organized workforce (or includes an acquired contract that provides access to an organized workforce) that is skilled, knowledgeable and experienced in performing the process;

• The process cannot be replaced without significant cost, effort or delay; or

• The process is considered unique or scarce.

Generally, the Company expects that acquisitions of real estate or in-substance real estate will not meet the revised definition of a business because substantially all of the fair value is concentrated in a single identifiable asset or group of similar identifiable assets (i.e., land, buildings and related intangible assets) or because the acquisition does not include a substantive process in the form of an acquired workforce or an acquired contract that cannot be replaced without significant cost, effort or delay.

Upon acquisition of real estate, the Company assesses the fair values of acquired tangible and intangible assets including land, buildings, tenant improvements, above-market and below-market leases, in-place leases and any other identified intangible assets and assumed liabilities. The Company allocates the purchase price to the assets acquired and liabilities assumed in an asset acquisition based on their relative fair values. In estimating fair value of tangible and intangible assets acquired, the Company assesses and considers fair value based on estimated cash flow projections that utilize appropriate discount and capitalization rates, estimates of replacement costs, net of depreciation, and available market information. The fair value of the tangible assets of an acquired property considers the value of the property as if it were vacant.

F-9

The Company records acquired above-market and below-market lease values initially based on the present value, using a discount rate which reflects the risks associated with the leases acquired based on the difference between (i) the contractual amounts to be paid pursuant to each in-place lease and (ii) management's estimate of fair market lease rates for each corresponding in-place lease, measured over a period equal to the remaining term of the lease for above-market leases and the initial term plus the term of any below-market fixed renewal options for the below-market leases. Other intangible assets acquired include amounts for in-place lease values and tenant relationship values (if any) that are based on management's evaluation of the specific characteristics of each tenant's lease and the Company's overall relationship with the respective tenant. Factors to be considered by management in its analysis of in-place lease values include an estimate of carrying costs to execute similar leases. In estimating carrying costs, management includes real estate taxes, insurance and other operating expenses and estimates of lost rentals at market rates during the expected lease-up periods, depending on local market conditions. In estimating costs to execute similar leases, management considers leasing commissions, legal and other related expenses.

The Company reviews long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. A property's value is impaired if management's estimate of the aggregate future cash flows (undiscounted and without interest charges) to be generated by the property is less than the carrying value of the property. To the extent impairment has occurred, a write-down is recorded and measured by the amount of the difference between the carrying value of the asset and the fair value of the asset. In the event that the Company obtains proceeds through an insurance policy due to impairment, the proceeds are offset against the write-down in calculating gain/loss on disposal of assets. Management of the Company does not believe that any of its properties within the portfolio are impaired as of December 31, 2024.

For long-lived assets to be disposed of, impairment losses are recognized when the fair value of the assets less estimated cost to sell is less than the carrying value of the assets. Properties classified as real estate held-for-sale generally represent properties that are actively marketed or contracted for sale with closing expected to occur within the next twelve months. Real estate held-for-sale is carried at the lower of cost, net of accumulated depreciation, or fair value less cost to sell, determined on an asset-by-asset basis. Expenditures for ordinary repair and maintenance costs on held-for-sale properties are charged to expense as incurred. Expenditures for improvements, renovations and replacements related to held-for-sale properties are capitalized at cost. Depreciation is not recorded on real estate held-for-sale.

If a tenant vacates its space prior to the contractual termination of the lease and no rental payments are being made on the lease, any unamortized balances of the related intangibles are written off. The tenant improvements and origination costs are amortized to expense over the remaining life of the lease (or charged against earnings if the lease is terminated prior to its contractual expiration date).

Depreciation is computed using the straight-line method over the estimated useful lives of the assets as follows:

| | |
|---|---|
| Building and improvements (in years) | 10 — 44 |
| Tenant improvements | Shorter of useful life or lease term |
| Furniture, fixtures and equipment (in years) | 3 — 15 |

The capitalized above-market lease values are amortized as a reduction to base rental revenue over the remaining terms of the respective leases, and the capitalized below-market lease values are amortized as an increase to base rental revenue over the remaining initial terms plus the terms of any below-market fixed rate renewal options of the respective leases. The value of in-place leases is amortized to expense over the remaining initial terms of the respective leases.

*Cash and Cash Equivalents*

Cash and cash equivalents are defined as cash on hand and in banks, plus all short-term investments with a maturity of three months or less when purchased. The Company maintains some of its cash in bank deposit accounts, which, at times, may exceed the federally insured limit. No losses have been experienced related to such accounts.

*Restricted Cash*

Restricted cash generally consists of escrows for future real estate taxes and insurance expenditures, repairs, capital improvements, loan reserves and security deposits.

*Tenant and Other Receivables and Allowance for Doubtful Accounts*

Tenant and other receivables are comprised of amounts due for monthly rents and other charges less allowance for doubtful accounts. In accordance with Accounting Standards Codification ("ASC") 842 "Leases," the Company performed a detailed review of amounts due from tenants to determine if accounts receivable balances and future lease payments were probable of collection, wrote off receivables not probable of collection and recorded a general reserve against revenues for receivables probable of collection for which a loss can be reasonably estimated. If management determines that the tenant receivable is not probable of collection it is written off against revenues. In addition, the Company records a general reserve under ASC 450.

*Deferred Costs*

Deferred lease costs consist of fees incurred to initiate and renew operating leases. Lease costs are being amortized using the straight-line method over the terms of the respective leases.

Deferred financing costs represent commitment fees, legal and other third-party costs associated with obtaining financing. These costs are amortized over the term of the financing and are recorded in interest expense in the consolidated statements of operations. Unamortized deferred financing costs are expensed when the associated debt is refinanced or repaid before maturity. Costs incurred in seeking financing transactions which do not close are expensed in the period the financing transaction is terminated.

*Comprehensive Income (Loss)*

Comprehensive income (loss) is comprised of net income (loss) adjusted for changes in unrealized gains and losses, reported in equity, for financial instruments required to be reported at fair value under GAAP. For the years ended December 31, 2024 and 2023, the Company did not own any financial instruments for which the change in value was not reported in net income (loss); accordingly, its comprehensive income (loss) was its net income (loss) as presented in the consolidated statements of operations.

*Revenue Recognition*

As mentioned above under Tenant and Other Receivables and Allowance for Doubtful Accounts the Company records lease income under ASC 842,"Leases" which replaces the guidance under ASC 840. ASC 842 applies to the Company principally as lessor; as a lessee, the Company's leases are immaterial. The Company has determined that all its leases as lessor are operating leases. The Company has elected to not bifurcate lease and non-lease components under a practical expedient provision. With respect to collectability, the Company has written off all receivables not probable of collection and related deferred rent, and has recorded income for those tenants on a cash basis. When the probability assessment has changed for these receivables, the Company has recognized lease income to the extent of the difference between the lease income that would have been recognized if collectability had always been assessed as probable and the lease income recognized to date. For remaining receivables probable of collection, the Company has recorded a general reserve under ASC 450.

For the year ended December 31, 2024 and 2023, the Company charged revenue in the amount of $4,219 and $4,526, respectively, for residential receivables not deemed probable of collection and recognized revenue of $299 and $1,447, respectively, for a reassessment of collectability of residential receivables previously not deemed probable of collection.

In accordance with the provisions of ASC 842, rental revenue for commercial leases is recognized on a straight-line basis over the terms of the respective leases. Deferred rents receivable represents the amount by which straight-line rental revenue exceeds rents currently billed in accordance with lease agreements. Rental income attributable to residential leases and parking is recognized as earned, which is not materially different from the straight-line basis. Leases entered by residents for apartment units are generally for one-year terms, renewable upon consent of both parties on an annual or monthly basis.

Reimbursements for operating expenses due from tenants pursuant to their lease agreements are recognized as revenue in the period the applicable expenses are incurred. These costs generally include real estate taxes, utilities, insurance, common area maintenance costs and other recoverable costs and are recorded as part of commercial rental income in the condensed consolidated statements of operations.

*Stock-based Compensation*

The Company accounts for stock-based compensation pursuant to Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 718, "Compensation — Stock Compensation." As such, all equity-based awards are reflected as compensation expense in the Company's consolidated statements of operations over their vesting period based on the fair value at the date of grant. In the event of a forfeiture, the previously recognized expense for unvested options would be reversed.

The following is a summary of awards granted to the Company's employees and non-employee directors during the years ended December 31, 2024 and 2023.

| Unvested LTIP Units | LTIP Units | | Weighted Grant-Date Fair Value |
|---|---|---|---|
| Unvested at December 31, 2022 | 1,903,273 | $ | 8.44 |
| Granted | 444,003 | $ | 5.62 |
| Vested | (574,382) | $ | 6.63 |
| Forfeited | — | | — |
| Unvested at December 31, 2023 | 1,772,894 | $ | 8.32 |
| Granted | 2,306,708 | $ | 4.56 |
| Vested | (372,476) | $ | 7.06 |
| Forfeited | — | | — |
| Unvested at December 31, 2024 | 3,707,126 | $ | 6.11 |

As of December 31, 2024 and 2023, there was $17,486 and $9,678, respectively, of total unrecognized compensation cost related to unvested share-based compensation arrangements granted under share incentive plans. As of December 31, 2024, the weighted-average period over which the unrecognized compensation expense will be recorded is approximately four years. For the years ended December 31, 2024 and 2023 the Company incurred $2,701 and $3,015 in LTIP amortization respectively.

In March 2024, the Company granted employees and non-employee directors 320,172 and 181,602 LTIP units, respectively, with a weighted-average grant date value of $4.90 per unit. The grants vesting period range from up to one year for those granted to the non-employee directors and from one to 2.5 years to those granted to employees as 2023 bonus and long-term incentive compensation.

In December 2024, the Company granted employees and a non-employee director 1,443,947 and 360,987 LTIP units, respectively, with a weighted-average grant date value of $4.46 per unit. The grants vest ratably over the a 10-year period and were an special reward related to the completion of certain elements of the Article 11 transaction at the Company's Flatbush Gardens property.

In March 2023, the Company granted employees and non-employee directors 286,272 and 157,731 LTIP units, respectively, with a weighted-average grant date value of $5.62 per unit. The grants vesting period range from up to one year for those granted to the non-employee directors and from one to 2.5 years to those granted to employees as 2022 bonus and long-term incentive compensation.

In the year-ended December 31, 2024 the Company granted employees and non-employee directors 1,764,119 and 542,589 LTIP units, respectively, with a combined weighted-average grant date fair value of $4.56 per unit. In the year-ended December 31, 2023 the Company granted employees and non-employee directors 286,272 and 157,731 LTIP units, respectively, with a combined weighted-average grant date fair value of $5.62 per unit.

*Transaction Pursuit Costs*

Transaction pursuit costs primarily reflect costs incurred for abandoned acquisition, disposition or other transaction pursuits.

*Income Taxes*

The Company elected to be taxed and to operate in a manner that will allow it to qualify as a REIT under the Code. To qualify as a REIT, the Company is required to distribute dividends equal to at least 90% of the REIT taxable income (computed without regard to the dividends paid deduction and net capital gains) to its stockholders, and meet the various other requirements imposed by the Code relating to matters such as operating results, asset holdings, distribution levels and diversity of stock ownership. Provided the Company qualifies for taxation as a REIT, it is generally not subject to U.S. federal corporate-level income tax on the earnings distributed currently to its stockholders. If the Company fails to qualify as a REIT in any taxable year, the Company will be subject to U.S. federal and state income tax on its taxable income at regular corporate tax rates and any applicable alternative minimum tax. In addition, the Company may not be able to re-elect as a REIT for the four subsequent taxable years. The entities comprising the Predecessor are limited liability companies and are treated as pass-through entities for income tax purposes. Accordingly, no provision has been made for federal, state or local income or franchise taxes in the accompanying consolidated financial statements.

In accordance with FASB ASC Topic 740, the Company believes that it has appropriate support for the income tax positions taken and, as such, does not have any uncertain tax positions that, if successfully challenged, could result in a material impact on its financial position or results of operations. The prior three years' income tax returns are subject to review by the Internal Revenue Service.

The Company has determined that the cash distributed to its stockholders is characterized as follows for Federal income tax purposes:

|  | Year Ended December 31, | |
|  | 2024 | 2023 |
|---|---|---|
| Ordinary income | 10% | 10% |
| Capital gain | — | — |
| Return of capital | 90% | 90% |
| Total | 100% | 100% |

*Fair Value Measurements*

Refer to Note 6, "Fair Value of Financial Instruments".

*Derivative Financial Instruments*

FASB derivative and hedging guidance establishes accounting and reporting standards for derivative instruments, including certain derivative instruments embedded in other contracts, and for hedging activities. As required by FASB guidance, the Company records all derivatives on the consolidated balance sheets at fair value. The accounting for changes in the fair value of derivatives depends on the intended use of the derivative and the resulting designation.

Derivatives used to hedge the exposure to changes in the fair value of an asset, liability, or firm commitment attributable to a particular risk, such as interest rate risk, are considered fair value hedges. Derivatives used to hedge the exposure to variability in expected future cash flows, or other types of forecast transactions, are considered cash flow hedges. For derivatives designated as fair value hedges, changes in the fair value of the derivative and the hedged item related to the hedged risk are recognized in earnings. For derivatives designated as cash flow hedges, the effective portion of changes in the fair value of the derivative is initially reported in other comprehensive income (loss) (outside of earnings) and subsequently reclassified to earnings when the hedged transaction affects earnings, and the ineffective portion of changes in the fair value of the derivative is recognized directly in earnings. The Company assesses the effectiveness of each hedging relationship by comparing the changes in the fair value or cash flows of the derivative hedging instrument with the changes in the fair value or cash flows of the designated hedged item or transaction. For derivatives not designated as hedges, changes in fair value would be recognized in earnings. As of December 31, 2024 and 2023, the Company has no derivatives for which it applies hedge accounting.

*Loss Per Share*

Basic and diluted net loss per share is computed by dividing net loss attributable to common stockholders by the weighted average common shares outstanding. As of December 31, 2024 and 2023, the Company had unvested LTIP units which provide for non-forfeitable rights to dividend-equivalent payments. Accordingly, these unvested LTIP units are considered participating securities and are included in the computation of basic and diluted net loss per share pursuant to the two-class method. The Company did not have dilutive securities as of December 31, 2024, or 2023.

The effect of the conversion of the 26,317 Class B LLC units outstanding is not reflected in the computation of basic and diluted net loss per share, as the effect would be anti-dilutive. The net loss allocable to such units is reflected as non-controlling interests in the accompanying consolidated financial statements.

The following table sets forth the computation of basic and diluted net loss per share for the periods indicated:

| | Year Ended December 31, | |
| | 2024 | 2023 |
|---|---|---|
| **(in thousands, except per share amounts)** | | |
| Numerator | | |
| Net loss attributable to common stockholders | $ (2,500) | $ (5,900) |
| Less: income attributable to participating securities | (1,476) | (1,289) |
| Subtotal | (3,976) | (7,189) |
| Denominator | | |
| Weighted-average common shares outstanding | 16,120 | 16,063 |
| | | |
| Basic and diluted net loss per share attributable to common stockholders | $ (0.25) | $ (0.45) |

***Recently Adopted Accounting Standards***

In 2023, the FASB issued ASU No. 2023-07, Reporting (Topic 280): Improvements to Reportable Segment Disclosures, which requires a public entity to disclose significant segment expenses and other segment items on an annual and interim basis and to provide in interim periods all disclosures about a reportable segment's profit or loss and assets that are currently required annually. Public entities with a single reportable segment are required to provide the new disclosures and all the disclosures required under ASC 280. The guidance is applied retrospectively to all periods presented in the financial statements, unless it is impracticable. The Company adopted ASU 2023-07 in the year ended December 31, 2024 and the adoption did not have a material impact on the Company's consolidated financial statements. See Note 9 – Segment Reporting.

Recent Accounting Pronouncements

In November 2024, the FASB issued ASU No. 2024-03, Income Statement—Reporting Comprehensive Income—Expense Disaggregation Disclosures (Subtopic 220-40), which requires a public business entity to provide disaggregated disclosures, in the notes to the financial statements, of certain categories of expenses that are included in expense line items on the face of the income statement. The guidance is effective for the Company in its 2027 annual reporting. The guidance is applied prospectively and may be applied retrospectively. The Company is evaluating the impact of ASU 2024-03.

**3. Deferred Costs and Intangible Assets**

Deferred costs and intangible assets consist of the following:

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Deferred costs | $ 348 | $ 348 |
| Lease origination costs | 1,610 | 1,474 |
| In-place leases | 428 | 428 |
| Real estate tax abatements | 9,142 | 9,142 |
| Total deferred costs and intangible assets | 11,529 | 11,392 |
| Less accumulated amortization | (5,852) | (5,265) |
| Total deferred costs and intangible assets, net | $ 5,676 | $ 6,127 |

Amortization of deferred costs, lease origination costs and in-place lease intangible assets was $106 and $114 for the years ended December 31, 2024 and 2023, respectively. Amortization of real estate tax abatements of $481 and $481 for the years ended December 31, 2024 and 2023, respectively, is included in real estate taxes and insurance in the consolidated statements of operations.

Deferred costs and intangible assets as of December 31, 2024, amortize in future years as follows:

| | |
|---|---|
| 2025 | $ 600 |
| 2026 | 584 |
| 2027 | 572 |
| 2028 | 551 |
| 2029 | 516 |
| Thereafter | 2,853 |
| Total | $ 5,676 |

**4. Notes Payable**

The mortgages, loans and mezzanine notes payable collateralized by the properties, or the Company's interest in the entities that own the properties and assignment of leases, are as follows:

| Property | Maturity | Interest Rate | December 31, 2024 | December 31, 2023 |
|---|---|---|---|---|
| Flatbush Gardens, Brooklyn, NY (a) | 6/1/2032 | 3.125% | 329,000 | $ 329,000 |
| 250 Livingston Street, Brooklyn, NY (b) | 6/6/2029 | 3.63% | 125,000 | 125,000 |
| 141 Livingston Street, Brooklyn, NY (c) | 3/6/2031 | 3.21% | 100,000 | 100,000 |
| Tribeca House, Manhattan, NY (d) | 3/6/2028 | 4.506% | 360,000 | 360,000 |
| Aspen, Manhattan, NY (e) | 7/1/2028 | 3.68% | 59,403 | 61,004 |
| Clover House, Brooklyn, NY (f) | 12/1/2029 | 3.53% | 82,000 | 82,000 |
| 10 West 65th Street, Manhattan, NY (g) | 11/1/2027 | SOFR + 2.50% | 31,437 | 31,836 |
| 1010 Pacific Street, Brooklyn, NY (h) | 9/1/2024 | LIBOR + 3.60% | — | — |
| 1010 Pacific Street, Brooklyn, NY (h) | 9/15/2025 | 5.55% | 60,000 | 60,000 |
| 1010 Pacific Street, Brooklyn, NY (h) | 9/15/2025 | 6.37% | 20,000 | 20,000 |
| Dean Street, Brooklyn, NY (i) | 9/22/2023 | Prime + 1.60% | — | — |
| Dean Street, Brooklyn, NY (i) | 8/10/2026 | SOFR + 4% | 98,849 | 42,909 |
| Dean Street, Brooklyn, NY (i) | 8/10/2026 | SOFR + 10% | 9,670 | 7,280 |
| Total debt | | | $ 1,275,359 | $ 1,219,029 |
| Unamortized debt issuance costs | | | (9,019) | (13,405) |
| Total debt, net of unamortized debt issuance costs | | | $ 1,266,340 | $ 1,205,624 |

(a) The $329,000 mortgage note agreement with Flagstar Bank N.A. (formerly New York Community Bank ("NYCB"))("Flagstar"), entered on May 8, 2020, matures on June 1, 2032, and bears interest at 3.125% through May 2027 and thereafter at the prime rate plus 2.75%, subject to an option to fix the rate. The note requires interest-only payments through May 2027, and monthly principal and interest payments thereafter based on a 30-year amortization schedule. The Company has the option to prepay all (but not less than all) of the unpaid balance of the note prior to the maturity date, subject to certain prepayment premiums, as defined.

(b) The $125,000 mortgage note agreement with Citi Real Estate Funding Inc., entered into on May 31, 2019, matures on June 6, 2029, bears interest at 3.63% and requires interest-only payments for the entire term. The Company has the option to prepay all (but not less than all) of the unpaid balance of the note within three months of maturity, without a prepayment premium.

As of February 23, 2024, The City of New York, a municipal corporation acting through the Department of Citywide Administrative Services ("NYC"), notified us of its intention to terminate its lease at 250 Livingston Street effective August 23, 2025. The lease generally provides for rent payments in the amount of $15,400 million per annum. We may be unable to replace NYC as a tenant or unable to replace it with other commercial tenants at comparable rent rates, may incur substantial costs to improve the vacated space or may have to offer significant inducements to fill the space, all of which may have an adverse effect on our financial condition, results of operations and cash flow. In connection with the termination of the 250 Livingston Street lease, pursuant to the terms of the loan agreement related to $125,000 building mortgage, we have established a cash management account for the benefit of the lender, into which we will be obligated to deposit all revenue generated by the building at 250 Livingston Street. All amounts remaining in such cash management account after the lender's allocations set forth in the loan agreement will be disbursed to us once the tenant cure conditions are satisfied under the loan agreement. As of February 14, 2025, we are required to deposit into such cash management account approximately $5,684 upon demand by the lender. If we are unable to replace the NYC lease at comparable rents, we may not be able to cure the conditions listed in the loan agreement. If the excess cash is not released to us, it could impact our available cash to fund corporate operations and pay dividends and distributions to our stockholders.

On January 2, 2025, the Company was notified that the loan servicing of the loan related to the 250 Livingston Street property was transferred, at our request, to LNR Partners ("LNR") to serve as special servicer in order for us to engage in negotiations on a modification of our loan. On January 6, 2025, the Company and LNR signed a Pre-Negotiation Letter Agreement to discuss our request for a reduction in the loan. These negotiations continue and there can be no guarantee that they will conclude with an agreement. On October 10, 2024, the Company guaranteed an agreement between the Company's subsidiary, 250 Livingston Owner LLC, and IronHound Management Company LLC, whose principal is the Company's director Roberto Verrone, to provide consulting services regarding the loan related to the 250 Livingston Street property. The initial fee paid upon the agreement is $125 and the agreement also includes restructuring and other fees payable upon certain loan modifications. The arrangement was approved by an independent committee of the Company's board of directors.

(c) The $100,000 mortgage note agreement with Citi Real Estate Funding Inc., entered into on February 18, 2021 matures on March 6, 2031, bears interest at 3.21% and requires interest-only payments for the entire term. The Company has the option to prepay all (but not less than all) of the unpaid balance of the note within three months of maturity, without a prepayment premium.

The 141 Livingston Street lease expires on December 27, 2025, and if NYC were to decide not to renew or extend such lease on its stated termination date, pursuant to the terms of the lease, we would be at risk of not being able to replace NYC as a tenant, leasing the space below the current rates, incurring costs to improve the space or offer other inducements to fill the space, all of which may have an adverse effect on our financial condition, results of operations and cash flow. The Company and NYC are in the process of negotiating the terms of a five-year extension of the current lease upon its expiration in December 2025. There can be no assurance that the negotiations will conclude with an agreement.

Our subsidiary, 141 Livingston Owner LLC (the "Borrower") and Citi Real Estate Funding Inc. entered into the loan agreement related to a $100,000 loan. The loan is evidenced by promissory mortgage notes and secured by the 141 Livingston Street property. The Company and our Operating Partnership subsidiary serve as limited guarantors of certain obligations under the loan, including those related to the reserve monthly deposit discussed below.

If the Company is not able to extend or replace the NYC lease at the 141 Livingston Street property for a minimum of a five-year term, the Company will be required to either fund a reserve account in the amount of $10,000 payable in equal monthly payments over the 18 months after lease expiration or deliver to the lender a letter of credit in the amount of $10,000.

On October 28, 2024, the Company received notice that, as of October 7, 2024, the servicing of the mortgage notes was transferred to a special servicer (the "Special Servicer") due to the Company's alleged failure to make certain required payments under the loan agreement, including, but not limited to, the reserve deposit starting on July 7, 2024. The Special Servicer demanded that the Company pay (i) $2,200 of reserve payments into a reserve account immediately (for July–October 2024) and continued monthly payments of $555 for an additional 14 months, (ii) $1,200 of default interest and late charges through October 7, 2024, and (iii) an additional $10 per diem interest for each day thereafter.

On November 11, 2024, the Special Servicer notified the Borrower that, due to its alleged event of default under the Loan Agreement, as a result of the failure to make the payments described above, the mortgage notes have been accelerated, and all amounts under the loan agreement were due and payable. Such amounts include, but are not limited to, $100,000 principal amount of the mortgage notes, approximately $5,000 of default yield maintenance premium, $10,000 aggregate reserve deposit, and the above-described penalty default interest and penalties.

The Company believes that (i) the Company has made timely payments under the loan agreement, (ii) the servicer and the Special Servicer have misinterpreted the terms of the loan agreement requiring monthly reserve payments beginning on July 7, 2024, (iii) the Company has no current obligation to make such reserve payments under the loan agreement and (iv) The Company should not be obligated to pay the default interest and late charges. The company and the Special Servicer have entered into a pre-negotiation agreement and as such are engaged in good faith discussions regarding the terms of the loan agreement related to the monthly reserve deposit, among other matters. However, if the Company is unable to resolve this matter in a manner favorable to us, the lender may also seek to exercise any of its other rights or remedies under the loan agreement.

On December 18, 2024, the Company received notice from the Special Servicer that due to its allegation that Clipper Realty Inc. (the "Guarantor") did not maintain a net worth of not less than $100 million as of December 31, 2022 and 2023, respectively, as required under the loan agreement, the Company is in default on the loan. The Company replied to the Special Servicer disputing such calculation and alleging that the Special Servicer did not calculate net worth in a reasonable manner. The Company provided the Special Servicer with its own calculation of net worth that shows a net worth in excess of the required amount. The Company awaits a response from the Special Servicer.

On January 2, 2025, the Company received notice from the Special Servicer alleging that certain elements of our insurance on the building at 141 Livingston Street are not in compliance with the loan agreement requirements, including, but not limited to, due to a deductible in excess of what is permitted under the terms of the loan agreement and the use of an insurance carrier with a rating agency rating below that which is permitted under the terms of the loan agreement.

(d) The $360,000 loan with Deutsche Bank, entered into on February 21, 2018, matures on March 6, 2028, bears interest at 4.506% and requires interest-only payments for the entire term. The Company has the option to prepay all (but not less than all) of the unpaid balance of the loan prior to the maturity date, subject to a prepayment premium if it occurs prior to December 6, 2027.

(e) The $61,000 mortgage note agreement with Capital One Multifamily Finance LLC matures on July 1, 2028, and bears interest at 3.68%. The note required interest-only payments through July 2017, and monthly principal and interest payments of $321 thereafter based on a 30-year amortization schedule. The Company has the option to prepay the note prior to the maturity date, subject to a prepayment premium.

(f) The $82,000 mortgage note agreement with MetLife Investment Management, entered into on November 8, 2019, matures on December 1, 2029, bears interest at 3.53% and requires interest-only payments for the entire term. The Company has the option, commencing on January 1, 2024, to prepay the note prior to the maturity date, subject to a prepayment premium if it occurs prior to September 2, 2029.

(g) There is $31,437 in mortgage debt secured by 10 West 65th Street as of December 31, 2024, in the form of a mortgage note to NYCB, entered into in connection with the acquisition of the property. The note matures on November 1, 2027. Through October 2022 the Company paid a fixed interest rate of 3.375% and thereafter was scheduled to pay at the prime rate plus 2.75%, subject to an option to fix the rate. On August 26, 2022 the Company and NYCB amended the note to replace prime rate plus 2.75% rate with SOFR plus 2.5% (7.88% at December 31, 2024). The note required interest-only payments through November 2019, and monthly principal and interest payments thereafter based on a 30-year amortization schedule. We have the option to prepay all (but not less than all) of the unpaid balance of the note prior to the maturity date, subject to certain prepayment premiums, as defined.

(h) On December 24, 2019, the Company entered into a $18,600 mortgage note agreement with CIT Bank, N.A., related to the 1010 Pacific Street acquisition. The Company also entered into a pre-development bridge loan secured by the property with the same lender to provide up to $2,987 for eligible pre-development and carrying costs. The notes were scheduled to mature on June 24, 2021, required interest-only payments and bore interest at one-month LIBOR (with a floor of 1.25%) plus 3.60%. The notes were extended in June 2021 with a new maturity date of August 30, 2021. The Company guaranteed this mortgage note and complied with the financial covenants therein.

On August 10, 2021, the Company refinanced the above 1010 Pacific Street loan with a group of loans with AIG Asset Management (U.S.), LLC providing for maximum borrowings of $52,500 to develop the property. The notes have a 36 month term, bear interest at 30 day LIBOR plus 3.60% (with a floor of 4.1%). The notes were scheduled to mature on September 1, 2024 and could have been extended until September 1, 2026. The Company could have prepaid the unpaid balance of the note within five months of maturity without penalty.

On February 9, 2023 the Company refinanced this construction loan with a mortgage loan with Valley National Bank which provided for maximum borrowings of $80,000. The loan provided initial funding of $60,000 and a further $20,000 subject to achievement of certain financial targets. The loan has a term of five years and an initial annual interest rate of 5.7% subject to reduction by up to 25 basis points upon achievement of certain financial targets. The interest rate on subsequent fundings will be fixed at the time of any funding. The loan requires interest-only payments for the first two years and principal and interest thereafter based on a 30-year amortization schedule. The Company has the option to prepay in full, or in part, the unpaid balance of the note prior to the maturity date. Prior to the second anniversary of the date of the note prepayment is subject to certain prepayment premiums, as defined. After the second anniversary of the date of the note the prepayment is not subject to a prepayment premium. During the quarter ended June 30, 2023 the company achieved a financial target and the interest rate was reduced by 15 basis points to 5.55%.

On September 15, 2023 the Company borrowed an additional $20,000 from Valley National Bank. The additional borrowing has a term of twenty-four months and an annual interest rate of 6.37%. The loan is interest only subject to the maintenance of certain financial targets after the first 16 months of the term. In conjunction with the additional borrowing, the Company and the bank agreed to amend the expiration date of the initial $60,000 to expire at the same time as the additional borrowing. No change was made to the interest rate on the initial borrowing.

In conjunction with the refinancing the Company incurred $3,868 of loan extinguishment costs related to prepayment penalties, writing off of unamortized deferred financed costs of previous loan and other fees. These costs are included in the consolidated statement of operations for the twelve-month period ended December 31, 2024.

(i) On December 22, 2021, the Company entered into a $30,000 mortgage note agreement with Bank Leumi, N.A related to the Dean Street acquisition. The note's original maturity was December 22, 2022 and was subsequently extended to September 22, 2023. The note required interest-only payments and bears interest at the prime rate (with a floor of 3.25%) plus 1.60%. In April 2022, the Company borrowed an additional $6,985 under the mortgage note in connection with the acquisition of additional parcels of land in February and April 2022.

On August 10, 2023, the "Company refinanced its $36,985 mortgage on its Dean Street development with a senior construction loan ("Senior Loan") with Valley National Bank that permits borrowings up to $115,000 and a mezzanine loan (the "Mezzanine Loan") with BADF 953 Dean Street Lender LLC that permits borrowings up to $8,000.

The Senior Loan allows maximum borrowings of $115,000 for a 30-month term, has two 6-month extension options, and bears interest at 1-Month Term SOFR plus 4.00%, with an all-in floor of 5.50% (8.55% at December 31, 2024). The Senior Loan consists of a land loan, funded at closing to refinance the existing loan totaling $36,985, a construction loan of up to $62,400 and a project loan of up to $15,600. The Company has provided a 30% payment guarantee of outstanding borrowings among other standard indemnities. As of December 31, 2024, the Company has drawn $49,315 from the construction loan and $12,549 from the project loan.

The Mezzanine Loan allows maximum borrowings of $8,000 for a 30-month term, have two 6-month extension options, and bears interest at 1-Month Term SOFR plus 10%, with an all-in floor of 13% (14.55% at December 31, 2024). Interest shall accrue on the principal, is compounded monthly and is due at the end of the term of the loan. At closing, $4,500 was funded to cover closing costs incurred on the construction loans. As of December 31,2024, the remaining $3,500 was drawn for ongoing construction costs.

During the years ended December 31, 2024 and 2023, the Company incurred $1,508 and $161, respectively, in interest and is included in the balance of the Notes Payable in the Consolidated Balance Sheet.

On August 10, 2023 the Company entered into a $5,000 corporate line of credit with Valley National Bank. The line of credit bears interest of Prime + 1.5%. The line of credit expired on August 10, 2024.

The Company has provided a limited guaranty for the mortgage notes at several of its properties. The Company's loan agreements contain customary representations, covenants and events of default. Certain loan agreements require the Company to comply with affirmative and negative covenants, including the maintenance of debt service coverage and debt yield ratios. In the event that the Company is not compliant, certain lenders may require cash sweeps of rent until the conditions are cured. Except as described above, the Company is not in default on any of its loan agreements.

The following table summarizes principal payment requirements under the terms of the mortgage notes as of December 31, 2024:

| | | |
|---|---|---|
| 2025 | $ | 82,144 |
| 2026 | | 101,090 |
| 2027 | | 43,019 |
| 2028 | | 416,554 |
| 2029 | | 209,572 |
| Thereafter | | 422,980 |
| Total | $ | 1,275,359 |

.

### 5. Rental Income under Operating Leases

The Company's commercial properties are leased to commercial tenants under operating leases with fixed terms of varying lengths. As of December 31, 2024, the minimum future cash rents receivable (excluding tenant reimbursements for operating expenses) under non-cancelable operating leases for the commercial tenants in each of the next five years and thereafter are as follows:

| | | |
|---|---|---:|
| 2025 | $ | 25,261 |
| 2026 | | 5,006 |
| 2027 | | 4,509 |
| 2028 | | 3,489 |
| 2029 | | 3,439 |
| Thereafter | | 17,717 |
| Total | $ | 59,421 |

The Company has commercial leases with the City of New York that comprised approximately 22% and 23% of total revenues for the years ended December 31, 2024 and 2023, respectively. As of February 23, 2024, the City of New York notified the Company of its intention to terminate its lease for 342,496 square feet of office space located at 240-250 Livingston Street effective August 23, 2025. The Lease generally provides for rent payments in the amount of $9,877 through the end of the term. Additionally, the Company and the City of New York are negotiating the terms of a five-year extension of its current 206,084 square foot lease at 141 Livingston Street that expires in December of 2025. There can be no assurance that the negotiations will conclude with an agreement. The current lease at 141 Livingston Street provides for $10,304 rent per annum.

### 6. Fair Value of Financial Instruments

GAAP requires the measurement of certain financial instruments at fair value on a recurring basis. In addition, GAAP requires the measure of other financial instruments and balances at fair value on a non-recurring basis (e.g., carrying value of impaired real estate and long-lived assets). Fair value is defined as the price that would be received upon the sale of an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. The GAAP fair value framework uses a three-tiered approach. Fair value measurements are classified and disclosed in one of the following three categories:

- Level 1: unadjusted quoted prices in active markets that are accessible at the measurement date for identical assets or liabilities;

- Level 2: quoted prices for similar instruments in active markets, quoted prices for identical or similar instruments in markets that are not active, and model-derived valuations in which significant inputs and significant value drivers are observable in active markets; and

- Level 3: prices or valuation techniques where little or no market data is available that require inputs that are both significant to the fair value measurement and unobservable.

When available, the Company utilizes quoted market prices from an independent third-party source to determine fair value and classifies such items in Level 1 or Level 2. In instances where the market for a financial instrument is not active, regardless of the availability of a nonbinding quoted market price, observable inputs might not be relevant and could require the Company to make a significant adjustment to derive a fair value measurement. Additionally, in an inactive market, a market price quoted from an independent third party may rely more on models with inputs based on information available only to that independent third party. When the Company determines the market for a financial instrument owned by the Company to be illiquid or when market transactions for similar instruments do not appear orderly, the Company uses several valuation sources (including internal valuations, discounted cash flow analysis and quoted market prices) and establishes a fair value by assigning weights to the various valuation sources.

Changes in assumptions or estimation methodologies can have a material effect on these estimated fair values. In this regard, the derived fair value estimates cannot be substantiated by comparison to independent markets and, in many cases, may not be realized in an immediate settlement of the instrument.

F-19

The financial assets and liabilities in the consolidated balance sheets include cash and cash equivalents, restricted cash, receivables, accounts payable and accrued liabilities, security deposits and notes payable. The carrying amount of cash and cash equivalents, restricted cash, receivables, accounts payable and accrued liabilities, and security deposits reported in the consolidated balance sheets approximates fair value due to the short-term nature of these instruments. The fair value of notes payable, which are classified as Level 2, is estimated by discounting the contractual cash flows of each debt instrument to their present value using adjusted market interest rates.

The carrying amount and estimated fair value of the notes payable are as follows:

|  | December 31, 2024 | | December 31, 2023 | |
|---|---|---|---|---|
| Carrying amount (excluding unamortized debt issuance costs) | $ | 1,275,359 | $ | 1,219,029 |
| Estimated fair value | $ | 1,209,629 | $ | 1,160,393 |

The above disclosures regarding fair value of financial instruments are based on pertinent information available as of December 31, 2024 and 2023, respectively. Although the Company is not aware of any factors that would significantly affect the reasonableness of the estimated fair value amounts, such -amounts have not been comprehensively revalued for purposes of these financial statements since those dates, and current estimates of fair value may differ significantly from the amounts presented herein.

**7. Commitments and Contingencies**

*Legal*

On July 3, 2017, the Supreme Court of the State of New York (the "Court") ruled in favor of 41 present or former tenants of apartment units at the Company's buildings located at 50 Murray Street and 53 Park Place in Manhattan, New York (the Tribeca House property), who brought an action (the "Kuzmich" case) against the Company alleging that they were subject to applicable rent stabilization laws with the result that rental payments charged by the Company exceeded amounts permitted under these laws because the buildings were receiving certain tax abatements under Real Property Tax Law ("RPTL") 421-g. The Court also awarded the plaintiffs- tenants their attorney's fees and costs. After various court proceedings and discussions from 2018-2022, on March 4, 2022 the court issued a ruling, finalized on May 9, 2022, on the rent overcharges to which the plaintiffs are entitled. While the court ruled that the overcharges to which the plaintiffs are entitled total $1.2 million, the court agreed with the Company's legal arguments that rendered the overcharge liability lower than it could have been, and therefore the Company did not appeal the ruling. On June 23, 2022, the court ruled that the plaintiffs are entitled to attorneys' fees incurred through February 28, 2022, in the amount of $0.4 million. The only remaining outstanding issues of which the Company is aware relate to the proper form of rent-stabilized renewal leases for the six plaintiffs who remain as tenants in the building. The parties are seeking judicial intervention to resolve this remaining issue. On July 17, 2023, a hearing was held at which the Judicial Hearing Officer ("JHO") determined five (5) of the tenant's lease renewal amounts, term and form. The amount of the lease renewal concerning the sixth plaintiff was made on August 28, 2023. At this time the Company is awaiting the execution and return of all the lease renewals. On June 14, 2024, the Court amended its August 28, 2023 decision, holding that no renewal lease had been entered into by one of the remaining tenants (Navascues) who claimed to have entered into a renewal lease at a preferential rent. On July 20, 2024, Plaintiff filed a notice of appeal from the June 14, 2024 decision. On August 13, 2024, the JHO issued a Determination awarding attorneys' fees to plaintiffs' attorneys in the amount of $13 for the Kuzmich matter. On December 31, 2024, the Company filed a notice of appeal from the August 13, 2024 JHO determination. The Company is preparing to comply with the JHO's Determinations regarding renewal leases, overcharge payments and payment of attorneys fees. The matter is currently pending.

On November 18, 2019, the same law firm which filed the Kuzmich case filed a second action involving a separate group of 26 tenants (captioned Crowe et al v 50 Murray Street Acquisition LLC, Supreme Court, New York County, Index No. 161227/19), which action advances essentially the same claims as in Kuzmich. The Company's deadline to answer or otherwise respond to the complaint in Crowe had been extended to June 30, 2020; on such date, the Company filed its answer to the complaint. Pursuant to the court's rules, on July 16, 2020, the plaintiffs filed an amended complaint; the sole difference as compared to the initial complaint is that seven new plaintiffs-tenants were added to the caption; there were no substantive changes to the complaint's allegations. On August 5, 2020, the Company filed its answer to the amended complaint. The case was placed on the court's calendar and was next scheduled for a discovery conference on November 16, 2022. Counsel for the parties have been engaged in and are continuing settlement discussions. On November 16, 2022, the court held a compliance conference and ordered the plaintiffs to provide rent overcharge calculations in response to proposed calculations previously provided by the Company. On July 12, 2023, the court referred this matter to a JHO to determine the outstanding issues. A hearing before the JHO was held in September 2023. On September 19, 2024 the JHO entered two orders, (1) a June 5, 2024 Determination determining the amount of rent overcharges, if any, due to each of the plaintiffs and the lease renewal amounts, term and form of lease for the plaintiffs remaining in occupancy of four units and (2) a September 3, 2024 Determination sustaining the June 5, 2024 JHO determination which set another plaintiffs rent but reducing the overcharge amount owed to the plaintiff. On October 21, 2024, the Company filed a notice of appeal from the September 3, 2024 JHO order. In addition, on August 13, 2024 the JHO issued a Determination awarding attorneys' fees to plaintiffs' attorneys in the amount of $63 for the Crowe matter. This Determination was entered on November 25, 2024. On December 31, 2024, the Company moved to appeal from the August 13, 2024 JHO determination. The Company is preparing to comply with the JHO's determinations. The matter is currently pending.

F-20

On March 9, 2021, the same law firm which filed the Kuzmich and Crowe cases filed a third action involving another tenant (captioned Horn v 50Murray Street Acquisition LLC, Supreme Court, New York County, Index No. 152415/21), which action advances the same claims as in Kuzmich and Crowe. The Company filed its answer to the complaint on May 21, 2021. On September 19, 2024 the JHO entered a June 5, 2024 order which determined, among other things, the amount of rent overcharge, the lease renewal amount, term and form of lease for plaintiff Horn. In addition, On August 13, 2024 the JHO issued a Determination awarding attorneys' fees to plaintiffs' attorneys in the amount of $18 for the Horn matter. This Determination was entered on November 25, 2024. On December 31, 2024, the Company filed a notice of appeal from the August 13, 2024 JHO determination. The Company is preparing to comply with the JHO's determinations.

As a result of the March 4 and May 9, 2022 decisions which established the probability and ability to reasonably compute amounts owed to tenants for all the cases, the Company recorded a charge for litigation settlement and other of $2.7million in the consolidated statements of operations during the year ended December 31, 2021 comprising rent overcharges, interest and legal costs of plaintiff's counsel. The Company paid $2.3million to the plaintiffs related to the Kuzmich case during the year ended December 31, 2022 and $0.4 million related to the Crowe case during the nine month period ended September 30, 2023.

Based on the JHO determinations made in 2024, the Company accrued an additional $175 for the plaintiffs and $94 for attorney fees.

In addition to the above, the Company is subject to certain legal proceedings and claims arising in connection with its business. Management believes, based in part upon consultation with legal counsel, that the ultimate resolution of all such claims will not have a material adverse effect on the Company's consolidated results of operations, financial position or cash flows.

On October 15, 2021, Rodney Sanchez ("Plaintiff") filed a Class and Collective Action Complaint (the "Complaint") against and the Company and certain of its affiliates and Clipper Equity LLC (collectively, the "Defendants") in the United States District Court for the Southern District of New York. The Plaintiff alleged that he was jointly employed by the Defendants and that the Defendants: (a) failed to pay Plaintiff and similarly situated employees overtime in violation of the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL"); (b) failed to pay Plaintiff and similarly situated employees for training sessions in violation of the FLSA and NYLL; (c) failed to pay Plaintiff and similarly situated employees on a timely basis in violation of NYLL; and (d) failed to provide Plaintiff and similarly situated employees with wage statements and wage notices as required by NYLL. The Company has denied the allegations and intends to defend both the allegations and the class certification action. Given the uncertainty of litigation, the preliminary stage of the case and the legal standards that must be met for, among other things, class certification and success on the merits, the Company cannot estimate the reasonably possible loss or range of loss, if any, that may result from this action and therefore no accrual has been made related to this.

The Office of the Attorney General of the State of New York ("OAG") commenced an investigation concerning the conduct of screening of tenant applicants in the building portfolio in which Clipper Equity and its principals have a management and/or ownership interest. Clipper Equity cooperated with the investigation and, in April 2022, entered into an Assurance of Discontinuance with the OAG to resolve the investigation on behalf of itself and its affiliates, the terms of which have no impact to the Company's financial position or results of operations.

On November 22, 2024, The New York City Department of Citywide Administrative Services issued the results of its audit of the Company's operating expense escalation charges for the period of June 2014 to December 2018. The audit in a claim by the City for the Company to pay the City $1,152. The Company is evaluating the results of the audit. Based on the results of the audit the Company believes it has adequate reserves to cover this payment.

*Commitments*

On June 29, 2023 the Company entered into the Article 11 Agreement. Under the Article 11 agreement, the Company has entered into a Housing Repair and Maintenance Letter Agreement ("HRMLA") in which the Company has agreed to perform certain capital improvements to Flatbush Gardens over the next three years. The current estimate is that the costs of that work will be an amount up to $27 million. The Company expects those costs to be offset by the savings provided by property tax exemption and enhanced payments for tenants receiving government assistance (See note 1). Through December 31, 2024 the Company spent approximately $9.1 million on capital improvements required under the HRMLA.

The Company is obligated to provide parking availability through August 2025 under a lease with a tenant at the 250 Livingston Street property; the current cost to the Company is approximately $205 per year.

*Concentrations*

The Company's properties are located in the Boroughs of Manhattan and Brooklyn in New York City, which exposes the Company to greater economic risks than if it owned a more geographically dispersed portfolio.

The breakdown between commercial and residential revenue is as follows:

|  | Commercial | Residential | Total |
|---|---|---|---|
| Year ended December 31, 2024 | 26% | 74% | 100% |
| Year ended December 31, 2023 | 28% | 72% | 100% |

**8. Related-Party Transactions**

The Company recorded office and overhead expenses pertaining to a related company in general and administrative expense of $308 and $264 for the years ended December 31, 2024 and 2023 respectively. The Company recognized reimbursable payroll expense pertaining to a related company in general and administrative expense of $1 and $97 for the years ended December 31, 2024 and 2023, respectively. On October 10, 2024, the Company guaranteed an agreement between the Company's subsidiary, 250 Livingston Owner LLC, and IronHound Management Company LLC, whose principal is the Company's director Roberto Verrone, to provide consulting services regarding the loan related to the 250 Livingston Street property. The initial fee paid upon the agreement is $125 and the agreement also includes restructuring and other fees payable upon certain loan modifications. The arrangement was approved by an independent committee of the Company's board of directors. During the year ended December 31, 2024, the Company engaged Greenberg Traurig, in which the Company's director Robert Ivanhoe is a senior partner, regarding the loan to 141 Livingston Street, for a fee of approximately $15.

**9. Segment Reporting**

The Company is a New York City real estate investment trust that is focused on developing, redeveloping and operating properties in the commercial and residential space.

Our Chief Operating Decision Maker ("CODM"), represented by our Co-Chairman and Chief Executive Officer, reviews the results in which the revenue and Income from Operations is divided between the commercial and residential performance. This metric enables the CODM to evaluate how the business is growing, as revenue is the key driver of growth. Additionally, the CODM uses segment income (loss) to allocate resources in the annual budgeting and forecasting process. The CODM considers budget to actual variances when making decisions about allocating capital to each segment.

The Company has classified its reporting segments into commercial and residential rental properties. The commercial reporting segment includes the 141 Livingston Street property and portions of the 250 Livingston Street, Tribeca House, Dean Street and Aspen properties. The residential reporting segment includes the Flatbush Gardens property, the Clover House property, the 10 West 65th Street property, the 1010 Pacific Street property and portions of the 250 Livingston Street, Tribeca House, Dean Street and Aspen properties.

Presented below are reconciliations of the reportable segment total revenues to the consolidated revenues, the reportable segment total operating expenses to consolidate operating expenses, the reportable income from operations to the consolidated income from operations, the segment and consolidated income from operations to segment and consolidated net income(loss), the reportable segment assets to the consolidated assets, the reportable segment interest expense to the consolidated interest expense and the reportable segment capital expenditures to the consolidated capital expenditures.

| Year ended December 31, 2024 | | Commercial | | Residential | | Total |
|---|---|---|---|---|---|---|
| Rental income | $ | 38,902 | $ | 109,873 | $ | 148,775 |
| Total revenues | | 38,902 | | 109,873 | | 148,775 |
| Property operating expenses | | 4,557 | | 29,604 | | 34,163 |
| Real estate taxes and insurance | | 10,926 | | 18,844 | | 29,770 |
| General and administrative | | 2,543 | | 11,609 | | 14,152 |
| Depreciation and amortization | | 6,013 | | 23,879 | | 29,892 |
| Total operating expenses | | 24,040 | | 83,935 | | 107,977 |
| Litigation Settlement and other | | | | (269) | | (269) |
| Income from operations | $ | 14,862 | $ | 25,669 | $ | 40,529 |
| Interest Expense | | (10,155) | | (36,956) | | (47,111) |
| Income (Loss) | $ | 4,707 | $ | (11,287) | $ | (6,582) |

| Year ended December 31, 2023 | | Commercial | | Residential | | Total |
|---|---|---|---|---|---|---|
| Rental income | $ | 38,489 | $ | 99,716 | $ | 138,205 |
| Total revenues | | 38,489 | | 99,716 | | 138,205 |
| Property operating expenses | | 4,432 | | 26,187 | | 30,619 |
| Real estate taxes and insurance | | 9,605 | | 22,346 | | 31,951 |
| General and administrative | | 2,364 | | 10,805 | | 13,169 |
| Transaction pursuit costs | | — | | 357 | | 357 |
| Depreciation and amortization | | 5,824 | | 23,115 | | 28,939 |
| Total operating expenses | | 22,225 | | 82,810 | | 105,035 |
| Income from operations | $ | 16,264 | $ | 16,906 | $ | 33,170 |
| Interest Expense, Net | | (10,135) | | (34,732) | | (44,867) |
| Loss on Modification/extinguishment of Debt | | - | | (3,868) | | (3,868) |
| Income (Loss) | $ | 6,129 | $ | (21,694) | $ | (15,565) |

The Company's total assets by segment are as follows, as of:

| | | Commercial | | Residential | | Total |
|---|---|---|---|---|---|---|
| December 31, 2024 | $ | 315,296 | $ | 971,668 | $ | 1,286,965 |
| December 31, 2023 | | 313,666 | $ | 935,664 | $ | 1,249,330 |

The Company's interest expense by segment for the years ended December 31, 2024 and 2023, is as follows:

| | | Commercial | | Residential | | Total |
|---|---|---|---|---|---|---|
| Year ended December 31, 2024 | $ | 10,155 | $ | 36,956 | $ | 47,111 |
| Year ended December 31, 2023 | | 10,135 | $ | 34,732 | $ | 44,867 |

The Company's capital expenditures by segment for the years ended December 31, 2024 and 2023, are as follows:

| | | Commercial | | Residential | | Total |
|---|---|---|---|---|---|---|
| Year ended December 31, 2024 | $ | 4,148 | $ | 65,582 | $ | 69,730 |
| Year ended December 31, 2023 | | 3,980 | $ | 42,318 | $ | 46,298 |

The Company allocates assets, expenses and capital expenditures to each reportable segment by building. For those buildings that are shared between the segment's allocations are done based on the percentage relative square footage of the building that is used to generate revenue for the segment. All corporate costs are allocated based on the percentage of square footage of the segment.

## 10. Multiemployer Union Agreement and Pension Plan

Certain of the Company's employees are covered by union-sponsored, collectively bargained, multiemployer defined benefit pension and profit-sharing plans, and health insurance, legal and training plans. Contributions to the plans are determined in accordance with the provisions of the negotiated labor contract. The Local 94 International Union of Operating Engineers ("Local 94") contract is in effect through December 31, 2026. The Local 32BJ Service Employees International Union ("Local 32BJ") apartment building contract is in effect through April 20, 2026. The Local 32BJ Service Employees International Union commercial building contract was in effect through December 31, 2024 and this contract is still under negotiation.

Contributions to the unions are not segregated or otherwise restricted to provide benefits only to the Company's employees. The risks of participating in a multiemployer pension plan differ from those of a single-employer pension plan in the following aspects: (a) assets contributed to a multiemployer pension plan by one employer may be used to provide benefits to employees of other participating employers; (b) if a participating employer stops contributing to the plan, the unfunded obligation of the plan may be borne by the remaining participating employers; and (c) if the Company chooses to stop participating in the multiemployer plan, it may be required to pay the plan an amount based on the unfunded status of the plan, which is referred to as the withdrawal liability. The Company has no intention of withdrawing from the plans.

The information for the union's multiemployer pension plans are as follows:

| | |
|---|---|
| Legal name | Building Service 32BJ Pension Fund |
| Employer identification number | 13-1879376 |
| Plan number | 001 |
| Type of plan | Defined benefit pension plan |
| Plan year-end date | June 30 |
| Certified Zone Status for 2024 and 2023* | Green |
| Funding improvement plan/rehabilitation plan* | Implemented |
| Surcharges paid to plan | None |
| Pension contribution made for 2024 and 2023, respectively | $440 and $432 |
| Minimum weekly required pension contribution per employee for 2024 and 2023, respectively (in dollars) | $129.45 and $126.91 |

| | |
|---|---|
| Legal name | Central Pension Fund of the International Union of Operating Engineers and Participating Employers |
| Employer identification number | 36-6052390 |
| Plan number | 001 |
| Type of plan | Defined benefit pension plan |
| Plan year-end date | January 31 |
| Certified Zone Status for 2024 and 2023* | Green |
| Funding improvement plan/rehabilitation plan* | N/A |
| Surcharges paid to plan | N/A |
| Pension contribution made for 2024 and 2023, respectively | $43 and $43 |
| Minimum weekly required pension contribution per employee for 2024 and 2023, respectively (in dollars) | $205.09 and $204.85 |

\* *Certified pension zone status (as defined by the Pension Protection Act) represents the level at which the pension plan is funded. Plans in the red zone are less than 65% funded; plans in the yellow zone are less than 80% funded; and plans in the green zone are at least 80% funded. The rehabilitation plan may involve a surcharge on employers or a reduction or elimination of certain employee adjustable benefits.*

The information provided above is from the respective pension plan's most current annual report, which for Local 32BJ is for the year ended January 01, 2025 and for Local 94 is for the year ended January 01, 2025. The Pension Protection Act Zone Status, the most recent zone status available, was provided to the Company by the respective plans and the Local 32BJ status is certified by the plan's actuary. The Company's contributions to the pension plans are less than 5% of all the employers' contributions to the plans.

**11. Subsequent Events**

Subsequent to December 31, 2024 the Board of Directors declared a fourth quarter dividend of $0.095 per share, to stockholders of record on March 19, 2025, payable April 3, 2025.

F-24

**Clipper Realty Inc. and Predecessor**
**Schedule III – Real Estate and Accumulated Depreciation**
**(In thousands)**

| Property | Location | Description | Encumbrances at December 31, 2024 | | Initial Costs | | | Gross Amounts at Which Carried at December 31, 2024 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Encumbrances | Land | Building and Improvements | Real Estate Under Develop. | Cost Capitalized Subsequent to Acquisition | Land | Building and Improvements | Real Estate Under Develop. | Total | Accumulated Depreciation | Date Acquired |
| Tribeca House | Manhattan, NY | Residential | $ 360,000 | $ 273,103 | $ 283,137 | $ — | $ 32,069 | $ 273,103 | $ 315,206 | — | $ 588,309 | $ 91,994 | Dec-14 |
| Aspen | Manhattan, NY | Residential | 59,403 | 49,230 | 43,080 | — | 2,990 | 49,230 | 46,071 | — | 95,301 | 10,389 | June-16 |
| Flatbush Gardens | Brooklyn, NY | Residential | 329,000 | 89,965 | 49,607 | — | 83,576 | 90,051 | 133,097 | — | 223,148 | 78,962 | Oct-05 |
| Clover House | Brooklyn, NY | Residential | 82,000 | 43,516 | 44,100 | — | 58,576 | 43,516 | 102,676 | — | 146,193 | 12,480 | May-17 |
| 10 West 65th St. | Manhattan, NY | Residential | 31,438 | 63,677 | 15,337 | — | 6,540 | 63,677 | 21,877 | — | 85,553 | 7,353 | Oct-17 |
| 1010 Pacific St. | Brooklyn, NY | Residential | 80,000 | 31,129 | 658 | — | 61,440 | 31,129 | 62,099 | — | 93,227 | 2,721 | Nov-19 |
| Dean Street | Brooklyn, NY | Residential | 108,519 | — | — | 40,548 | 105,701 | — | — | 146,249 | 146,249 | — | Dec-21 |
| 250 Livingston St. | Brooklyn, NY | Commercial | 125,000 | 10,452 | 20,204 | — | 24,719 | 10,452 | 44,923 | — | 55,376 | 24,583 | May-02 |
| 141 Livingston St. | Brooklyn, NY | Commercial | 100,000 | 10,830 | 12,079 | — | 15,654 | 10,830 | 27,733 | — | 38,564 | 14,910 | May-02 |
| | | | $ 1,275,359 | $ 571,902 | $ 468,202 | $ 40,548 | $ 391,265 | $ 571,988 | $ 753,683 | $ 146,249 | $ 1,471,920 | $ 243,392 | |

(1)    At December 31, 2024, the aggregate cost for Federal tax purposes of our real estate assets was $983,084.

(2)    The following summarizes activity for real estate and accumulated depreciation, for the years ended December 31, 2024 and 2023:

| | | 2024 | | 2023 |
|---|---|---|---|---|
| *Investment in real estate:* | | | | |
| Balance at beginning of period | $ | 1,402,190 | $ | 1,355,890 |
| Acquisition of real estate | | — | | — |
| Additions during period | | 69,730 | | 46,300 |
| Write-off of assets | | — | | — |
| Balance at end of period | $ | 1,471,920 | $ | 1,402,190 |
| | | | | |
| *Accumulated depreciation:* | | | | |
| Balance at beginning of period | $ | 213,606 | $ | 184,781 |
| Depreciation expense | | 29,786 | | 28,825 |
| Write-off of assets | | — | | — |
| Balance at end of period | $ | 243,392 | $ | 213,606 |

**CLIPPER REALTY INC.**
**INSIDER TRADING POLICY**

In order to take an active role in the prevention of insider trading violations by its officers, directors, employees and other individuals, Clipper Realty Inc. (together with its subsidiaries, the "Company") has adopted this Insider Trading Policy (the "Policy"). The Company opposes the unauthorized disclosure of any nonpublic information acquired in the workplace and the misuse of material nonpublic information ("Material Nonpublic Information") in securities trading. Any such actions will be deemed violations of the Policy. From time to time, the Company may engage in transactions in its own securities. It is the Company's policy to comply with all insider trading laws, rules and regulations, and any applicable listing standards when engaging in transactions of the Company's securities.

A.     Definitions

All defined terms shall have the meanings set forth in Annex A.

B.     Inquiries

Please direct your questions as to any of the matters discussed in this Policy to the Insider Trading Compliance Officer, initially the Company's Chief Financial Officer.

C.     Regulatory Background

Pursuant to federal and state securities laws, an Insider may be subject to significant civil and criminal penalties for engaging in transactions in the Company's securities at a time when he or she has knowledge of Material Nonpublic Information regarding the Company.

An Insider may also be liable for improper transactions by any person (commonly referred to as a "tippee") to whom he or she has disclosed Material Nonpublic Information regarding the Company or to whom he or she has made recommendations or expressed opinions on the basis of such information as to trading in the Company's securities. The SEC has imposed large penalties even when the disclosing person did not profit from the trading. The SEC, the stock exchanges and the Financial Industry Regulatory Authority use sophisticated electronic surveillance techniques to uncover insider trading and vigorously pursue suspicious trading activity.

In addition, those Insiders who are Section 16 Individuals are reminded that they are subject to the reporting obligations under Section 16 of the Exchange Act, as well as the Section 16 short-swing profit rules requiring them to disgorge profits related to certain purchases and sales of securities within a six-month period.

D.     Persons to Whom the Policy Applies

The Policy applies to all officers, directors, employees and their members of households or immediate family (spouse and minor children or other unrelated persons who live with or are supported by officers, directors or employees). These persons are called "Insiders".

From time to time, other persons may be subject to the Policy, in each case where such persons have or may have access to Material Nonpublic Information. Any person who is aware of or possesses Material Nonpublic Information regarding the Company is an Insider for so long as the information is not publicly known.

E.       Exceptions and Waivers

Personal financial emergencies do not excuse Insiders from compliance with this Policy. However, there may be circumstances from time to time in which the application of this Policy produces unfair or undesirable results and in which a proposed transaction is not inconsistent with the purposes of this Policy. In these circumstances, the Insider Trading Compliance Officer or the Board of Directors may grant exemptions from any provision of this Policy based on his or her determination that the exempted transaction is not inconsistent with this Policy.

F.       Transactions to Which the Policy Applies

This Policy applies to all transactions in the securities of the Company, including shares of common stock, class B LLC interests and shares of special voting stock, LTIP units and OP units, and any other securities the Company may issue from time to time, as well as to derivative securities relating to such securities, whether or not issued by the Company, such as exchange-traded options.

As described below, the Policy requires that:

- all Insiders shall be prohibited from trading any securities of the Company except during an open trading window (the "Trading Window") that will commence at the open of market on the second Trading Day following the date of public disclosure of the Company's financial results for a particular fiscal quarter or year and will close at the close of market on the last day of the next fiscal quarter;

- any Insider may be subject to special Blackout Periods during which they will be prohibited from trading any securities of the Company, even though the Trading Window would otherwise be open; and

- no Insider may take a short position in any Company securities, or purchase, hold or trade derivatives of the Company's securities, which includes, but is not limited to, trading in put or call options or collars related to Company securities, whether or not such derivatives are settled in Company securities or cash; and

-2-

More specifically, the Company has adopted the following policies:

1. <u>Trading on Material Nonpublic Information</u>.

 (a) No Insider may engage in any transaction involving a purchase or sale of the Company's securities, including any offer to purchase or offer to sell, during any period commencing with the date that he or she is aware of or possesses Material Nonpublic Information concerning the Company, and ending at the open of the market on the second Trading Day following the date of public disclosure of that information, or at such time as such nonpublic information is no longer material.

 (b) No Insider shall disclose ("<u>tip</u>") Material Nonpublic Information to any other person (including family members) where such information may be used by such person to profit by trading in the securities of companies to which such information relates, nor shall such Insider or related person make recommendations or express opinions on the basis of Material Nonpublic Information as to trading in the Company's securities. This practice violates the securities laws, even if the Insider does not trade or gain any benefit from another person's trading, and can result in the same civil and criminal penalties that apply if the Insider engaged in insider trading directly.

2. <u>Blackout Period and Trading Window</u>. The period outside of the Trading Window (the "<u>Blackout Period</u>") is a particularly sensitive period of time for transactions in the Company's securities from the perspective of compliance with applicable securities laws. This sensitivity is due to the fact that certain Insiders will, during that period, often be aware of or possess or at the very least be presumed to possess Material Nonpublic Information about the expected financial results for the quarter during that period.

 (a) <u>Open Trading Window</u>. To ensure compliance with this Policy and applicable federal and state securities laws, the Company requires that all Insiders refrain from conducting transactions involving the purchase or sale of the Company's securities other than during the Trading Window. The prohibition against trading during the Blackout Period encompasses the fulfillment of "limit orders" by any broker for any person subject to this Policy, and the broker with whom the limit order is placed should be so instructed when the order is placed.

 (b) <u>Special Blackout Periods</u>. From time to time, the Company may also prohibit some or all Insiders from trading securities of the Company because of material developments known to the Company and not yet disclosed to the public. The Insider Trading Compliance Officer will notify all Insiders subject to a special Blackout Period. In such event, the applicable Insiders may not engage in any transaction involving the purchase or sale of the Company's securities during the period designated by the Insider Trading Compliance Officer (each such period, a "<u>Special Blackout Period</u>") and should not disclose to others the fact of such suspension of trading. The Company will notify affected Insiders when the special Blackout period ends.

-3-

(c)    **No Trading on Material Nonpublic Information at Any Time. Even during a Trading Window, any Insider who is aware of or possesses Material Nonpublic Information concerning the Company may not engage in any transactions in the Company's securities until such information has been known publicly for at least one full Trading Day, whether or not the Company has imposed a Blackout Period. Trading in the Company's securities during the Trading Window should not be considered a "safe harbor," and all Insiders must use good judgment in determining whether to purchase or sell the Company's securities at all times.**

(d)    <u>Certain Exceptions</u>. This Policy's trading restrictions do not apply to an Insider's exchange of LTIP units for OP units or exercise of other options granted under the Company's compensation plans if the exercise price is paid in cash, because the other party to the transaction is the Company itself and the exercise price does not vary with the market but is fixed by the terms of the award agreement or the plan. However, the Policy **would** apply to the (1) sale of any shares issued upon such exercise or (2) any cashless exercise as this is accomplished by the sale of a portion of the shares issued upon exercise of the option. All such exercises are subject to the terms and conditions of the Company's compensation plans, which may contain additional restrictions on exercise. Transactions may also be exempt from the Policy if made pursuant to an approved trading plan that complies with certain requirements of the Company and with Rule 10b5-1, which is discussed in more detail below.

3.    <u>Short Sales and Other Derivatives</u>.    **NO INSIDER MAY ENGAGE IN A SHORT SALE OF, OR OTHERWISE HEDGE, THE COMPANY'S SECURITIES**.    A short sale is a sale of securities not owned by the seller or, if owned, not delivered against such sale within 20 days thereafter.

Transactions in certain put and call options for the Company's securities may in some instances constitute a short sale. To ensure compliance with this Policy and applicable federal and state securities laws, the Company requires that all Insiders refrain from investing in or selling other derivatives of the Company's securities, such as puts or call options, at any time. Short sales and investing in or selling other derivatives of the Company's securities are prohibited by this Policy even when the Trading Window is open. In addition, Insiders may not place Company securities in a margin account or pledge Company securities as collateral for a loan except with the express consent of the Insider Trading Compliance Officer.

4.    <u>Gifts</u>. For purposes of this Policy, gifts of Company securities will be treated as sales of Company securities. For Insiders, the making of gifts of Company securities shall occur only during the Trading Window and only if the Insider is not in possession of Material Nonpublic Information at the time of the gift. Notwithstanding this general rule, an Insider may make a bona fide year-end gift of securities to a tax qualified charitable institution that is not controlled by the Insider and for which the Insider (or members of their household or immediate family) does not act as a director, trustee or executive officer.

-4-

5. <u>Material Nonpublic Information</u>. Nonpublic information is information that is not generally known or available to the public. Information becomes public when (i) it is disclosed to achieve broad, non-exclusionary distribution to the investing public generally, without favoring any person or group, and (ii) there has been adequate time for the public to digest that information. Examples of broad dissemination include press releases, filings with the SEC and meetings, conference calls or webcasts that are open to the public. Nonpublic information relating to the Company is the property of the Company and the unauthorized disclosure of such information is strictly forbidden. In the event any Insider receives any inquiry from outside the Company, such as a stock analyst or other securities market professional, for information (particularly financial results and/or projections), the inquiry should be referred to the Company's investor relations department, which is responsible for coordinating and overseeing the release of such information to the investing public, analysts, and others in compliance with applicable laws and regulations.

It is not possible to define all categories of material information. Information is material if there is a reasonable likelihood that a reasonable investor would consider it important in deciding whether to buy, hold or sell the Company's securities. Any information that could reasonably be expected to affect the price of the Company's securities is material for these purposes. In this regard, potential market reaction or sensitivity to the information is a key consideration. Moreover, although multiple pieces of information may not be material individually, if the aggregate effect of those pieces, when they become public, would alter the "total mix" of available information and result in a reevaluation of the Company's securities, then such pieces of information are considered material. Material information can be positive or negative.

Although the materiality of information may vary depending on the circumstances, please note that such information will be scrutinized by federal, state and other governmental investigators with the benefit of evaluating the situation with hindsight. Consequently, an Insider should avoid any appearance of impropriety and should carefully review the particular facts of each situation. When in doubt, Insiders should always assume the information is material and not engage in any transaction involving that company. Examples of potentially material information include:

- Financial results

- Known but unannounced future earnings or losses

- Execution or termination of significant financing, management or tenant agreements or other contracts with business entities

- Information relating to a pending or proposed merger, joint venture, tender offer or other acquisition or divestiture

- Information relating to the acquisition or disposition of significant assets

- Changes in control of the Company

- Changes in financial liquidity

- Significant developments involving corporate relationships

- Events involving the Company's debt or equity securities, such as repurchases of common stock or debt, changes in dividend policy, stock splits, a change in the Company's debt rating or offerings of additional securities.

- Developments (whether positive or negative) in pending litigation

- Significant litigation exposure due to actual or threatened litigation

- Changes in senior management or the Board of Directors

- Changes in auditors or an auditor notification that the Company may no longer rely on the auditor's reports

- Information about significant misstatements or omissions in the Company's disclosure documents

The aforementioned list of information likely to be considered material is not exhaustive and depending upon the circumstances, other information not included may be considered material. In short, if a reasonable person would consider the information relevant in making an investment decision, an Insider should assume it is material and treat it as such.

This Policy described herein also applies to Material Nonpublic Information relating to other companies, including the Company's Business Partners, when that information is obtained in the course of employment with, or other services performed on behalf of, the Company. Civil and criminal penalties, and termination of employment, may result from trading on inside information regarding the Company's Business Partners. All Insiders should treat Material Nonpublic Information about the Company's Business Partners with the same care required with respect to information related directly to the Company.

6. Individual Responsibility. Every Insider has the individual responsibility to comply with this Policy against insider trading. An Insider may, from time to time, have to forego a proposed transaction in the Company's securities even if he or she planned to make the transaction before learning of the Material Nonpublic Information and even though the Insider believes he or she may suffer an economic loss or forego anticipated profit by waiting.

G. Violations of the Policy. Insiders are ultimately responsible for adhering to this Policy and determining whether they are in possession of Material Nonpublic Information, and any action on the part of the Company or any other officer, director or employee pursuant to this Policy (or otherwise) does not in any way constitute legal advice or insulate an individual from liability under applicable securities laws. Insiders with any questions about this Policy or its application to a proposed transaction may obtain additional guidance from the Insider Trading Compliance Officer.

Any person subject to the Policy who violates this Policy also shall be subject to disciplinary action by the Company, up to and including termination of employment, whether or not the person's failure to comply with the Policy results in a violation of law.

The Company reserves the right to determine, in its own discretion and on the basis of information available to it, whether this Policy has been violated.

     H.   Trading Plans in Compliance with SEC Rule 10b5-l. Insiders may elect to trade in the Company's securities pursuant to a written plan or set of instructions to his or her stock broker (a "Trading Plan") that complies with Rule 10b5-1. Trades made pursuant to a Trading Plan that complies with Rule 10b5-1 may occur during a Blackout Period as described above and/or while the Insider is otherwise in possession of Material Nonpublic Information. In addition, trades made pursuant to any such Trading Plan will not be subject to the pre-clearance procedures. However, no Trading Plan may be entered into when the Insider has Material Nonpublic Information. All Trading Plans must be approved in advance by the Insider Trading Compliance Officer.

     *The Company strongly recommends that any person seeking to adopt a Trading Plan consult with his or her own legal counsel prior to the adoption of a Trading Plan.*

     **Each individual adopting the Trading Plan is solely responsible for compliance with Rule 10b5-1 and ensuring that the Trading Plan meets the other conditions set forth above.** Insiders also remain individually responsible for compliance with all applicable laws, rules and regulations on insider trading and remain subject to disciplinary action for any violations of this Policy, regardless of whether a Trading Plan has been adopted. Notwithstanding the conditions set forth above, the Company does not undertake any obligation to ensure that a Trading Plan approved by the Insider Trading Compliance Officer complies with Rule 10b5-1.

     I.   Pre-Clearance of Trades for the Company's Directors and Officers.

     The Company has determined that all Section 16 Individuals and certain other persons identified by the Company from time to time and who have been notified that they have been so identified, must refrain from trading in the Company's securities, even during the Trading Window, without first complying with the Company's "pre-clearance" process. Each such person should contact the Insider Trading Compliance Officer (or, in the case of the Insider Trading Compliance Officer, the Chief Executive Officer or Chief Financial Officer) prior to commencing any trade in the Company's securities. Insider Trading Compliance Officer will consult as necessary with other officers of the Company or counsel before clearing any proposed trade.

-7-

<u>**Annex A: Defined Terms**</u>

"<u>Blackout Period</u>" shall have the meaning set forth in <u>Section 2</u>.

"<u>Business Partners</u>" shall mean the Company's tenants or suppliers.

"<u>Company</u>" shall have the meaning set forth in the introduction to this Policy.

"<u>Exchange Act</u>" shall mean the Securities Exchange Act of 1934, as amended.

"<u>Insiders</u>" shall have the meaning set forth in <u>Section D</u>.

"<u>Insider Trading Compliance Officer</u>" shall have the meaning set forth in Section B.

"<u>Material Nonpublic Information</u>" shall have the meaning set forth in the introduction to this Policy.

"<u>Policy</u>" shall mean this Insider Trading Policy.

"<u>Rule 10b5-1</u>" shall mean Rule 10b5-1 promulgated under the Exchange Act.

"<u>SEC</u>" shall mean the United States Securities and Exchange Commission.

"<u>Section 16 Individuals</u>" means the members of the Board of Directors and officers whom the Company has determined are subject to the reporting and liability provisions of Section 16 of the Exchange Act and the rules and regulations promulgated thereunder.

"<u>tip</u>" whether or not capitalized, shall have the meaning set forth in <u>Section F(1)(b)</u>.

"<u>tippee</u>" whether or not capitalized, shall have the meaning set forth in <u>Section C</u>.

"<u>Trading Plan</u>" shall have the meaning set forth in <u>Section H</u>.

"<u>Trading Window</u>" shall have the meaning set forth in <u>Section F</u>.

"<u>Trading Day</u>" shall mean a day on which the New York Stock Exchange is open for trading. A Trading Day begins at the time trading begins on such day.

**Subsidiaries of Clipper Realty Inc.**
Page 1 of 1

| Name of Subsidiary | Jurisdiction of Incorporation/Formation |
| --- | --- |
| 10 West 65 Owner LLC | New York |
| 50 Murray Mezz LLC | Delaware |
| 50 Murray Mezz One LLC | Delaware |
| 50 Murray Mezz Two LLC | Delaware |
| 50 Murray Street Acquisition LLC | Delaware |
| 50/53 JV LLC | Delaware |
| 141 Livingston Owner LLC | Delaware |
| 250 Livingston Owner LLC | Delaware |
| 1010 Pacific Owner LLC | Delaware |
| Dean Owner LLC | Delaware |
| Aspen 2016 LLC | Delaware |
| Berkshire Equity LLC | Delaware |
| Clipper 107 CH LLC | Delaware |
| Clipper 107 CH Member LLC | Delaware |
| Clipper 107 CH MT, L.P. | Delaware |
| Clipper Realty Construction LLC | Delaware |
| Clipper Realty L.P. | Delaware |
| Clipper TRS LLC | Delaware |
| Gunki Holdings LLC | Delaware |
| Kent Realty, LLC | New York |
| Renaissance Equity Holdings LLC | New York |
| Renaissance Equity Holdings LLC A | New York |
| Renaissance Equity Holdings LLC B | New York |
| Renaissance Equity Holdings LLC C | New York |
| Renaissance Equity Holdings LLC D | New York |
| Renaissance Equity Holdings LLC E | New York |
| Renaissance Equity Holdings LLC F | New York |
| Renaissance Equity Holdings LLC G | New York |

**Consent of Independent Registered Public Accounting Firm**

**Clipper Realty Inc.**
**New York, New York**

We hereby consent to the incorporation by reference in the registration statements on Form S-3 (No. 333-284429) and Form S-8 (Nos. 333-217191, 333-239536, 333-265818 and 333-281187) of Clipper Realty Inc. of our report dated February 14, 2025, relating to the consolidated financial statements and financial statement schedule as of December 31, 2024, which appears in this Form 10-K.

/s/ PKF O'Connor Davies, LLP

New York, New York
February 14, 2025

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER**
**PURSUANT TO SECTION 302**
**OF THE SARBANES-OXLEY ACT OF 2002**

I, David Bistricer, certify that:

1.  I have reviewed this Annual Report on Form 10-K of Clipper Realty Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal controls over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:     February 14, 2025

By:     _____
                        /s/ David Bistricer
                        David Bistricer
                        Chief Executive Officer

**CERTIFICATION OF CHIEF FINANCIAL OFFICER**
**PURSUANT TO SECTION 302**
**OF THE SARBANES-OXLEY ACT OF 2002**

I, Lawrence E. Kreider, certify that:

1.   I have reviewed this Annual Report on Form 10-K of Clipper Realty Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)   Designed such internal controls over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:   February 14, 2025

By:   _____
        /s/ Lawrence E. Kreider
        Lawrence E. Kreider
        Chief Financial Officer

Exhibit 32.1

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with this Annual Report on Form 10-K of Clipper Realty Inc. (the "Company") for the period ended December 31, 2024, as filed with the Securities and Exchange Commission (the "Report"), the undersigned, as the Chief Executive Officer of the Company, hereby certifies pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to his knowledge:

    1.    The Report fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934; and

    2.    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:    February 14, 2025

Signed:           /s/ David Bistricer

               David Bistricer
               Chief Executive Officer

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with this Annual Report on Form 10-K of Clipper Realty Inc. (the "Company") for the period ended December 31, 2024, as filed with the Securities and Exchange Commission (the "Report"), the undersigned, as the Chief Financial Officer of the Company, hereby certifies pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to his knowledge:

1.   The Report fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934; and

2.   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:   February 14, 2025                                    Signed:   _____/s/ Lawrence E. Kreider_____

                                                                                    Lawrence E. Kreider
                                                                                    Chief Financial Officer