**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

**LOUIS GACHELIN and**
**DEBORAH ABRAHAMS,**

$\qquad\qquad\qquad\qquad\qquad\qquad\qquad$ **Index No.  1:25-cv-03127-PKC-LKE**

$\qquad\qquad\qquad$ **Plaintiffs,**

**v.**

**KAVULICH & ASSOCIATES, P.C.,**
**GARY KAVULICH,**
**RENAISSANCE EQUITY HOLDINGS LLC D,**
**RENAISSANCE EQUITY HOLDINGS LLC,**
**CLIPPER REALTY, L.P.,**
**CLIPPER EQUITY, LLC,**
**CLIPPER REALTY, INC.,**
**HASHEM HUSSEIN, and**
**A & F PROCESS SERVICE, INC. d/b/a**
**ALLIED PROCESS SERVICE,**

$\qquad\qquad\qquad$ **Defendants.**

----------------------------------------------------------------x



**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO LANDLORD**
**DEFENDANTS' MOTION TO DISMISS**

# Contents

**I.    PROCEDURAL HISTORY.** .................................................................................................... 1

**II.    SUMMARY OF CLAIMS.** ................................................................................................ 2

**III.    STATEMENT OF FACTS** ............................................................................................... 4

*A.    The Housing Court Lawsuit* ......................................................................................... 4

*B.    The Kavulich Defendants, on behalf of Renaissance, File a Civil Court Collection Lawsuit for the Rental Arrears Already Settled in Housing Court* ............................................... 4

*C.    Defendants Inflicted Substantial Garden-Variety Emotional Distress Damages and Economic Damages on This Limited Income Retired Couple* .................................................. 9

*D.    Systematic Sewer Service by the Process Server Defendants for Kavulich Defendants and Renaissance* ................................................................................................................ 11

*E.    Kavulich Defendants Have A History Of Failing To Perform Meaningful Attorney Review, And Have Previously Been Sued For It Multiple Times* ................................................. 13

*F.    Landlord Defendants and Kavulich Attempted to Use the Collection Lawsuit and False Affidavit of Service to Coerce Mr. Gachelin Into Waiving His Rights to Hold Defendants Accountable for the Illegality of the Collection Lawsuit* ............................................. 14

**IV.    ARGUMENT** ................................................................................................................ 15

A.    The Landlord Defendants must fail in their cacophony of disjointed arguments. ................ 15

B.    Plaintiffs have not brought a claim for breach of contract, and Landlord Defendants committed gross negligence by, *inter alia,* forwarding a settled debt for collections. ..................... 15

C.    Landlord Defendants are directly liable as a party to the wrongful civil court lawsuit and vicariously liable for the acts of Kavulich, their agent and freely chosen attorney. ...................... 17

*a.    Conduct Which "Smacks" of Intentional Wrongdoing is the Definition of Gross Negligence* .. 18

*D.    Plaintiffs State a Claim for Violations of GBL § 349 in the Landlord-Tenant and Debt Collection Contexts* ........................................................................................................ 19

*E.    Plaintiffs' Claim for Violations of GBL § 349 is not precluded by GBL § 601(8)* .................... 22

*F.    Arguments as to Comity of State Court So-Ordered Stipulation Fail.* ......................................... 23

*G.    Punitive Damages Are Not A Separate Legal Claim and Cannot Be Dismissed At This Stage* .. 23

**V.    CONCLUSION** ............................................................................................................ 24

## Cases

*23 Realty Assoc. v. Teigman*, 213 AD2d 306 (1st Dept 1995).................................................................21

*Aguaiza v. Vantage Properties, LLC*, 69 A.D.3d 422 (App. Div. 1ˢᵗ Dep't 2010)............................20, 21

*Amusement Indus., Inc. v. Stern*, 693 F.Supp.2d 301 (S.D.N.Y. 2010) ...................................................25

*Brake v. Slochowsky & Slochowsky, LLP*, 504 F.Supp.3d 103 (E.D.N.Y. 2020) ....................................23

*Calixto v. A. Balsamo & Rosenblatt, P.C.*, xx A.D.3d xx (App. Div. 2ⁿᵈ Dept. 2025). ............................21

*Campbell v. City of Elmira*, 84 N.Y.2d 505, 511, 644 N.E.2d 993 (1994). ..............................................19

*Colnaghi, U.S.A. v. Jewelers Protection Servs.*, 81 N.Y.2d 821 (N.Y. 1993) .....................................16, 19

*Conboy v AT&T Corp.*, 241 F.3d 242 (2d Cir. 2001) ...............................................................................24

*Hallock v. State of New York*, 64 N.Y.2d 224 (1984) ...............................................................................18

*Hawkins-El v. First American Funding, LLC*, 891 F.Supp.2d 402 (E.D.N.Y., 2012), *aff'd*, 529 Fed.Appx.
45 ........................................................................................................................................................17

*Hunter v. Palisades Acquisition XVI, LLC*, 2017 WL 5513636 (S.D.N.Y. 2017).....................................18

*Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs., Inc.*, 871 F.Supp. 709 (S.D.N.Y. 1995) ...26

*Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 448 N.E.2d 413 (1983) ..................................19

*Lozano v. Grunberg*, 195 A.D.2d 308 (App. Div. 1st Dept. 1993)...........................................................21

*Martinez v. LVNV Funding, LLC*, 2016 WL 5719718 (E.D.N.Y., 2016) ..................................................24

*Morales v. Kavulich & Associates, P.C., et al.*, 294 F.Supp.3d 193 (S.D.N.Y. 2018) ............................14

*Myerson v. Prime Realty Services, LLC*, 7 Misc.3d 911 (Sup. Ct. NY Co. 2005).....................................21

*Nezry v. Haven Ave. Owner LLC*, 28 Misc. 3d 1226[A], 1226A, 2010 NY Slip Op 51506[U] ...........20, 22

*Okyere v. Palisades Collection, LLC*, 961 F. Supp. 2d 508 (S.D.N.Y. 2013) .....................................18, 25

*Onfroy v. The Law Offices of Geoffrey T. Mott, P.C.*, 751 F.Supp.3d 195 (E.D.N.Y. 2024) ...................19

*Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 647 N.E.2d 741
(1995)..................................................................................................................................................23

*Plummer v. Atlantic Credit & Finance, Inc.*, 66 F. Supp. 3d 484 (S.D.N.Y. 2014) ..................................18

*Samms v. Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara & Wolf, LLP*, 2015 WL 6437493
.............................................................................................................................................................22

*Sanchez v. Ehrlich*, No. 16-cv-8677 (LAP), 2018 WL 2084147 (S.D.N.Y. Mar. 29, 2018) ...............17, 22

*Small v. Lorillard Tobacco Co., Inc.* 94 N.Y.2d 43 (1999) ......................................................................21

*Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540 (1992) ........................................................................19

*Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413 (S.D.N.Y. 2010) ...........................................11

*Torres v. Gutman, Mintz, Baker & Sonnenfeldt P.C.*, No. 17-cv-4109 (KAM) (CLP), 2018 WL 1545687
(E.D.N.Y. Mar. 29, 2018) ....................................................................................................................23

*United Nat. Ins. Co. v. Tunnel, Inc.*, 988 F.2d 351 (2d Cir. 1993)...........................................................19

*Vangorden v. Second Round, Limited P'ship*, 897 F.3d 433 (2d Cir. 2018) .......................................15, 16

## I.    **PROCEDURAL HISTORY.**

On November 19, 2025, Plaintiffs Louis Gachelin and Deborah Abrahams filed a First Amended Complaint [Dkt. No. 44] against the debt collection law firm Kavulich & Associates, P.C. (the "Firm") and the firm's principal, Gary Kavulich (collectively the "Kavulich Defendants"), as well as Hashem Hussein and A & F Process Service, Inc. d/b/a Allied Process Service ("Allied") (collectively "Process Server Defendants"), for their violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et. seq.* (the "FDCPA"); against a putative creditor and former landlord Renaissance Equity Holdings LLC D, the Kavulich Defendants, the Process Server Defendants, and a number of Renaissance-related entities involved in the management and ownership of the Flatbush Gardens complex where Mr. Gachelin and Ms. Abrahams once lived—including Renaissance Equity Holdings LLC D's parent company Renaissance Equity Holdings LLC, its managing member, Clipper Realty L.P., its managing agent, Clipper Equity, LLC, and its publicly traded parent entity, Clipper Realty, Inc. (together with Renaissance Equity Holdings LLC D, "the Landlord Defendants")—for violations of New York General Business Law § 349 and for negligence and gross negligence; and against Kavulich Defendants for violating New York Judiciary Law § 487.

Crucially, on the December 8, 2025 the new Landlord Defendants joined the pending Motion to Dismiss of Defendant Renaissance Equity Holdings LLC D as served on November 7, 2025, as opposed to seeking to file a separate motion to dismiss or a new joint motion to dismiss. [Dkt. No. 48].  The Landlord Defendants thus agreed they would be making no new arguments against, or challenging the additional allegations in, the First Amended Complaint. The Landlord

1

Defendants do not challenge the allegations in the First Amended Complaint that they constitute a single unified enterprise

## II.    <u>SUMMARY OF CLAIMS.</u>

Louis Gachelin had been a tenant of Flatbush Gardens since 2005 when his nominal landlord Renaissance Equity Holdings LLC D, represented by attorney Benjamin Epstein, filed a nonpayment action against him and his wife Deborah Abrahams in housing court in November 2020. The housing court case culminated in a settlement, with Mr. Gachelin and Ms. Abrahams vacating the premises on September 13, 2022 in exchange for Renaissance's "waive[r of] any and all claims it asserted or could have asserted in this action related to [Gachelin's] tenancy, including but not limited to **any claim for rental arrears owed**." (Emphasis added.)

Renaissance, now represented by Kavulich, nevertheless filed suit for the settled rental arrears against Mr. Gachelin and Ms. Abrahams in Kings County Civil Court on June 9, 2023. Renaissance and Kavulich then used a false affidavit of service executed by the Process Server Defendants that allowed Renaissance and Kavulich to fraudulently conceal their suit against Mr. Gachelin and Ms. Abrahams. This is typical of the Process Server Defendants, who systematically execute false affidavits of service on behalf of creditors and collection lawyers, including Renaissance and Kavulich.

Mr. Gachelin and Ms. Abrahams only became aware of the lawsuit in 2024, when, oddly, the Kavulich Defendants filed a lengthy motion to enter default judgment and mailed it to an address where their daughter resided. The daughter received the application for default judgment and, panicked, called her parents in Florida to tell them about the papers, and they rushed to New York.

The Kavulich Defendants forced Mr. Gachelin and Ms. Abrahams, *pro se*, to make multiple trips from Florida to Kings County Court in attempt to strong-arm and wear them down to sign a judgment and release when the Kavulich Defendants were repeatedly told by them that the debt was settled in landlord-tenant court. It was only after four trips from Florida to court in Brooklyn that Mr. Gachelin and Ms. Abrahams, *pro se*, were able to defeat the motion to enter default judgment, and to have the suit dismissed with prejudice.

At the direction of the Landlord Defendants, various Renaissance Equity Holdings LLC entities controlled by the Landlord Defendants, lettered Renaissance Equity Holdings A-F, used the Kavulich Defendants to file collection lawsuits in civil court, filing 181 collection suits in 2023; all but the last eight were filed by Kavulich. In an unrelated lawsuit, Mr. Hussein was subpoenaed to produce his logbooks reflecting service for a period from 2022 to 2023. Critically, in response to the subpoena, Hussein emailed a detailed spreadsheet he stated he received from Allied showing service he performed for Allied. These were Allied's own records.  The spreadsheet documents impossible or nearly impossible service.  For a twelve-month period, from October 3, 2022 to September 25, 2023, Mr. Hussein attempted service of 3,525 lawsuits. Unbelievably, in each and every instance he was successful in service; all service was to a person of suitable age and discretion; and all service was successful on the very first attempt. Additionally, the person who notarized Mr. Hussein's affidavits of service in this case and other cases reviewed is Frances T. Mondrone, a principal of Allied. This demonstrates Hussein is fully integrated into Allied, despite the fact that the name of Allied is conspicuously absent from the affidavits of service executed by Mr. Hussein.

As described further below, the timing of service and the distance traveled between service in many instanced – including in the case at bar – alone demonstrate the near

impossibility of service.

### III.    STATEMENT OF FACTS
#### A.  The Housing Court Lawsuit

1.      3305 Flatbush Avenue is a residential apartment building in the Flatbush Gardens complex ("the Building.") FAC ¶ 25. Mr. Gachelin originally moved into the Building in 2005, and renewed his lease regularly until 2019, when he added his wife Deborah Abrahams as a tenant of record and renewed his lease for what would be the final two-year term. FAC ¶ 26. The Landlord Defendants stopped cashing Mr. Gachelin's rent checks in August of 2020. Mr. Gachelin was not given a clear or satisfactory answer as to why the Landlord Defendants stopped cashing his rent checks. FAC ¶ 27. And on November 18, 2020, through the law firm of Benjamin Z. Epstein, P.C., the Landlord Defendants in the name of Renaissance Equity Holdings LLC D filed an action in housing court alleging nonpayment of rent. FAC ¶ 28. This lawsuit was eventually settled in September 2022, with Mr. Gachelin agreeing to vacate the premises and surrender his keys that month in exchange for the Landlord Defendants' waiver of "any and all claims it asserted or could have asserted in this action related to [Gachelin's] tenancy, including but not limited to any claim for rental arrears owed." See FAC ¶ 29. Exhibit A (2022-10-21 LT settlement). The language of the housing court settlement is clear and unequivocal: Mr. Gachelin surrendered the premises in exchange for the waiver of any and all potential rental arrears claims. Nevertheless, the Landlord Defendants soon continued their pursuit of Mr. Gachelin and Ms. Abrahams in another forum, forwarding the settled debt to the Kavulich Defendants on or about November 21, 2022 to commence a collection lawsuit in civil court against Mr. Gachelin and Ms. Abrahams, among others. See FAC ¶ 30, Exhibit S, 2022-11-21 Clipper Email.

#### B.  The Kavulich Defendants, on behalf of Renaissance, File a Civil Court

*Collection Lawsuit for the Rental Arrears Already Settled in Housing Court*

Despite being bound by the terms of the settlement, the Landlord Defendants—through a different attorney, Mr. Kavulich, and in a different forum, in Civil Court rather than Housing Court—chose to sue for rental arrears anyway. After an employee of Clipper Equity forwarded the account to Kavulich for collections on November 21, 2022, Kavulich filed a complaint against Mr. Gachelin and Ms. Abrahams in the name of Renaissance Equity Holdings LLC D on June 6, 2023 in Kings County Civil Court. See FAC ¶ 31, Exhibit B (2023-06-09 summons and complaint), Exhibit S (2022-11-21 Clipper Email).

The direct involvement of Clipper Equity in the debt collection litigation in the name of Renaissance Equity Holdings LLC D is suggested by a number of items. The November 21 email from Clipper Equity specifically directed Mr. Kavulich to "Please commence collections cases against the former tenants below," listing not only Mr. Gachelin but tenants from other properties of the Landlord Defendants. The November 21 email was sent by a "Legal & Accounts Receivable Associate" for Clipper Equity. One of the email addresses copied on the email was apparently specifically for legal matters for Clipper Equity, "Legal - Clipper Equity legal@clipperequity.com." An email dated January 17, 2023 from the same Clipper Equity "Legal & Accounts Receivable Associate" states, "*We* received the approved LRAP payment of $20,170.44." (emphasis added). Exhibit T (2023-01-17 Clipper Email). In addition, an account screen produced by the Kavulich Defendants in this lawsuit shows that while the Plaintiff is listed as Renaissance Equity Holdings LLC D, the "Agent/Mgnt Co." is listed as Clipper Equity. Exhibit U (Kavulich Collection Screen). FAC ¶ 32.

The Kavulich Defendants did not take the most minimal of steps to make a meaningful attorney review to determine whether the debt sought was actually owed. FAC ¶ 33. The collection lawsuit alleged that Mr. Gachelin and Ms. Abrahams owed $23,940.39 and had stayed

in possession of the unit beyond the expiration of their lease. *Id.*, FAC Exhibit B. A meaningful attorney review before filing suit would entail spending 30 seconds to check the court's free, publicly available NYSCEF website, which would show the case and all of the filings, including the stipulation of settlement. Instead, as discussed below, the Kavulich Defendants continue their pattern and practice of performing no meaningful attorney review to determine whether the debts he collects upon are actually due, as required under 15 U.S.C. § 1692(3). *Id.*

In addition to suing Mr. Gachelin and Ms. Abrahams on a settled debt, the Landlord Defendants and the Kavulich Defendants used a false affidavit of service to seek to enter a default judgment against them. FAC ¶ 34. An affidavit of service was executed by Hashem Hussein on behalf of the Landlord Defendants and the Kavulich Defendants, claiming that Hussein could not accomplish personal service on Mr. Gachelin and Ms. Abrahams at the listed address, claiming that the address was their place of abode, and claiming he left the summons and complaint with a person of suitable age and discretion, a person named Kenyatis Gachelin, described as a 26-year-old Black man standing between six feet and six feet three inches tall. *See* FAC ¶ 35, Exhibit C (2023-07-29 affidavit of service). Mr. Gachelin and Ms. Abrahams know one Kenyatis—a woman under six feet tall who does not carry the surname Gachelin, and who did not receive the complaint. FAC ¶ 36. By the time of Hussein's alleged service at the listed address, the Gachelins no longer lived in New York at all; they had moved to Port St. Lucie, Florida, where they continue to reside today.

After "serving" Mr. Gachelin and Ms. Abrahams, the Landlord Defendants and the Kavulich Defendants took no further action for nearly a year. Finally, on June 4, 2024, Kavulich filed a motion for default judgment on the Landlord Defendants' behalf, and at some point thereafter mailed it to the address of the daughter of Mr. Gachelin and Ms. Abrahams. *See* FAC ¶

37, Exhibit D (2024-06-04 Motion for Default Judgment). At this point, Mr. Gachelin and Ms. Abrahams became aware of the lawsuit as their daughter received the mailed notice of this motion. Their daughter called her parents in a panic, saying she got a court paper saying there was a hearing on June 26, 2024 seeking to enter a default judgment against them for $23,940.39. FAC ¶ 38. This was the first time Mr. Gachelin and Ms. Abrahams knew that there was a lawsuit filed against them. They had never received a copy of the summons and the complaint by service, by mail, or by any other method, and knew nothing about a lawsuit until their daughter called. FAC ¶ 39.

Mr. Gachelin and Ms. Abrahams are retired and living on a fixed income. They do not have much money. The thought of the entry of a judgment for $23,940.39 shocked and terrified them. They immediately purchased tickets to fly from their home in Florida to New York to appear at the June 26 hearing. FAC ¶ 40.

At this June 26, 2024 hearing, the Kavulich Defendants attempted to pressure Mr. Gachelin and Ms. Abrahams into signing some papers, telling them they did not need to worry about the contents of the papers. Mr. Gachelin and Ms. Abrahams refused and attempted to inform the Kavulich Defendants that they did not owe this debt anymore, as it had been settled in 2022. The Kavulich Defendants nevertheless proceeded with the case, causing additional motion hearings to be held on August 6, 2024, October 17, 2024, and January 21, 2025. To attend each hearing, Mr. Gachelin and Ms. Abrahams had to purchase airfare from Florida to New York and back, and at each hearing, the Kavulich Defendants attempted to pressure Mr. Gachelin and Ms. Abrahams into signing papers, telling them that since their income was from judgment-proof sources they need not worry about the effect of a judgment against them and ignoring their repeated assertions that the debt was not owed and had been settled. FAC ¶ 41.

7

The papers included a judgment for the amount of the alleged rental arrears as well as a release of the Landlord Defendants and the Kavulich Defendants from their very misconduct in pressuring Mr. Gachelin and Ms. Abrahams to sign a judgment for a settled debt. FAC ¶ 42. At the October hearing, worn down by the months of travel, the stress of the alleged debt, and the frustration of reopening a matter they believed to be solved, Mr. Gachelin and Ms. Abrahams signed the Kavulich Defendants' papers, desperately hoping it would put an end to this ordeal. Upon reviewing these papers, a judge rejected the Kavulich Defendants' proposed agreement and was so outraged that she literally tore up the papers. FAC ¶ 43. At the January hearing, Mr. Gachelin and Ms. Abrahams brought the driver's license of the only Kenyatis they know: the aforementioned woman under six feet tall with a different surname, who does not match the description of the alleged recipient of Hashem Hussein's July 2023 service (e.g. being a woman not a man, not being anything close to six feet three inches). *Id.* Mr. Gachelin and Ms. Abrahams provided this license to the attorney for the day. With the driver's license, the legal services attorney for the day was able to get the lawsuit dismissed with prejudice, at which point the appearance attorney for the Kavulich Firm stormed out in anger. *Id.*

Finally, the collection lawsuit was dismissed with prejudice—after five months of fighting and four cross-country trips to attend hearings, all while the Kavulich Defendants and the Landlord Defendants ignored Mr. Gachelin and Ms. Abrahams's repeated assertions that the debt was no longer owed because it had been settled. At any time, the Kavulich Defendants could have performed a NYSCEF search which would have revealed that any alleged or actual rental arrears had been settled in 2022. Presumably, the Kavulich Defendants could have also asked their clients, the Landlord Defendants, about the veracity of Mr. Gachelin and Ms. Abrahams's claims that the debt was not owed and had been settled. Certainly, the Kavulich

Defendants should not have tried, at every turn, to attempt to strong-arm Mr. Gachelin and Ms. Abrahams into signing a judgment for a debt they repeatedly said was settled, and then absolve themselves by pressuring the signing of a release. And the Landlord Defendants, as a party to the original settlement, knew the putative debt was already settled. FAC ¶ 44-45.

The Kavulich Defendants are the Renaissance entities' near-exclusive attorney in civil court collection lawsuits for 2023. Of the 181 collection cases filed by a Renaissance entity in 2023, all but the last eight index numbers were filed by Kavulich. FAC ¶ 46.

### C. Defendants Inflicted Substantial Garden-Variety Emotional Distress Damages and Economic Damages on This Limited Income Retired Couple

Mr. Gachelin and Ms. Abrahams experienced significant stress as a result of the civil court collection lawsuit. Upon realizing the suit was for the same rental arrears they had conclusively settled in housing court in 2022, Mr. Gachelin and Ms. Abrahams were dumbfounded. How were they going to pay a judgment for $23,940.39, and why were they being threatened with one since the debt was settled? Would their bank accounts be restrained and their savings seized if they lost in court? FAC ¶ 47.

Mr. Gachelin and Ms. Abrahams could not sleep at night, worrying what they were going to do, how they were going to be able to fight this when they were ignored and spoken down to when they went to court. They worried about their financial future and felt frustrated by the absurdity and cruelty of the situation. The stress of the lawsuit also contributed to Mr. Gachelin's gaining twenty pounds. FAC ¶ 48-49.

Ms. Abrahams, who is diabetic, experienced blood sugar spikes and troughs as a result of the stress and the associated changes to her appetite. As a result of the stress, Ms. Abrahams was frequently tired and had little desire to eat, altering her eating habits significantly. In the opposite direction than her husband, Ms. Abrahams lost about twenty pounds due to the stress, changes in

her appetite, and increased walking, which Ms. Abrahams does in response to stress. Due to the stress, Ms. Abrahams was crying on a weekly basis, and her emotional state was worsened because she did not want Mr. Gachelin to know how stressed she was. FAC ¶ 50-52.

Mr. Gachelin and Ms. Abrahams also incurred significant costs defending themselves in the civil court collection lawsuit, including airfare for four trips from Florida to New York and back. They had to charge the flights on a credit card, which they are still trying to pay down, along with substantial interest.  As a result of Defendants' repeated dismissals of Mr. Gachelin and Ms. Abrahams's assertions that the debt had already been settled—assertions which Mr. Gachelin and Ms. Abrahams flew up from Florida to make in person at their court appearances— Mr.  Gachelin and Ms. Abrahams felt ignored, as if their words had no value. Whenever Mr. Gachelin and Ms. Abrahams asked why Defendants continued to force them to fly up from Florida to defend themselves despite the 2022 settlement, they were only met with boilerplate repetitions of the allegation that more was still owed—an allegation that the Landlord Defendants and the Kavulich Defendants actually knew was false or would have known to be false had they checked their own records *or* publicly available court records. FAC ¶ 53-55.

Mr. Gachelin and Ms. Abrahams are retirees on fixed incomes, and the prospect of having to pay tens of thousands of dollars in a matter they had already settled in court previously was alarming to them. This prospect hung over their heads from when they learned of the suit in June 2024 to its final dismissal with prejudice in January 2025—causing six months of sustained fear and anxiety for Mr. Gachelin and Ms. Abrahams. Additionally, due to their financial circumstances, Mr. Gachelin and Ms. Abrahams had to put the airfare on their credit card, which they are still paying off. FAC ¶ 53, 56-57.

### D.  Systematic Sewer Service[1] by the Process Server Defendants for Kavulich Defendants and Renaissance

The physically impossible service of a six-foot-tall Black male "Kenyatis Gachelin" was not an aberration. Defendant Hussein routinely attests to his successful effectuation of physically impossible service of process. In fact, according to records belonging to the Process Server Defendants received in response to a subpoena in the case *Capital One, N.A. v. Watkins*, CV-5138-23/QU (Exhibit E, email providing records, Exhibit F, subpoena), Mr. Hussein's alleged service of process in the case of Mr. Gachelin and Ms. Abrahams occurred at 6:48:36 AM on July 19—just *one minute* after his alleged service of process in another case, at another address a block away, at 6:47:16 AM. FAC ¶ 58-59.

According to these records, the vast majority—2,715 out of 3,525, more than 77%—of Mr. Hussein's service occurred between the hours of 6 AM and 7 AM each day, and 3,436 of 3,525, more than 97%, occurred before noon. Allied's records of Mr. Hussein's service also exclusively claim substitute service rather than personal service of the defendant, and exclusively claim to successfully serve a person of suitable age and discretion on the very ***first*** attempt. While much of his claimed service could be discovered as physically impossible with a simple map search, the Kavulich Defendants and Allied need not have gone that far to conclude Mr. Hussein's service was suspect given the statistical impossibility that every single one of 3,525 services was not only successful on the first attempt, but successful on a substitute person of suitable age and discretion. Defendant Hussein has attested to his effectuation of physically impossible service of process in numerous other cases for the Kavulich Defendants and Renaissance while in the employ of Allied Process Service. FAC ¶ 60-62.

---

[1] *See, e.g. Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 418 (S.D.N.Y. 2010) ("""[S]ewer service" [is] the practice of failing to serve a summons and complaint and then filing a fraudulent affidavit attesting to service. When the debtors failed to appear in court because they did not have notice of the lawsuits, defendants obtained default judgments against them.")

For example, according to the same records, on August 17, 2023, Mr. Hussein effectuated service of process at three different Brooklyn addresses within a six-minute period, in the following order: 817 E. 17th Street at 6:17:40 AM, 2615 Avenue O at 6:20:03 AM, and 1012 Avenue K at 6:23:12 AM. Each address is approximately one mile from the address allegedly served before it. Also according to the same records, on August 22, 2023, Mr. Hussein effectuated service of process at a pair of Queens addresses more than two miles apart within a four-minute interval: 17040 132nd Street at 6:23:57 AM and 17114 140th Avenue at 6:27:17 AM. FAC ¶ 63-64.

But the Process Server Defendants' records reveal the most egregious conduct on behalf of Kavulich and Renaissance in a three-day period in April 2023. From April 11 to April 13, between the hours of 6 AM and 7 AM each day, Hashem Hussein claims to have blanketed the Flatbush Gardens complex with service of process in nearly 100 cases at blinding speed, exclusively in cases where a Renaissance entity is the plaintiff and Mr. Kavulich is their attorney. On April 11, beginning at 6:00:03 AM and ending at 6:41:22 AM, Mr. Hussein claims to have served 35 defendants in the Flatbush Gardens complex in 41 minutes, supposedly serving a new defendant every one minute and eleven seconds. On April 12, beginning at 6:00:01 AM and ending at 6:34:15 AM, Mr. Hussein claims to have served 26 defendants in the Flatbush Gardens complex in 34 minutes, supposedly serving a new defendant every one minute and nineteen seconds. On April 13, beginning at 6:00:42 AM and ending at 6:39:27 AM, Mr. Hussein claims to have served 37 defendants in the Flatbush Gardens complex in 39 minutes, supposedly serving a new defendant every one minute and three seconds. FAC ¶ 65-69.

Mr. Hussein's work on behalf of other attorneys and plaintiffs reveal the same pattern of questionable service times and methods. Even without reviewing Mr. Hussein and Allied's

records, his Affidavits of Service reveal a pattern of impossible early-morning rapid-fire substitute service. On March 18, 2023, for example, Mr. Hussein allegedly served ten individuals in Queens in quick succession within the span of an hour and a half: at 5:38 AM, 6:01 AM, 6:06 AM, 6:08 AM, 6:14 AM, 6:20 AM, 6:38 AM, 6:47 AM, 6:50 AM, 7:07 AM. Exhibit G (March 18, 2023 Affidavits of Service). Two of these service attempts, one at 6:06 AM and another at 6:08 AM, allegedly took place a mere two minutes apart in two different buildings. All ten were allegedly served by substitute service. Eight of the ten were served on individuals with the same last name as the defendant, and the other two were John or Jane Doe. Id. FAC ¶ 70-72.

### E.   Kavulich Defendants Have A History Of Failing To Perform Meaningful Attorney Review, And Have Previously Been Sued For It Multiple Times

Defendants, despite having previously waived their right to pursue any and all rental arrears arising from Mr. Gachelin's tenancy, filed the Collection Lawsuit against him in order to obtain a judgment or pressure him into a settlement. What happened to Mr. Gachelin is another example of Kavulich Defendants' long-documented practice of engaging in debt collection without any meaningful attorney review. Kavulich Defendants either did not perform a meaningful attorney review prior to filing the Collection Lawsuit against Mr. Gachelin, or, alternatively, Kavulich Defendants did perform a review and filed the Collection Lawsuit knowing that Mr. Gachelin did not owe the debt. Kavulich Defendants, a firm that exclusively practices collections for landlords, would want to do what it needed to keep as a client an apartment complex the size of Flatbush Gardens. FAC ¶ 74-75.

Kavulich Defendants have been sued in previous lawsuits for similar misconduct as they committed against Mr. Gachelin: (1) *Prage v. Kavulich & Associates, P.C., et al.,* No. 1:16-cv-01627-CBA-RLM (EDNY) (**Exhibit H**); (2) *Morales v. Kavulich & Associates, P.C., et al.,* No. 1:16-cv-02134-ALC-JLC (SDNY) (**Exhibit I**); and (3) *Creary v. Kavulich & Associates,*

*P.C., et al.,* No. 1:18-cv-02277-JPO-GWG (SDNY) (**Exhibit J**). In *Morales,* the Court granted summary judgment against Kavulich Defendants, finding them liable for violating GBL § 349 for, among other conduct, "falsely implying [Kavulich] had performed a meaningful review in signing and serving the Restraint and Execution." *Morales v. Kavulich & Associates, P.C., et al.,* 294 F.Supp.3d 193, 197 (S.D.N.Y. 2018). *Prage* and *Morales* both resulted in injunctions being entered against Kavulich Defendants to cease violating the FDCPA and GBL § 349 – injunctions which Kavulich Defendants violated with their conduct in both *Creary* and in the present case. **Exhibit K** (*Prage* Injunction) and **Exhibit L** (*Morales* Injunction). FAC ¶ 76-107.

> **F.   *Landlord Defendants and Kavulich Attempted to Use the Collection Lawsuit and False Affidavit of Service to Coerce Mr. Gachelin Into Waiving His Rights to Hold Defendants Accountable for the Illegality of the Collection Lawsuit***

The papers which the Kavulich Defendants attempted to coerce Mr. Gachelin and Ms. Abrahams into signing included a judgment for the amount of the alleged rental arrears as well as a release from liability for the Defendants. Using the threat of future court dates—in a lawsuit which itself should have never been brought—the Kavulich Defendants attempted to coerce Mr. Gachelin and Ms. Abrahams into releasing Defendants from liability for their conduct in the collection suit, even telling them that signing these papers was "the only way to get out of this." FAC ¶ 108-109. In other words, the Kavulich Defendants used the expense and inconvenience of a lawsuit for a debt which had already been settled to attempt to coerce Mr. Gachelin and Ms. Abrahams into waiving their own rights to hold the Kavulich Defendants accountable *for that very same lawsuit*. Not content to drag Mr. Gachelin and Ms. Abrahams into court again and again over a settled debt, the Kavulich Defendants sought to use their own unlawful conduct as a cudgel to immunize themselves from liability. FAC ¶ 110-111.

IV.     **ARGUMENT**

      **A. The Landlord Defendants must fail in their cacophony of disjointed arguments.**

Landlord Defendants make a series of disjointed arguments that do not track the headers under which they are listed.  Therefore, this Opposition will rebut the actual arguments of the Landlord Defendants in the order they were made, renaming headers as needed.

      **B. Plaintiffs have not brought a claim for breach of contract, and Landlord Defendants committed gross negligence by, *inter alia*, forwarding a settled debt for collections.**

Landlord Defendants contend Plaintiff's gross negligence claims are really just a breach of contract claim, and there is no independent duty that can support gross negligence in a contract action. MTD p.3-5.

Plaintiffs state a gross negligence claim against Landlord Defendants for, *inter alia,* forwarding a settled debt to Kavulich to file suit. As to Kavulich, there can be no doubt that they violated the FDCPA by seeking to collect on a settled debt. *Vangorden v. Second Round, Limited P'ship*, 897 F.3d 433 (2d Cir. 2018). Landlord Defendants' argument that Plaintiffs' only avenue for relief would be a suit for breach of the settlement agreement as a breach of contract action cannot be squared with the holding of *Vangorden*, in which the plaintiff likewise had executed a written agreement to settle a debt for less than the full amount alleged by the creditor and performed their piece of the contract. In *Vangorden*, the plaintiff was to make payment of $571.20; in this case, Plaintiffs surrendered possession of an apartment as well as a security deposit. Defendants do not dispute that Plaintiffs surrendered possession and the security deposit, and the *Vangorden* plaintiff's payment of the agreed settlement amount was likewise not in dispute. As the *Vangorden* Court concluded, "[w]here, as here, a debt collector misreports a debt

15

obligation to a consumer that she no longer owes, and requests payment on that debt, the consumer plausibly alleges violations of 15 U.S.C. § 1692e and § 1692f." *Vangorden*, 897 F.3d at 443. The decision to forward a settled debt to an attorney for collections, a well-established violation of the FDCPA, is in turn grossly negligent. To be clear, Plaintiffs are not arguing that Landlord Defendants are debt collectors. Rather Landlord Defendants are grossly negligent for forwarding a settled debt to Kavulich to sue upon when such an act, *inter alia*, violates the FDCPA.

The *Vangorden* plaintiff was not limited to a breach of contract claim for breach of the written settlement agreement as her only avenue for relief, nor are Mr. Gachelin and Ms. Abrahams limited to a breach of contract claim as their only avenue for relief; while the FDCPA is not their cause of action against the Landlord Defendants, as the Landlord Defendants are the original creditor, the violation of a written, executed, and partially performed settlement agreement is unfair and deceptive, thus violating the Landlord Defendants' common law duty of reasonable care in the collection of their debts. That the Landlord Defendants chose to pursue the collection of an alleged debt *they themselves had waived* in a signed and so-ordered court filing reinforces that they did so with "reckless disregard for the rights of others" and that their conduct "'smacks' of intentional wrongdoing," the standard for gross negligence under New York law. *Colnaghi, U.S.A. v. Jewelers Protection Servs.*, 81 N.Y.2d 821, 824 (N.Y. 1993).

Landlord Defendants contend that they have no duty Plaintiffs and thus their gross negligence claims must fail.  However, Landlord Defendants, as a putative creditor, have a common law duty of reasonable care in the collection of their debts. "[F]ederal courts applying New York common law have held that creditors and debt collectors owe debtors a duty of reasonable care in the collection of debts." *Sanchez v. Ehrlich*, 2018 WL 2084147, at *9

16

(S.D.N.Y., 2018) (landlord liable for gross negligence and GBL 349 for, *inter alia*, filing suit to collect rent not owed) *quoting Hawkins-El v. First American Funding, LLC*, 891 F.Supp.2d 402, 412 (E.D.N.Y., 2012), *aff'd*, 529 Fed.Appx. 45.

### C. Landlord Defendants are directly liable as a party to the wrongful civil court lawsuit and vicariously liable for the acts of Kavulich, their agent and freely chosen attorney.

Landlord Defendants argue they are not liable for negligent hiring and supervision of Kavulich. MTD pp. 4-5. However, Plaintiffs' First Amended Complaint clarifies they are not seeking liability for negligent hiring or supervision of Kavulich. Dkt. No. 48-2 p. 8 ¶ 22 (red-lined version of First Amended Complaint). Landlord Defendants are liable for the acts of their agent and freely chosen attorney, Kavulich.

Landlord Defendants cite decisions where the principle must be a "debt collector" in order to be liable *under the FDCPA* for the FDCPA violations of their debt collector agents. MTD p. 5. That is not surprising. The FDCPA only applies to debt collectors. Vicarious liability does not transform a principal into a debt collector as defined by the FDCPA.

However, even though Landlord Defendants are not debt collectors, general principles of agency law hold litigants vicariously liable for the acts of their attorneys when the attorneys act within the scope of their authority—and it was the Landlord Defendants, via the Clipper entities, who forwarded Mr. Gachelin and Ms. Abrahams to the Kavulich Defendants to initiate the second, wholly meritless collection lawsuit. Suing Mr. Gachelin and Ms. Abrahams for the alleged arrears which had previously been waived was not just "in the scope" of the Kavulich Defendants' authority; it was the entire purpose of the Kavulich Defendants' representation of the Landlord Defendants in this case.

Under New York law, "from the nature of the attorney-client relationship itself, an attorney derives authority to manage the conduct of litigation on behalf of a client,

17

including the authority to make certain procedural and tactical decisions." *Hallock v. State of New York,* 64 N.Y.2d 224, 230 (1984) (concluding that a client was bound by her attorney's decision to enter into a settlement without her consent because he had the apparent authority to act on her behalf). Lawyers are generally regarded as agents of their clients in pursing litigation and other legal activities. *See* Restatement (Third) of the Law Governing Lawyers § 26 cmt. B (2000). Under traditional principles of agency, a principal is liable for the actions of his agent "when the agents are acting 'in the scope of their authority.' " *Plummer v. Atlantic Credit & Finance, Inc.,* 66 F. Supp. 3d 484, 493 (S.D.N.Y. 2014) (quoting *Okyere v. Palisades Collection, LLC,* 961 F. Supp. 2d 508, 515-16 (S.D.N.Y. 2013)).

*Hunter v. Palisades Acquisition XVI, LLC*, 2017 WL 5513636, at *9 (S.D.N.Y. 2017)

And of course, Renaissance Equity Holdings LLC D was the plaintiff in the civil court collection lawsuit, so it is liable for the acts it takes as a party to the suit, separate from the issue of vicarious liability.

### a. Conduct Which "Smacks" of Intentional Wrongdoing is the Definition of Gross Negligence

The Landlord Defendants cite to a case, *Onfroy v. The Law Offices of Geoffrey T. Mott, P.C.*, 751 F.Supp.3d 195 (E.D.N.Y. 2024), in which a federal district court held that intentional conduct could not support a negligence or gross negligence claim under New York law, citing to a pair of Appellate Division cases and a Second Circuit case. However, caselaw from both the New York Court of Appeals and the Second Circuit conflicts with this proposition.

The Court of Appeals has repeatedly held that the appearance of intentional wrongdoing states a claim for gross negligence. *Colnaghi*, 81 N.Y.2d 821, 824; *Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 553 (1992); *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 385, 448 N.E.2d 413, 416 (1983). Additionally, the Court of Appeals, citing *Colnaghi*, analogized the reckless disregard standard in another context to a finding of "general intentionality, not necessarily with intent to cause particular injury." *Campbell v. City of Elmira*, 84 N.Y.2d 505, 511, 644 N.E.2d 993, 996 (1994).

Separately, the Second Circuit case cited, *United Nat. Ins. Co. v. Tunnel, Inc.*, 988 F.2d 351 (2d Cir. 1993), only holds that *battery* and negligence are mutually exclusive. Plaintiffs do not allege actions analogous to battery; they allege a rental arrears collection scheme which is deliberately indifferent as to whether the rent sought is actually owed and as to whether the current and former tenants sued are properly served process, hardly comparable to a case in which a bouncer sent the plaintiff into a two-week coma with a fractured skull.

More generally, a party may always bring claims in the alternative. Even if the Court finds some inconsistency in the theories, they can be considered in the alternative, especially at the motion to dismiss stage where discovery has not been conducted.

### D. Plaintiffs State a Claim for Violations of GBL § 349 in the Landlord-Tenant and Debt Collection Contexts

The Landlord Defendants also assert that as a matter of law, GBL § 349 does not apply to disputes between landlord and tenants. There is no such categorical exclusion. The only New York state court case on which Defendants' GBL § 349 argument relies is *Nezry v. Haven Ave. Owner LLC*, 28 Misc. 3d 1226[A], 1226A, 2010 NY Slip Op 51506[U], *10, which in turn relies exclusively on *Aguaiza v. Vantage Properties, LLC*, 69 A.D.3d 422 (App. Div. 1st Dep't 2010) for its GBL § 349 holding. But *Aguaiza* is not controlling law, does not apply to the facts here, and was incorrectly decided.

The *Aguaiza* court's ruling was based on its finding that the allegations involved private disputes between tenants and their landlords and did not constitute consumer-oriented conduct aimed at consumers at large. *Id.* This misstates the consumer-oriented requirement. The relevant inquiry is not whether the conduct at issue involves two parties, but whether the activity has the potential to affect consumers more broadly.

19

Many consumer transactions are contracts in which an individual consumer is deceived by a seller or other contracting party, but the consumer's status as an individual does not mean GBL § 349 does not apply. See e.g., *Small v. Lorillard Tobacco Co., Inc.* 94 N.Y.2d 43 at 55 (1999). GBL § 349 is a consumer-protection statue, and consumers interact with the marketplace through individual contractual dealings. In fact, many cases at both the trial and appellate level run counter to or distinguish *Aguaiza* and apply GBL § 349 to landlord tenant disputes. *23 Realty Assoc. v. Teigman*, 213 AD2d 306, 308 (1st Dept 1995) ("An apartment dweller is today viewed, functionally, as a consumer of housing services—as much a consumer as the purchaser of any other goods or services"). A recent Second Department Appellate Division decision provides further support for the application of GBL § 349 to meritless rental arrears collection lawsuits, finding that allegations of meritless or deceptive eviction suits for nonexistent or inflated arrears adequately stated a claim for violation of GBL § 349. *Calixto v. A. Balsamo & Rosenblatt, P.C.*, xx A.D.3d xx (App. Div. 2nd Dept. 2025).

In *Lozano v. Grunberg*, 195 A.D.2d 308 (App. Div. 1st Dept. 1993), the court reversed the Supreme Court's dismissal of the tenant's action challenging the landlord's repeated issuance of deceptive notices as a violation of GBL § 349.  In *Myerson v. Prime Realty Services, LLC*, 7 Misc.3d 911, 921 (Sup. Ct. NY Co. 2005), the court held that repeated false demands that tenants were required to disclose their Social Security numbers was a violation of GBL § 349 and was consumer-oriented because "defendants own and manage a substantial number of rent-regulated apartments, and use the challenged forms for all lease renewals, so that the dispute is not simply a private contract dispute and generally claims involving residential units are a type of claim recognized under the statute."

After citing *Nezry*, the Landlord Defendants proceed to federal caselaw, quoting decisions which state that "ramifications for the general public" or plausible allegations that "defendants are engaged in a pattern of misconduct involving other tenants" are required to state a GBL § 349 claim in the landlord-tenant context. Renaissance specifically cites the July 6, 2015 order in the case *Samms v. Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara & Wolf, LLP*, which dismissed a plaintiff's GBL § 349 claim for failing to allege sufficient consumer-oriented conduct—but overlooks the October 21, 2015 order in the same case which reinstated Plaintiff's claim after it was amended to allege a pattern of hundreds of baseless and wrongful collection suits. *Samms*, 2015 WL 6437493 (S.D.N.Y. 2015). Plaintiffs' complaint details nearly 100 instances of facially impossible claimed service of process in a three-day period in 2023 on behalf of Renaissance entities including Renaissance Equity Holdings LLC D, targeting tenants at the sprawling Flatbush Gardens complex which the various Renaissance entities own and control. FAC at ¶ 65-68.

GBL § 349 has been routinely applied to debt collection litigation misconduct in collecting alleged rental arrears. Courts are willing to apply GBL § 349 to the landlord-tenant context where the plaintiff sufficiently alleges a pattern or practice of deceptive, consumer-oriented conduct, such as regularly filing suits for rent not owed. *See e.g. Sanchez v. Ehrlich*, No. 16-cv-8677 (LAP), 2018 WL 2084147, at *11 (S.D.N.Y. Mar. 29, 2018) (concluding that plaintiff had stated a claim under GBL § 349 when plaintiff asserted a claim on her behalf but also pleaded that defendants engaged in a pattern or practice of bringing housing court proceedings against low-income tenants for rent they did not owe); *Torres v. Gutman, Mintz, Baker & Sonnenfeldt P.C.*, No. 17-cv-4109 (KAM) (CLP), 2018 WL 1545687, at *3 (E.D.N.Y. Mar. 29, 2018) (same). One case cited by Landlord Defendants which dismissed a GBL § 349

claim for a lack of consumer-oriented conduct specifically invited the plaintiff to replead the claim with "concrete allegations *concerning similar conduct aimed at an appreciable number of other tenants.*" *Brake v. Slochowsky & Slochowsky, LLP*, 504 F.Supp.3d 103, 115-16 (E.D.N.Y. 2020) (emphasis added).

In the case at bar, Landlord Defendants are liable, as parties to the suit and vicariously liable, for, *inter alia*, widespread sewer service in collecting on collecting on alleged rental arrears in civil court.

Landlord Defendants make an unsupported assertion that Plaintiffs do not allege they were deceived by their GBL § 349 violations. MTD p. 7. GBL § 349 does not require the consumer to be actually deceived. *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26, 647 N.E.2d 741, 745 (1995). But in any event, Plaintiffs were deceived. They did not understand how they could be sued for a debt that was settled. That wrongful suit was caused by the Landlord Defendants gross negligence in forwarding the settled debt for collections and or Kavulich's GBL § 349 violation of failure to perform a meaningful review before filing suit to determine that the debt was actually owed. Plaintiffs were deceived by how Landlord Defendants and Kavulich could be moving to enter a default judgment against them when they were never served with the lawsuit, a result of the use of the GBL § 349 violations of Landlord Defendants and Kavulich in broadly usung false affidavits of service to seek (and usually obtain) default judgments.

### E.  Plaintiffs' Claim for Violations of GBL § 349 is not precluded by GBL § 601(8)

Landlord Defendants' argument (MTD pp. 7, 8) that GBL § 349 claims based on wrongful debt collection practices are precluded by GBL § 601(8), has been resoundingly

rejected as a misreading of *Conboy v AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001).  See e.g. *Martinez v. LVNV Funding, LLC*, 2016 WL 5719718 (E.D.N.Y., 2016) (GBL § 349 claim for collecting on vacated judgment) (collecting cases). Landlord Defendants make arguments as to the consumer-oriented element of GBL § 349, which is addressed in the prior section of this Opposition.

### F.  Arguments as to Comity of State Court So-Ordered Stipulation Fail.

Along the lines of their argument that Plaintiffs' claims are really for breach of the so-ordered stipulation of settlement, Landlord Defendants argue that for purposes of "comity," Plaintiffs' claims in the instant case should be addressed with the state court judge who so-ordered the stipulation. That argument fails, for the same reasons that the argument of Landlord Defendants that this lawsuit is really the masquerading of a breach of contract claim must fail. The Landlord Defendants' conduct, as well as the conduct of the Attorney Defendants and the Process Server Defendants, violated various state and federal laws, caused the Plaintiffs to incur monetary and emotional distress damages, and gave rise to this independent action for the reasons stated more fully herein and in Plaintiffs' pleadings. Additionally, as relief, Plaintiffs do not seek, as the Landlord Defendants bewilderingly assert, the enforcement of the settlement agreement; they seek damages for the harm caused by the conduct of all Defendants, including the Landlord Defendants.

### G.  Punitive Damages Are Not A Separate Legal Claim and Cannot Be Dismissed At This Stage

Renaissance finally argues that Plaintiffs' claim for punitive damages should be dismissed, citing a Court of Appeals case which held punitive damages unavailable in GBL § 349 actions. However, Plaintiffs' complaint does not seek punitive damages under GBL § 349,

23

but only under the theory of gross negligence. Renaissance additionally claims Plaintiffs do not plausibly allege what they assert is required for punitive damages on a gross negligence claim: "such a high degree of moral turpitude and wanton dishonesty as to imply criminal indifference to civil obligations which is aimed at the public, generally." But Plaintiffs allege exactly that via their allegation of nearly 100 instances of facially fraudulent service on behalf of the Renaissance entities within a single three-day period, an allegation supported by the internal records of Defendants A & F Process Service, Inc. and Hashem Hussein.

Additionally, "a motion to dismiss is addressed to a 'claim'—not to a form of damages." *Amusement Indus., Inc. v. Stern*, 693 F.Supp.2d 301, 318 n.5 (S.D.N.Y. 2010). Because there is "no independent cause of action for punitive damages under New York law," Renaissance's Motion to Dismiss is "procedurally premature" with respect to the issue of punitive damages under Plaintiff's gross negligence claim. *Okyere v. Palisades Collection, LLC*, 961 F.Supp.2d 522, 536 (quoting *Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs., Inc.*, 871 F.Supp. 709, 731-32 (S.D.N.Y. 1995)).

## V.  <u>CONCLUSION</u>

For the foregoing reasons, the Landlord Defendants' Motion to Dismiss should be denied in its entirety.

*/s/ Ahmad Keshavarz*

_____

Ahmad Keshavarz
The Law Office of Ahmad Keshavarz
16 Court St., 26th Floor
Brooklyn, NY 11241
Tel: (718) 522-7900
Fax: (877) 496-7809
Email: ahmad@NewYorkConsumerAttorney.com